# EXHIBIT A

## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **PARKER POE,** | : | |
| | : | |
| **Plaintiff,** | : | Docket No.: |
| | : | |
| v. | : | **COMPLAINT AND** |
| | : | **JURY DEMAND (12)** |
| **DR. MELANIE LOWE, in her** | : | |
| **individual and official capacity, DR.** | : | |
| **JEREMY BOURGOIN, in his individual** | : | |
| **and official capacity, and** | : | |
| **VANDERBILT UNIVERSITY,** | : | |
| | : | |
| **Defendants.** | : | |

Plaintiff Parker Poe[1] (hereinafter referred to as "Plaintiff" or "Poe"), by Plaintiff's attorneys Nesenoff & Miltenberg, LLP, and Brewer Krause Brooks Chastain & Meisner, PLLC, as and for his Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This action arises out of the discriminatory actions, procedural violations, breaches of contract, privacy breaches, and arbitrarily excessive sanction imposed on Plaintiff upon Vanderbilt University's finding that Plaintiff violated provisions of its Student Handbook.

2.      Notably, the conduct for which Plaintiff was found responsible and disciplined related to posts made by Plaintiff to a social media platform during a brief period of time in April 2022, concerning allegations of sexual assault committed by another Vanderbilt student.

---

[1] Plaintiff files simultaneously herewith a motion to proceed by pseudonym.

1

3.     Rather than acknowledge that Plaintiff's actions, which had the objective of bringing further attention to the prevalent issue of sexual violence and drugging on Vanderbilt's campus, had been specifically encouraged and endorsed by various groups and students within the University, Vanderbilt instead treated Plaintiff as the sole perpetrator, which Vanderbilt knew to be false, imposed an excessively disproportionate sanction against Plaintiff while failing to discipline others for the same alleged offenses, and found Plaintiff responsible for posts Plaintiff did not make and was not even charged with. Vanderbilt is the same University that in 2013 had four football players (undergraduate students) charged with, among other crimes, Class A Felony Aggravated Rape of an unconscious undergraduate student. Three of the four football players (undergraduate students) were tried and convicted of Class A Felony Aggravated Rape and are presently serving 15 – 17 years in the Tennessee Department of Corrections. The fourth football player pleaded guilty to Class B Felony Facilitation of Aggravated Rape and was sentenced to 10 years' probation and must register as a lifetime sex offender. A fifth Vanderbilt University football player (undergraduate student) pleaded guilty to Class A Misdemeanor Accessory After the Fact and admitted to helping attempt to cover up the criminal actions of four Vanderbilt University football players (undergraduate students). Despite this horrific stain to the Vanderbilt campus, and despite the University supposedly fostering an environment of speaking out against sexual assault, Vanderbilt treated Plaintiff as a pariah and as if Plaintiff was the perpetrator instead of a person seeking to be bring this issue to light. Vanderbilt's improper actions, including in finding Plaintiff responsible for violations of its policies and imposing the unwarranted sanction of suspension will result in lifelong ramifications to Plaintiff's future educational and career endeavors, in addition to other damages.

2

4.     Consequently, Plaintiff Parker Poe brings this action for relief under federal and state law claims.

## THE PARTIES

5.     At all times relevant to this Complaint, Plaintiff was and is a natural person, citizen of the United States, and resident of a state in the Northeast.

6.     At all times relevant to this Complaint, Dr. Melanie Lowe ("Dr. Lowe") was and is an Associate Professor of Musicology at Vanderbilt University and issued the appeal decision in Plaintiff's case. Based upon information and belief, Dr. Lowe is a resident of Davidson County, Tennessee.

7.     At all times relevant to this Complaint, Dr. Jeremy Bourgoin ("Dr. Bourgoin") was and is the Director of Student Accountability, Community Standards, and Academic Integrity at Vanderbilt University and was the investigator and adjudicator in Plaintiff's case. Based upon information and belief, Dr. Bourgoin is a resident of Davidson County, Tennessee.

8.     At all times relevant to this Complaint, Defendant Vanderbilt University ("Vanderbilt" or the "University") was and is a private research university, located in Nashville, Davidson County, Tennessee.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over Plaintiff's claims pursuant to Tenn. Code Ann. § 16-10-101, *et seq.*

10.     This Court has personal jurisdiction over Dr. Bourgoin on the grounds that he was an employee of Vanderbilt University at all relevant times herein, as well as being a citizen and resident of the State of Tennessee.

3

11.     This Court has personal jurisdiction over Dr. Lowe on the grounds that she was an employee of Vanderbilt University at all relevant times herein, as well as being a citizen and resident of the State of Tennessee.

12.     This Court has personal jurisdiction over Defendant Vanderbilt University on the grounds that it is conducting business within the State of Tennessee, including in this judicial district.

13.     Venue for this action is proper in Davidson County, Tennessee pursuant to Tenn. Code. Ann. § 20-4-101.

<b>FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS</b>

*I.*     *Background Information.*

14.     Plaintiff matriculated at Vanderbilt in the fall of 2020.

15.     Plaintiff chose to attend Vanderbilt because of its high national ranking and its reputation for academic excellence.

16.     During his time at Vanderbilt, Plaintiff has been a highly productive and accomplished student.

17.     In the spring of 2022, Plaintiff took a semester off from Vanderbilt to prepare for and apply to a highly competitive and specialized internship opportunity.

18.     Plaintiff was ultimately offered the opportunity to work full time for a company located outside of Tennessee, beginning in January of 2023.

19.     Thus, during the second semester of his junior year, Plaintiff took another semester away from Vanderbilt. During this semester, in addition to working full time from January through March, Plaintiff also participated in eighteen (18) credits worth of Vanderbilt approved courses, to remain on track with his educational requirements.

4

20.     Accordingly, Plaintiff was not present on Vanderbilt's campus at the time when the alleged misconduct took place, nor was Plaintiff on Vanderbilt's campus during the investigation and adjudication of the complaint made against Plaintiff.

21.     Plaintiff also received an offer to participate in an internship in the same field of work during the summer of 2023.

## II.     Vanderbilt University's Student Handbook and Conduct Policies.

22.     The Vanderbilt University Student Handbook (the "Handbook") affirms that Vanderbilt is committed to principles of equal opportunity and affirmative action and ensures a community that is welcoming and inclusive to all students.

23.     The Handbook applies to all students enrolled at Vanderbilt and has the purpose of acquainting students with the specifics of the standards expected of them, as members of the University community, as well as the expectations the students could have as to how the University would handle disciplinary matters.

24.     The Handbook addresses student accountability policies and procedures in Chapter 3, which opens with the statement that "[a]lthough the University values personal freedom, celebration, and recreation, the policies and regulations that apply to student conduct at Vanderbilt are also informed by principles that value the health, safety, and well-being of students and other members of the University community, as well as their academic and personal success."

25.     Further, the Handbook provides that it "hopes that educational conferences, deferred probations, and probationary periods with accountability action plans will be sufficient to help students make better choices so that separation from the community never becomes necessary."

5

26.     Among the types of conduct prohibited by the Handbook is harassment, defined as: "unwelcome verbal, physical, electronic, or other conduct toward another that is so severe, persistent, or pervasive that it alters the conditions of education or participation in a University program or activity. A person's subjective belief that behavior is intimidating, hostile, or abusive does not necessarily make that behavior harassment."

27.     The Handbook also prohibits "disorderly conduct" and "impersonating a University official or any other person," however neither of these violations are specifically defined.

28.      The Handbook specifies that Student Accountability has original jurisdiction in all cases of nonacademic misconduct, excluding sexual misconduct and discrimination cases, involving undergraduate, graduate, and professional students.

29.     The procedures applied in cases where students are suspected of misconduct are intended to provide a fair process and just findings.

30.     As such, this process requires: (i) written and timely notice of charges against students, including possible consequences; (ii) opportunity for students to present all relevant information at an accountability meeting, to challenge adverse testimony and information, to speak on their own behalf, to call witnesses, and to be accompanied by a member of the Vanderbilt community who has not had formal legal training; (iii) to have findings reached on the basis of the information presented, under a preponderance of the evidence standard; and (iv) an unbiased appellate body to which students may appeal.

31.     Initially, a student facing potential corrective action, will be notified that a report has been received and will be instructed to schedule a meeting with Student Accountability.

6

32. Student Accountability will then meet with the student to present a notice of charges, including the specific regulations or policies allegedly violated. The student will also be notified of the procedures that will be followed.

33. Thereafter, the student is permitted a three-day waiting period before an accountability meeting is held, or the student may choose to proceed immediately.

34. The student is permitted to be accompanied by an adviser, however the selected adviser must be a Vanderbilt faculty, staff, or student adviser who is not related to the student and who has not had formal legal training. The adviser may not address the staff member(s) conducting the accountability meeting and may only consult with the student.

35. The student may testify personally and present witnesses on their behalf, and may examine all information that may form the basis for corrective action.

36. Information derived from experts will not be considered by the University, except in rare circumstances.

37. The Handbook explicitly prohibits the use of polygraph examinations under all circumstances.

38. Those conducting the accountability meeting are required to advise the student of the content of the statements against the student and must give the student an opportunity to rebut any inferences that might be drawn.

39. The student facing corrective action may present testimony and make arguments as to the alleged violations, as well as potential justifications and mitigating circumstances, and the appropriateness of any corrective action or sanction.

40. The findings are to be based on information presented at the accountability meeting.

41.     If a student is found responsible for a violation of University policy, the finding will specify the violations for which the student is responsible and the corrective action to be taken, and the sanction to be imposed.

42.     The finding will be delivered to the student promptly and include information about the student's right to appeal.

43.     The Appellate Review Board (the "Board") is described as a "University-wide body consisting of faculty and students to review appeals from findings of certain administrative offices and bodies that have the authority to render findings and/or impose sanctions upon students in academic and co-curricular matters."

44.     A petition for appeal must be submitted by the student challenging a finding and sanction within ten (10) calendar days of the decision date.

45.     The petition for appeal must include a statement of the grounds for appeal, supporting explanation, and copies of or reference to all evidence the petitioner would like the Board to consider.

46.     The grounds for appeal include: (i) procedural irregularities sufficient to affect the finding of the original authority; (ii) insufficient information to support the finding of the original authority; (iii) new information that was not reasonably available for presentation to the original authority, the introduction of which could reasonably be expected to affect the finding of the original authority; and (iv) harshness of the penalty/sanction imposed by the original authority sufficient to show an abuse of discretion by that authority.

47.     In regard to procedural irregularities, the Handbook notes that original authorities are expected to conduct themselves in accordance with their policies and procedures. As such, deviation from the policies and procedures render their actions fundamentally unfair, constituting

8

a sufficient basis for an appeal to the Board. However, procedural irregularities deemed "harmless" and those that did not adversely affect the process, are not a basis for revising the determination.

48.    As for insufficient information to support the finding, the Handbook notes that "it is not the role of the Appellate Review Board to substitute its judgment for the judgment of the original authority if there is a reasonable basis for that authority's finding. Deference must be given to the judgment of the original authority, which had the opportunity to hear the witnesses and to assess their credibility and demeanor. The Board may not alter the finding of the original authority unless the determination of the original authority is clearly erroneous and cannot be reasonably supported by the information considered."

49.    Concerning new information, the Handbook provides that all available information, including testimony of witnesses, is expected to be presented to the original authority. Thus, a student seeking to introduce new information has the burden of demonstrating that the information was not reasonably available for presentation to the original authority, and that the new information can reasonably be expected to affect the finding.

50.    Finally, as for the harshness of the sanction ground for appeal, the Handbook again notes that deference should be given to the sanctions imposed by the original authority. However, "[a]t the same time, the Board should recognize that an original authority can make errors in judgment sufficient to show an abuse of discretion. Abuse of discretion does not necessarily imply an intentional wrong or bad faith, but simply the failure to exercise reasonable judgment under the circumstances."

51.    Upon receipt of a petition, the Chair of the Board will be provided with the entire record of the case.

9

52. The Chair will then review the petition and the record, to determine whether the petition, when viewed in the light most favorable to the petitioner, sets forth a basis sufficient to provide the relief sought by the petitioner.

53. If the Chair determines that the petition does not set forth a sufficient basis, the Chair will dismiss the petition. The Chair's decision is final.

54. If the Chair determines that the petition, or any part of it, does set forth a basis sufficient to provide the relief sought, the Chair will forward a copy of the petition to the original authority with instructions to respond to it.

55. The original authority is permitted ten (10) calendar days to provide the Chair with a response, which is then sent to the petitioner for a chance to reply, within five (5) calendar days.

56. The Chair then selects three (3) faculty members and three (3) student members from the Board to serve on the appeals panel, to consider the petition.

57. The Chair makes available to the panel a copy of the petition and all supporting documents.

58. After reviewing the record, the appeals panel decides by majority vote whether to affirm, modify, or reverse the finding of the original authority, or to remand the case to the original authority with instructions.

59. The appeal panel's decision is final.

60. In regard to sanctioning, the Handbook describes that the University's system of graduated sanctions and structured accountability plans "is designed to educate and effect reflection on the part of students… as well as to effect students'…voluntary compliance with the policies and regulations established to protect themselves, other students, and the community."

10

61.    The Handbook specifically notes that "Vanderbilt hopes that educational conferences and probationary periods will be sufficient to help students and their organizations make better choices so that separation from the community never becomes necessary."

62.    As such, given the intended educational nature of the University's accountability proceedings, several factors are to be considered when determining appropriate sanctions. These factors include: the student's previous record, the circumstances surrounding the violation, the nature and severity of the event and the impact on others, and the student's level of cooperation and honesty throughout the process.

63.    The range of sanctions available include: educational conferences, deferred disciplinary probation, disciplinary probation, deferred suspension, suspension, and expulsion.

64.    The common components of an accountability action plan include: restriction of certain privileges, restitution, fines/fees, letters of apology, online tutorials, research or reflection essays, counseling, and evaluation and treatment programs.

65.    If a student is found to be in violation of University policy, the findings of the case and any sanction imposed may only be made known to appropriate persons including the complainant (only when required by law, as in the case of Title IX offenses), the appropriate academic dean, the faculty adviser, staff members, and the student's parents or guardians.

66.    Additional privacy agreements and restrictions pertaining to confidential student information are also found on Vanderbilt's website.

67.    Specifically, Vanderbilt's Online Privacy Notice (the "Privacy Notice") provides that the University "does not share personal information with third parties except under the following circumstances: with prior written consent; as required by law; as necessary to protect

11

Vanderbilt's legitimate interests; with trusted third parties who have contractually agreed to keep personal information confidential."

68.     The University's Privacy Notice also references FERPA[2] and the rights of students concerning the privacy of student educational records, linking to a page on the website for the University's Registrar's office.

69.     Additionally, the University's Standards of Conduct for employees, states at Section K: "Vanderbilt University is committed to protecting confidential information. Many faculty and staff have access to various forms of sensitive, confidential, financial, or proprietary information. Federal law and University policies prohibit the unauthorized seeking, disclosing or giving of such information, including confidential information contained in health care records, student educational records, and employee records. All members of the University community are required to know and comply with laws and University policies related to information privacy and security."

70.     Upon graduation, a student's records with Student Accountability are maintained for a period of seven (7) years. However, records of students who are suspended or expelled from the University are maintained indefinitely.

###     III.    The Relevant Events of April 2022.

71.     Starting in the spring of 2021, Plaintiff began to hear about a fellow Vanderbilt student, Simon Roe,[3] and his involvement in various forms of misconduct.

72.     Over the subsequent year, Plaintiff learned that Simon Roe had been tied to allegations of sexual misconduct, students alleged they had been roofied at parties hosted by Roe's

---

[2] FERPA is an acronym for the Family Educational Rights and Privacy Act of 1974, 20 U.S.C. § 1232g; 34 CFR Part 99.
[3] Simon Roe is a pseudonym.

12

fraternity, Roe attempted to take advantage of diversity programs by misrepresenting his ethnicity, and Roe used racial slurs.

73.     While Plaintiff and Roe did not have any relationship, Plaintiff learned about Roe's negative reputation from various credible sources, including other students and numerous posts made on social media sites Yik Yak[4] and Greek Rank[5].

74.     April of 2022 was recognized by Vanderbilt as Sexual Assault Awareness Month. As such, Plaintiff had read multiple articles in student newspaper the Hustler which discussed the importance of students standing up on behalf of sexual assault victims and being more proactive in preventing sexual assault on campus. The articles included statements such as, but not limited to, the following:

- "I am far too used to seeing sexual assault be swept under the run and never mentioned again."
- "We need to create a system of accountability for perpetrators that goes beyond campus rules because when we rely on rules our attitudes fail to change. Sexual assault being on record doesn't drastically change how we treat one another on campus. We need to empower individuals to address the intricacies of sexism and sexual assault."
- "It's On Us…[The mission is] to make sure that we're raising awareness for this issue on college campuses, specifically, and then working collectively to call out problematic behavior."
- "VSG's (Vanderbilt Student Government) week of student action is an important step to begin the discussion around on-campus sexual violence. They also suggested ways in which it can lead to further action by the student body."
- "Alongside the current events in our nation, members of our student body have begun an extremely important conversation about our campus culture and the scourge of sexual violence, misogyny, racism, classism, homophobia, and transphobia perpetrated by members of the fraternity community…"

75.     Plaintiff, having been a victim of sexual assault, as well as both of Plaintiff's parents, and feeling a moral obligation to take a stand with victims of sexual assault, help ensure

---

[4] Yik Yak is a pseudonymous social media smartphone application that allows college students to create and view discussion threads within a 5-mile radius.

[5] Greek Rank is an online source for fraternity and sorority news and reviews, which includes discussion boards.

13

COPY

that those who engaged in such reprehensible conduct be held accountable, and protect potential future victims, Plaintiff reposted to Yik Yak some of the posts that Plaintiff had seen on Greek Rank and Yik Yak about Roe.

76.     Accordingly, during a brief period in April of 2022, Plaintiff made posts to Yik Yak, some of which concerned the allegations of sexual assault and roofying that were committed by Roe. For purposes of comparison, as part of the subsequent investigation against Plaintiff, Roe provided approximately seventy-five (75) posts related to him (the majority of which were not made by Plaintiff), which did not even include the full universe of posts made about Roe having committed sexual assault and drugging women, dating back to at least February 7, 2022.

77.     Plaintiff stopped posting on his own initiative, after a few days, and did not post anything about Roe at any other time. Notably, most of the posts made by Plaintiff took place over a two-day period.

78.     At all times, Plaintiff genuinely believed that every statement Plaintiff posted, or reposted, about Simon Roe was truthful.

79.     This was further confirmed by the sheer number of posts made about Simon Roe, by individuals other than Plaintiff, in addition to the fact that neither Roe nor his friends or fraternity members responded to the posts to refute them, and Roe himself never directly refuted any of the sexual assault or roofying allegations, despite being fully aware of them.

80.     In comparison, other students had in the past stood up for Roe by responding to previous posts made about him, unrelated to issues of sexual assault or roofying, to dispute the claims made.

14

81.     At all times, Plaintiff fully believed that Plaintiff was doing the right thing by bringing further attention to issues of public safety on campus, including sexual assault and drugging.

82.     In fact, Vanderbilt itself had explicitly advocated for students to report sexual assault and speak out for victims of sexual assault, with the University's Project Safe office acting as "a major resource and help to the account owner" of the VU Survivors Instagram page on which students report victims' stories of sexual assault, either anonymously or by publicly naming the accused.[6]

83.     As of the date of this filing, the VU Survivors Instagram page still encourages and offers the accuser to anonymously post, while at the same time publicly naming an alleged assailant, regardless of whether a report was made with the University, the police, the Title IX office, or Project Safe, and regardless of whether any investigation has taken place into such allegations.

84.     Additionally, the Vanderbilt Office of Greek Life ("OGL") has acknowledged that it closely monitors content posted on Greek Rank. As part of this oversight, OGL has in the past issued public statements in response to certain inappropriate posts made on Greek Rank and has removed the posts. However, at no time did OGL either take down, or publicly condemn, any of the posts that related to Simon Roe, nor did they ever condemn anonymous posts of sexual assault allegations.

85.     Importantly, while the posts Plaintiff made about Roe were limited to a brief period of time and were only made on Yik Yak, many other students posted about Roe on both Yik Yak

---

[6] *See https://vanderbilthustler.com/2022/02/06/vanderbilt-survivors-instagram-account-shares-stories-of-survivors-of-sexual-assault/.*

and on Greek Rank, beginning several months prior to April of 2022, and continuing well into the summer of 2022, several months after Plaintiff stopped posting.

86.    These posts, which numbered in the *hundreds* in total, in addition to responsive comments—all of which, upon information and belief, were monitored by Vanderbilt's OGL—referred to Roe as having committed sexual assault, drugging women at his fraternity house, cheating a diversity program, and using racial slurs.

### *IV.    Vanderbilt's Defective and Biased Investigation and Adjudication Process.*

87.    In November of 2022, Roe commenced a civil action for defamation against defendants described as "Posters Nos. 1-25" in Davidson County Circuit Court.

88.    In an effort to "unmask" those who had posted anonymously about him, Roe served subpoenas upon Yik Yak, Greek Rank, and Linked In, requesting telephone numbers and information for the anonymous posters' accounts.

89.    As part of the responses to subpoenas received by Roe, he was able to identify Plaintiff as one of the individuals that had only posted to Yik Yak.

90.    Despite Plaintiff having refrained from posting anything about Simon Roe since April of 2022, Roe nonetheless amended his complaint to name Plaintiff as one of the defendants in the civil action.

91.    Subsequently, and as a result of having obtained this information through the civil suit, Roe reported Plaintiff to Vanderbilt University's Student Accountability, Community Standards, and Academic Integrity office.

### *a. Failure to Provide Plaintiff Proper Notice of the Charges.*

92.    On January 9, 2023, Plaintiff was notified that a report had been forwarded to the Student Accountability office. This initial notice stated only that "a report has been forwarded to

16

COPY

our office that we need to discuss with you," requested that Plaintiff schedule a meeting with the office, and included general links to the Student Handbook.

93.     This initial notice did not include any information about the identity of the reporting party, the precise allegations at issue, or the policy violations in question. As such, Plaintiff had no knowledge as to what alleged conduct this notice concerned other than the fact that on a scheduling phone call with Student Accountability, Plaintiff was informed that it did not have to do with anything related to academic integrity.

94.     Notwithstanding, Plaintiff appeared for a meeting with Dr. Jeremy Bourgoin, Director of Student Accountability, Community Standards, and Academic Integrity, a few days thereafter.

95.     At the very end of the meeting, Dr. Bourgoin indicated that the charges brought against Plaintiff were related to posts Plaintiff had made on a social media site but did not state which social media website he was referring to, the date(s) when such posts were made (other than the season they occurred in), and again failed to identify the name of the reporting party.

96.     Plaintiff learned that Plaintiff was alleged to have violated three provisions of the Student Handbook: (i) harassment; (ii) disorderly conduct; and (iii) impersonating a University official or any other person.

97.     Yet, upon receiving this information, Plaintiff realized that neither "disorderly conduct" nor "impersonating a University official or any other person" were defined in the Handbook.

98.     As such, Plaintiff sought clarification from Dr. Bourgoin as to the precise meaning of these two charges. However, Dr. Bourgoin failed to provide any clarity, explaining that

COPY

"disorderly conduct," could mean anything he wanted it to, because "disorderly conduct is basically anything that could be considered disorderly."

99.    As for the definition of impersonation, Dr. Bourgoin refused to provide an answer on the definition of this charge, leaving Plaintiff to question how Plaintiff was to put forth a defense against charges that lacked any clear definition.

100.    Concerning the charge of harassment, when Plaintiff sought clarity on the definition during one of Plaintiff's earlier meetings with Dr. Bourgoin in January 2023, Dr. Bourgoin explicitly referred to language used to define harassment under the University's Title IX policy, which differs in crucial ways from a charge of harassment as defined in a Student Accountability case.

101.    Specifically, he referred to any behavior that reasonably impacts someone's opportunity to get an education, actions that create an environment such that the student feels as though they can no longer remain enrolled in school, and other factors that contribute to an environment in which the student feels as though they cannot be safe on campus.

102.    This description was lifted from the Title IX policy's definition of a hostile environment claim. At least twice, Dr. Bourgoin made specific reference to Title IX and its definition.

103.    That Dr. Bourgoin referenced the Sexual Misconduct policy definition of harassment in response to Plaintiff's inquiry regarding the violations Plaintiff was facing, raised serious concerns about whether the proper definition was applied in reaching the ultimate decision in this matter.

104.    Moreover, the fact that the student conduct definition of harassment was recently changed (after the 2019-2020 academic year) to impose a narrower definition, demonstrates the

18

University's clear intent to use the current definition as opposed to the aforementioned definition taken from Title IX law.

### b. Failure to Conduct an Impartial and Thorough Investigation.

105.    The investigative process that followed consisted of meetings between Dr. Bourgoin and Plaintiff via Zoom, during which Dr. Bourgoin would have Plaintiff read the allegations, impact statements, or other documents on the Zoom screen.

106.    Dr. Bourgoin demonstrated his bias against Plaintiff and his predetermined finding of responsibility when he prevented Plaintiff from obtaining critical evidence and witness testimony, failed to pursue relevant witness testimony, accepted Roe's allegations without question while disregarding Plaintiff's account, and failed to conduct a thorough and meaningful investigation.

107.    First, Dr. Bourgoin prevented Plaintiff from obtaining critical witnesses and evidence when he failed to speak with any of the other students that made posts online regarding Roe, and despite Plaintiff's multiple requests that he do so.

108.    For several months prior to, and several months after April of 2022, various other students posted about Simon Roe on both Yik Yak and on Greek Rank.

109.    These posts, which numbered in the *hundreds*, referred to Roe as having committed sexual assault, drugging women at his fraternity house, cheating a diversity program, and using racial slurs.

110.    None of these posts were made by Plaintiff, yet this information was nonetheless material to his case as the students who did make those posts on both social media platforms could have corroborated the content of the posts concerning Roe.

19

COPY

EFILED 03/06/24 03:07 PM CASE NO. 24C548 Joseph P. Day, Clerk

111.    Dr. Bourgoin's failure to contact and interview these witnesses, or at minimum to provide their contact information to Plaintiff, was a significant material error. In fact, Dr. Bourgoin chose to deliberately wait to interview these people until at least two (2) weeks after issuing the outcome decision to Plaintiff.

112.    Though there was no question that Plaintiff had only posted about Roe on Yik Yak, Roe and by extension Dr. Bourgoin, improperly attempted to attribute the posts made about Roe on Greek Rank to Plaintiff as well.

113.    Though unclear from Dr. Bourgoin as to whether Roe had even accused Plaintiff of posting about him on Greek Rank, Plaintiff nonetheless attempted to put forth a defense against this charge as well. Plaintiff provided Dr. Bourgoin with the name of at least one individual who had posted about Roe, one whose IP address was obtained from the subpoena served on Greek Rank as part of Roe's civil suit, and the name of another college student whose name was obtained from a subpoena to LinkedIn plus additional IP addresses of posters.[7]

114.    Dr. Bourgoin never sought to speak with these individuals, never spoke with anyone from Roe's fraternity, never asked Roe about his relationship to any of these individuals, nor did Dr. Bourgoin even request that Roe provide him with a complete and full copy of every post made about him on social media between January and June of 2022, despite Plaintiff's requests and Roe's own evidence acknowledging dozens of other posts predating Plaintiff's.

115.    The failure to interview all relevant witnesses was a critical procedural error, not only because it resulted in an incomplete and biased investigation, but also because it deprived Plaintiff of the ability to establish that Plaintiff's limited actions did not cause the requisite

---

[7] Importantly, Plaintiff later learned that Dr. Bourgoin was aware that Roe had this same information but neglected to provide it in his complaint packet submitted to Vanderbilt as part of the investigation.

Case 3:24-cv-00368   Document 1-1   Filed 04/01/24   Page 21 of 90 PageID #: 26

alteration in the conditions of Roe's education or participation in a University program or activity sufficient to establish a harassment claim.

116.    Further, Dr. Bourgoin's failure to provide information to Plaintiff about the other posters' identities precluded Plaintiff from: (i) establishing that Plaintiff was not responsible for the majority of the posts made about Roe, (ii) demonstrating that the other students who posted about Roe were not similarly sanctioned (and in fact, were only "spoken to" without any punishment), and (iii) showing that the posts that Plaintiff did make did not on their own cause any specific harm to Roe.

117.    Similarly, Dr. Bourgoin refused to examine the validity of the other posts made about Roe, as evidenced by his failure to interview other students, including members of Roe's fraternity, to obtain information about whether the statements made about Roe's conduct were true.

118.    In fact, despite Plaintiff's repeated requests, Dr. Bourgoin refused to question Roe about whether he ever had any "allegations" brought against him. Instead, he accepted Roe's assertion of their falsity, in order to find Roe credible, and to find Plaintiff solely responsible for the alleged violations.

119.    Second, Dr. Bourgoin deprived Plaintiff of a fair process when he presented inaccurate information to Plaintiff and failed to explore issues and questions raised by Plaintiff that would have impacted Roe's credibility.

120.    By way of example, Dr. Bourgoin informed Plaintiff that Roe was alleging Plaintiff had posted about him on Greek Rank, a fact that was easily refutable as Roe never made such a claim in his initial report. Dr. Bourgoin subsequently changed his story about whether Roe was

21

claiming that Plaintiff posted on Greek Rank. Notwithstanding, Plaintiff was still left with the burden of establishing that Plaintiff did not make such posts.

121.    To refute this allegation, after providing evidence that Dr. Bourgoin had dismissed, Plaintiff voluntarily sought to take a polygraph examination, the results of which confirmed that Plaintiff was being truthful. However, Dr. Bourgoin refused to consider the polygraph examination results as evidence in the case, because this evidence was favorable to Plaintiff.

122.    Since Dr. Bourgoin blocked Plaintiff from obtaining evidence and witnesses, and since Dr. Bourgoin refused to address any issues of credibility involving Roe, Plaintiff had to resort to the time and expense of finding an alternative and unbiased way of proving Plaintiff was telling the truth.

123.    Additionally, in response to Plaintiff's statement that Plaintiff believed the information Plaintiff had posted about Roe regarding a sexual assault to be true, Dr. Bourgoin responded by stating there had been no report filed with Project Safe, the University's Center for Sexual Misconduct Prevention and Response, about Roe. However, when Plaintiff raised to Dr. Bourgoin that Project Safe does not release to third parties any information about specific reports filed with its office without express authorization from the students involved, Dr. Bourgoin backtracked, revising his comment to note that he was given general statistics about reports made to Project Safe, rather than any specifics about whether a report had actually been filed against Roe. This was but another instance of Dr. Bourgoin knowingly providing Plaintiff with inaccurate information.

124.    Further, Dr. Bourgoin defended and accepted without question Roe's allegations, while he pushed back and refused to investigate the information that Plaintiff presented. For instance, when Plaintiff raised an opportunity for Dr. Bourgoin to determine Roe's credibility

22

regarding some other posts made against Roe concerning Roe having taken advantage of a diversity program despite the lack of any qualifying status, Dr. Bourgoin chose to defend Roe. Despite having access to student demographic information, Dr. Bourgoin never followed up on this issue to determine if Roe had been untruthful.

125.     Moreover, when Plaintiff pointed out that Roe's complaint neglected to mention the fact that there were multiple IP addresses from which posts about Roe were made — thus giving the false impression that only one person was responsible for all of the posts about Roe — Dr. Bourgoin again offered an excuse for Roe's misrepresentations, responding that perhaps it was only one person who utilized the various IP addresses.

126.     Incredibly, Dr. Bourgoin never once asked Roe the obvious question: were there any sexual assault allegations made against him at any time? Plaintiff requested that he pose this exact question to Roe on multiple occasions, however, in an effort to defend Roe, Dr. Bourgoin failed to do so, again accepting Roe's claim that such allegations were not true.

127.     It was further apparent that Dr. Bourgoin failed to fully investigate the matter when he questioned Plaintiff as to whether the posts made about Roe on Greek Rank and Yik Yak had been removed. Had he questioned Roe about this, or performed a simple online search, he could have easily obtained this information, as anyone is permitted to view the Greek Rank site. He likewise could have searched for the information himself on Yik Yak because, though access is limited by geography, upon information and belief, he was in Nashville at all relevant times.

128.     Dr. Bourgoin also failed to conduct a diligent investigation when he did not pursue lines of questioning that would have impacted an assessment of Roe's credibility. These included: (i) the failure to ask Roe or any other witnesses, about the posts accusing Roe of using the "n-word" which, if true, should have impacted the assessment of Roe's reputation, which was relevant

23

to a determination as to whether the particular posts Plaintiff made had the degree of impact that Roe and his family claimed they had; (ii) failure to question the students that made accusations of having been roofied at parties held by Roe's fraternity; (iii) the failure to look into whether any reports had been filed with Vanderbilt in regards to roofying at Sigma Chi (an investigation into this event could have corroborated the fact that Roe was involved in such illegal actions); (iv) the failure to question Roe about the posts made to Greek Rank and other social media sites in February 2022 which Roe did not provide as part of the investigation; and (v) the failure to question Roe as to why the information provided in his impact statement differed from the information provided in his statement submitted under oath in the civil court action.

129. Additionally, despite the Handbook's assurance that a charged student "may examine all information that may form the basis for corrective action," Dr. Bourgoin did not provide Plaintiff with copies of all documents obtained during the investigation and instead, only permitted Plaintiff to view the information on a screen during meetings held via Zoom. This placed an unnecessary burden on Plaintiff, as it was extremely difficult to both pay attention to what was occurring during the meeting, digest the information contained in the documents that were presented on the screen, and also formulate responses to the information.

130. Even further, there were also certain documents and information related to the case, and referenced at various points, that Dr. Bourgoin never disclosed to Plaintiff, further hindering Plaintiff's ability to present a defense. By way of example, it was apparent that Dr. Bourgoin engaged in *ex parte* discussions with Roe and his family concerning Roe's civil lawsuit, which resulted in Plaintiff being denied access to the subpoenas and information collected through the lawsuit.

24

COPY

131.    In addition to the multitude of procedural errors committed by Dr. Bourgoin, the University evidenced a bias against Plaintiff when it failed to pursue the cross-complaint Plaintiff submitted against Roe, on February 20, 2023. Had the University properly and fully investigated Plaintiff's cross-complaint, it would have discovered that Roe was not credible. Instead, Dr. Bourgoin wholly accepted Roe's account to find him credible and Plaintiff not credible, disregarding the various falsehoods and inconsistencies that appeared in the information presented by Roe.

132.    To date, Plaintiff has not received any information from the University regarding the status of the complaint.

133.    In contrast, upon receipt of Roe's complaint on or about January 3, 2023, the University proceeded to undertake an investigation that culminated in a finding against Plaintiff approximately two months later.

134.    Importantly, because the cross-complaint addressed falsehoods in statements provided by both Roe and his family, had it been resolved during the pendency of the complaint against Plaintiff, an investigation would have revealed information casting further doubt on Roe's credibility.

135.    Finally, Dr. Bourgoin improperly placed the burden of proof upon Plaintiff as the accused to establish that Plaintiff did not make certain posts about Roe on Greek Rank, notwithstanding that the burden properly rested with the University, and despite the impossibility of Plaintiff proving a negative.

136.    Dr. Bourgoin indicated to Plaintiff that if Plaintiff were able to provide proof that what Plaintiff had posted about Roe was accurate, this would be helpful to Plaintiff's defense.

25

137.    However, because Roe and his legal team, as well as Dr. Bourgoin, consistently withheld and/or blocked from Plaintiff critical and potentially exculpatory information during the University's investigation, including other posters' names and phone numbers, as well as a full record of all posts ever made about Roe, Plaintiff was precluded from obtaining information establishing the truth of the statements, and thus, was prohibited from fully and meaningfully putting forth a defense.

138.    Incredibly, Plaintiff learned months later that information from the other posters and witnesses would have provided exculpatory evidence. Specifically, one of the posters identified someone whom they believed to be a victim of Roe's. Had Dr. Bourgoin taken the time to speak to this person, they could have provided the very information that Dr. Bourgoin said would help Plaintiff. Instead, this exculpatory information was blocked from Plaintiff.

139.    The disclosure of this information was even more critical to Plaintiff's ability to put forth a defense because Roe misrepresented that the posts about him tapered off between January 2022 and when Plaintiff posted about him in April 2022, in an effort to falsely attribute the posts that continued into June to the actions of Plaintiff.

140.    However, as Plaintiff pointed out to Dr. Bourgoin, even Roe's parents admitted that posts about Roe appeared primarily on Greek Rank in late February 2022 which accused him of committing sexual assault and drugging women. They further stated that the posts continued monthly and well into the summer of 2022. Yet, none of the posts that Roe or his family referenced, and which Roe claimed to have caused him harm, were provided to Vanderbilt.

141.    Dr. Bourgoin shockingly refused to ask Roe about these posts, knowing this evidence would not only confirm Plaintiff's statements about the existence of posts concerning

26

COPY

Roe prior to Plaintiff's reposting, but would also disprove Roe's false statements about the posts tapering off prior to April 2022.

142.     All of the foregoing failures led to an investigation and adjudication process that was far from impartial, comprehensive, or in accordance with established procedures.

### c. The Unsubstantiated Decision and Overly Punitive Sanctions.

143.     In pursuit of reaching a predetermined conclusion, Dr. Bourgoin unsurprisingly found Plaintiff responsible for all three charges in a decision letter dated March 6, 2023.

144.     The decision letter did not provide any rationale or explanation as to how Dr. Bourgoin arrived at the findings.

145.     In finding Plaintiff responsible for harassment, Dr. Bourgoin improperly concluded that the definition of harassment, per the Handbook, had been met.

146.     Notably, one factor in establishing a charge of harassment requires a demonstration that the conduct at issue "alters the conditions of education or participation in a University program or activity."

147.     Roe failed to establish that Plaintiff's specific actions in posting about Roe for a brief period of time on one social media site in April of 2022 had the effect of altering the conditions of his education or participation in a University program.

148.     In fact, in an affidavit filed as part of his civil court case in the fall of 2022 wherein he discussed the harm suffered due to the social media posts made about him, Roe did not identify any specific examples of how Plaintiff's specific actions altered the conditions of his education or participation in a university program or activity. Instead, Roe claimed that he had to move off campus due to fears for his safety, because individuals were making physical threats against him

27

in social media posts. Significantly, none of Plaintiff's posts included any threats of physical violence.

149.    Further, Roe discussed how his job prospects have purportedly been impacted by Google searches performed by potential employers, as the search engine results include posts made about him on Greek Rank. However, again, there is no dispute that Plaintiff did not post to Greek Rank about Roe at any time.

150.    In his impact statement, Roe also made it seem as though he and Plaintiff were competing for the same internships, in an effort to fabricate a malicious motive for Plaintiff posting about him, when in actuality Plaintiff's actions were at all times well-intentioned. Regardless, Plaintiff and Roe are pursuing entirely different fields of work and would not be in any competition over internship opportunities. Yet once again, Dr. Bourgoin failed to question Roe on this point and accepted Roe's false and inaccurate statements as truth.

151.    Recognizing that the foregoing would not be sufficient to meet Vanderbilt's definition of harassment, Roe revised his discussion about the alteration in his education when submitting his impact statement to the University, as part of the University conduct case against Plaintiff. He now made sure to include a discussion regarding his emotional distress, thoughts of suicide, and stated that his decision to move off campus was due to the impact on his reputation, rather than threats of physical violence.

152.    Roe further claimed that female students were making comments to his fraternity brothers, to the effect that the fraternity was enabling his actions and that he should be kicked out of the fraternity.

28

153.    However, because Dr. Bourgoin failed to investigate the basis of and when such statements were allegedly made, an improper presumption was drawn that Plaintiff's posts not only preceded, but also caused this behavior.

154.    In any event, Dr. Bourgoin failed to observe the difference between the information Roe provided to the court, under the risk of perjury, in comparison to the information presented as part of his University conduct case, when addressing how his education has been affected.[8] This should have raised further doubt regarding the veracity of Roe's claims, yet Dr. Bourgoin once again overlooked any evidence tending to refute his account.

███.    Moreover, there is no question that there were numerous posts made on social media about Roe in the months preceding and the months following Plaintiff's posts from April 2022. Roe did not point to any evidence demonstrating that Plaintiff's posts on their own, which were taken down very quickly after they were made in April 2022, had the direct effect of altering the conditions of his education or participation in a university program or activity.

156.    Furthermore, there was no evidence presented to establish that Plaintiff's posts alone were responsible for all of the adverse impact to Roe, as required to meet the level of the alleged conduct being "so severe, persistent, or pervasive that it alters the conditions of education or participation in a University program or activity."

157.    Indeed, any claim that Plaintiff's posts caused the requisite impact on Roe to support a finding of harassment is further belied by the fact that Roe suffered from a negative reputation well before Plaintiff's posts, by virtue of his membership in a fraternity that was removed from campus for four years due to allegations of misconduct.

---

[8] This issue was also raised as part of Plaintiff's cross-complaint against Roe which, to date, the University has failed to take any action on.

29

158.    Moreover, it is not plausible that the hundreds of posts made by various individuals alleging that Roe had committed sexual assault, drugged women, and used racial slurs had no effect on Roe, while the handful of posts made by Plaintiff in the midst of all of these posts were the ones that had the single greatest impact on Roe. In fact, Roe's own impact statement made clear that the posts which were searchable via Google were the ones that had the most significant impact on him, and not the ones posted by Plaintiff.

159.    Therefore, there was insufficient information to support a finding that Plaintiff violated the University's policy on harassment, and Dr. Bourgoin's finding on this charge was clearly erroneous.

160.    As for the charge of impersonation, there was likewise insufficient information to establish a violation. The evidence gathered did not dispute that Plaintiff merely reposted some posts made by others; Plaintiff never misrepresented Plaintiff's identity.

161.    Additionally, as discussed *supra*, the charges of disorderly conduct and impersonation are not defined in the Handbook. Given the lack of any clear definition, by extension, it could not properly be determined that there was sufficient information to uphold a finding of these violations.

162.    Dr. Bourgoin, acting as both investigator and adjudicator assigned the following sanctions: (i) suspension; (ii) prohibition from being on campus or at any Vanderbilt sponsored or co-sponsored program without express authorization from Student Accountability during the period of suspension; (iii) notation on Plaintiff's academic record of "Suspended for Violations of University Policy" during the period of suspension; (iv) academic work earned at other schools during the suspension period may not be transferred as credit toward Plaintiff's degree; (v) prior to resuming Plaintiff's studies at Vanderbilt, Plaintiff must complete an accountability action plan;

30

(vi) completion of an online integrity seminar by May 8, 2023[9]; (vii) Plaintiff must read Some Men: Feminist Allies and the Movement to End Violence Against Women; (viii) once the seminar and reading of the book are complete, Plaintiff is to meet with someone from Project Safe to discuss the incident, and Plaintiff's learning from it; (ix) in order to resume Plaintiff's studies, Plaintiff must submit a formal request in writing at least 45 days before the end of the suspension period, which includes confirmation of completion of the accountability action plan and a reflection paper on what Plaintiff has learned following the incident, and how Plaintiff plans to apply what Plaintiff has learned in the future. Finally, Plaintiff is required to write an essay of at least four pages that synthesizes the module, the reading, and the meeting to reflect on what Plaintiff has learned, and how Plaintiff will apply it in the future. Dr. Bourgoin did not specify which sanction(s) applied to which alleged offense.

163. In violation of Vanderbilt's Policy, Tennessee state law and FERPA, the federal privacy law prohibiting a University from notifying a complainant about any outcome or sanctions other than in cases involving sexual misconduct, on April 13, 2023, Dr. Bourgoin informed Poe that on March 9, 2023, Dr. Bourgoin had notified Roe that his complaint against Plaintiff had been addressed through the Student Accountability Process, in an effort to provide Roe and his family "closure",[10] further evidencing Dr. Bourgoin's proclivity to assist Roe in any way possible in regard to his claims against Plaintiff.

---

[9] This sanction is typically reserved for students found to have engaged in academic integrity, demonstrating the University's belief that the matter could be resolved through education, rather than by imposing the overly punitive sanction of separation from the University.

[10] There were at least two specific discussions between Plaintiff and Dr. Bourgoin during the investigation when Plaintiff inquired whether Dr. Bourgoin would inform Roe about any outcome and/or sanction. Dr. Bourgoin indicated that he was permitted to share information with Roe, despite Plaintiff expressing concern that providing this information to Roe would be detrimental to Plaintiff at school. Dr. Bourgoin responded that Roe and his family needed closure.

31

164. Incredibly, the March 9, 2023 letter from Dr. Bourgoin to Roe, stated in part as follows:

> "I am writing to update you regarding your complaint of misconduct. The person who instigated the harassing posts against you has completed our process and has been held accountable. [Plaintiff] is currently not an enrolled student, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student...."

165. The contents of this letter were highly concerning for several reasons. First, Vanderbilt's Policy, Tennessee state law, and federal law prohibited Dr. Bourgoin from notifying Roe of the outcome and sanctions imposed on Plaintiff.

166. Second, the statement that Plaintiff "instigated the harassing posts" was demonstrably false, and Dr. Bourgoin was aware of its falsity. There was no question that numerous posts were made on a different site entirely (Greek Rank) which accused Roe of committing sexual assault and drugging women, beginning as early as January or February of 2022, at least two months prior to any post that Plaintiff made in April of 2022. This was a fact that even Roe's parents admitted to in their impact statements submitted as part of the investigation. There was simply no evidence establishing that Plaintiff instigated the harassing posts against Roe, yet Dr. Bourgoin relied upon this misinformation in pursuing his false narrative and biased agenda against Plaintiff.

167. This unsupported conclusion was even further problematic in that it denied Plaintiff a meaningful appeal. As Dr. Bourgoin notified Plaintiff *only* that Plaintiff had been found responsible for posting on one social media site, Plaintiff was never informed that Dr. Bourgoin had actually found Plaintiff responsible for *all* prior posts made against Roe. As such, Plaintiff was prevented from submitting a proper appeal, as Plaintiff did not have knowledge of this critical fact; i.e. that Plaintiff was erroneously found responsible for something of which there was no

COPY

supporting evidence. Had Plaintiff been provided this information at the proper time, Plaintiff's appeal would likely have been successful. By failing to notify Plaintiff of the actual and false findings made against Plaintiff, Dr. Bourgoin thus deprived Plaintiff of a true appeal.

168.    Third, this letter to Roe definitively establishes that Dr. Bourgoin was not truthful with Plaintiff, when describing what information Roe had been provided concerning the outcome of the disciplinary case against Plaintiff.

169.    Specifically, by email dated April 13, 2023, Dr. Bourgoin assured Plaintiff that Roe was only advised that "the matter had been addressed through the Student Accountability Process." Dr. Bourgoin, knowing full well what he had advised Roe back on March 9, brazenly stated to Plaintiff that Vanderbilt "did not share details about the specific outcome, sanction, or appeal."

170.    It is irrefutable however that Dr. Bourgoin did in fact notify Roe that Plaintiff had been found responsible ("held accountable"), and that Plaintiff was separated from the University through a suspension ("no longer enrolled as a student"; "we will notify you if [Plaintiff] reenrolls as a student while you are an undergraduate student.")

171.    Fourth, Dr. Bourgoin wrote in this letter that he would interview the other students who had posted online about Roe after spring break. This statement further confirmed that Dr. Bourgoin was aware of the identities of the other students who had posted about Roe on social media. Notwithstanding, Dr. Bourgoin refused to speak with these individuals as part of the investigation in the case against Plaintiff despite Plaintiff's repeated requests, claiming these other students would merely state that they had posted what Plaintiff posted.

172.    As learned by Plaintiff later, Dr. Bourgoin did not speak to all of the other Vanderbilt students who had posted about Roe, ensuring that Dr. Bourgoin would not find anyone

33

else responsible for similar conduct and that he would not obtain evidence that could exculpate Plaintiff.

173. Dr. Bourgoin's deliberate decision to ascribe all of the blame to Plaintiff and deem Plaintiff the instigator of all social media postings about Roe – despite clear evidence to the contrary – further reveals the obvious bias held by Dr. Bourgoin, and illuminates how the University either intentionally or mistakenly arrived at the excessively harsh sanction against Plaintiff.

174. Furthermore, Dr. Bourgoin's March 9, 2023 letter to Roe was defamatory in nature, as it falsely accused Plaintiff of being the instigator of all posts made about Roe, which was demonstrably false.

175. As this defamatory content has been published and further disseminated by Roe, Dr. Bourgoin's actions will continue to cause substantial harm to Plaintiff.

176. The University further violated Plaintiff's privacy rights when the Student Access Office disclosed to the College of Arts and Sciences that Plaintiff had accommodations with the University, despite prior assurances to both Plaintiff and Plaintiff's mother on two separate occasions that the only individuals who would ever be informed of such accommodations would be those that Plaintiff specifically decided Plaintiff wanted to inform, such as certain of Plaintiff's professors.

### d. The Appeal Decision.

177. On March 23, 2023, Plaintiff timely submitted Plaintiff's appeal of the decision and sanctions, based upon the following grounds: (i) procedural errors sufficient to affect the finding of the original authority; (ii) insufficient information to support the finding of the original

34

COPY

authority; and (iii) the harshness of the penalty/sanctions imposed by the original authority is sufficient to show an abuse of discretion by that authority.

178.    With regard to the first ground for appeal, Plaintiff described that Dr. Bourgoin failed to provide Plaintiff with proper notice of the charges, utilized the incorrect definition of harassment in finding Plaintiff responsible, deprived Plaintiff of access to relevant witnesses and information, failed to conduct a fair and impartial investigation process, improperly placed the burden of proof upon Plaintiff, failed to pursue Plaintiff's cross-complaint filed against Roe, and did not provide Plaintiff with all case documentation.

179.    As for insufficient information to support the finding, Plaintiff described that Roe failed to establish that Plaintiff's conduct altered the conditions of his education or participation in a University program or activity, and there was insufficient evidence to establish that Plaintiff violated the policies on disorderly conduct or impersonation.

180.    Additionally, regarding the harshness of the penalty/sanction, Plaintiff demonstrated why the sanctions imposed on Plaintiff were not in line with the University's policies, discussed how severely the sanctions would impact Plaintiff's future career goals, and pointed to a multitude of examples which revealed how excessively disproportionate the sanctions imposed upon Plaintiff were.

181.    Upon information and belief, these included the following:

- In or about 2019, a fraternity was removed from campus after allegations that pledges were forced to put rocks inside of their anuses as part of their hazing. No one was suspended or expelled in response to this incident.
- Also in 2019, another fraternity forced their pledges to video themselves naked. No one was suspended or expelled in response to this incident.
- In the spring/early summer of 2020, a video of a previous student yelling "Nigga" two different times surfaced. Vanderbilt had to send out a school wide email about the incident because there was so much outrage. Yet, the student was not suspended for any period of time and was not even removed from his

35

fraternity or other campus organizations. *See* Dean of Students Mark Bandas' July 7, 2020 memo to students.

- In the fall of 2020, the University had a zero-tolerance policy related to Covid violations. Dean of Students Mark Bandas stated: "[t]he minimum sanction applied by Student Accountability if a student is found responsible for hosting a gathering that violates the policy will be suspension for a minimum of one semester; a first sanction may be as severe as expulsion, depending on the nature of and circumstances surrounding the violation." *See* https://vanderbilthustler.com/2020//08/19/anchor-down-step-up-diermeier-and-bandas-email-students-detailing-accountability-policies-emphasizing-personal-responsibility/ Yet, to Plaintiff's understanding, the vast majority were never suspended.

- Also in or about 2020, a fraternity required all of their fraternity pledges to drink alcohol until they vomited and then forced the pledges to drink their own vomit. Additionally, members of the fraternity urinated on their pledges. Again, no one was suspended or expelled in response to either of these incidents.

- In or about 2020, a fraternity forced all their pledges to write down embarrassingly personal information about themselves, such as the measurements of their genitals. This document was then shared with others on campus, and was seen by administrators of Vanderbilt. Yet again, no one was suspended or expelled in response to this incident.

- In or about the fall of 2021, a fraternity emotionally abused a pledge to the point where he had to seek therapy at school (this therapist was a mandatory reporter, therefore this hazing experience was reported). No one from the fraternity was suspended, and the fraternity remains on Vanderbilt's campus.

- In or about the fall of 2021, two Vanderbilt students were arrested, for using fake ID's, resisting arrest, trespassing, and public intoxication, all of which are crimes in Tennessee. This was reported to Student Accountability. Yet again, neither of these students faced any period of suspension.

- In the fall of 2021, a student in the class of 2024 was found guilty of rape through the University's Title IX process. He was suspended until the complainant's graduation date. Notably, because this student received a suspension just after his first year at the University, he would have the option to transfer to another institution and still graduate on time. In contrast, because Plaintiff had more than 60 credits – the maximum allowed for transfer to another undergraduate institution – and most schools impose residency requirements of at least two years prior to graduation, Plaintiff would be unable to transfer. *See* https://vanderbilthustler.com/2022/01/17/guest-editorial-vanderbilt-chose-not-to-expel-my-rapist/

- In the spring of 2021, a fraternity was kicked off campus for hazing, fraud, and COVID-19 violations, among other reasons. Director of Greek Life Kristen Torrey sent out a warning statement advising students not to associate with this group because they were not safe to be around. However, they remained on campus and no suspension was imposed. *See* https://vanderbilthustler.com/2021/10/26/office-of-greek-life-director-condemns-off-campus-operations-by-former-dke-students/

36

COPY

- Also in or about the spring of 2021, another member of Roe's fraternity was accused of being racist. At the time, he was running for student body president, which led to the creation of an online campaign to smear his name and reputation. The resultant name calling, death threats, and verbal attacks caused this student to leave the Nashville metropolitan area. Yet, the students who initiated the campaign were not suspended for any period of time. *See* https://www.washingtonexaminer.com/opinion/op-eds/when-the-social-justice-mob-came-for-me
- In or about 2021, a fraternity covered all of their pledges with jars of condiments (ketchup, mayo, etc.) and made all of the pledges stay until it was licked off of each other. No one was suspended or expelled in response to this incident.
- In February of 2023, Roe's fraternity was kicked off campus for four years for repeated safety and hazing violations, after receiving the ongoing benefit of training, retraining, and multiple chances to change behavior. Yet again, no one was suspended from the University.

182. In addition to the sanctions imposed against Plaintiff being out of line with those issued (or not issued) in prior cases, Plaintiff also explained why the factors required by the Handbook to be considered as part of the sanctioning process weighed against a sanction of suspension: (i) this was the first offense Plaintiff had faced at Vanderbilt; (ii) Plaintiff's posts concerned serious public safety issues, which were supported and encouraged by others, and were made during Vanderbilt's Sexual Assault Awareness Month, when various campus events and activism efforts focused on bringing greater awareness to the prevalent problem of campus sexual assault; (iii) Plaintiff honestly believed that every statement Plaintiff posted was 100% truthful; and (iv) the majority of the posts Plaintiff made were actually duplicates that Plaintiff had reposted because all of them were taken down very quickly; and Plaintiff stopped posting on Plaintiff's own volition approximately eleven months prior.

183. Furthermore, in light of the Handbook's language noting that "educational conferences and probationary periods will be sufficient to help students and their organizations make better choices," the imposition of a suspension on Plaintiff was even more gratuitous.

37

184.    Despite Plaintiff having already stopped the behavior at issue more than ten months prior, the University failed to afford Plaintiff any opportunity to undergo educational conferences or a probationary period, to demonstrate that Plaintiff had learned from this experience and was committed to making better choices moving forward.

185.    Instead, Dr. Bourgoin decided to make an example out of Plaintiff and imposed one of the harshest sanctions possible.

186.    Of particular concern, Dr. Bourgoin informed Plaintiff that his decision about what sanctions to impose on Plaintiff would have implications on the larger culture on campus, in regards to what students are permitted to speak out against.

187.    Consideration of the impact on others also weighed against any sanction requiring a period of separation from the University. Roe provided inconsistent information regarding the impact to him, and failed to provide evidence supporting his claim that Plaintiff's posts specifically, which were made over a brief period of a few days almost one year prior, which were taken down quickly (and only available briefly to a local Nashville group), and which did not appear on a search engine results page, somehow caused all of the harm he suffered.

188.    Finally, and of particular importance, Vanderbilt University had consistently advocated for students to report sexual assault and speak out for victims of sexual assault, with Vanderbilt's Project Safe serving as a resource for the owner of the VU Survivors Instagram page, on which students report victims' stories of sexual assault, either anonymously or by publicly naming the accused. To this day, this option to publicly post about an alleged assailant without any investigation having been completed, and without any report to Project Safe, the Title IX office, or any other agency having been made, remains on this site.

38

189. Thus, to penalize Plaintiff so severely for reposting about claims of sexual assault—all of which Plaintiff understood to be fully credible, and which were made with the laudable goal of bringing further attention to a campus wide issue in an effort to protect further victims—was unwarranted and hypocritical.

190. On April 14, 2023, Dr. Melanie Lowe denied Plaintiff's appeal in its entirety, and upheld the findings and sanctions reached by Dr. Bourgoin.

191. While the Handbook provides that the appeal decision is to be issued by the Chair, it is unclear whether Dr. Lowe was the Chair of the Board, as she was not identified as such on Vanderbilt's website, nor did she sign a designation as Chair along with her name in the appeal decision letter.

192. In fact, Dr. Lowe did not and still does not appear anywhere on the list that identifies Vanderbilt's Appellate Review Board members (https://www.vanderbilt.edu/provost/committees/active/appellate-review-board/), calling into question her qualifications and raising doubt as to whether she received appropriate training on deciding student conduct appeals.

193. Dr. Lowe inaccurately determined that Plaintiff's appeal did not set forth a basis sufficient to provide relief, disregarding every one of Plaintiff's well established and substantiated arguments without any rational basis.

194. Dr. Lowe concluded that Plaintiff had not "set forth a sufficient basis for the Board to determine that the Office of Student Accountability did not conduct themselves in accordance with their policies and procedures, or that any irregularities were harmful to the extent that they adversely affected the process."

195. Specifically, in response to Plaintiff's arguments regarding procedural irregularities, Dr. Lowe erroneously concluded that: (i) providing Plaintiff with a specific

39

definition of disorderly conduct and impersonating a university official would not have affected the finding; (ii) the definition of harassment was properly applied; (iii) Plaintiff was not precluded from presenting witnesses on Plainiff's behalf; (iv) Dr. Bourgoin did not have a bias against Plaintiff; (v) the University did bear the burden of proof and properly applied the preponderance of the evidence standard; (vi) the cross-complaint filed by Plaintiff was not relevant to the finding; and (vii) Plaintiff was permitted an opportunity to examine all documents relevant to the case.

196.    While concluding that had Dr. Bourgoin provided Plaintiff with a specific definition of disorderly conduct, this would not have affected the finding, she nonetheless applied her own, brand new, never before presented to Plaintiff, definition of disorderly conduct—which does not appear in the Handbook—for purposes of the appeal decision.

197.    Specifically, she stated: "I find there is sufficient evidence for the original hearing authority to conclude that your conduct *disrupted the civility of the University community*, especially the campus culture for reporting sexual assault." (emphasis supplied).

198.    Not only does this description of disorderly conduct not appear anywhere in the Handbook, but Dr. Lowe also seemingly found Plaintiff responsible for "disrupting the civility," a new charge which Plaintiff had never previously been notified that Plaintiff was under investigation for.

199.    While making such a far-reaching statement, Dr. Lowe conspicuously failed to point to any evidence in support of this conclusion that Plaintiff's conduct disrupted the civility of the entire University, as none existed.

200.    In fact, the evidence demonstrated to the contrary: (i) the posts made by Plaintiff were taken down very quickly after they were made in April 2022, confirming that very few people actually saw them; (ii) for several months prior to, and several months after April of 2022, various

40

other students posted about Roe on both Yik Yak and on Greek Rank; (iii) Plaintiff never posted about Roe on Greek Rank; and (iv) at no time did OGL either take down, or publicly condemn, any of the posts that related to Roe, while it has removed posts in the past deemed "offensive and culturally unacceptable." Dr. Lowe was aware of this as part of the appeal record.

201.    Additionally, because the charge was not defined by the University in this manner, and because Plaintiff was never offered this definition previously during any of Plaintiff's meetings with Dr. Bourgoin, Dr. Lowe's unilateral imposition of this new, overbroad, and ambiguous definition was arbitrary and capricious and further deprived Plaintiff of the opportunity to meaningfully put forth a defense against this charge.

202.    Notably, in refuting the argument that Dr. Bourgoin had a bias against Plaintiff, Dr. Lowe proclaimed that Dr. Bourgoin's assessment of Plaintiff's truthfulness was impacted by Plaintiff's statement that a Title IX case was filed against Roe. However, Dr. Lowe misconstrued this information as presented by Plaintiff.

203.    In fact, Plaintiff never stated that there was a Title IX report that had been filed against Roe. Instead, Plaintiff explained to Dr. Bourgoin that the absence of a formal report does not in and of itself confirm that a sexual assault did not occur, given there are various reasons that people decide not to make a formal report.

204.    To use this misinterpretation of Plaintiff's testimony against Plaintiff, in support of a finding that Plaintiff was not truthful, was wholly improper and further indicative of the predetermined conclusion, as well as Dr. Lowe's failure to review the record evidence in its entirety.

205.    As for the appeal ground of insufficient information, Dr. Lowe stated that she was not able to substitute her judgment for that of the original hearing authority and must give

41

deference to the hearing authority's judgment. Accordingly, she accepted without question the findings of Dr. Bourgoin and refused to conduct an independent level of review to determine whether the outcome was supported by the evidence.

206.    As for Plaintiff's argument regarding the harshness of the sanction, Dr. Lowe upheld the sanctions assigned by Dr. Bourgoin, concluding that there was no abuse of discretion in imposing the sanctions.

207.    This conclusion evidently overlooked the unsupported finding reached by Dr. Bourgoin, that Plaintiff allegedly instigated all of the posts about Roe. Had Dr. Lowe thoroughly reviewed the documents and case file, she would have learned that there was zero evidence to support a finding that Plaintiff was the instigator. Accordingly, any sanctions imposed on this basis were entirely groundless and excessive, and warranted a granting of the appeal on this factor alone.

208.    Dr. Lowe also failed to consider or address the eight specific instances provided by Plaintiff in Plaintiff's appeal which irrefutably demonstrated that the sanctions assigned to Plaintiff were severely disproportionate and inconsistent with prior cases and failed to address each of the factors to be considered when assigning a sanction. Although withheld from Plaintiff at the time, had Dr. Lowe conducted a thorough review as required, she would have learned that other students received no punishment whatsoever for posting about sexual assault allegations against Roe.

209.    Dr. Lowe stated only that Plaintiff's lack of a prior disciplinary record was taken into account. However, the Handbook is clear that the following criteria must also be considered: "the student's previous record, the circumstances surrounding the violation, the nature and severity of the event and the impact on others, and the student's level of cooperation and honesty throughout the process."

42

210.    First, Dr. Lowe disregarded the circumstances surrounding the violation. Plaintiff presented a plethora of evidence concerning school culture and showing why Plaintiff's actions should have been commended rather than punished, in the name of ending violent sexual assault on campus.

211.    Second, Dr. Lowe failed to properly consider the nature and severity of the event and the impact on others. Had Dr. Lowe reviewed the full record, it would have become apparent that Roe presented inconsistent information concerning the impact sustained as a direct and proximate result of Plaintiff's action alone.

212.    Finally, Dr. Lowe disregarded the fact that despite the numerous meetings with Dr. Bourgoin causing much disruption to Plaintiff's work, Plaintiff still made every attempt to meet with Dr. Bourgoin in a timely manner, responded to every email, and was overall highly cooperative.

213.    Consequently, Plaintiff's appeal was dismissed without a hearing, and the suspension was put into effect as of the date of the decision, April 14, 2023.

214.    This was the final decision in the University's conduct process.

### V.    *Plaintiff's Damages*

215.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff was subjected to a disciplinary process that failed to comport with Vanderbilt's promises to Plaintiff as an enrolled student and principles of good faith and fundamental fairness.

216.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff was improperly suspended from the University for one and a half years, depriving Plaintiff of nine (9) credits worth of classes taken during the spring 2023 semester, in addition to nine (9) credits to be taken over the summer of 2023, three (3) of which Plaintiff had intended to take at Vanderbilt.

43

217.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff's academic file and transcript are now marred by a false and baseless finding of harassment, disorderly conduct, and impersonation.

218.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff's education and career paths have been derailed, resulting in considerable economic and consequential harm.

219.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff has suffered emotional and psychological distress.

220.    As a result of Defendants' unlawful, unfair, and improper conduct, Plaintiff has suffered reputational harm, embarrassment, emotional damages, and harm to Plaintiff's future career prospects.

### COUNT I: BREACH OF CONTRACT
### (Against the University)

221.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

222.    Plaintiff applied to and enrolled at the University and paid all required fees and expenses.

223.    Plaintiff did so in reliance on and with the reasonable expectation that the University would provide Plaintiff with academic instruction, and, upon satisfaction of all academic and financial requirements, Plaintiff would receive a degree and diploma from Vanderbilt University.

224.    Plaintiff also reasonably expected that Vanderbilt would implement and enforce the provisions and policies set forth in its official publications, including the Handbook, and would

refrain from unfair practices that could unfairly and/or arbitrarily result in punishment that would hinder Plaintiff's educational and career opportunities.

225.    The U.S. Court of Appeals for the Sixth Circuit, applying Tennessee law, has stated that "the student-university relationship is contractual in nature." *Sifuna v. S. Coll. of Tennessee, Inc.,* No. 17-5660, 2018 WL 3005814, at *2 (6th Cir. Apr. 5, 2018). It is well settled that a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings. *See Anderson v. Vanderbilt Univ.*, 450 F. App'x 500, 502 (6th Cir. 2011).

226.    An express contract, or alternatively, a contract implied in law or in fact was formed between Poe and Vanderbilt.

227.    Thus, at all times relevant hereto, a contractual relationship existed between Vanderbilt and Parker Poe, by virtue of Poe's enrollment at Vanderbilt and payment of required tuition and fees, and as defined by and through Vanderbilt's policies and procedures, including the Handbook.

228.    Through these policies, Vanderbilt provided specific, enforceable provisions outlining certain privacy practices and procedures that were to be followed by the institution before imposing discipline upon its students, including Plaintiff.

229.    Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

230.    Vanderbilt committed several breaches of its agreements with Poe during the investigation and adjudication processes. As described in detail at paragraphs 93-215 *supra*, a non-exhaustive list of Vanderbilt's breaches includes the following:

45

a. Dr. Bourgoin failed to provide proper written notice of the charges against Poe, changed his story, and refused to answer certain questions thus preventing Poe from knowing what exactly Poe was being charged with.

b. Dr. Bourgoin held Poe accountable for posts Poe did not make.

c. Dr. Bourgoin deprived Poe of the opportunity to present all relevant information at an accountability meeting.

d. Dr. Bourgoin deprived Poe of the ability to challenge adverse testimony and information.

e. Dr. Bourgoin precluded Poe from having an opportunity to call relevant witnesses, despite Dr. Bourgoin knowing the names of these witnesses.

f. The University permitted a finding that was not based on the information presented and did not properly apply the preponderance of the evidence standard.

g. Dr. Bourgoin improperly notified the complainant of the findings reached and sanctions imposed against Poe, in violation of Vanderbilt's policy, FERPA, and Tennessee state law.

h. Dr. Bourgoin made intentional false statements to Poe in an email regarding the communication of the outcome to Roe, in an attempt to cover up his violation of FERPA.

i. Dr. Bourgoin failed to speak with all of the students who had posted about Roe.

j. Dr. Bourgoin neglected to consider that no other posters who made similar, or even worse posts, received any comparable punishment.

k. The University failed to ensure the appellate body which heard Poe's appeal request was unbiased and would take a thorough review of the record and properly determine whether or not Poe's punishment was in line with other posters or those alleged to have committed similar or worse acts.

l. The Appellate Officer failed to view Poe's appeal in the light most favorable to Poe.

m. The Appellate Officer found Poe responsible for an additional policy violation that Poe was never charged with.

n. The University failed to consider the relevant factors when deciding upon a sanction.

o. The University failed to ensure a fair process and just findings.

p. The University violated Poe's privacy rights when the Student Access Office disclosed to the College of Arts and Sciences that Poe had accommodations with the University, despite prior assurances to both Poe and Poe's mother that the only individuals who would ever be informed of such accommodations would be those that Poe specifically decided Poe wanted to inform, such as certain of Poe's professors.

231. The contract between Vanderbilt and Poe also contained an implied covenant of good faith and fair dealing in its performance and enforcement. It implicitly guaranteed that any proceedings would be conducted with basic fairness. *See Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 829 (M.D. Tenn. 2014).

232.    Each of the foregoing breaches contributed to a process that deprived Plaintiff of Plaintiff's fundamental and contractually guaranteed rights, ultimately leading to an erroneous finding and severely disproportionate sanctions.

233.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages including, but not limited to, emotional distress, psychological damages, delay/loss in education, delay/loss of future educational and career opportunities, future lost income, reputational damages, and other direct and consequential damages.

234.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT II: TITLE IX SELECTIVE ENFORCEMENT
### (Against Vanderbilt University)

235.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

236.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

237.    Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. *See Cannon v. Univ. of Chicago*, 441 U.S. 677 (1979); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

238.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant Vanderbilt University.

47

239.    Upon information and belief, Vanderbilt University, at all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

240.    The Second Circuit in *Yusuf v. Vassar College* articulated two theories under which a plaintiff could plead a Title IX violation – erroneous outcome and selective enforcement.

241.    Under an "erroneous outcome" case, the claim is that the plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings.

242.    Under the "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

243.    For a plaintiff to prevail on a plaintiff's selective enforcement claim, Plaintiff "must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Univ. of Dayton*, 766 F. App'x 275, 284 (6th Cir. 2019)

244.    Specifically, it must be demonstrated that gender bias motivated the selective enforcement. *See Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003).

245.    One way in which a plaintiff can establish gender biased motivation is by showing that all relevant aspects of Plaintiff's situation are "nearly identical" to those of an individual of the opposite sex who was treated more favorably. *See Doe v. Oberlin Coll.*, 60 F.4th 345, 356 (6th Cir. 2023).

246.    Here, Plaintiff was treated differently when he was subjected to a disproportionately severe punishment, in comparison to female students who engaged in the same

48

conduct, and this selective enforcement was motivated by gender bias.

247. First, Vanderbilt's decision to discipline Plaintiff with a suspension was not in line with its actions in responding to allegations brought against female students who had engaged in similar conduct.

248. Upon information and belief, one female student, L.N., made multiple posts concerning Roe, including false claims that she was a victim of Roe's and accusing Roe of being a rapist. Further, L.N. posted that she had contacted Roe's employer to notify them about his conduct.

249. Despite the foregoing actions, which were arguably more egregious than any conduct undertaken by Plaintiff, Dr. Bourgoin chose not to investigate L.N. for her conduct.

250. L.N., as a female student, was thus treated more favorably than Plaintiff, the male student, when she was not held responsible for any conduct policy violations and did not receive any sanctions, while Plaintiff was found responsible for three violations and issued a sanction including suspension.

251. Similarly, another female student, M.G. instigated L.N. to contact Roe's employer. M.G. posted about this twice, to which L.N. replied that she had contacted Roe's employer, and M.G. responding by "laughing" at the post.

252. Yet again, upon information and belief, Dr. Bourgoin failed to investigate the female poster, did not find her responsible for any policy violations and did not impose any sanction against her.

253. Second, gender bias is further demonstrated by the University's actions in responding to and addressing the complaint against Plaintiff.

254. After improperly finding Plaintiff responsible for three policy violations, Dr.

49

Bourgoin assigned several sanctions that were not only irrelevant to the issue at hand but also demonstrated a clear bias against Poe as a male accused of wrongdoing.

255.    One part of Plaintiff's sanctions included a requirement that Plaintiff read "Some Men: Feminist Allies and the Movement to End Violence Against Women," a book that discusses men and their role related to "women's issues." Specifically, it is described as exploring "the strains and tensions of men's work as feminist allies in preventing sexual assault and domestic violence." https://www.somemen.org/synopsis

256.    Additionally, the integrity assignment imposed by Dr. Bourgoin as part of the sanctions imposed on Poe included a number of required readings and a movie, all of which centered around a male figure that Plaintiff was intended to learn a lesson from.

257.    Moreover, upon information and belief, Vanderbilt's mishandling of the case against Plaintiff was informed by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

258.    Specifically, on April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf (hereinafter "Dear Colleague Letter" or "DCL").

259.    The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence

and address its effects." DCL at 4.

260.    The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, NATIONAL           PUBLIC            RADIO            (Feb.            24,            2010), http://www.npr.org/templates/story/story.php?storyId=124001493.

261.    The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

262.    The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

263.    Despite its supposed purpose as a mere guidance letter, the Department of Education ("DOE") treated the DCL as a binding regulation and pressured colleges and

51

COPY

universities to aggressively pursue investigations of sexual assault on campus.

264.    Since the DCL was published, schools including Vanderbilt have changed their sexual assault and sexual harassment policies and procedure, out of concern for being investigated and/or sanctioned by the Department of Education.

265.    The threat of revocation of federal funds remains a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.

266.    Additionally, the Office for Civil Rights is currently investigating nine complaints dating back to March of 2014, alleging Title IX discrimination against Vanderbilt University, raising additional concerns about how the University responds to and disciplines male students accused of misconduct, whether the alleged misconduct is sexual in nature or otherwise.

267.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX, designed to find him, the male, responsible and to punish him severely for it.

268.    Based on the foregoing, Plaintiff was treated adversely in comparison to similarly-situated members of the opposite sex, due to gender bias.

269.    This unlawful discrimination in violation of Title IX proximately caused Poe to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, loss of education, loss of future educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

270.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

52

## COUNT III: NEGLIGENCE
### (Against All Defendants)

271.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

272.     To establish a claim for negligence in Tennessee, a plaintiff must prove each of the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) proximate legal causation.

273.     As stated by the Sixth Circuit in *Atria v. Vanderbilt University* (142 F. App'x 246, 251 (6th Cir. 2005)), "Vanderbilt and its agents owe everyone, including [the Plaintiff], a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm. In Tennessee "[a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. Thus, it has been said that duty is the legal obligation that a defendant owes a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm."

274.     Here, Defendants owed Plaintiff a duty to conduct a disciplinary process that was fair and impartial, to ensure that any findings reached were just, and to refrain from imposing arbitrary sanctions.

275.     For the reasons discussed above in paragraphs 93-215 *supra*, Defendants violated their duty of care to Plaintiff, which proximately caused substantial injury to Plaintiff's educational and career trajectories in addition to other economic and non-economic harms.

276.     Further, these damages were reasonably foreseeable, given a finding of a violation of university conduct policies and a resultant sanction invariably causes direct harm to the student.

277.     As a proximate and foreseeable consequence of the foregoing, Plaintiff sustained damages including, but not limited to, emotional distress, psychological damages, delay/loss in

53

education, delay/loss of future educational and career opportunities, future lost income, reputational damages, and other direct and consequential damages.

278.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

279.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

280.    To establish a claim for intentional infliction of emotional distress, a plaintiff must establish: (i) the defendant engaged in intentional or reckless conduct; (ii) the conduct was so outrageous that it is not tolerated by civilized society; and (iii) the conduct resulted in serious mental harm.

281.    Defendants Dr. Bourgoin and Dr. Lowe acted intentionally and/or recklessly when performing their duties related to the investigation and adjudication of the complaint against Poe, as described in detail at paragraphs 93-215 *supra*.

282.    Beyond their reckless and harmful behavior in carrying out the investigatory process, Dr. Bourgoin engaged in further outrageous conduct in relation to the manner in which he delivered information about the case to Poe.

283.    Specifically, Dr. Bourgoin refused to find a time to meet with Poe outside of business hours, to deliver the outcome letter to Plaintiff, despite Poe having made clear on several occasions the challenges Plaintiff faced each time Plaintiff had to step away from work, and in disregard of the knowledge that Poe's parents had expressed concerns to the University about Poe's mental health.

54

COPY

284. In fact, on or about February 23, 2023, Poe's parents spoke with Lisa Clapper ("Ms. Clapper"), the Director of the Student Care Network and Student Care Coordination at Vanderbilt, to explicitly request that issuance of the decision letter be delayed until such time as Poe was able to return home, to ensure that Poe could be with Poe's parents and obtain the necessary support.

285. When this request was relayed from Ms. Clapper to Dr. Bourgoin, Dr. Bourgoin initially agreed to hold the decision, and assured Poe and Poe's parents that he would not send the outcome letter to Poe until he had a chance to connect with Poe's parents in regard to Poe's care and well-being. Notwithstanding, Dr. Bourgoin subsequently disregarded this clear request and delivered the outcome letter to Poe while Poe was at work and hundreds of miles away from home, without consulting Poe's parents.

286. After the outcome was delivered to Poe, Ms. Clapper immediately attempted to find out Poe's location so she could seek police intervention to prevent any suicidal acts by Poe. She also called Poe's mother in a panic, as she was worried something might happen after the deliberate disregard for Poe's well-being, and Poe's life. In comparison, Dr. Bourgoin never once reached out to Poe's parents after his decision was communicated.

287. Equally disturbing was the fact that the decision was delivered to Poe at 4:45 p.m.; Dr. Bourgoin could not be bothered to, at minimum, wait until the workday concluded a mere fifteen minutes later, despite Poe having informed him previously of the adverse impact of having to leave Poe's internship to meet with Dr. Bourgoin. He was keen on delivering the decision to Poe, in a clear attempt to inflict the most harm possible. Disturbingly, Dr. Bourgoin delivered the outcome with a smirk on his face.

288. Evidently, Dr. Bourgoin's priority was to communicate the punitive decision and severe sanctions to Poe as soon as possible, even though neither Poe nor Roe were on campus that

55

semester. Meanwhile, Dr. Bourgoin was in no rush to speak to the other posters and planned to postpone such conversations for several weeks.

289. Upon receipt of the decision, and due to Dr. Bourgoin's actions, Poe sought medical care in the hospital due to Poe's thoughts of committing suicide.

290. Incredibly, while the posts at issue had been made nearly one year prior, Poe was not present on campus for the spring 2023 semester, Roe was not on campus, and there was no evidence that the posts from April of 2022 which were taken down very quickly had any ongoing effect or concern as to the safety of Roe or any other member of the University community, Dr. Bourgoin nonetheless refused to withhold the decision for a couple of days, until Poe was able to seek the support of Poe's family members.

291. Ms. Clapper, who was present at the meeting while Dr. Bourgoin delivered the decision to Poe, appeared to try and stop Dr. Bourgoin from presenting the outcome, knowing that Poe was not with Poe's parents and that Poe was dealing with a significant mental health concern. Yet, Dr. Bourgoin took it upon himself to overrule her, and delivered the decision to Poe.

292. Evidently, Dr. Bourgoin was more concerned with providing closure to Roe and his family, than with ensuring the safety and health of Poe.

293. Along the same lines, as part of the seminar that Poe was required to complete in accordance with the sanctions imposed, Poe was instructed to watch the film "Shattered Glass." The selection of this film was highly inappropriate and irrelevant as the premise involves a journalist who repeatedly fabricates stories and when ultimately caught, lies to his boss by claiming that he is going to commit suicide in order to avoid getting fired. Requiring Poe to watch a film with undertones of suicidal ideation, despite having direct knowledge that Poe had experienced such mental health concerns was outrageous, irresponsible, and reckless.

56

294.    The actions of Dr. Bourgoin and Dr. Lowe, as described herein, were so outrageous that they are not tolerated in a civilized society where due process and the presumption of innocence are the cornerstone of justice and fundamental fairness. A top tier University should be held to the same top tier standards they expect of their students.

295.    As a direct, proximate result of the foregoing, Poe sustained and will continue to sustain substantial injury, damages, and losses. Poe's damages, injuries and losses include, but are not limited to: injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of present and future career opportunities, loss of educational and extracurricular opportunities, and a deprivation of a right to the presumption of innocence and a fair and adequate grievance and adjudication process.

## COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

296.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

297.    To establish a claim for negligent infliction of emotional distress, a plaintiff must demonstrate: (1) the defendant owed plaintiff a duty of care, (2) defendant engaged in conduct below the applicable standard of care amounting to a breach of defendant's duty, (3) plaintiff suffered an injury or loss, (4) the defendant's breach of its duty was the cause-in-fact of the injury and (5) defendant's breach was the legal cause of the plaintiff's injury.

298.    Dr. Bourgoin and Dr. Lowe each carried out their duties with respect to the case against Plaintiff in a negligent manner.

299.    By way of example but not limitation, Dr. Bourgoin acted negligently when he: (i) failed to ensure that the investigation and adjudication process was fair and objective; (ii) prevented Poe from obtaining critical evidence and witness testimony; (iii) failed to pursue

57

relevant witness testimony; (iv) accepted Roe's allegations without question while disregarding Poe's account; (v) improperly assisted Roe to the detriment of Poe; (vi) reached a predetermined conclusion that Poe was responsible; (vii) imposed an excessively disproportionate and severe sanction; (viii) disregarded Poe's wellbeing and safety; and (ix) ultimately held Plaintiff responsible for something Plaintiff did not do.

300. Additionally, Dr. Lowe acted negligently when she: (i) disregarded every one of Poe's well established and substantiated arguments without any rational basis; (ii) rubber stamped the decision and sanction imposed by Dr. Bourgoin and failed to conduct any independent assessment of the facts; (iii) drew erroneous factual conclusions and misinterpreted the testimony of Poe; (iv) found Poe responsible for conduct that Poe was never charged with; (v) applied her own arbitrary definition of one of the charges, to create support for Dr. Bourgoin's findings when none existed; and (vi) made conclusions unsupported by the evidence.

301. Upon information and belief, Dr. Lowe could have compared the sanction assigned to Poe to the lack of punishment administered to other students who had posted about Roe, yet she failed to do so at any point during the entire month it took her to render her decision.

302. Had she reviewed the information concerning the other posters, she could not in good faith have stated that Poe's punishment was consistent with that of others.

303. It was reasonably foreseeable that the foregoing negligent acts would result in severe emotional distress to Plaintiff, given the months long process that forced Plaintiff to continuously put forth a defense, attempt to prove Plaintiff's innocence, face administrators that were not unbiased but instead presumed Plaintiff to be responsible from the beginning and, despite all of Plaintiff's efforts, ultimately resulted in Plaintiff being suspended from the University,

58

resulting in substantial damage to Plaintiff's future endeavors and causing irreparable harm to Plaintiff's reputation and emotional well-being.

304.    Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to Plaintiff's reputation, the interruption in and loss of Plaintiff's education, and the lifelong ramifications that will flow therefrom.

305.    It was reasonably foreseeable that Plaintiff would suffer emotional and psychological harm as a result of Defendants' conduct.

306.    As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

### COUNT VI: DEFAMATION
### (Against Defendant Bourgoin)

307.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

308.    To establish the elements for defamation in Tennessee, a plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement. *Rose v. Cookeville Reg'l Med. Ctr.*, 2008 WL 2078056, at *4 (Tenn. Ct. App. May 14, 2008).

309.    Dr. Bourgoin published a defamatory statement to a third party when, by letter dated March 9, 2023, he wrote to Roe: "The person who ***instigated*** the harassing posts against you has completed our process and has been held accountable. [Plaintiff] is currently not an enrolled student, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student…."

59

310.    Dr. Bourgoin knew his statement to Roe that Poe "instigated the harassing posts" was demonstrably false, and Dr. Bourgoin was aware of its falsity. There was no question that numerous posts were made on a different site entirely (Greek Rank) which accused Roe of committing sexual assault and drugging women, beginning as early as January or February of 2022, at least two months prior to any post that Poe made in April of 2022. This was a fact that even Roe's parents admitted to in their impact statements.

311.    There was simply no evidence establishing that Poe instigated the harassing posts against Roe.

312.    As recently explained by the Middle District of Tennessee, for a communication to be considered defamatory, "[i]t must constitute a serious threat to the plaintiff's reputation." In other words, the statement "*must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule." Hudik v. Fox News Network, LLC,* 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (emphasis in original).

313.    Here, Dr. Bourgoin's written statement that Poe instigated the harassing posts against Roe was defamatory because it constituted a serious threat to Poe's reputation, and will subject Poe to hatred, contempt, or ridicule from Roe, Roe's parents, Roe's fraternity brothers, and Roe's friends.

314.    Plaintiff Poe has been directly damaged by the publication of this false information, as Plaintiff has suffered reputational harm, emotional harm, and lost job opportunities.

315.    By way of example but not limitation, subsequent to the issuance of the defamatory letter, multiple students at Poe's internship confronted Poe to ask Poe about the sanction, which they understood to be an expulsion from Vanderbilt.

316.    Moreover, since the issuance of the March 9 letter, Poe has received inquiries from students that Plaintiff otherwise would not be in contact with, about where Plaintiff is employed, places Plaintiff is applying to for jobs, and where Plaintiff is currently located, adding to the harassment and severe level of distress that Defendants' actions have caused.

317.    Further, the information conveyed in the March 9 letter has been published to third parties by Roe, further harming Plaintiff's name and reputation.

318.    Undoubtedly, this statement in the March 9, 2023 letter was defamatory in that falsely declared, through publication to a third party, that Poe was the individual who had initiated all of the harassing posts against Roe.

319.    Dr. Bourgoin is therefore liable to Poe for defamation.

## RELIEF REQUESTED

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    On the first cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

(ii)    On the second cause of action for Title IX selective enforcement, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-

61

being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

(iii)   On the third cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

(iv)   On the fourth cause of action for intentional infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

62

COPY

(v)    On the fifth cause of action for negligent infliction of emotional distress, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante;

(vi)   On the sixth cause of action for defamation, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, punitive damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Vanderbilt University to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante; and

(vii)  Such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of 12 of all triable issues in the present matter.

**Dated:  New York, New York
         March 6, 2024**

63

COPY

Respectfully submitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff Parker Poe*

By: */s/ Tara J. Davis*
**Tara J. Davis (*Pro Hac Vice* forthcoming)**
**Stuart Bernstein (*Pro Hac Vice* forthcoming)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**tdavis@nmllplaw.com**
**sbernstein@nmllplaw.com**

and

By: */s/ Cory R. Miller*
**Cory R. Miller**
**TN BPR No. 034770**
**Jacob E. Moses**
**TN BPR No. 041637**
**Brewer Krause Brooks Chastain & Meisner,
PLLC**
**545 Mainstream Drive, Suite 101**
**Nashville, Tennessee 37228**
**(615) 630-7745**
**(615) 630-7742**
**cmiller@bkblaw.com**
**jmoses@bkblaw.com**

64

# IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **PARKER POE,** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No.:** |
| | : | **JURY DEMAND (12)** |
| **v.** | : | |
| | : | |
| **DR. MELANIE LOWE, in her** | : | |
| **individual and official capacity, DR.** | : | |
| **JEREMY BOURGOIN, in his individual** | : | |
| **and official capacity, and** | : | |
| **VANDERBILT UNIVERSITY,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S MOTION TO PROCEED UNDER PSEUDONYM

Comes now Plaintiff Parker Poe, by and through undersigned counsel, pursuant to Local Rule § 6.04, and respectfully requests leave to proceed under the pseudonym "Parker Poe." In light of the private, sensitive, and highly personal nature of the allegations contained in the Complaint, the potential harm that Plaintiff may face if his identity is disclosed, the likelihood that educational records protected by the Family Educational Right and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, 34 CFR Part 99, would be disclosed, and the minimal public interest in learning Plaintiff's identify, Plaintiff should be permitted to proceed under the pseudonym "Parker Poe" in this action.

## STATEMENT OF FACTS

The complete facts underlying this litigation are set forth more fully in Plaintiff's Complaint, which is being filed simultaneously with the instant motion and is incorporated herein by reference.

1

## ARGUMENT

### I.    The Legal Standard.

Various courts, including the Supreme Court of Tennessee, have permitted parties to proceed anonymously when special circumstances arise. Generally, in determining whether to permit a party to proceed anonymously, a court must "weigh the plaintiff's privacy interest against the presumption of open judicial proceedings." *Doe v. Bruner*, 2012-Ohio-761, ¶ 6, 2012 WL 626202, at *2 (12th Dist. Feb. 27, 2012); *see also Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004); *Redwig v. Catholic Bishop for the Diocese of Memphis,* 363 S.W.3d 436 (Tenn. 2012); *Doe v. HCA Health Services of Tenn.,* 46 S.W.3d 191 (Tenn 2001).

The Sixth Circuit has articulated the following non-exhaustive list of factors to consider when conducting this balancing test: "(1) whether the plaintiff "seeking anonymity [is] suing to challenge governmental activity"; (2) whether pursuit of the lawsuit will compel the plaintiff "to disclose information 'of the utmost intimacy'"; (3) "whether the litigation compels plaintiff[ ] to disclose an intention to violate the law, thereby risking criminal prosecution"; and (4) whether the plaintiff is a child." *Doe v. Mitchell*, No. 2:20-CV-00459, 2020 WL 6882601, at *4 (S.D. Ohio Nov. 24, 2020) (citations omitted). *See also, Doe v. Porter*, 370 F.3d 558, 560 (6th Cir. 2004). The court may also exercise its discretion to consider other factors that may be relevant in a particular case, keeping in mind that the relevant standard is "whether a plaintiff's privacy interests *substantially outweigh* the presumption of open judicial proceedings." *Porter*, 370 F.3d at 560. Additionally, "whether the defendants are being forced to proceed with insufficient information to present their arguments against the plaintiff's case" is also a relevant consideration. *Id.* (quoting *Citizens for a Strong Ohio v. Marsh*, 123 F. App'x 630, 636 (6th Cir. 2005)).

As outlined below, a balancing of these factors strongly counsels in favor of permitting Plaintiff to proceed anonymously in this litigation.

## II.    Plaintiff Meets the Criteria for Proceeding Under a Pseudonym.

First, prosecution of this lawsuit will compel the disclosure of information 'of the utmost intimacy,' including, but not limited to, information concerning Plaintiff's educational records and his mental health. Plaintiff does not merely contend that the revelation of his name would result in embarrassment or public humiliation. Rather, Plaintiff notes the highly sensitive nature and privacy issues that are associated with this matter and submits that if required to disclose his identity, he will suffer additional mental, emotional, and psychological harm. As described in the Complaint, Vanderbilt's actions which are the focus of this lawsuit have already caused tremendous distress to Plaintiff. Requiring him to reveal his identity now, as part of the commencement of a lawsuit in which he seeks to rectify Vanderbilt's wrongs will only cause further anguish and distress.

Courts around the country have permitted parties to proceed pseudonymously in situations involving matters of a highly personal nature. *See e.g. Doe v. Mitchell*, No. 2:20-CV-00459, 2020 WL 6882601, at *5 (S.D. Ohio Nov. 24, 2020) (permitting identification of alleged victim of sexual assault as "Jane Roe" during proceedings); *NMIC Ins. Co. v. Smith*, No. 2:18-CV-533, 2018 WL 7859755, at *2 (S.D. Ohio Oct. 24, 2018) (quoting *Doe v. Blue Cross & Blue Shield United of Wisconsin*, 112 F.3d 869, 872 (7th Cir. 1997) ("fictitious names are allowed when necessary to protect the privacy of ... rape victims"); *Grottano v. the City of New York,* 2016 WL 2604803 (S.D.N.Y. Mar. 30, 2016); *Doe No. 2 v. Kolko*, 242 F.R.D. 193 (E.D.N.Y. 2006); *Doe v. Penzato*, 2011 WL 1833007 (N.D.Ca. May 13, 2011); *Doe v. Evans*, 202 F.R.D. 173 (E.D.Pa. 2001); *Doe v. Western Am. Province of the Capuchin Franciscan Friars*, 2015 WL 8770017 (D. Or. Dec. 13,

3

2015) (allowing the plaintiff to proceed as "Jane Roe" in light of the "accepted practices of the federal courts of the United States, allowing those who … fear reprisals from the particular litigation to commence cases under assumed names"); *Doe v. Cabrera*, 301 F.R.D. 1 (D.D.C. 2014) (allowing victim of sexual assault to proceed as a "Jane Roe" plaintiff); *Roe v. St. Louis Univ.*, 2009 WL 910738 (E.D. Mo. Apr. 2, 2009) (allowing rape victim plaintiff to use a pseudonym because plaintiff's privacy interest outweighed the public's right to access judicial records); *E.E.O.C. v. Spoa, LLC.*, 2013 WL 5634337 (D. Md. Oct. 15, 2013) (finding that "sexual assault" is a "highly sensitive and personal matter"); *Doe v. City of Chicago*, 360 F.3d 667, 669 (7th Cir. 2004) (in denying the right to proceed anonymously, court emphasized the fact that the plaintiff was "not a minor, a rape or torture victim, a closeted homosexual, or … a likely target of retaliation by people who would learn her identity only from a judicial opinion or other court filing") (emphasis added).

Further, courts have recognized that allowing a plaintiff to proceed anonymously in similar situations is not merely a tactic to avoid inconsequential embarrassment or humiliation. Instead, requiring a plaintiff to disclose their identity could result in not only further embarrassment, but also further victimization and loss of dignity, resulting in more harm than good. *See Doe v. Cabrera,* 301 F.R.D. 1, at *5, n. 6 (D.D.C. 2014); *Doe v. Shakur*, 164 F.R.D. 359, 362 (S.D.N.Y.1996); *Rose v. Beaumont Indep. Sch. Dist.*, 240 F.R.D. 264, 267 (E.D.Tex. 2007). Here, Plaintiff, who has taken steps to protect his identity leading up to these proceedings, should be permitted to proceed anonymously due to the recognized highly sensitive and personal nature associated with the allegations at issue in this matter.

Finally, there is no risk of prejudice to either party. "Other than the need to make redactions and take measures not to disclose Plaintiff's and Roe's identities, Defendants will not be hampered

4

or inconvenienced merely by Plaintiff's anonymity in court papers." *Doe No. 2 v. Kolko*, 242 F.R.D. 193, 198 (E.D.N.Y. 2006); *see also Doe v. Mitchell*, No. 2:20-CV-00459, 2020 WL 6882601, at *6 (S.D. Ohio Nov. 24, 2020) ("plaintiff has indicated she is willing to have her counsel privately disclose her identity to defendants' counsel. This measure is sufficient to protect defendants from prejudice."). Significantly, Defendants are likely already aware of Plaintiff's and the complainant, Simon Roe's, true identities. Thus, there is no doubt that Defendants will have an unobstructed opportunity to conduct discovery, present their defenses and litigate this matter, regardless of whether Plaintiff identifies himself or proceeds anonymously. Moreover, it would be equally harmful to publicize the name of Roe as it would subject him to similar "unwanted scrutiny, harassment and ridicule." *See Virginia Polytechnic Inst. & State Univ.,* 2022 WL 972629 at *2. Therefore, Plaintiff's anonymity, as well as that of the non-party Roe, should only further Defendants' interests in keeping student disciplinary proceedings confidential.

## CONCLUSION

The Court should allow Plaintiff to proceed anonymously because of the highly sensitive and private nature of the issues before the Court, and the lack of prejudice to Defendants. Therefore, Plaintiff requests that he be allowed to proceed under a pseudonym for the duration of this litigation.

**Dated:   New York, New York**
**March 6, 2024**

5

COPY

Respectfully submitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff Parker Poe*

By: /s/ *Tara J. Davis*
Tara J. Davis (*Pro Hac Vice* forthcoming)
Stuart Bernstein (*Pro Hac Vice* forthcoming)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
tdavis@nmllplaw.com
sbernstein@nmllplaw.com

and

By: /s/ *Cory R. Miller*
Cory R. Miller
TN BPR No. 034770
Jacob E. Moses
TN BPR No. 041637
Brewer Krause Brooks Chastain & Meisner,
PLLC
545 Mainstream Drive, Suite 101
Nashville, Tennessee 37228
(615) 630-7745
(615) 630-7742
cmiller@bkblaw.com
jmoses@bkblaw.com

6

# IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **PARKER POE,** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No.:** |
| | : | **JURY DEMAND (12)** |
| **v.** | : | |
| | : | |
| **DR. MELANIE LOWE, in her** | : | |
| **individual and official capacity, DR.** | : | |
| **JEREMY BOURGOIN, in his individual** | : | |
| **and official capacity, and** | : | |
| **VANDERBILT UNIVERSITY,** | : | |
| | : | |
| **Defendants.** | : | |

## AFFIDAVIT OF COUNSEL FOR PLAINTIFF IN
## SUPPORT OF MOTION UNDER LOCAL RULE 6.04

I, Cory R. Miller, execute the following Affidavit in support of my client's motion to proceed under pseudonym under Local Rule § 6.04.

1.     I am an attorney, over the age of 21, and make this Affidavit based upon my personal knowledge or based on information made available to me.

2.     I am counsel for the Plaintiff. I submit this Affidavit in support of Plaintiff's Motion under Local Rule 6.04 to file under a pseudonym.

3.     For the reasons described in the Plaintiff's motion, filing this matter under a pseudonym should be permitted.

4.     Specifically, in light of the private, sensitive, and highly personal nature of the allegations contained in the Complaint, the potential harm that Plaintiff may face if Plaintiff's identity is disclosed, the likelihood that educational records protected by the Family Educational

1

Right and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, 34 CFR Part 99, would be disclosed, and the minimal public interest in learning Plaintiff's identify, Plaintiff should be permitted to proceed under the pseudonym "Parker Poe" in this action.

5.      As described in the accompanying Complaint, Vanderbilt's actions which are the focus of this lawsuit have already caused tremendous distress to Plaintiff. Upon learning of Dr. Bourgoin's decision finding Plaintiff responsible for violations of the University's policies, Poe was caused to seek medical care. Requiring Plaintiff to reveal Plaintiff's identity now, as part of the commencement of a lawsuit in which he seeks to rectify Vanderbilt's wrongs will only cause further anguish and distress.

6.      Importantly, Defendants are already aware of Plaintiff's and the complainant, Simon Roe's true identities. Therefore, there is no doubt that Defendants will have an unobstructed opportunity to conduct discovery, present their defenses and litigate this matter, regardless of whether Plaintiff is identified or proceeds anonymously.

7.      For all of these reasons, as well as those set forth in the accompanying motion, Plaintiff should be permitted to proceed anonymously in this action.

<<SIGNATURE PAGE TO FOLLOW>>

2

FURTHER AFFIANT SAITH NOT.

_____
**CORY R. MILLER**


STATE OF TENNESSEE   )

COUNTY OF DAVIDSON   )

     Personally appeared before me, the undersigned, a Notary Public, in and for said county and state, the within named Cory R. Miller, with whom I am personally acquainted (or upon the basis of satisfactory evidence presented to me), who, after being duly sworn, made oath that he executed the foregoing for the purposes therein contained.

     WITNESS my hand and official seal this 5th day of March, 2024.

**NOTARY PUBLIC**

My Commission Expires:

11-02-2024

3

## IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **PARKER POE,** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No.:** |
| | : | **JURY DEMAND (12)** |
| **v.** | : | |
| | : | |
| **DR. MELANIE LOWE, in her** | : | |
| **individual and official capacity, DR.** | : | |
| **JEREMY BOURGOIN, in his individual** | : | |
| **and official capacity, and** | : | |
| **VANDERBILT UNIVERSITY,** | : | |
| | : | |
| **Defendants.** | : | |

### ORDER FOR LEAVE TO PROCEED UNDER PSEUDONYM

Upon reading the accompanying motion for leave to file under pseudonym, supporting documents filed therewith, and good cause appearing,

IT IS SO ORDERED that Plaintiff is granted leave to file under pseudonym in this action under the pseudonym "PARKER POE" and that the caption shall remain as such above.

ORDERED, that the parties, their attorneys, and agents shall refrain from publishing Plaintiff's true identity.

ORDERED, that all papers filed in this action, all judgments, orders and decisions, notices to the Court and other documents shall refer to Plaintiff under the pseudonym PARKER POE.

IT IS SO ORDERED.

_____
**PRESIDING JUDGE OF THE TWENTIETH
JUDICIAL DISTRICT**

1

**APPROVED FOR ENTRY:**


**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Parker Poe*

By: /s/ *Tara J. Davis*
**Tara J. Davis (*Pro Hac Vice* forthcoming)**
**Stuart Bernstein (*Pro Hac Vice* forthcoming)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**tdavis@nmllplaw.com**
**sbernstein@nmllplaw.com**


and


By: /s/ *Cory R. Miller*
**Cory R. Miller**
**TN BPR No. 034770**
**Jacob E. Moses**
**TN BPR No. 041637**
**Brewer Krause Brooks Chastain & Meisner,**
**PLLC**
**545 Mainstream Drive, Suite 101**
**Nashville, Tennessee 37228**
**(615) 630-7745**
**(615) 630-7742**
**cmiller@bkblaw.com**
**jmoses@bkblaw.com**

2

# IN THE CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **PARKER POE,** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No.:** |
| | : | **JURY DEMAND (12)** |
| **v.** | : | |
| | : | |
| **DR. MELANIE LOWE, in her** | : | |
| **individual and official capacity, DR.** | : | |
| **JEREMY BOURGOIN, in his individual** | : | |
| **and official capacity, and** | : | |
| **VANDERBILT UNIVERSITY,** | : | |
| | : | |
| **Defendants.** | : | |

## ORDER FOR LEAVE TO PROCEED UNDER PSEUDONYM

Upon reading the accompanying motion for leave to file under pseudonym, supporting documents filed therewith, and good cause appearing,

IT IS SO ORDERED that Plaintiff is granted leave to file under pseudonym in this action under the pseudonym "PARKER POE" and that the caption shall remain as such above.

ORDERED, that the parties, their attorneys, and agents shall refrain from publishing Plaintiff's true identity.

ORDERED, that all papers filed in this action, all judgments, orders and decisions, notices to the Court and other documents shall refer to Plaintiff under the pseudonym PARKER POE.

IT IS SO ORDERED.

_____
**PRESIDING JUDGE OF THE TWENTIETH JUDICIAL DISTRICT**

1

**APPROVED FOR ENTRY:**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff Parker Poe*

By: */s/ Tara J. Davis*
**Tara J. Davis (*Pro Hac Vice* forthcoming)**
**Stuart Bernstein (*Pro Hac Vice* forthcoming)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
**tdavis@nmllplaw.com**
**sbernstein@nmllplaw.com**

and

By: */s/ Cory R. Miller*
**Cory R. Miller**
**TN BPR No. 034770**
**Jacob E. Moses**
**TN BPR No. 041637**
**Brewer Krause Brooks Chastain & Meisner,**
**PLLC**
**545 Mainstream Drive, Suite 101**
**Nashville, Tennessee 37228**
**(615) 630-7745**
**(615) 630-7742**
**cmiller@bkblaw.com**
**jmoses@bkblaw.com**

2

COPY

CIRCUIT COURT SUMMONS                                        NASHVILLE, TENNESSEE

Service ID 419884

# STATE OF TENNESSEE
# DAVIDSON COUNTY
# 20TH JUDICIAL DISTRICT

POE, PARKER

                                                    CIVIL ACTION
                                                    DOCKET NO. 24C548
                                                    Method of Service:
                                Plaintiff            Personal Service

vs.

VANDERBILT UNIVERSITY
305 KIRKLAND HALL
C/O GENERAL COUNSEL
NASHVILLE, TN 37240

                                Defendant

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in the Circuit Court, 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303 , and your defense must be made within thirty (30) days from the date this Summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the Complaint.

ISSUED:  03/07/2024

                                                    JOSEPH P. DAY
                                                    Circuit Court Clerk
                                                    Davidson County, Tennessee

                                        By:  _S.W._

                                             _____
                                             Deputy Clerk

ADDRESS OF PLAINTIFF'S ATTORNEY OR PLAINTIFF:

CORY MILLER
545 MAINSTREAM DRIVE
SUITE 101
NASHVILLE, TN 37228-1209

---

NOTICE TO THE DEFENDANT:

Tennessee law provides a Ten Thousand and 00/100 Dollars ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

---

 To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

rev. 09/01/2022

COPY

CIRCUIT COURT SUMMONS                                            NASHVILLE, TENNESSEE

Service ID 419884

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20ᵀᴴ JUDICIAL DISTRICT

POE, PARKER

Plaintiff

vs.

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
Personal Service

VANDERBILT UNIVERSITY
305 KIRKLAND HALL
C/O GENERAL COUNSEL
NASHVILLE, TN 37240

Defendant

### RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____ day of _____ _____ _____, 20___, I:

_____ served this Summons and Complaint/Petition on _____ in the following manner:
_____

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

_____
Sheriff/Process Server

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

rev. 09/01/2022

COPY

EFILED 03/07/24 05:39 PM CASE NO. 24C548 Joseph P. Day, Clerk

CIRCUIT COURT SUMMONS                                                    NASHVILLE, TENNESSEE

Service ID 419885

# STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20TH JUDICIAL DISTRICT

POE, PARKER

                                                    Plaintiff

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
  Personal Service

vs.

LOWE, MELANIE, INDIVIDUALLY AND OFFICIAL
CAPACITY
7419 LAKEVIEW DRIVE
NASHVILLE, TN 37209

                                                    Defendant

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in the Circuit Court, 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303 , and your defense must be made within thirty (30) days from the date this Summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the Complaint.

  ISSUED:  03/07/2024

                                          JOSEPH P. DAY
                                          Circuit Court Clerk
                                          Davidson County, Tennessee

                              By:  [signature]

                              _____
                                          Deputy Clerk

ADDRESS OF PLAINTIFF'S ATTORNEY OR PLAINTIFF:

  CORY MILLER
  545 MAINSTREAM DRIVE
  SUITE 101
  NASHVILLE, TN 37228-1209

---

**NOTICE TO THE DEFENDANT:**

Tennessee law provides a Ten Thousand and 00/100 Dollars ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

 To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

rev 09/01/2022

COPY

CIRCUIT COURT SUMMONS         NASHVILLE, TENNESSEE

Service ID 419885

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20™ JUDICIAL DISTRICT

POE, PARKER

                      Plaintiff

vs.

LOWE, MELANIE, INDIVIDUALLY AND OFFICIAL
CAPACITY
7419 LAKEVIEW DRIVE
NASHVILLE, TN 37209

                      Defendant

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
   Personal Service

Service ID 419885

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____day of _____ _____ _____, 20____, I:

_____ served this Summons and Complaint/Petition on _____ in the following manner:
_____

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

_____
                 Sheriff/Process Server

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

COPY

CIRCUIT COURT SUMMONS                                                    NASHVILLE, TENNESSEE

Service ID 419886

# STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20TH JUDICIAL DISTRICT

POE, PARKER

                                            Plaintiff

vs.

BOURGOIN, JEREMY, INDIVIDUALLY AND IN OFFICAL
CAPACITY
3901 WHITLAND AVENUE
UNIT 32
NASHVILLE, TN 37205

                                            Defendant

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
  Personal Service

Service ID 419886

To the above named Defendant:

You are summoned to appear and defend a civil action filed against you in the Circuit Court, 1 Public Square, Room 302, P.O. Box 196303, Nashville, TN 37219-6303 , and your defense must be made within thirty (30) days from the date this Summons is served upon you. You are further directed to file your defense with the Clerk of the Court and send a copy to the Plaintiff's attorney at the address listed below.

In case of your failure to defend this action by the above date, judgment by default will be rendered against you for the relief demanded in the Complaint.

                                              JOSEPH P. DAY
                                            Circuit Court Clerk
                                        Davidson County, Tennessee

ISSUED:  03/07/2024

                                      By:

                                            Deputy Clerk

ADDRESS OF PLAINTIFF'S ATTORNEY OR PLAINTIFF:

CORY MILLER
545 MAINSTREAM DRIVE
SUITE 101
NASHVILLE, TN 37228-1209

---

**NOTICE TO THE DEFENDANT:**

Tennessee law provides a Ten Thousand and 00/100 Dollars ($10,000.00) debtor's equity interest personal property exemption from execution or seizure to satisfy a judgment. If a judgment should be entered against you in this action and you wish to claim property as exempt, you must file a written list, under oath, of the items you wish to claim as exempt with the Clerk of the Court. The list may be filed at any time and may be changed by you thereafter as necessary; however, unless it is filed before the judgment becomes final, it will not be effective as to any execution or garnishment issued prior to the filing of the list. Certain items are automatically exempt by law and do not need to be listed; these include items of necessary wearing apparel (clothing) for yourself and your family and trunks or other receptacles necessary to contain such apparel, family portraits, the family Bible, and school books. Should any of these items be seized, you would have the right to recover them. If you do not understand your exemption right or how to exercise it, you may wish to seek the counsel of a lawyer.

---

 To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

# STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20ᵗʰ JUDICIAL DISTRICT

Service ID 419886

POE, PARKER

Plaintiff

vs.

BOURGOIN, JEREMY, INDIVIDUALLY AND IN OFFICAL
CAPACITY
3901 WHITLAND AVENUE
UNIT 32
NASHVILLE, TN 37205

Defendant

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
  Personal Service

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____day of _____ _____ _____, 20___, I:

_____ served this Summons and Complaint/Petition on _____ in the following manner:
_____

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

_____
Sheriff/Process Server

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

rev. 09/01/2022

COPY

CIRCUIT COURT SUMMONS                                    NASHVILLE, TENNESSEE

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20™ JUDICIAL DISTRICT

Service ID 419886

POE, PARKER

|                | CIVIL ACTION                |
|                | DOCKET NO. 24C548           |
Plaintiff        | Method of Service:          |
|                | Personal Service            |

vs.

BOURGOIN, JEREMY, INDIVIDUALLY AND IN OFFICAL
CAPACITY
3901 WHITLAND AVENUE
UNIT 32
NASHVILLE, TN 37205

Defendant

### RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____8th_____ day of _March_ _____, 20_24_, I:

_✓_ served this Summons and Complaint/Petition on _Jeremy Bourgoin_ in the following manner:
_personal service - delivery_

_____ failed to serve this Summons within 90 days after its issuance because _____

_____

Sheriff/Process Server

_Jacob Moses_        _545 Mainstream Dr_
                     _Suite 101_
                     _Nashville, TN 37228_

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

rev. 09/01/2022

COPY

CIRCUIT COURT SUMMONS                                    NASHVILLE, TENNESSEE

# STATE OF TENNESSEE
# DAVIDSON COUNTY
# 20TH JUDICIAL DISTRICT

Service ID 419885

POE, PARKER

                                                    Plaintiff

vs.

LOWE, MELANIE, INDIVIDUALLY AND OFFICIAL
CAPACITY
7419 LAKEVIEW DRIVE
NASHVILLE, TN 37209

                                                    Defendant

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
  Personal Service

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____ 8th _____ day of ___March___ _____, 20_24_, I:

___✓___ served this Summons and Complaint/Petition on _Melanie Lowe_____ in the following manner:
_personal service ~ delivery_

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

                                                    _____
                                                    Sheriff/Process Server
                                                    Jacob Moses      545 Mainstream
                                                                     Drive
                                                                     Suite 161
To request an ADA accommodation, please contact Trey Collier at (615) 880-3309   Nashville, TN 37228

rev. 09/01/2022

Service ID 419885

EFILED 03/11/24 03:06 PM CASE NO. 24C548 Joseph P. Day, Clerk

COPY

CIRCUIT COURT SUMMONS

NASHVILLE, TENNESSEE

Service ID 419884

## STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20TH JUDICIAL DISTRICT

POE, PARKER

CIVIL ACTION
DOCKET NO. 24C548
Method of Service:
Personal Service

Plaintiff

vs.

VANDERBILT UNIVERSITY
305 KIRKLAND HALL
C/O GENERAL COUNSEL
NASHVILLE, TN 37240

Defendant

### RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____18th_____ day of _March_ _____, 20_24_, I:

_✓_ served this Summons and Complaint/Petition on _Vanderbilt University_ in the following manner:
_personal service/hand delivery_

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

_____
                                    Sheriff/Process Server

Jacob Moses
595 Mainstream Dr, Suite 101
Nashville, TN 37228

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309

## IN THE FIRST CIRCUIT COURT FOR DAVIDSON COUNTY, TENNESSEE
### TWENTIETH JUDICIAL DISTRICT

| | | |
|---|---|---|
| PARKER POE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24C548 |
| | ) | |
| v. | ) | Judge Briley |
| | ) | |
| DR. MELANIE LOWE, in her | ) | JURY DEMAND |
| Individual and official capacity, DR. | ) | |
| JEREMY BOURGOIN, in his individual | ) | |
| And official capacity, and VANDERBILT | ) | |
| UNIVERSITY, | ) | |
| | ) | |
| Defendants. | ) | |

### NOTICE OF APPEARANCE

Mark A. Baugh, Ryan P. Loofbourrow, and Katie Dwyer enter their appearances as attorneys of record on behalf of Defendants.

Respectfully submitted:

*/s/ Ryan P. Loofbourrow*

Mark A. Baugh (#15779)
Ryan P. Loofbourrow (#33414)
Katie Dwyer (#39090)
BAKER DONELSON BEARMAN CALDWELL
    & BERKOWITZ, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
(615) 726-5600
rloofbourrow@bakerdonelson.com
mbaugh@bakerdonelson.com
kdwyer@bakerdonelson.com

*Counsel for Defendants*

1

COPY

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on March 12, 2024 via email on the following:

Tara J. Davis (*Pro Hac Vice*)
Stuart Bernstein (*Pro Hac Vice*)
363 Seventh Avenue, Fifth Floor
New York, NY 10001
tdavis@nmllplaw.com
sbernstein@nmllplaw.com

Cory R. Miller (#034770)
Jacob E. Moses (#041637)
Brewer Krause Brooks Chastain &
Meisner, PLLC
545 Mainstream Drive, Suite 101
Nashville, TN 37228
cmiller@bkblaw.com
jmoses@bkblaw.com

*Attorneys for Plaintiff*

*/s/ Ryan P. Loofbourrow*
Ryan P. Loofbourrow

2

COPY

CIRCUIT COURT SUMMONS                                    NASHVILLE, TENNESSEE

Service ID 419884

# STATE OF TENNESSEE
## DAVIDSON COUNTY
## 20ᵀᴴ JUDICIAL DISTRICT

POE, PARKER

|  | CIVIL ACTION |
|  | DOCKET NO. 24C548 |
|  | Method of Service: |
|  | Personal Service |

Plaintiff

vs.

VANDERBILT UNIVERSITY
305 KIRKLAND HALL
C/O GENERAL COUNSEL
NASHVILLE, TN 37240

Defendant

## RETURN ON PERSONAL SERVICE OF SUMMONS

I hereby certify and return that on the _____ *18ᵗʰ* _____ day of *March* _____, 20*24*, I:

____✓____ served this Summons and Complaint/Petition on *Vanderbilt University* _____ in the following manner:
_____ *personal service/hand delivery* _____

_____ failed to serve this Summons within 90 days after its issuance because _____
_____

_____
                                    Sheriff/Process Server

*Jacob Moses*
*595 Mainstream Dr, Suite 101*
*Nashville, TN 37228*

To request an ADA accommodation, please contact Trey Collier at (615) 880-3309