# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **PARKER POE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:24-CV-00368** |
| | ) | **JURY DEMANDED** |
| **DR. MELANIE LOWE, in her individual** | ) | |
| **and official capacity, DR. JEREMY** | ) | **Judge Crenshaw** |
| **BOURGOIN, in his individual and official** | ) | **Magistrate Judge Frensley** |
| **capacity, VANDERBILT UNIVERSITY,** | ) | |
| **NEIL JAMERSON, in his individual and** | ) | |
| **official capacity, LISA CLAPPER, in her** | ) | |
| **Individual and official capacity,** | ) | |
| **DR. JAMIE BOJARSKI, in her individual** | ) | |
| **and official capacity, and** | ) | |
| **DR. CYNTHIA PASCHAL, in her** | ) | |
| **Individual and official capacity.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

Comes now Plaintiff, Parker Poe[1] ("Plaintiff" or "Poe"), by and through their undersigned

counsel, and pursuant to Fed. R. Civ. P. 15, does hereby file their First Amended Complaint as a

result of learned additional information from sources, including, but not limited to, a review of

Plaintiff's FERPA records (official school records), and would respectfully allege as follows:

### THE NATURE OF THIS ACTION

1.      This action arises out of the voluminous number violations by individuals and the

University that are supported by a plethora of evidence, much of which was hidden from Plaintiff

at the critical time of their disciplinary hearings and appeal. Violations include holding Plaintiff

---

[1] Poe is a pseudonym by Court order when this matter was initiated in the Davidson County
Circuit Court.

responsible for actions they did not do and actions they were never even charged with and therefore could not properly defend; withholding critical information and evidence from Plaintiff that will demonstrate the University's accountability process was conducted with non-prescribed procedures that were "designed to influence the decision"; a process impacted by external influence combined with clear bias that caused a multitude of breaches to favor Brady Chitkara, specifically to appease his father, Nevin Chitkara, to the detriment of Plaintiff.

2.      The blatant breaches and violations were numerous and include but are not limited to, procedural violations; breaches of contract; state, contractual, and federal privacy breaches; defamation; contractual and federal discriminatory and retaliatory actions; and arbitrarily excessive sanctions imposed on Plaintiff resulting from and following the Vanderbilt University Office of Student Accountability, Community Standards, & Academic Integrity ("Student Accountability") issuing a finding that Plaintiff violated provisions of its Student Handbook ("the Handbook") and other policies.

3.      The evidence will show intentional, reckless and negligent treatment of Plaintiff on a specific occasion causing a life threatening and life altering situation. Further intentional, reckless and negligent treatment through knowingly false statements and policy and law breaching violations has continued against Plaintiff well into May 2024.

4.      Vanderbilt University and its officials have acted in a dishonest and biased manner in order to preserve a personal stake in the outcome, such that is no longer "entitled to presumption of honesty and integrity with respect to academic discipline" which the court could normally afford "Institution officials in [this] highly sophisticated academic discipline". Defendants acted in a manner that was intentional, reckless, malicious, and/or negligent that caused harm to Plaintiff. The conduct for which Plaintiff was found responsible and disciplined related to posts made by

Plaintiff to a social media platform during a brief period of time in April 2022, concerning allegations of sexual assault committed by another Vanderbilt student.

5.     Rather than acknowledge that Plaintiff's actions had the objective of bringing further attention to the prevalent issue of sexual violence and drugging on Vanderbilt's campus, which had been specifically encouraged and endorsed by various groups and students within the University because of the ongoing issues, Vanderbilt treated Plaintiff as the sole perpetrator, which Vanderbilt knew to be false, imposed an excessively disproportionate sanction against Plaintiff while failing to even investigate others for the same alleged offenses, and found Plaintiff responsible for actions of others.

6.     Vanderbilt allows and condones the very conduct Plaintiff was found responsible for. Not only did Vanderbilt admit to monitoring social media sites, including one referenced in this First Amended Complaint, never once did it seek to have any posts removed related to sexual assault allegations that were made against Brady Chitkara and other Vanderbilt students. Additionally, after Vanderbilt was notified at least twice about specific posts being made about Brady Chitkara other students, Vanderbilt took no action whatsoever to warn students or even ask them to cease making such posts.

7.     Vanderbilt is the same University that in 2013 had four football players (undergraduate students) charged with, among other crimes, Class A Felony Aggravated Rape of an unconscious undergraduate student. Three of the four football players (undergraduate students) were tried and convicted of Class A Felony Aggravated Rape and are presently serving 15 – 17 years in the Tennessee Department of Corrections. The fourth football player pleaded guilty to Class B Felony Facilitation of Aggravated Rape and was sentenced to 10 years' probation and must register as a lifetime sex offender. A fifth Vanderbilt University football player

(undergraduate student) pleaded guilty to Class A Misdemeanor Accessory After the Fact and admitted to helping attempt to cover up the criminal actions of four Vanderbilt University football players (undergraduate students).

8.      Despite this horrific stain to the Vanderbilt campus, and despite the University supposedly fostering an environment of speaking out against sexual assault, Vanderbilt treated Plaintiff as a pariah and as if Plaintiff was a perpetrator instead of a person seeking to be bring this issue to light while simultaneously letting off everyone else that engaged in the same actions.

9.      Vanderbilt's improper actions, including in finding Plaintiff responsible for violations of its policies and imposing the unwarranted "extreme" sanction of suspension will result in lifelong ramifications to Plaintiff's future educational and career endeavors, in addition to other damages.

## THE PARTIES

10.     At all times relevant to this First Amended Complaint, Plaintiff was and is a natural person, citizen of the United States, and resident of a state in the Northeast.

11.     At all times relevant to this First Amended Complaint, Dr. Melanie Lowe ("Defendant Lowe") was and is an Associate Professor of Musicology at Vanderbilt University and issued the appeal application decision in Plaintiff's case. Based upon information and belief, Dr. Lowe is a citizen and resident of Davidson County, Tennessee.

12.     At all times relevant to this First Amended Complaint, Dr. Jeremy Bourgoin ("Defendant Bourgoin") was and is the Director of Student Accountability, Community Standards, and Academic Integrity at Vanderbilt University and was the investigator and adjudicator in Plaintiff's case. Based upon information and belief, Defendant Bourgoin is a citizen and resident of Davidson County, Tennessee.

13.     At all times relevant to this First Amended Complaint, Defendant Vanderbilt University ("Vanderbilt" or the "University") was and is a private research university, located in Nashville, Davidson County, Tennessee.

14.     At all times relevant to this First Amended Complaint, Defendant Neil Jamerson, ("Defendant Jamerson") formerly served in the role of Assistant Dean of Students, Community Standards and Support at Vanderbilt University and currently holds the position of Associate Dean of Students, Community Standards and Support at Vanderbilt University. At all times relevant to the averments contained in this First Amended Complaint, Defendant Jamerson was the direct supervisor to Defendant Lisa Clapper ("Defendant Clapper") and Defendant Bourgoin. Based upon information and belief, Defendant Jamerson is a citizen and resident of Williamson County, Tennessee.

15.     At all times relevant to this First Amended Complaint, Defendant Clapper was and is the Director of the Student Care Network and Student Care Coordination at Vanderbilt University. Based upon information and belief, Defendant Clapper is a citizen and resident of Lee County, North Carolina.

16.     At all times relevant to this First Amended Complaint, Defendant Dr. Jamie Bojarski ("Defendant Bojarski") was and is the Executive Director of Student Access Service at Vanderbilt University. Based upon information and belief, Defendant Bojarski is a citizen and resident of Williamson County, Tennessee.

17.     At all times relevant to this First Amended Complaint, Defendant Dr. Cynthia Paschal ("Defendant Paschal") was and is the Senior Associate Dean for Undergraduate Students, School of Engineering, at Vanderbilt University. Based upon information and belief, Defendant Paschal is a citizen and resident of Davidson County, Tennessee.

<u>**JURISDICTION AND VENUE**</u>

18.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, which provides this Court jurisdiction over causes of action containing a Federal Question. This Court does not have diversity jurisdiction over this matter, however, pursuant to 28 U.S.C. § 1332.[2]

19.     This Court has personal jurisdiction over all Defendants as a substantial portion of the events discussed herein, including the acts and/or omissions of the Defendants, took place in the Middle District of Tennessee.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

*I.      BACKGROUND INFORMATION.*

20.     Plaintiff applied to and enrolled at Vanderbilt and paid all required fees and expenses since matriculating in 2020. Plaintiff chose to attend Vanderbilt because of its high national ranking and its reputation for academic excellence. During their time at Vanderbilt, Plaintiff has been a highly productive and accomplished student.

21.     In the Spring of 2022, Plaintiff took a semester off from Vanderbilt to prepare for and apply to a highly competitive and specialized internship opportunity. Plaintiff was ultimately offered the opportunity to work full time for a company located outside of Tennessee during the spring semester of the 2023 academic year, beginning in January of 2023; Plaintiff was also offered multiple other internship opportunities in the same field of work.

22.     Thus, during the second semester of their junior year, Plaintiff took another semester away from Vanderbilt. During this semester, in addition to working full time in a winter

---

[2] Plaintiff initially filed this action in Davidson County Circuit Court. Defendants removed this action on the basis of Federal Question jurisdiction but also heavily implied they could have removed this action on the basis of diversity jurisdiction even if no Federal Question jurisdiction existed. Such removal would have been improper because Plaintiff chose to file his action in the State Court of the State where Defendants are domiciled. See <u>Smith v. Baker Concrete Constr., Inc.</u>, No. 1:13-CV-207, 2014 U.S. Dist. LEXIS 105152, at *10 (E.D. Tenn. Mar. 28, 2014) ("[E]ven if there is complete diversity among the parties, the presence of a properly joined and served resident defendant bars removal.") (citations omitted).

internship, Plaintiff also participated in eighteen (18) credits worth of Vanderbilt approved courses, to remain on track with their educational requirements.

23.     Accordingly, Plaintiff was not present on Vanderbilt's campus at the time when the alleged misconduct took place, nor was Plaintiff on Vanderbilt's campus during the investigation and adjudication of the complaint made against Plaintiff. In 2023, Plaintiff was in the middle of internship and full-time employment application and interview processes.

## II.     VANDERBILT UNIVERSITY'S STUDENT HANDBOOK AND CONDUCT POLICIES

24.     The Student Accountability Mission Statement: "The student accountability system addresses student violations of University policy through fair, consistent, and confidential procedures." Plaintiff attaches Vanderbilt's Student Handbook for 2021-2022 (the "handbook") hereto as Exhibit A, and by attaching the handbook, it is incorporated into this First Amended Complaint as if fully stated herein pursuant to Fed. R. Civ. P. 10(c). Rather than recite the handbook verbatim herein, Plaintiff relies on the handbook as an exhibit to this First Amended Complaint.

25.     Plaintiff also attaches The University Standards of Conduct hereto as Exhibit B, and by attaching these, it is incorporated into this First Amended Complaint as if fully stated herein pursuant to Fed. R. Civ. P. 10(c). Rather than recite the handbook verbatim herein, Plaintiff relies on the handbook as an exhibit to this First Amended Complaint.

## III.     THE FACTS OF APRIL 2022.

26.     Beginning in the Spring of 2021, Plaintiff began to hear about a fellow Vanderbilt student, Brady Chitkara, and his involvement in various forms of misconduct.

27.     Over the subsequent year, Plaintiff learned that Brady Chitkara had been tied to allegations of sexual misconduct, students alleged they had been roofied at parties hosted by his

fraternity, he attempted to take advantage of diversity programs by misrepresenting his ethnicity, and his use of racial slurs.

28.     While Plaintiff and Brady Chitkara did not have any relationship, Plaintiff learned about his negative reputation from various credible sources, including other students and numerous posts made on social media sites, including, but not limited to, Yik Yak and Greek Rank

29.     April 2022 was recognized by Vanderbilt as Sexual Assault Awareness Month. As such, Plaintiff had read multiple articles in the Vanderbilt Hustler, a student-led newspaper sponsored by Vanderbilt, which discussed the importance of students standing up on behalf of sexual assault victims and being more proactive in preventing sexual assault on campus. The articles included various statements concerning sexual assault such as, but not limited to, the following:

> "I am far too used to seeing sexual assault be swept under the run and never mentioned again."

> "We need to create a system of accountability for perpetrators that goes beyond campus rules because when we rely on rules our attitudes fail to change. Sexual assault being on record doesn't drastically change how we treat one another on campus. We need to empower individuals to address the intricacies of sexism and sexual assault."

> "It's On Us…[The mission is] to make sure that we're raising awareness for this issue on college campuses, specifically, and then working collectively to call out problematic behavior."

> "VSG's (Vanderbilt Student Government) week of student action is an important step to begin the discussion around on-campus sexual violence. They also suggested ways in which it can lead to further action by the student body."

> "Alongside the current events in our nation, members of our student body have begun an extremely important conversation about our campus culture and the scourge of sexual violence, misogyny, racism, classism, homophobia, and transphobia perpetrated by members of the fraternity community…"

30.     Plaintiff was a sexual assault victim themself.  Both of Plaintiff's parents were also victims of sexual assault. Feeling a moral and ethical obligation to take a stand with victims of sexual assault, seeking to help ensure that those who engaged in such reprehensible conduct be held accountable, and in an effort to protect potential future victims, Plaintiff reposted to Yik Yak some of the posts that Plaintiff had seen on Greek Rank and Yik Yak about Brady Chitkara. Not once has Plaintiff made any social media posts concerning Brady Chitkara in any way on Greek Rank or any other social media website/app. Plaintiff only made posts concerning Brady Chitkara on Yik Yak for a very brief time, and Plaintiff only reposted previous posts he had seen made about Brady Chitkara on other social media platforms, including, but not limited to, Yik Yak and Greek Rank.

31.     Accordingly, during a handful of days in April of 2022, Plaintiff made posts to Yik Yak, some of which concerned reposting allegations of sexual assault and roofying that were allegedly committed by Brady Chitkara. For purposes of comparison, as part of the subsequent investigation against Plaintiff, Brady Chitkara provided approximately seventy-five (75) posts related to him (the vast majority of which were not made by Plaintiff), which did not even include the full universe of posts made about Brady Chitkara having committed sexual assault and drugging women, dating back to at least February 7, 2022. Many more posts were referenced by Brady Chitkara and his family that were never even provided as part of the investigation. However, Vanderbilt held these, and others, against Plaintiff.

32.     Plaintiff stopped posting on their own initiative, after a few days, and did not post anything about him at any other time. Notably, most of the posts made by Plaintiff took place over a two-day period in April 2022.

33.     Plaintiff genuinely believed that every statement Plaintiff posted, or reposted, about Brady Chitkara was truthful.

34.     This was further confirmed by the sheer number of posts made about Brady Chitkara, by individuals other than Plaintiff, in addition to the fact that neither he, nor his friends or fraternity members, responded to the posts to refute them, and he himself never directly refuted any of the sexual assault or roofying allegations, despite being fully aware of them.

35.     Plaintiff fully believed that Plaintiff was doing the right thing by bringing further attention to issues of public safety on campus, including sexual assault and drugging.

36.     Vanderbilt itself had explicitly advocated for students to report sexual assault and speak out for victims of sexual assault, with the University's Project Safe office acting as "a major resource and help to the account owner" of the VU Survivors Instagram page on which students report victims' stories of sexual assault, either anonymously or by publicly naming the accused.

37.     As of the date of this filing, the VU Survivors Instagram page still encourages and offers the accuser to anonymously post, while at the same time publicly naming an alleged assailant, regardless of whether a report was made with the University, the police, the Title IX office, or Project Safe, and regardless of whether any investigation has taken place into such allegations.

38.     Additionally, the Vanderbilt Office of Greek Life ("OGL") has acknowledged that it closely monitors content posted on Greek Rank. As part of this oversight, OGL has in the past issued public statements in response to certain inappropriate posts made on Greek Rank and has removed the posts. However, at no time did OGL either take down, or publicly condemn, any of the posts that related to Brady Chitkara, nor did they ever condemn anonymous posts of sexual assault allegations.

39.     Importantly, while the posts Plaintiff made about Brady Chitkara were limited to a brief period of time and were only made on Yik Yak, many other students posted about Brady Chitkara on both Yik Yak and on Greek Rank, beginning several months prior to April 2022, and continuing well into the Summer of 2022, several months after Plaintiff stopped posting.

40.     These posts, which numbered in the *hundreds* in total, in addition to responsive comments—all of which, upon information and belief, were monitored by Vanderbilt's OGL—referred to Brady Chitkara as having committed sexual assault, drugging women at his fraternity house, using racial slurs and cheating a diversity program.

## IV.     VANDERBILT'S DEFECTIVE AND BIASED INVESTIGATION AND ADJUDICATION PROCESS

### a.     External Influence, Bias, and Predetermined Decision

41.     On or about February 2022, Nevin Chitkara first contacted Defendant Jamerson to lodge a complaint on Brady Chitkara's behalf about social media posts concerning his son. No action was taken at that time by any Defendant. However, in the past when unacceptable social media posts were brought to Vanderbilt's attention, they had taken action by warning and informing the student body of culturally offensive or inappropriate anonymous online posting. However, Vanderbilt's lack of action allowed students to continue to use social media as a platform to call out sexual assault and other behaviors.

42.     Posts concerning allegations about Brady Chitkara continued in March and April on multiple social media sites, and on April 26, 2022, Nevin Chitkara once again contacted Defendant Jamerson and said that his son "had again been targeted on Yik Yak and Greek Rank and named as a rapist…[he does] not feel that VU has done enough to protect him, or other students from this type of cyberbullying and harassment. [He is] deeply concerned about the toxic culture that exists at Vanderbilt that allows the students to engage with each other in these ways online

and [does] not feel that the university has taken enough action to stop these types of activities from continuing ".

43.     Defendant Jamerson, Student Accountability, and Student Affairs took no action and outright ignored Nevin Chitkara's pleas altogether choosing not to inform or warn students of making said anonymous posts. Clearly Vanderbilt had no concerns of Handbook violations, otherwise they would have taken action as they did in the past when students were making racial slurs online. But in this case, sexual allegations and drugging posts were not against culture or policy. As a result, students continued this "acceptable" means of calling out Brady Chitkara for certain behaviors of which they were aware.

44.     As Vanderbilt refused to take any action whatsoever, Nevin Chitkara took other measures. In the Fall of 2022, Brady Chitkara commenced a civil action for defamation against numerous Doe defendants. In an effort to "unmask" those who had posted anonymously about him, Brady Chitkara served subpoenas upon Yik Yak, Greek Rank, and LinkedIn, requesting telephone numbers and information for the anonymous posters' accounts.

45.     After obtaining identifying information of several student posters through subpoenas in the alleged defamation action, Nevin Chitkara provided the identity of Vanderbilt students who had made posts concerning his son on his son's behalf to Defendant Jamerson on or before January 3, 2023. Nevin Chitkara additionally emailed a Complaint against multiple alleged posters, including Plaintiff.

46.     It was only at this time, after Defendant Jamerson was aware Brady Chitkara had retained counsel, did Defendant Jamerson decide to act on the very information he had nearly one year prior.

47.     This time, Nevin Chitkara demanded Vanderbilt take immediate action and demanded all posters who made posts concerning his son be severely punished. In fact, it was Nevin Chitkara who requested "remote" hearings to speed up the process, and Defendants Jamerson and Bourgoin complied with this request.

48.     It was later disturbingly learned the true and deep extent to which Nevin Chitkara was able to influence Defendant Jamerson that resulted in numerous material breaches of significant magnitude. Defendant Jamerson was clearly worried about his own repercussions as a result of Brady Chitkara now having retained counsel and that Defendant Jamerson had taken zero action whatsoever after Nevin Chitkara lodged at least two different complaints to him nearly one year prior and accused Vanderbilt of not protecting his son.

49.     To remove himself from the hot seat, Defendant Jamerson would proceed to commit multiple violations of Vanderbilt's standards and procedures, as well as have others commit multiple violations of Vanderbilt's standards and procedures in an effort to appease Nevin Chitkara and Brady Chitkara to the detriment of Plaintiff. It is noteworthy that Brady Chitkara's parents are financial donors to Vanderbilt.

50.     On or about January 3, 2023, in keeping with Defendant Jamerson's obvious commitment to partner with Nevin Chitkara and Brady Chitkara throughout this private and confidential process, Defendant Jamerson breached law and policies by providing Plaintiff's private and personal information to Nevin Chitkara, including the fact that Plaintiff was on a "personal" leave.

51.     Additionally, on January 3, 2023, Defendant Jamerson shared more information and informed Nevin Chitkara that he would reach out to the Title IX office to determine jurisdiction in this matter. In this same communication, Defendant Jamerson wanted to help Brady Chitkara's

family influence the outcome and told Nevin Chitkara, "[a] statement from [Brady Chitkara] on the personal impact to him as well as from your family regarding the costs and other challenges faced in responding to this <u>will be helpful to the end decision</u>. The adjudicating body will be in touch for [the impact statements] as part of its investigation". (Emphasis added).

52.     Given the nature of the allegations against Brady Chitkara, on the same day, January 3, 2023, Defendant Jamerson did in fact reach out to the Office of Sexual Misconduct, to address whether the allegations reported by Nevin Chitkara fell under the jurisdiction of Student Accountability or the jurisdiction of the Office of Sexual Misconduct. In Defendant Jamerson's correspondence, he acknowledged that multiple students, including female students, had been identified as having made the posts concerning Brady Chitkara and sexual assault. Further, in this communication, Defendant Jamerson acknowledged concern that one of the female students may allege they had been sexually assaulted by Brady Chitkara or were speaking on behalf of a victim.

53.     The very next day on January 4, 2023, Student Accountability "cut and pasted" the parts about Plaintiff out of Nevin Chitkara's email complaint, which was made on behalf of Brady Chitkara, that was made against multiple posters, and pasted them into an official Student Accountability generated Complaint only against Plaintiff.  As it turns out, a decision was made not to investigate the other posters and only investigate Plaintiff, despite the allegations, alleged impact on Brady Chitkara, the formal complaint emailed by Nevin Chitkara, and Nevin Chitkara's request that these other posters be punished severely. The decision not to investigate, and not even speak to the others, was despite the clear concern that one of these other posters could be a victim of Brady Chitkara.

54.     Defendant Jamerson did not want to determine whether or not the other posters, female posters, were victims of Brady Chitkara in order to protect him. Instead, only Plaintiff would be investigated. This was all hidden from Plaintiff.

55.     Nevin Chitkara wanted Defendants Jamerson and Bourgoin to find out if the other posters made the Greek Rank or other social media posts because he said he wanted to give his son "closure". But since these other posters were not being investigated and therefore not even asked if the other posters made any of these Greek Rank posts, in order for Brady Chitkara to get this requested "closure", Defendant Bourgoin chose to blame Plaintiff.

56.     Nevin Chitkara was never informed that other posters were not investigated. So not finding an "instigator", the person that was behind all the posting about Brady Chitkara, was a problem. Defendant Bourgoin admitted in an email he was not going to find out who made these and other posts. So, Plaintiff was secretly charged with them, found responsible for them, and Brady Chitkara was told Plaintiff made those posts, despite any evidence in support thereof, when Defendant Bourgoin told Brady Chitkara that Plaintiff was the "instigator". All of this was done without Plaintiff's knowledge but to give the requested "closure".

57.     Plaintiff was never made aware they were the only one being investigated, despite Plaintiff's request to know if Brady Chitkara reported the other posters. Defendant Bourgoin allowed Plaintiff to feel singled out by a student despite Plaintiff's expressed concerns about all the blame for posting being pinned only on them, which would allow Brady Chitkara to say none of the allegations were true because it would give the appearance to be one lone wolf, a male, who posted everything. Defendant Bourgoin never relieved Plaintiff of this concern. In fact, Defendants wanted Plaintiff to think this was the truth, as confirmed by their own false statements in their

Motion to Dismiss filed on May 3, 2024, when Defendants said that no complaint was filed against other posters and that only a complaint was filed against Plaintiff.

58.     As it turns out, Brady Chitkara never filed any Complaint; instead, it was his father that filed the Complaints on his son's behalf. Furthermore, Nevin Chitkara did file a complaint against the other posters, but it was Defendant Jamerson and/or Defendant Bourgoin who made the decision to single out Plaintiff. This was hidden from Plaintiff for over a year.

59.     Since Student Accountability did not open an investigation into any of the other students who had made posts concerning Brady Chitkara that had been identified by his father, Student Accountability had no place or file to keep Nevin Chitkara's complaint lodged against the other posters. As a result, it was dumped into Plaintiff's records and Plaintiff was charged as being responsible for posts that Plaintiff unequivocally did not make. This was not revealed to Plaintiff and covered up by one or more of the Defendants.

60.     Specifically, Defendants covered up the fact that Nevin Chitkara submitted a formal complaint against the other posters in their Motion to Dismiss filed on May 8, 2024, when they said no complaint was filed against the other posters. The Motion to Dismiss brazenly stated, "conversely, Plaintiff's Complaint is devoid of any facts regarding Student Accountability complaints made against the alleged female posters *that would have triggered a subsequent investigation (as was the case for Plaintiff)*. Rather, Plaintiff takes issue with the fact that Defendant Bourgoin failed to investigate the female posters **sua sponte**. Because Plaintiff's selective enforcement argument is based on the premise that he was 'punished more harshly' than female students during the investigation, it is effectively impossible for him to be 'similarly situated' to other students who were not under investigation **because there were no complaints made against them**." This statement presented by Defendants is simply not true.

61.    However, it should not have mattered if a formal complaint was not filed, because Vanderbilt's policy stated that if social media posting was "reported to Student Accountability" then the matter will be addressed through the Student Accountability process. Nevin Chitkara's complaint filed against two female posters was not addressed through the Student Accountability process as Vanderbilt stated it would.

62.    Also hidden from Plaintiff was a copy of the official Student Accountability generated Complaint. This is the Complaint in which Defendant Bourgoin "cut and pasted" portions of Nevin Chitkara's Complaint and created the official Student Accountability Complaint. This official Complaint included all of the February posts that Nevin Chitkara twice reported to Defendant Jamerson the year prior and additional Greek Rank posts made thereafter. This was hidden from Plaintiff during the investigation and during their appeal request, so Plaintiff could not properly defend nor appeal these added complaints/charges.

63.    On January 9, 2023, Student Accountability sent its first notice to Plaintiff, only communicating that certain charges had been brought against them.

64.    However, the initial notice to Plaintiff did not include any information about the identity of the reporting party, the precise allegations at issue, or the policy violations in question. As such, Plaintiff had no knowledge as to what alleged conduct this notice concerned other than the fact that on a scheduling phone call with Student Accountability, Plaintiff was informed that it did not have to do with anything related to academic integrity.

65.    *As it turns out*, Defendant Bourgoin did not yet know what charges he would be pursuing against Plaintiff and that's why Plaintiff was given no relevant information on January 9th. But in order to appease Nevin Chitkara, *there was a rush to schedule a meeting without even knowing what Plaintiff would even be charged with*.

66.     Student Accountability scheduled the meeting for January 12, 2023, to discuss the charges with Defendant Bourgoin, as a representative from Student Accountability.

67.     On January 11, 2023, Defendant Jamerson expressed his suspicion to Defendant Bourgoin that Plaintiff was responsible for making a multitude of social media posts concerning Brady Chitkara on Greek Rank, in which Defendant Jamerson said caused the most harm to Brady Chitkara in terms of job prospects. Defendant Jamerson made this unjust prejudgment despite having conducted no prior investigation but knowing that Defendant Bourgoin would be influenced by Defendant Jamerson's comments.

68.     The next morning, at approximately 9:45am on January 12, 2023, hours before Plaintiff first met with Student Accountability to receive their formal charges, Student Accountability made the decision to include an additional charge against Plaintiff: impersonation.

69.     In this same communication, Defendant Jamerson suggested "if we want to make [out] more than we do and add that to the impersonation charge as well" and he then referred to an allegation by a Belmont woman. Defendant Jamerson then told Defendant Bourgoin that Captain Tony Meadows from the Vanderbilt University Police Department ("VUPD") has a file with evidence. Defendant Jamerson was attempting to influence Defendant Bourgoin to support charges to match his predetermined sanction and match Nevin Chitkara's demand of inflicting the severest punishment possible.

70.     In this same communication, Defendant Bourgoin said he added the Greek Rank posts into Plaintiff's packet of evidence and said they will see if Plaintiff denies it. Defendant Jamerson responded, again demonstrating his predetermined judgment, and said, "[Plaintiff] will just fess up or [they'll] double down and argue [they] heard it from a friend". Without even speaking to Plaintiff, Defendant Jamerson had already concluded Plaintiff was responsible and

conveyed that predetermined conclusion to the person responsible for conducting the investigation.

71.     This significantly influenced Defendant Bourgoin, because even when Defendant Bourgoin expressed concerns to Defendant Jamerson about working outside of the rules or process, in the end, Defendant Bourgoin complied and in fact disregarded those rules and law.

72.     On January 12, 2023, at approximately 2:00pm, Plaintiff met with Defendant Bourgoin to receive some notice of some of the charges being investigated by Student Accountability.

73.     Nevin Chitkara remained heavily involved in the process, and his heavy involvement in the process – despite not being a student of Vanderbilt – significantly influenced the process.

74.     On January 13, 2023, Defendant Bourgoin sent Nevin Chitkara an email communication thanking him for his continued involvement in Plaintiff's disciplinary investigation and again soliciting "impact statements" from him.

75.     On January 19, 2023, Nevin Chitkara provided the family impact statement to Defendant Bourgoin and requested an estimated timeframe for the outcome of the decision on Plaintiff's investigation. He also asked "more importantly" when would the other posters be contacted. One reason he gave is he wanted Vanderbilt to speak to the other posters before his attorney did and he also said he would modify the impact statements for the others as part of the disciplinary process.

76.     Therefore, it was clear at this point, Defendant Jamerson or Bourgoin had not yet informed Nevin Chitkara that Vanderbilt only intended to investigate Plaintiff and had made the

affirmative decision to avoid investigating the female posters, despite the Complaint that was filed against them.

77.    Defendant Bourgoin separately expressed his concern to Defendant Jamerson about the impropriety of the father's continued involvement in Plaintiff's disciplinary investigations. Specifically, Defendant Bourgoin expressed concern with the use of impact statements in Plaintiff's disciplinary proceedings by communicating the following: "we've never had anyone give impact statements and **they aren't prescribed in any of our processes, but I know you raised them with the family**" and "if it's being considered evidence, then [Plaintiff] needs to see them. **Because it is designed to influence the decision**, by demonstrating the impact, I think an accused would have to know these were reviewed." (Emphasis added).

78.    Notably, although Defendant Bourgoin had these impact statements on or around January 19, 2023, he withheld them from Plaintiff for many weeks. When Plaintiff finally was given the opportunity to review and analyze them, Plaintiff expressed concern that Defendant Bourgoin had these unchallenged statements for so long, which could result in bias, without Plaintiff having a timely opportunity to address and reply to them and the falsehoods contained within.

79.    In this same January 19, 2023, communication, Defendant Bourgoin expressed concern that he thought Nevin Chitkara wanted them to release the outcome decision to him. Defendant Bourgoin admitted "[they] aren't going to tell them the outcome…at most we would say is that the process is concluded and the **person has been held accountable**". (Emphasis added). This is proof of Vanderbilt's predetermined conclusion without any investigation whatsoever.

80.     Then Defendant Bourgoin informed Defendant Jamerson that this situation does not qualify, by law, for informing Brady Chitkara that Plaintiff will be held accountable when he said, "[he doesn't] intend to share really more than that it is completed when I do finish with [Plaintiff]". As evidence will show, just a couple months later, "someone" influenced Defendant Bourgoin to reverse course, break the law, and share the very information he said he would not.

81.     Equally disturbing is Defendant Bourgoin admitted that "anything we give them is going to be used in the legal process". The subsequent decision for Defendant Bourgoin to breach federal and state law and the Vanderbilt contract, was in an effort to aid in Brady Chitkara's lawsuit against Plaintiff and further harm Plaintiff. Defendant Bourgoin was also correct that the March 9, 2023, letter he sent to Brady Chitkara was in fact used in the legal process.

82.     On January 19, 2023, Defendant Bourgoin also expressed concern to Defendant Jamerson that Nevin Chitkara is "pointedly asking" when the other posters will be investigated. Defendant Bourgoin was looking for guidance as to when and how Nevin Chitkara would be notified the others would NOT be investigated. Defendant Bourgoin was worried and asked, "should I run a response through OGC [Office of General Counsel] given all of the layers in how that response can or will be used?"

83.     By continuing to involve Nevin Chitkara after the initial complaint was filed and permitting him to influence the outcome of the investigation and overall disciplinary process, Defendants Jamerson and Bourgoin, on behalf of Vanderbilt, acted in contradiction to their own standards designed to promote fairness in the process and just findings, as set out in the student accountability Handbook and policies.

84.     Based upon Plaintiff's own experience in filing two Student Accountability complaints against Brady Chitkara and receiving zero feedback whatsoever, it was surprising to

learn in March 2024 that Defendant Jamerson and Defendant Bourgoin were directing Nevin Chitkara to help strengthen his complaint, were continually communicating with him and encouraging communications, and were even complying with Nevin Chitkara's requests and demands. Therefore, Plaintiff wanted to find out if this was in fact the standard process for when a *parent* filed a complaint with Student Accountability.

85.     Plaintiff's mother called Student Accountability on April 19, 2024 and was informed that not only should a General Incident Report be submitted (as opposed to phone calls and an email complaint that Nevin Chitkara submitted which was accepted without question), but Plaintiff's mother was informed Student Accountability "do[es] not engage with [a parent]" at all after a parent submits a complaint, unless clarification of any complaint substance is required. Student Accountability further confirmed that the parent would not be informed of any outcome. Despite this clear process of not engaging with a parent, Defendant Jamerson and Defendant Bourgoin continued to ignore Vanderbilt's policies and engage and partner with Nevin Chitkara for months.

86.     Despite acknowledging that the external influence, including the impact statements, which was present in Plaintiff's disciplinary proceedings, was outside the scope of the Student Accountability processes set forth in the Handbook, Student Accountability continued to allow such external influence to shape the course of Plaintiff's investigation and the ultimate disciplinary decisions and maintained communications with Nevin Chitkara. This was hidden from Plaintiff.

87.     Notably, on one known occasion, February 23, 2023, Defendant Jamerson asked Defendant Bourgoin when Plaintiff's investigation would be concluded. Only one hour later, Defendant Jamerson emailed him again and said, "[Brady Chitkara's] dad has questions about

when the matter will be concluded. I'm going to respond to him and hand him off to you at that point. If he has other questions, feel free to redirect him".

88.     It was additionally clear early on that Defendant Bourgoin had already made up his mind and the outcome was predetermined by his own body language when he kept his arms folded and would roll his eyes. Defendant Bourgoin barely listened to Plaintiff, as Plaintiff had to repeat things and overly explain basic information. Defendant Bourgoin defended Brady Chitkara and defended the other posters that he never even spoke to (i.e., when he said, they would just say they posted because you did); and challenged everything Plaintiff said, while simultaneously blocking Plaintiff from evidence and information being used against Plaintiff.

89.     This impeded Plaintiff's ability to properly present facts., thus forcing Plaintiff to prepare a lengthy written document with the hopes of at least documenting the facts for an eventual appeal, hoping to count on the contractually required unbiased appellate review. But as it turns out, Mr. Jamerson's involvement and influence continued with the Appellate Review Board, as will be discussed later, ***thus*** Plaintiff never had a chance of any unbiased review at any stage of this matter.

   **b.     *Failure to Provide Plaintiff Notice of all Charges and thus Preventing a Complete Defense.***

90.     In addition to Plaintiff not being made aware of all the charges against them, Plaintiff was provided incorrect definitions to defend against or no definitions at all.

91.     Plaintiff learned that Plaintiff was alleged to have violated three provisions of the Student Handbook: (i) harassment; (ii) disorderly conduct; and (iii) impersonating a University official or any other person.

92.     Yet, upon receiving this information, Plaintiff realized that neither "disorderly conduct" nor "impersonating a University official or any other person" were defined in the Handbook.

93.     As such, Plaintiff sought clarification from Defendant Bourgoin as to the precise meaning of these two charges. However, Defendant Bourgoin failed to provide any clarity, explaining that "disorderly conduct," could mean anything he wanted it to, because "disorderly conduct is basically anything that could be considered disorderly."

94.     As for the definition of impersonation, Defendant Bourgoin refused to respond to Plaintiff's question and never provided an answer on the definition of this charge, leaving Plaintiff to question how Plaintiff was to put forth a defense against charges that lacked any clear definition.

95.     Concerning the charge of harassment, when Plaintiff sought clarity on the definition during one of Plaintiff's earlier meetings with Defendant Bourgoin in January 2023, Defendant Bourgoin explicitly referred to language used to define harassment under the University's Title IX policy, which differs in crucial ways from a charge of harassment as defined in a Student Accountability case.

96.     Specifically, he referred to any behavior that reasonably impacts someone's opportunity to get an education, actions that create an environment such that the student feels as though they can no longer remain enrolled in school, and other factors that contribute to an environment in which the student feels as though they cannot be safe on campus.

97.     This description was lifted from the Title IX policy's definition of a hostile environment claim. At least twice, Defendant Bourgoin made specific reference to Title IX and its definition.

98.     That Defendant Bourgoin referenced the Sexual Misconduct policy definition of harassment in response to Plaintiff's inquiry regarding the violations Plaintiff was facing, raised serious concerns about whether the proper definition was applied in reaching the ultimate decision in this matter.

99.     Moreover, the fact that the student conduct definition of harassment was recently changed (after the 2019-2020 academic year) to impose a significantly narrower definition, demonstrates the University's clear intent to use the current definition as opposed to the aforementioned definition taken from Title IX law; and as will be demonstrated, no evidence existed to demonstrate that this new, narrow definition was met.

100.    Specifically, posting, as per the definition does not in itself equate to harassment, and specific damages are prerequisites. Thus in order to possibly meet the definition of harassment, Plaintiff needed to have made significantly more posts, thus the reason, as will be demonstrated below, Plaintiff was held responsible for posts they never made. The problem is, this was all hidden from Plaintiff, so they were denied the opportunity to get an Appeal on this critical breach and fact.

101.    Although Plaintiff was only informed they were charged with allegedly making posts on one social media site, Yik Yak, Plaintiff was shown numerous Greek Rank posts. Despite Plaintiff asking Defendant Bourgoin whether or not Plaintiff was being charged with these as well, Defendant Bourgoin refused to answer and would instead switch topics.

102.    Plaintiff even asked if the evidence Plaintiff provided to prove they did not make these Greek Rank posts was being disputed, but Defendant Bourgoin would not answer this simple question. As Plaintiff learned months after when it was too late, Defendant Bourgoin did in fact hold Plaintiff accountable for making these posts on this "second " social media site. This will be

described later, but the fact remains, Plaintiff did not know before the entire process concluded that they were charged with and even held liable for these posts.

103.    This specific evidence is critical because Plaintiff was also unaware that they were specifically charged with instigating the entire matter and never made aware they were actually found responsible for instigating the entire matter. This was learned months later via a copy of a letter that Defendant Bourgoin emailed to Brady Chitkara. As a result, Plaintiff was blocked from a proper defense on the charge of instigator.

104.    Additionally, the Appellate Chair assigned a new charge to Plaintiff and found them responsible for "disrupting the civility of the community". Plaintiff never saw this prior and therefore was denied an opportunity to defend. Adding a charge with the word "disrupt" also gave Defendant Lowe latitude and justification to have it fit the punishment she knew she needed to justify rubber stamping the decision. Notably, 173 Vanderbilt faculty members agreed, in a public petition they signed on or about April 2024, that said using the term "disrupt" in student conduct charges is "perniciously vague and expansive". It will be shown that Mr. Jamerson remained involved in this process as he communicated with the Appellate Review Board.

105.    Even now, well over a year later on May 8, 2024, Plaintiff even learned of additional posts they were charged with and found accountable for, but never informed of: Vanderbilt's Motion to Dismiss filed on this date states, "*Plaintiff's posts* included allegations that [Brady Chitkara] 'commit[ed] sexual assault, drugg[ed] women at his fraternity house, cheat[ed] a diversity program, and us[ed] racial slurs.'" The investigative record will prove Plaintiff was not knowingly charged with these posts and was not even shown all of these posts. Yet now Plaintiff learned they were found responsible for them without any shred of evidence, and evidence to the contrary.

### c. Failure to Conduct an Impartial, Fair and Thorough Investigation.

106. The investigative process that followed consisted of meetings between Defendant Bourgoin and Plaintiff via Zoom, during which Defendant Bourgoin would have Plaintiff read the allegations, "impact statements", or other documents on the Zoom screen.

107. Defendant Bourgoin demonstrated additional bias against Plaintiff and his predetermined finding of responsibility when he prevented Plaintiff from obtaining critical evidence and refused witness testimony, accepted Brady Chitkara's allegations without question while disregarding Plaintiff's account, and failed to conduct a thorough and meaningful investigation.

108. Since credibility was in fact an issue in the determination, as stated in the first hearing in January 2023, and further by the Appellate Chair, these were severe and harmful contract violations.

109. First, Defendant Bourgoin prevented Plaintiff from obtaining critical witnesses and evidence when he failed to speak with any of the other students that made posts online regarding Brady Chitkara, and despite Plaintiff's multiple requests that he do so. For several months prior to, and several months after April 2022, various other students posted about Brady Chitkara on both Yik Yak and on Greek Rank.

110. These posts, which numbered in the *hundreds*, referred to Brady Chitkara as having committed sexual assault, drugging women at his fraternity house, cheating a diversity program, and using racial slurs.

111. None of these posts were made by Plaintiff, yet this information was nonetheless material to Plaintiff's case as the students who did make those posts on multiple social media platforms could have corroborated the content of the posts concerning Brady Chitkara. Since

Brady Chitkara initiated a lawsuit in court, students not named in the subpoena results could not be counted on to come in and tell the truth and recall all the facts leading up to posts made an entire year prior, for fear of being dragged into litigation. Speaking to the known posters, those that were unmasked, was the only chance to obtain credible witness testimony.

112.     Plaintiff repeatedly asked Defendant Bourgoin to speak to these witnesses, the other posters, and Defendant Bourgoin refused. Defendant Bourgoin was not transparent and would not even admit to Plaintiff that he was in fact aware of the names of the other posters, in an effort to successfully deny Plaintiff these witnesses. The Handbook process requires identified witnesses to be interviewed. Defendant Bourgoin's failure to contact and interview these witnesses, or at minimum to provide their contact information to Plaintiff, was a significant material error. In fact, Defendant Bourgoin chose to deliberately wait to informally speak to these people until at least two (2) weeks after issuing the outcome decision to Plaintiff, which proved he did have their identities, so not speaking to them during Plaintiff's investigation was a choice. However, Plaintiff did not discover this fact until months after the appeal was improperly denied.

113.     Though there was no question that Plaintiff had only posted about Brady Chitkara on Yik Yak on specific dates, Defendant Bourgoin improperly attributed the posts made about Brady Chitkara on Greek Rank (and others on Yik Yak) to Plaintiff as well.

114.     At the time, it was unclear from Defendant Bourgoin as to whether the complaint had even accused Plaintiff of posting about him on Greek Rank, Plaintiff nonetheless attempted to put forth a defense against this charge as well. Plaintiff provided Defendant Bourgoin with the name of at least one individual who had posted about Brady Chitkara, one whose IP address was obtained from the subpoena served on Greek Rank as part of Brady Chitkara's civil suit, and the

name of another college student whose name was obtained from a subpoena to LinkedIn plus additional IP addresses of posters.

115. Defendant Bourgoin never sought to speak with these individuals, never asked Brady Chitkara about his relationship to any of these individuals, never spoke with anyone from his fraternity, nor did Defendant Bourgoin even request that Brady Chitkara provide him with a complete and full copy of every post made about him on social media between January and June of 2022, despite Plaintiff's requests and Brady Chitkara's own evidence acknowledging dozens of other posts predating Plaintiff's.

116. The failure to interview all relevant witnesses was a critical procedural error, not only because it resulted in an incomplete and biased investigation, but also because it deprived Plaintiff of the ability to establish that Plaintiff's limited actions did not cause the requisite alteration in the conditions of Brady Chitkara's education or participation in a University program or activity sufficient to establish a harassment claim and it would corroborate the fact that Plaintiff reposted already made posts.

117. Further, Defendant Bourgoin's failure to provide information to Plaintiff about the other posters' identities precluded Plaintiff from: (i) establishing that Plaintiff was not responsible for the majority of the posts made about Brady Chitkara, (ii) demonstrating that the other students who posted about Brady Chitkara were not even investigated and received absolutely no sanctions, (iii) showing that the posts that Plaintiff did make did not on their own cause any specific harm to Brady Chitkara and (iv) deprived Plaintiff from evidence that could have corroborated posts.

118. Similarly, Defendant Bourgoin refused to examine the validity of the other posts made about Brady Chitkara, as evidenced by his failure to interview other students, including

members of Brady Chitkara's fraternity, to obtain information about whether the statements made about Brady Chitkara's conduct were true.

119.    Incredibly, despite Plaintiff's requests, Defendant Bourgoin never once asked Brady Chitkara the obvious question: were there any sexual assault allegations made against him at any time? This question was obvious because nowhere in Brady Chitkara's lengthy "impact statement" did he ever claim that there were never any allegations against him. Plaintiff requested that Defendant Bourgoin pose this exact question to Brady Chitkara on multiple occasions, however, in an effort to defend him, Defendant Bourgoin failed to do so, again accepting Brady Chitkara's claim that such allegations were not true.

120.    Shockingly, as later learned, there was a concern documented in an early January 2023 email that included Mr. Jamerson and the Title IX Office, that one of the posters could be a victim of Brady Chitkara's or could be speaking on behalf of a friend. Despite Vanderbilt's own clear concern that information about allegations against Brady Chitkara could surface, Defendant Jamerson made a swift decision to not investigate the other posters, about their knowledge about the truth of the allegations. The possibility of learning such disparaging information about Brady Chitkara had to immediately be quashed. As such, Defendant Bourgoin continued this blocking of critical questions and evidence by witnesses.

121.    Instead of asking Brady Chitkara critical questions, let alone any questions at all, Defendant Bourgoin accepted all of his written statements as true in order to find him credible, and to find Plaintiff solely responsible for the alleged violations. As proven by the Appeal denial, credibility was in fact a factor in the sanctions, thus preventing Plaintiff from proving their credibility and Brady Chitkara's lack of credibility, broke the rules of the Handbook.

122.    In fact, there is no evidence in the record whatsoever that Brady Chitkara drafted "His" "impact statement". This could be why it conflicted with his under oath statement provided to the court and why Defendant Bourgoin refused to talk to him about statements that were challenged to be false.

123.    Defendant Bourgoin also deprived Plaintiff of a fair process when he presented inaccurate information to Plaintiff and failed to explore additional issues and questions raised by Plaintiff that would have impacted Brady Chitkara's credibility and corroborated Plaintiff's.

124.    By way of example, Defendant Bourgoin first informed Plaintiff that "Brady Chitkara" (in actuality his father) was alleging Plaintiff had posted about him on Greek Rank. Defendant Bourgoin subsequently changed his story about whether "Brady Chitkara" was claiming that Plaintiff posted on Greek Rank. Notwithstanding, Plaintiff was still left with the burden of establishing that Plaintiff did not make such posts, proving a negative.

125.    Defendant Bourgoin improperly placed the burden of proof upon Plaintiff, as the accused, to establish that Plaintiff did not make certain posts about Brady Chitkara on Greek Rank, notwithstanding that the burden properly rested with the University, and despite the impossibility of Plaintiff proving a negative. Defendant Bourgoin then refused to inform Plaintiff if they met any burden of proof, despite Plaintiff's asking.

126.    Plaintiff did not know how else to convince Defendant Bourgoin they did not make those posts, because even after Plaintiff provided credible evidence of not making them, with folded arms, Defendant Bourgoin brazenly responded by saying that Plaintiff still could have made those posts.

127.    Therefore, Plaintiff had to resort to the time and expense of finding alternative objective ways of proving Plaintiff was telling the truth, so Plaintiff took three actions: took a

polygraph test, got a statement from Plaintiff's attorney that could provide exculpatory evidence, and finally Plaintiff had to file a formal Student Accountability Complaint against Brady Chitkara so that perhaps someone else in the department would investigate Plaintiff's allegations to prove Plaintiff's credibility.

128.    Plaintiff voluntarily sought to take a polygraph examination, the results of which confirmed that Plaintiff was being truthful. Plaintiff's attorney was uninvolved and was not even aware Plaintiff was going to get a polygraph. Plaintiff decided, last minute, over a weekend to try to find a place in the vicinity of their location that had availability. However, Defendant Bourgoin refused to consider the polygraph examination results as evidence in the case, because this evidence was favorable to Plaintiff.

129.    However, as Plaintiff learned too late, Defendant Bourgoin should have allowed the favorable Polygraph results since Defendant Bourgoin allowed Brady Chitkara's  family impact statements that were "not prescribed" in the process, he had to allow other evidence "not prescribed" in their process, such as polygraph results. Vanderbilt was aware of this fair and proper procedure from the decision in Atria v. Vanderbilt University 142 F. App'x 246 (6th Cir. 2005). Therefore, not using the polygraph results was yet another violation of the contract. However, Plaintiff could not use this in their defense at the time, because the fact that the impact statements were not only "not prescribed" but the fact that they were also solicited from Defendant Jamerson specifically to influence the outcome was concealed from Plaintiff.

130.    Plaintiff had to obtain a signed letter from their counsel at the time that provided evidence that Plaintiff did not make the Greek Rank posts. Significantly, when Plaintiff's lawyer motioned to quash the Yik Yak subpoena, that could expose Plaintiff's identity, back in around September 2022, Plaintiff's lawyer never filed a motion to quash the Greek Rank or LinkedIn

subpoenas. Plaintiff's attorney also provided statements to refute information provided by Brady Chitkara's family in their impact statements. Yet, Defendant Bourgoin ignored these significant facts that demonstrated Plaintiff's credibility and challenged Brady Chitkara's credibility.

131.    Since Defendant Bourgoin refused to follow up on Plaintiff's allegations that Brady Chitkara and his family stated untruths in their "impact statements", Plaintiff filed a formal Student Accountability Complaint ("Cross Complaint") against Brady Chitkara to solicit the attention of another member of Student Accountability to investigate to prove Plaintiff's credibility and Brady Chitkara's lack of credibility especially concerning the alleged impact Plaintiff's limited posting had on Brady Chitkara.

132.    Had Vanderbilt properly and fully investigated Plaintiff's Cross Complaint, it could have discovered that Brady Chitkara was not credible. Instead, Defendant Bourgoin wholly accepted Brady Chitkara's account to find him credible and Plaintiff not credible, disregarding the various falsehoods and inconsistencies that appeared in the information presented by Brady Chitkara.

133.    At the time of this First Amended Complaint, Plaintiff has not received any information from Vanderbilt regarding the status of the complaint.

134.    In contrast, upon receipt of Brady Chitkara's complaint on or about January 3, 2023, Plaintiff was summoned to a meeting even before charges were decided. Vanderbilt proceeded to undertake an investigation that culminated in a finding against Plaintiff approximately two months later. In fact, as Plaintiff has demonstrated and learned many months later, Nevin Chitkara received ongoing feedback for months, and disturbingly received guidance on how to help him and his son achieve the express request for the most severe sanctions against

Plaintiff. Additionally, in violation of federal and state law and Vanderbilt's own policies, Defendant Bourgoin informed Brady Chitkara of the outcome against Plaintiff.

135.    Another example of Defendant Bourgoin not being transparent or truthful is Defendant Bourgoin never refuted that Brady Chitkara made the complaint against Plaintiff, meanwhile it was his father who made the Complaint. Defendant Bourgoin never informed Plaintiff that others were in fact reported by Nevin Chitkara as well, which would have not only aided Plaintiff's Appeal, but disclosure of this fact would have addressed one of Plaintiff's expressed concerns.

136.    Plaintiff was very concerned about "Brady Chitkara" singling out Plaintiff to make it appear as Plaintiff was the "only" poster and thus Brady Chitkara could then blame only one person for his reputation. Defendant Bourgoin could have put this concern at ease, but instead Defendant Bourgoin made a deliberate decision to continue to not be transparent and withhold this information from Plaintiff.

137.    But this truth had to remain secret as it would have revealed that Plaintiff was not treated fairly nor consistently as required in the Handbook and Vanderbilt's disciplinary policies. This obviously deprived Plaintiff of inclusion of these critical facts in their Appeal.

138.    In response to Plaintiff's statement that Plaintiff believed the information Plaintiff had posted about Brady Chitkara regarding a sexual assault to be true, Defendant Bourgoin responded by stating there had been no report filed with Project Safe, the University's Center for Sexual Misconduct Prevention and Response, about Brady Chitkara. However, when Plaintiff later raised to Defendant Bourgoin that Project Safe does not release to third parties any information about specific reports filed with its office without express authorization from the students involved, Defendant Bourgoin backtracked, revising his comment to note that he was given general statistics

about reports made to Project Safe. This would mean that during the prior two years, zero reports were filed with Project Safe, which is false. This was but another instance of Defendant Bourgoin knowingly providing Plaintiff with inaccurate information.

139.    Further, Defendant Bourgoin defended and accepted without question Brady Chitkara's allegations, even though credibility was at issue, while he pushed back and refused to investigate the information that Plaintiff presented. For instance, when Plaintiff raised an opportunity for Defendant Bourgoin to determine Brady Chitkara's credibility regarding some other posts made against him concerning him having taken advantage of a diversity program despite the lack of any qualifying status, Defendant Bourgoin chose to defend him by saying something to the effect that you don't know someone's motives for claiming diversity. Despite having access to student demographic information, and despite Plaintiff's request, Defendant Bourgoin never followed up on this issue to determine if Brady Chitkara had been untruthful.

140.    Moreover, as Plaintiff learned nearly a year later, Defendant Bourgoin never communicated at all with Brady Chitkara, only his father, who would of course maintain his son's innocence and kept his son off the hook for direct questioning, as is required when credibility is an issue. Not questioning Brady Chitkara in a recorded hearing would also protect him from future scrutiny in his civil litigation if any discrepancies were presented. As Defendant Bourgoin was aware, discrepancies in Brady Chitkara's "impact statements" already existed in comparison to his under-oath statement provided to the court. Plaintiff pointed these out, but Defendant Bourgoin ignored Plaintiff's request to ask Brady Chitkara about these discrepancies and instead continued to give him unqualified and unchecked credibility and continued to challenge Plaintiff's statements even when backed by evidence.

141.    As an example, when Plaintiff pointed out that Brady Chitkara (in actuality his father's) complaint neglected to mention the fact that there were multiple IP addresses from which posts about Brady Chitkara were made — thus giving the false impression that only one person was responsible for all of the posts — Defendant Bourgoin again offered an excuse for "Brady Chitkara's" misrepresentations, instead of speaking to him, responding that perhaps it was only one person who utilized the various IP addresses. Even after Plaintiff countered with the facts that the IP addresses were switching in short succession between messages, indicating multiple, unique posters, Defendant Bourgoin responded with something to the effect, well, it still could be you.

142.    It was further apparent that Defendant Bourgoin failed to fully investigate the matter when he questioned Plaintiff as to whether the posts made about Brady Chitkara on Greek Rank and Yik Yak had been removed. Had he questioned Brady Chitkara about this, or performed a simple online search, he could have easily obtained this information, as anyone is permitted to view the Greek Rank site. Instead, he asked Plaintiff if they kept screenshots or proof posts were removed, forcing Plaintiff to defend their truthful statements; had Defendant Bourgoin investigated the other posters, Plaintiff's truthful statements could have been verified. Defendant Bourgoin likewise could have searched for the information himself on Yik Yak because, though access is limited by geography, upon information and belief, he was in Nashville at all relevant times and knew Plaintiff was not and did not have this ability to search.

143.    Additionally, Defendant Bourgoin challenged Plaintiff's truthfulness about their Yik Yak posts being taken down quickly. Despite Plaintiff even pointing out one of the posts already provided by Brady Chitkara (his father) spoke to the fact the Yik Yak posts were coming down quickly, Defendant Bourgoin wanted Plaintiff to provide additional evidence. Defendant Bourgoin asked Plaintiff for "screenshots" for proof that posts were removed. Even though

Plaintiff tried to explain that if such evidence could ever have existed, it was unreasonable to expect Plaintiff to have screenshotted such "evidence" and save it for nearly a year. Yet, Defendant Bourgoin made the comparison to Brady Chitkara having screenshot evidence suggesting Plaintiff should have done the same; Plaintiff had to remind Defendant Bourgoin that's because Brady Chitkara was building a lawsuit.

144.    Knowing Brady Chitkara was building and preparing for a lawsuit is also the very reason Defendant Bourgoin should have asked him for screenshots for all the posts he and his father/family noted existed in their statements. It does not make sense that someone was screenshotting evidence for a lawsuit yet did not screenshot the specific posts they spoke about that were "sandwiched" in the middle of the screenshotted posts they did provide. Instead, Defendant Bourgoin took their word for it, and as Plaintiff would learn months later and even well over a year later, Plaintiff was found accountable for posts that were never even shown to them and never turned up in Plaintiff's file, meaning Defendant Bourgoin never saw them either.

145.    Defendant Bourgoin also failed to conduct a fair and diligent investigation when he did not pursue other obvious lines of questioning that would have impacted an assessment of Brady Chitkara's credibility, which was of critical importance. These included: (i) the failure to ask him or any other witnesses, the posts accusing him of using the "n-word" which, if true, should have impacted the assessment of his reputation, which was relevant to a determination as to whether the particular posts Plaintiff made had the degree of impact that he and his family claimed they had; (ii) failure to question the students that made accusations of having been roofied at parties held by his fraternity; (iii) the failure to look into whether any reports had been filed with Vanderbilt in regards to roofying at Sigma Chi (an investigation into this event could have corroborated the fact that he was involved in such illegal actions); (iv) the failure to question him about the posts made

to Greek Rank and other social media sites in February 2022, March 22, and even the April 24, 2022 Greek Rank posts, which he or his father did not provide copies of as part of the investigation, but his father said existed; and (v) the failure to question him as to why the information provided in his impact statement differed from the information provided in his statement submitted under oath in the civil court action.

146.     Additionally, despite the Handbook's assurance that a charged student "may examine all information that may form the basis for corrective action," Defendant Bourgoin did not provide Plaintiff with all charges against them, did not provide Plaintiff the official Complaint, only a summary that left out facts and charges, and did not get copies of all posts, and did not provide Plaintiff with copies of all documents obtained during the investigation.  Instead, only permitted Plaintiff to view an *incomplete* packet of the information on a screen during meetings held via Zoom. This placed an unnecessary burden on Plaintiff, as it was extremely difficult to both pay attention to what was occurring during the meeting, digest the information contained in the lengthy documents that were presented on the screen, and also formulate responses to the information.

147.     Even further, there were also certain documents and information related to the case, and referenced at various points, that Defendant Bourgoin never disclosed to Plaintiff, further hindering Plaintiff's ability to present a defense. By way of example, it was apparent that Defendant Bourgoin engaged in discussions concerning Brady Chitkara's civil lawsuit, which resulted in Plaintiff being denied access to the subpoenas and information collected through the lawsuit.

148.    Critically, Defendant Bourgoin indicated to Plaintiff that if Plaintiff was able to provide proof that what Plaintiff had posted about Brady Chitkara was accurate, this would be helpful to Plaintiff's defense.

149.    However, because Brady Chitkara (his father) and his legal team, as well as Defendant Bourgoin, consistently withheld and/or blocked from Plaintiff critical and potentially exculpatory information during Vanderbilt's investigation, including other posters' names and phone numbers, as well as a full record of all posts ever made about Brady Chitkara, Plaintiff was precluded from obtaining information establishing the truth of the statements, and thus, was prohibited from fully and meaningfully putting forth a defense.

150.    Incredibly, Plaintiff learned months later that information from the other posters and witnesses would have provided the needed exculpatory evidence. Specifically, one of the posters identified someone whom they believed to be a victim of Brady Chitkara's. Had Defendant Bourgoin taken the time to speak to this person, they could have provided the very information that Defendant Bourgoin said would help Plaintiff. Instead, this exculpatory information was blocked from Plaintiff.

151.    The disclosure of this information was even more critical to Plaintiff's ability to put forth a defense because Brady Chitkara (or his family) misrepresented that the posts about him tapered off between January 2022 and when Plaintiff posted about him in late April 2022, in an effort to falsely attribute the posts that continued into June to the actions of Plaintiff.

152.    However, as Plaintiff pointed out to Defendant Bourgoin, even Brady Chitkara's parents admitted that posts about their son appeared primarily on Greek Rank in late February 2022, which accused him of committing sexual assault and drugging women. They further stated that the posts continued monthly and well into the summer of 2022. Yet, none of the posts that

Brady Chitkara or his family referenced, and which he claimed to have caused him harm, were provided to Vanderbilt.

153.    Defendant Bourgoin shockingly refused to ask Brady Chitkara about these posts, knowing this evidence would not only confirm Plaintiff's statements about the existence of posts concerning Brady Chitkara prior to Plaintiff's reposting, but would also disprove the false statements about the posts tapering off prior to April 2022.

154.    All of the foregoing failures led to an investigation and adjudication process that was far from impartial, comprehensive, or in accordance with established procedures and alternatively the Handbook rules and Vanderbilt's policies were broken to the detriment of Plaintiff.

155.    Lastly, when Plaintiff was given access to their disciplinary audio recordings in 2024, the Student Accountability representative, Jenny Chung, flashed up on the screen timestamps that showed a modification date of the recordings. This date was well after the original recording of the meetings. When Plaintiff read out loud the modification date and Ms. Chung was alerted to the fact that Plaintiff was looking at it, she immediately nervously and quickly closed out the file inspection and told Plaintiff she could not show Plaintiff that again. Plaintiff informed her that they had a right to see their file, but Ms. Chung said something to the effect that seeing the file did not extend to seeing when the tapes were modified. Upon recollection and belief, the modification dates were months after some of them were recorded, but before the Appellate Chair would have been provided these audio recordings as part of the entire record.

156.    Plaintiff additionally noticed that there was no recording of their outcome decision Zoom call at all, and from recollection the recording times did not match up to the Zoom hearings, and notably one recording appeared to be short by approximately 20 minutes.

***d.*** ***The Unsubstantiated Decision and Overly Punitive Sanctions.***

157.    In pursuit of reaching a predetermined conclusion, Defendant Bourgoin found Plaintiff responsible for all three charges in a decision letter dated March 6, 2023. The decision letter did not provide any rationale or explanation as to how Defendant Bourgoin arrived at the findings.

158.    In finding Plaintiff responsible for harassment, Defendant Bourgoin improperly concluded that the definition of harassment, per the Handbook, had been met.

159.    Notably, one factor in establishing a charge of harassment requires a demonstration that the conduct at issue "alters the conditions of education or participation in a University program or activity."

160.    Nevin Chitkara and Brady Chitkara failed to establish that Plaintiff's specific actions in posting about Brady Chitkara for a brief period of time on one social media site in April of 2022 had the effect of altering the conditions of his education or participation in a Vanderbilt program.

161.    In fact, in an affidavit filed as part of his civil court case in the fall of 2022 wherein Brady Chitkara discussed the harm suffered due to the social media posts made about him, he did not identify any specific examples of how Plaintiff's specific actions altered the conditions of his education or participation in a university program or activity. Instead, he claimed that he had to move off campus due to fears for his safety, because individuals were making physical threats against him in social media posts. Significantly, none of Plaintiff's posts included any threats of physical violence.

162.    Further, Brady Chitkara discussed how his job prospects have purportedly been impacted by Google searches performed by potential employers, as the search engine results

include posts made about him on Greek Rank. However, again, there is no dispute that Plaintiff did not post to Greek Rank about him at any time. Notably, Defendant Jamerson was informed that these Greek Rank posts caused Brady Chitkara the most harm with potential employers.

163.    Brady Chitkara's "impact statement" also included the significant impact caused by a poster stating they had contacted his summer internship employer, yet it was clear from the evidence that someone else made the career jeopardizing post, which allegedly caused him significant harm and endless worry.

164.    In his impact statement, Brady Chitkara implied that he and Plaintiff were competing for the same internships in an effort to fabricate a malicious motive for Plaintiff posting about him, when in actuality Plaintiff's actions were at all times well-intentioned. Regardless, Plaintiff never even applied for any job in Brady Chitkara's profession as Plaintiff and Brady Chitkara are pursuing entirely different fields of work and would not be in any competition over internship opportunities. Yet once again, Defendant Bourgoin failed to question Brady Chitkara on this point and accepted his false and inaccurate statements as truth. When Plaintiff tried to explain why their career is different, Defendant Bourgoin refused to acknowledge the obvious differences and just replied, "well you're both in finance", demonstrating Defendant Bourgoin ignored everything Plaintiff had stated as Plaintiff is not in finance. Nonetheless, Defendant Bourgoin tried to create an equivalence to help give credibility to Brady Chitkara's assertions.

165.    Recognizing that the foregoing would not be sufficient to meet Vanderbilt's definition of harassment, Brady Chitkara revised his discussion about the alteration in his education when submitting his impact statement to the University, as part of the University conduct case against Plaintiff. He now made sure to include a discussion regarding his emotional distress, thoughts of suicide, and stated that his decision to move off campus was due to the impact on his

reputation, rather than threats of physical violence (as he knew Plaintiff did not make any posts alleging physical violence).

166.    Brady Chitkara further claimed that female students were making comments to his fraternity brothers to the effect that the fraternity was enabling his actions and that he should be kicked out of the fraternity.

167.    However, because Defendant Bourgoin failed to investigate the basis of and when such statements were allegedly made, an improper presumption was drawn that Plaintiff's posts not only preceded, but also caused this behavior.

168.    In any event, Defendant Bourgoin failed to observe the difference between the information Brady Chitkara provided to the court, under the risk of perjury, in comparison to the information presented as part of his University conduct case, when addressing how his education has been affected. This should have raised further doubt regarding the veracity of his claims, yet Defendant Bourgoin once again overlooked any evidence tending to refute his account and instead upheld his credibility without addressing these issues.

169.    Moreover, there is no question that there were numerous posts made on social media about Brady Chitkara in the months preceding and the months following Plaintiff's posts in April 2022. Brady Chitkara did not point to any evidence demonstrating that Plaintiff's posts on their own, which were taken down very quickly after they were made in April 2022, had the direct effect of altering the conditions of his education or participation in a university program or activity.

170.    Furthermore, there was no evidence presented to establish that Plaintiff's posts alone were responsible for all of the adverse impact Brady Chitkara, as required to meet the level of the alleged conduct being "so severe, persistent, or pervasive that it alters the conditions of education or participation in a University program or activity."

171.     Indeed, any claim that Plaintiff's posts caused the requisite impact on Brady Chitkara to support a finding of harassment is further belied by the fact that he suffered from a negative reputation well before Plaintiff's posts, by virtue of his membership in a fraternity that was removed from campus for four years due to allegations of repeat misconduct.

172.     Moreover, it is not plausible that the hundreds of posts made by various individuals alleging that Brady Chitkara had committed sexual assault and drugged women had no effect on him, while the handful of posts made by Plaintiff in the midst of all of these posts were the ones that had the single greatest impact on him. In fact, Brady Chitkara's own impact statement made clear that the posts which were searchable on Google were the ones that had the most significant impact on him, and not the ones posted by Plaintiff. Defendant Jamerson admitted knowing this as well.

173.     Had Defendants Bourgoin and Jamerson chosen to fairly investigate all posters, they could have learned who actually made these additional posts falsely attributed to Plaintiff. However, the only way to support the documented predetermined outcome and ensure alleged actions rose to the level of a Handbook violation was to harmfully pin all of these on one person, Plaintiff.

174.     The predetermined outcome demonstrates why Mr. Jamerson additionally told Nevin Chitkara to write impact statements and what to include in them to help the end result.

175.     The outcome to Plaintiff was also, by definition in the handbook, illegitimate, and insufficient to support one of the most severe sanctions possible. Otherwise, the actions of the other posters, who made numerous posts, including, that Brady Chitkara was a rapist, published the name of his employer, successfully instigated another poster to contact the employer, allegedly impersonated being a victim of Brady Chitkara, among other others, would have resulted in some

level of punishment. In other words, if none of these actions even rose to any level to even warrant an investigation, then there is no possible doubt that Plaintiff's sanction was blatantly arbitrary and erroneous which is against the Handbook and Vanderbilt policies.

176. Therefore, there was insufficient information to support a finding that Plaintiff violated the University's policy on harassment, and Defendant Bourgoin's finding on this charge was clearly erroneous.

177. As for the charge of impersonation, there was likewise insufficient information to establish a violation. The evidence gathered did not dispute that Plaintiff merely reposted some posts made by others. And if Plaintiff violated the Handbook with this charge, so did one of the other posters, yet she was never even investigated.

178. Additionally, the charges of disorderly conduct and impersonation are not defined in the Handbook. Given the lack of any clear definition, by extension, it could not properly be determined that there was sufficient information to uphold a finding of these violations.

179. Defendant Bourgoin, acting as both investigator and adjudicator, and heavily influenced by Defendant Jamerson and Nevin Chitkara, assigned the following sanctions: (i) suspension; (ii) prohibition from being on campus or at any Vanderbilt sponsored or co-sponsored program without express authorization from Student Accountability during the period of suspension; (iii) notation on Plaintiff's academic record of "Suspended for Violations of University Policy" during the period of suspension; (iv) academic work earned at other schools during the suspension period may not be transferred as credit toward Plaintiff's degree; (v) prior to resuming Plaintiff's studies at Vanderbilt, Plaintiff must complete an accountability action plan; (vi) completion of an online integrity seminar by May 8, 2023; (vii) Plaintiff must read Some Men: Feminist Allies and the Movement to End Violence Against Women; (viii) once the seminar and

reading of the book are complete, Plaintiff is to meet with someone from Project Safe to discuss the incident, and Plaintiff's learning from it; (ix) in order to resume Plaintiff's studies, Plaintiff must submit a formal request in writing at least 45 days before the end of the suspension period, which includes confirmation of completion of the accountability action plan and a reflection paper on what Plaintiff has learned following the incident, and how Plaintiff plans to apply what Plaintiff has learned in the future. Finally, Plaintiff is required to write an essay of at least four pages that synthesizes the module, the reading, and the meeting to reflect on what Plaintiff has learned, and how Plaintiff will apply it in the future. Defendant Bourgoin did not specify which sanction(s) applied to which alleged offense.

180.    It is a violation of Vanderbilt's Policy, Tennessee state law and FERPA, the federal privacy law prohibiting a University from notifying a complainant about any outcome or sanctions other than in cases involving sexual misconduct. When Plaintiff asked Defendant Bourgoin, on April 11, 2023, before the Appeal denial was communicated to Plaintiff, if he shared any outcome information with Brady Chitkara, Defendant Bourgoin informed Plaintiff that on March 9, 2023, Defendant Bourgoin had notified him that "his" complaint against Plaintiff had been addressed through the Student Accountability Process.

181.    Incredibly, as learned many months later that statement from Defendant Bourgoin was false because the March 9, 202,3 letter from Defendant Bourgoin to Brady Chitkara, stated in part as follows:

> "I am writing to update you regarding your complaint of misconduct. The person who instigated the harassing posts against you has completed our process and has been held accountable. [Plaintiff] is currently not an enrolled student, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student…."

182.    The contents of this letter were highly concerning for several reasons. First, Vanderbilt's Policy, Tennessee state law, and federal law prohibited Defendant Bourgoin from notifying Brady Chitkara of the outcome and sanctions imposed on Plaintiff.

183.    Second, the statement that Plaintiff "instigated the harassing posts" was demonstrably false, and Defendant Bourgoin was aware of its falsity. There was no question that numerous posts were made on a different site entirely (Greek Rank) which accused Brady Chitkara of committing sexual assault and drugging women, beginning as early as January or February of 2022, at least two months prior to any post that Plaintiff made in April of 2022. This was a fact that even Brady Chitkara's parents admitted to in their impact statements submitted as part of the investigation. There was simply no evidence establishing that Plaintiff instigated the allegedly harassing posts against Brady Chitkara, yet Defendant Bourgoin relied upon this misinformation in pursuing his false narrative and biased agenda against Plaintiff.

184.    Additionally, there were specific posts on Yik Yak prior to Plaintiff's posts proves that Plaintiff could not even be considered the instigator on even "just" Yik Yak. No evidence supports the defamatory claim or charge of being the instigator in this matter in any way.

185.    This unsupported conclusion was even further problematic in that it denied Plaintiff a meaningful appeal. As Defendant Bourgoin notified Plaintiff *only* that Plaintiff had been found responsible for posting on one social media site, Plaintiff was never informed that Defendant Bourgoin had actually found Plaintiff responsible for *all* prior posts made against Brady Chitkara, including prior Yik Yak and "other social media" posts. Defendant Bourgoin and Vanderbilt found Plaintiff responsible for posts they unequivocally did not make, including posts that were made prior to Plaintiff ever making any posts. As such, Plaintiff was prevented from submitting a proper appeal as Plaintiff did not have knowledge of this critical fact.

186.     Had Plaintiff been provided this information at the proper time, Plaintiff's appeal would have been successful because Defendant Bourgoin and Vanderbilt withheld critical information from Plaintiff. By failing to notify Plaintiff of the actual and false findings made against Plaintiff, Defendant Bourgoin thus deprived Plaintiff of a true appeal and his deceitful actions adversely influenced the Appeal.

187.     Third, this March 9, 2023, letter to Brady Chitkara establishes that Defendant Bourgoin was not truthful with Plaintiff, when describing what information Brady Chitkara had been provided concerning the outcome of the disciplinary case against Plaintiff.

188.     Specifically, by email dated April 13, 2023, in response to Plaintiff's email, Defendant Bourgoin **assured** Plaintiff that Brady Chitkara was only advised that "the matter had been addressed through the Student Accountability Process." Defendant Bourgoin, knowing full well what he had advised Brady Chitkara back on March 9, brazenly stated to Plaintiff that Vanderbilt "did not share details about the specific outcome, sanction, or appeal."

189.     Defendant Bourgoin did in fact notify Brady Chitkara that Plaintiff had been found responsible ("held accountable"), and that Plaintiff was separated from the University.

190.     Plaintiff later learned that Defendant Bourgoin was well aware of his obligations to follow privacy policies and laws and therefore this breach was intentional, malicious, and/or reckless to aid Brady Chitkara and harm Plaintiff.

191.     On January 19, 2023, Defendant Bourgoin said, "[he doesn't] intend to share really more than that it is completed when I do finish with [Plaintiff]". Therefore, clearly Defendant Bourgoin knew he could NOT share any outcome at all.

192.     However, he rushed to inform Plaintiff the outcome and on the very same day Defendant Bourgoin did not have time to respond to a time-sensitive email from Plaintiff.

Defendant Bourgoin did not even mail out the outcome letter to Plaintiff's parents until the next day, March 10, 2023, after first informing Brady Chitkara, showing favoritism and bias to giving Brady Chitkara's "closure" as Nevin Chitkara had requested and providing this very helpful document for Brady Chitkara's civil litigation matter.

193.    Defendant Bourgoin also wrote in this March 9, 2023, letter that he would speak to the other students who had posted online about Brady Chitkara after spring break, which was several weeks after he had already made up his mind as to whom the culprit was. No one else was investigated or even spoken to by Defendant Bourgoin or any other Vanderbilt official, which ensured Defendant Bourgoin could maintain his statements he held against Plaintiff, such as when he falsely claimed the others would just say they posted because [Plaintiff] did, thus additionally supporting Defendant Bourgoin's false accusation that Plaintiff was the instigator. Defendant Bourgoin knew the identities and contact information for the other posters, in which Plaintiff asked him to speak to as witnesses, which Defendant Bourgoin denied against the rules of the Handbook.

194.    The March 9, 2023, letter was sent not only unlawfully and against Vanderbilt policies, but with the deliberate goal to create a false impression to Brady Chitkara and his father.

195.    Since no other investigations took place, and since Nevin Chitkara demanded all posters be asked about making the Greek Rank, other Yik Yak and other social media posts in order to give his son closure, in order to avoid revealing that the others were never investigated, they decided to claim that they had apprehended the instigator, and falsely assigned this role to Plaintiff.

196.    This then took the pressure off the fact that the others had not been investigated. Since the letter said Defendant Bourgoin would speak to the other posters in a couple of weeks

(after Spring Break), Nevin Chitkara would withdraw pressure knowing the "instigator" had been caught.

197.    Defendant Bourgoin's deliberate decision to ascribe all of the blame to Plaintiff and deem Plaintiff the instigator of all social media postings about Brady Chitkara – despite clear evidence to the contrary – further reveals the obvious bias held by Defendant Bourgoin, and illuminates how the University intentionally arrived at the excessively harsh sanction against Plaintiff.

198.    Furthermore, Defendant Bourgoin's March 9, 2023, letter, to Brady Chitkara was defamatory in nature, as it not only falsely accused Plaintiff of being the instigator of all posts made about Brady Chitkara, which was demonstrably false, but it also deliberately gave the impression that Plaintiff was expelled. Dr. Bourgoin had previously admitted that the words not enrolled could be interpreted as being expelled. This statement was published by Defendant Bourgoin to a third-party with the knowledge that it would be utilized and further published by Brady Chitkara in his legal action against some of the posters.

199.    As this defamatory content has been published and further disseminated by Brady Chitkara, Defendant Bourgoin's actions have caused substantial harm to Plaintiff. As admitted by Defendant Bourgoin's own words on January 19, 2023, he was aware that anything "[they] give them is going to be used in the legal process". This confirms his actions were intentional, reckless, and/or malicious.

200.    Despite being asked on April 11, 2023, by Plaintiff, Bourgoin did not admit he sent the content of the March 9, 2023 letter to Brady Chitkara because of this outright false presentation by Defendant Bourgoin, Plaintiff was caught off guard and unprepared to address the content of this letter when confronted by fellow non-Vanderbilt interns and employees during a

summer 2023 internship just a few months after Defendant Bourgoin published his March 9, 2023, letter.

201.     This false and defamatory statement intentionally gave the false impression that Plaintiff was the instigator to all of Brady Chitkara's alleged troubles. This letter was on ` Vanderbilt letterhead, and after the severe sanctions included in this very same letter, anyone that saw it or heard about it would believe Plaintiff is the one that made the hundreds of posts with various topics against Brady Chitkara. This was defamatory. Someone that made hundreds of posts would be considered and treated differently than someone that made posts on a handful of days. There is an indisputable distinction to both of these descriptions that severely damaged Plaintiff's reputation. These actions by Defendant Bourgoin were malicious, intentional, and/or reckless.

202.     Plaintiff made two separate demands and opportunities for Defendant Bourgoin and Vanderbilt to retract this letter. Once in approximately late August 2023 via counsel to Vanderbilt's outside counsel, Mr. Bruce Berman and he relayed that Vanderbilt will not retract the letter. Then once again before filing suit, Plaintiff emailed Defendant Bourgoin in the first week of January 2024, to retract this letter, and Defendant Bourgoin replied that the letter would not be retracted.

   *e.*     ***March 6, 2023, Outrageous & Unconscionable Delivery of the Outcome***

203.     Defendant Bourgoin, Defendant Jamerson, and Defendant Clapper (Director of the Student Care Network and Student Care Coordination at Vanderbilt), engaged in outrageous conduct in relation to the manner in which Plaintiff was delivered the arbitrary and unexpected outcome.

204.    At the timeframe of February and March 2023, Plaintiff and Plaintiff's parents were unaware of discussions going on between Defendant Bourgoin, Defendant Clapper, and Defendant Jamerson regarding Plaintiff's distress level.

205.    However, Plaintiff has unearthed astonishing facts proving the intentional, malicious, and/or reckless decisions made by these individuals that have further altered Plaintiff's life forever.

206.    On February 23, 2023, Plaintiff's mother attempted to call Student Accountability, but it was after 5:00pm and no one picked up the phone. In desperation, she called VUPD hysterically crying about Plaintiff's thoughts of suicide. Plaintiff realized they were being singled out and it was obvious Defendant Bourgoin was uninterested in anything Plaintiff said and ignored their requests for witnesses and questioning of Brady Chitkara that could corroborate Plaintiff's statements. Thus, Plaintiff began anticipating an outcome that could destroy their entire future and life.

207.    The VUPD immediately put Plaintiff's mother in touch with Defendant Clapper. Plaintiff's mother explained the suicidal thoughts and all she asked is that any further communication wait just a couple weeks until Plaintiff was home from their internship in a safe, supportive environment where they would know how to seek support, since Plaintiff was a long plane ride away. Defendant Clapper immediately began texting Defendant Bourgoin, while on the phone with Plaintiff's mother. Defendant Clapper then relayed to Plaintiff's mother that Defendant Bourgoin informed her he was still weeks away from a decision and was still collecting information and evidence. At Defendant Clapper's suggestion, Plaintiff's mother followed up with an email to Defendant Bourgoin, copying Defendant Clapper:

"We tried to call Student Accountability earlier, did not know what to do, so we called the VUPD, who must've put us in connection with Lisa (thank you Lisa for taking the time so late to call and help start a plan).

This is _____, ____ who is currently under student conduct review. [they are] currently not at school, but [are] at an internship and taking night classes. [They're] in a psychiatric crisis, not sleeping, crying to us all night about the student conduct review and not thinking rationally.

[They are] now talking suicide, and we are trying to manage that right now with appropriate resources. **We are absolutely convinced an adverse decision now will take [their] life**.

We were worried about our involvement getting construed as inappropriate due to the conduct review, but I feel better after talking to Lisa, that parent reach out is not unusual. We are first looking to delay an outcome so that we can ensure [they are] stable: suspension or expulsion will end [their] life. We have no doubt - we would have not called the VUPD crying for help. [They are] currently not at school and not a threat to anyone there or anywhere.

[They need] your help and we need your help. [They] can't get [themself] to ask for your help, plus with [their] state of mind, [they] can't think rationally about what is happening to [them] and any communications with [them] can put [them] at risk. So we are doing it on [their] behalf.

Before any decisions are made, we first need to stabilize the situation. We also need to meet with the appropriate people at school to figure out a strategy to handle this entire situation. We do not know what to do. We saw [them] on FaceTime last night, and [they] did not look like [themself], [they look] horrible, we know [they're] functioning on very little sleep each night; we are worried about a tragic outcome. Obviously a lot of complicated issues. Thank you so much for working with us through this crisis. We would appreciate direct guidance and communications about next steps.

Call us anytime at all…."

208.     Defendant Bourgoin responded to this email that he would not do anything until he

"has a chance to connect on care and wellbeing".

209.     Defendant Bourgoin had previously expressed concern to Defendants Clapper and

Jamerson about Plaintiff's level of distress even before Plaintiff's mother called. Defendant

Bourgoin and Defendant Jamerson conducted a call with "Michelle" to get advice on the situation, before Plaintiff's mother even called.

210.    The same morning of Plaintiff's mother's call on February 23, 2023, Defendant Jamerson emailed Defendant Bourgoin **twice** only one hour apart regarding when Plaintiff's investigation would be concluded. He said Nevin Chitkara had questions about when the matter would be concluded. Defendant Jamerson said he would address him then send him to Defendant Bourgoin, but that Defendant Bourgoin could send Nevin Chitkara back to him, Defendant Jamerson, again if Nevin Chitkara has additional questions. There was clear external pressure from Nevin Chitkara to get immediate feedback as to the status of Plaintiff's outcome. As a reminder, Nevin Chitkara was not supposed to be permitted by Vanderbilt's own policy to get any update at all.

211.    At some point after the phone call with Nevin Chitkara and Plaintiff's mother, there was clearly now a choice that needed to be made: risk Plaintiff's life or risk some consequence from Nevin Chitkara.

212.    An intentional, malicious, and/or reckless decision was made to roll the dice with Plaintiff's life, as opposed to waiting *one* week.

213.    On March 1, 2023, Defendant Clapper called Plaintiff's mother to say they wanted to target March 6, 2023, to deliver the outcome. Defendant Clapper documented Plaintiff's mother's response expressing concern and "insisting" the outcome be delayed ONLY ONE week when Plaintiff would return home.  Defendant Clapper was going to follow up to request a delay. Plaintiff's mother never received a "yes" or "no" regarding the requested delay.

214.    After Plaintiff's mother's call with Defendant Clapper, an inquiry by Defendant Bourgoin to Defendant Jamerson followed. Defendant Jamerson said the March 6, 2023, outcome

communication would not get moved. Defendant Bourgoin informed Defendant Clapper there was no flexibility in the date. Defendant Jamerson even told Defendant Bourgoin that if Plaintiff did not provide a time that worked, then the outcome would be emailed to Plaintiff at exactly 11:00 am on March 6, 2023, while Plaintiff was working at his internship. Plaintiff's life-threatening health risks were completely disregarded regardless of the knowledge everyone had from more than one source and previous commitments to wait only one more week.

215. Despite Plaintiff's continued pleas about not holding meetings during business hours, as it was affecting their performance and obligations at their internship, Defendant Bourgoin required this meeting to once again be held during business hours, in order to inflict the harm possible. Defendant Bourgoin informed Plaintiff it had to be done on March 6 during business hours and it was "important", so Plaintiff continued their cooperativeness, and felt there was no choice, and agreed to 4:45pm on March 6. 2023.

216. Apparently, Defendant Clapper and Defendant Bourgoin wanted Plaintiff's parents to fly across the country to, "swoop in" to save Plaintiff after they delivered the message to Plaintiff at work, in the office with coworkers around, because they knew and documented that Plaintiff was suicidal. Defendant Bourgoin even said "it will likely be rough". However, they placed additional restrictions that Plaintiff's parents could not be with Plaintiff during the Zoom call. Meanwhile, no one ever discussed the "swoop in" plan at all nor any of the logistics with either of Plaintiff's parents.

217. When Plaintiff's mother never heard back from Defendant Clapper after March 1, 2023, it was assumed the meeting was not yet scheduled. Defendant Jamerson's department is responsible for student care and student wellbeing and Defendant Bourgoin had already committed to ensure he would connect on care and wellbeing before he communicated any decision at all.

218. Although Defendant Clapper, Defendant Bourgoin and Defendant Jamerson owed a standard duty of care to Plaintiff, a student at their University, they also owed Plaintiff an elevated affirmative duty of care under this extreme, isolated and immediate circumstance that they had the absolute power to control and they could have, if they chose to, ensured Plaintiff's health and safety. Especially because Defendants Clapper, Bourgoin, and Jamerson agreed to insert themselves into this situation.

219. But as it turns out, Plaintiff's mother got lip service, and no one cared at all. In fact, Defendant Clapper and Defendant Bourgoin treated the entire matter as a joke. Defendant Clapper and Defendant Bourgoin shared a "laugh" about the possibility that Plaintiff could be alone while receiving the outcome while suicidal. In fact, the night before the outcome, a Sunday night, Defendant Clapper emailed Defendant Bourgoin and said, "The parents better have flown out there. **lol**". (Emphasis added). It was further devastating for Plaintiff and family to learn that Plaintiff's emotional state was just a joke all along and that no one shared an ounce of concern for Plaintiff whatsoever. This revelation caused an emotional relapse.

220. Although Defendant Clapper had the time to email Defendant Bourgoin the night before, she never took the time that evening, or the entire next day on March 6, 2023, to bother to call or email Plaintiff's mother to confirm she was able to fly out to be "close" because apparently she was not allowed to be with Plaintiff. Aside from the outrageousness that instead of waiting one week, Vanderbilt would expect a parent to fly thousands of miles, secure a hotel, and incur other expenses in a city they were unfamiliar with and unfamiliar where to find care, there was no plan as to what should be done when Plaintiff became distressed (as they admitted they knew would happen) when the knowingly unfair and life altering communication would be shared with Plaintiff.

221.     After being informed Plaintiff's parents were not with them, the outcome was nonetheless delivered to Plaintiff. Disturbingly, Defendant Bourgoin delivered the outcome with a smirk on his face.

222.     Plaintiff then exhibited the anticipated distress to Defendant Clapper and Defendant Bourgoin. Defendant Clapper immediately attempted to find out Plaintiff's location so she could seek police intervention to possibly prevent any suicidal acts by Plaintiff. She wanted to send the police to Plaintiff's internship. She also called Plaintiff's mother in a panic as she was worried something might happen after the deliberate disregard for Plaintiff's well-being and Plaintiff's life. Defendant Bourgoin never once reached out to Plaintiff's parents after the decision was communicated.

223.     Defendant Bourgoin's priority was to communicate the overly punitive decision and severe sanctions to Plaintiff as soon as possible even though neither Plaintiff nor Brady Chitkara was on campus that semester. Meanwhile, Defendant Bourgoin was in no rush to speak to the other posters and planned to postpone such conversations for several weeks.

224.     Upon receipt of the decision and due to Defendant Bourgoin's, Defendant Clapper's, and Defendant Jamerson's intentional, malicious, and/or reckless actions, Plaintiff made an actual attempt to commit suicide to end their life.

225.     Defendants were more concerned with providing closure to Brady Chitkara and his family, than with ensuring the safety and health of Plaintiff, while also finding time to simultaneously "laugh" about the matter.

226.     To further provide evidence of the "joke" the department had about Plaintiff's suicidal ideation, as part of the seminar that Plaintiff was immediately required to complete in accordance with the sanctions imposed, Plaintiff was instructed to learn lessons from and watch

the film "Shattered Glass." The selection of this film was highly inappropriate and irrelevant as the premise involves a journalist who repeatedly fabricates stories and when ultimately caught, lies to his boss by claiming that he is going to commit suicide in order to avoid getting fired. Requiring Plaintiff to watch a film with a main character that "threatened" but never committed suicide is outrageous, irresponsible, and reckless. This is particularly true considering Plaintiff actually did make an attempt to end his life, and Defendants Bourgoin, Clapper, and Jamerson, knew that Plaintiff had been suicidal over the prospects of the meeting with Defendant Bourgoin.

227.     Another assignment required Plaintiff to read about Abraham Lincoln and about his own suicidal ideology, and how Lincoln was "not afraid to die".

228.     Defendant Bourgoin's assignments continuously brought the discussion of suicide to the forefront of someone who attempted to commit suicide. Defendant Bourgoin knew this and could not have cared less.

229.     Defendant Clapper did get to speak to Plaintiff's mother the following day on March 7, 2023, who was hysterically crying. Plaintiff's mother informed Defendant Clapper of the suicide attempt and that Plaintiff was hospitalized due to the suicide attempt, which resulted in physical and emotional injuries.

230.     On March 13, 2023, Defendant Bourgoin responded to an email Plaintiff sent him four days prior. Despite that Defendant Bourgoin must have known about the suicide attempt on March 9, 2023, he never responded to Plaintiff's email because he was too busy tied up in hiring processes. However, he did have time to send that outcome letter to Brady Chitkara, which, of course, was his top priority.

231.     When Defendant Bourgoin did "get around" to responding to Plaintiff, he offensively said, "I'm glad you sought support", clearly demonstrating Defendant Bourgoin did

know what happened to Plaintiff. In furtherance of this offensive comment, Defendant Clapper replied to this email and said, "I echo Jeremy that I'm glad you were able to get support". This was the extent of the superficial words of "concern".

232.    This all comes about a year and a half after Defendant Jamerson's department and Defendant Clapper were allegedly involved with a student who did commit suicide. Meanwhile, this department still knowingly, intentionally, maliciously, and/or recklessly rolled the dice with another student's life and poked fun at the student's unsuccessful attempt.

233.    Curiously, the audio recording of this Zoom meeting is entirely missing from Plaintiff's record. Yet for every other Zoom meeting with Defendant Bourgoin, there exists an audio recording.

### f.    *The Appeal Decision.*

234.    Critical evidence related to the Appeal decision was deliberately hidden from Plaintiff by Vanderbilt, which did not ensure fair and due process were afforded to Plaintiff.

235.    Defendant Lowe made specific statements in her Appeal denial about Plaintiff's truthfulness and gave a specific example. Yet, no such example exists in Plaintiff's records. The Appellate Chair, Dr. Lowe in this instance, may only rely on information in the record and nothing more. Dr. Lowe used information not privy to Plaintiff and used information outside the purview of her review.

236.    Plaintiff sent an email to Defendant Bourgoin and other individuals that stated Plaintiff requesting all notes in relation to the decision to levy punishment against them to the extent those notes were shared with other persons. Plaintiff received no response to this email.

237.    In April 2024, Plaintiff sent a similar request asking Defendant Lowe for missing documents or notes related to Plaintiff's case. Defendant Lowe also never responded.

238.     However, on April 22, 2024, Michelle Tellock, ("Ms. Tellock") Vanderbilt's Deputy General Counsel, provided feedback on some of Plaintiff's FERPA requests to others, and presumably to address the missing "notes" Plaintiff was requesting and stated, "[i]n addition, certain other documents you requested are not 'education records' under FERPA; for example, an individual's notes generally are not education records under the law".

239.     The definition of what is considered a FERPA accessible academic record is included on Vanderbilt's website as part of their policies. Ms. Tellock would be accurate if she was referring to "sole possession" notes, as such notes would not be considered an education record and therefore not available to a student under FERPA. However, once those "sole possession" records are "revealed or accessible to any other person", those records would in fact become available for a student's review as part of a FERPA records request. This is particularly true when these notes are used in the process of punishing a student and those notes are then considered by the Appellate Chair as part of the student's "record".

240.     Therefore, since no "revealed" or "shared" notes were provided to Plaintiff as part of their formal FERPA records request, then that would mean Defendant Bourgoin never revealed or shared any information to Defendant Lowe about Plaintiff's truthfulness, and/or those notes were withheld from Plaintiff.

241.     Additionally, the record shows the Appellate Review Board was in fact aware of Plaintiff's level of distress and what just occurred with Plaintiff. So not only should the Appellate Chair ensure a complete and thorough review of the entire record with any student, as required in the Handbook, not doing so in this case (as will be demonstrated) would knowingly cause emotional distress in another outrageous manner.

242.     On March 23, 2023, Plaintiff timely submitted Plaintiff's appeal of the decision and sanctions, based upon the following grounds: (i) procedural errors sufficient to affect the finding of the original authority; (ii) insufficient information to support the finding of the original authority; and (iii) the harshness of the penalty/sanctions imposed by the original authority is sufficient to show an abuse of discretion by that authority.

243.     With regard to the first ground for appeal, Plaintiff described that Defendant Bourgoin failed to provide Plaintiff with proper notice of the charges, utilized the incorrect definition of harassment in finding Plaintiff responsible, deprived Plaintiff of access to relevant witnesses and information, failed to conduct a fair and impartial investigation process, improperly placed the burden of proof upon Plaintiff, failed to pursue Plaintiff's cross-complaint filed against Brady Chitkara, and did not provide Plaintiff with all case documentation.

244.     As for insufficient information to support the finding, Plaintiff described that Brady Chitkara failed to establish that Plaintiff's conduct altered the conditions of his education or participation in a University program or activity, and there was insufficient evidence to establish that Plaintiff violated the policies on disorderly conduct or impersonation. Additionally, regarding the harshness of the penalty/sanction, Plaintiff demonstrated why the sanctions imposed on Plaintiff were not in line with the University's policies, discussed how severely the sanctions would impact Plaintiff's future career goals, and pointed to a multitude of examples which revealed how excessively disproportionate the sanctions imposed upon Plaintiff were. Plaintiff provided several examples where more egregious conduct was given a lesser or no punishment to the Appellate Chair, which Upon information and belief, these included the following:

- In or about 2019, a fraternity was removed from campus after allegations that pledges were forced to put rocks inside of their anuses as part of their hazing. No one was suspended or expelled in response to this incident.

- Also in 2019, another fraternity forced their pledges to video themselves naked. No one was suspended or expelled in response to this incident.

- In the spring/early summer of 2020, a video of a previous student yelling "Nigga" two different times surfaced. Vanderbilt had to send out a school wide email about the incident because there was so much outrage. Yet, the student was not suspended for any period of time and was not even removed from his fraternity or other campus organizations. *See* Dean of Students Mark Bandas' July 7, 2020 memo to students.

- In the fall of 2020, the University had a zero-tolerance policy related to Covid violations. Dean of Students Mark Bandas stated: "[t]he minimum sanction applied by Student Accountability if a student is found responsible for hosting a gathering that violates the policy will be suspension for a minimum of one semester; a first sanction may be as severe as expulsion, depending on the nature of and circumstances surrounding the violation." See https://vanderbilthustler.com/2020/08/19/anchor-down-step-up-diermeier-and-bandas-email-students-detailing-accountability-policies-emphasizing-personal-responsibility/ Yet, to Plaintiff's understanding, the vast majority were never suspended.

- Also in or about 2020, a fraternity required all of their fraternity pledges to drink alcohol until they vomited and then forced the pledges to drink their own vomit. Additionally, members of the fraternity urinated on their pledges. Again, no one was suspended or expelled in response to either of these incidents.

- In or about 2020, a fraternity forced all their pledges to write down embarrassingly personal information about themselves, such as the measurements of their genitals. This document was then shared with others on campus, and was seen by administrators of Vanderbilt. Yet again, no one was suspended or expelled in response to this incident.

- In or about the fall of 2021, a fraternity emotionally abused a pledge to the point where he had to seek therapy at school (this therapist was a mandatory reporter, therefore this hazing experience was reported). No one from the fraternity was suspended, and the fraternity remains on Vanderbilt's campus.

- In or about the fall of 2021, two Vanderbilt students were arrested, for using fake ID's, resisting arrest, trespassing, and public intoxication, all of which are crimes in Tennessee. This was reported to Student Accountability. Yet again, neither of these students faced any period of suspension.

- In the fall of 2021, a student in the class of 2024 was found guilty of rape through the University's Title IX process. He was suspended until the complainant's graduation date. Notably, because this student received a suspension just after his first year at the University, he would have the option to transfer to another institution and still graduate on time. In contrast, because Plaintiff had more than 60 credits – the maximum allowed for transfer to another undergraduate institution – and most schools impose residency requirements of at least two years prior to graduation, Plaintiff would be unable to transfer. See https://vanderbilthustler.com/2022/01/17/guest-editorial-vanderbilt-chose-not-to-expel-my-rapist/

- In the spring of 2021, a fraternity was kicked off campus for hazing, fraud, and COVID-19 violations, among other reasons. Director of Greek Life Kristen Torrey sent out a warning statement advising students not to associate with this group because they were not

safe to be around. However, they remained on campus and no suspension was imposed. See https://vanderbilthustler.com/2021/10/26/office-of-greek-life-director-condemns-off-campus-operations-by-former-dke-students/

- Also in or about the spring of 2021, another member of Roe's fraternity was accused of being racist. At the time, he was running for student body president, which led to the creation of an online campaign to smear his name and reputation. The resultant name calling, death threats, and verbal attacks caused this student to leave the Nashville metropolitan area. Yet, the students who initiated the campaign were not suspended for any period of time. See https://www.washingtonexaminer.com/opinion/op-eds/when-the-social-justice-mob-came-for-me

- In or about 2021, a fraternity covered all of their pledges with jars of condiments (ketchup, mayo, etc.) and made all of the pledges stay until it was licked off of each other. No one was suspended or expelled in response to this incident.

- In February of 2023, Roe's fraternity was kicked off campus for four years for repeated safety and hazing violations, after receiving the ongoing benefit of training, retraining, and multiple chances to change behavior. Yet again, no one was suspended from the University.

245.    In addition to the sanctions imposed against Plaintiff being out of line and not consistent with those issued (or not issued) in prior cases, Plaintiff also explained why the factors required by the Handbook to be considered as part of the sanctioning process weighed against a sanction of suspension: (i) this was the first offense Plaintiff had faced at Vanderbilt; (ii) Plaintiff's posts concerned serious public safety issues, which were supported and encouraged by others, and were made during Vanderbilt's Sexual Assault Awareness Month, when various campus events and activism efforts focused on bringing greater awareness to the prevalent problem of campus sexual assault; (iii) Plaintiff honestly believed that every statement Plaintiff posted was 100% truthful; and (iv) the majority of the posts Plaintiff made were actually duplicates that Plaintiff had reposted because all of them were taken down very quickly; and Plaintiff stopped posting on Plaintiff's own volition approximately eleven months prior.

246.    Despite Plaintiff having already stopped the behavior at issue more than ten months prior, the University failed to afford Plaintiff any opportunity to undergo educational conferences

or a probationary period, to demonstrate that Plaintiff had learned from this experience and was committed to making better choices moving forward.

247.    Instead, Defendant Bourgoin decided to make an example out of Plaintiff and imposed one of the harshest sanctions possible.

248.    Defendant Bourgoin informed Plaintiff that his decision about what sanctions to impose on Plaintiff would have implications on the larger culture on campus with regard to what students are permitted to speak out against. Meanwhile any sanctions against Plaintiff are confidential and private, which means a severe sanction could not have this implication if the law and Vanderbilt's policies were Followed.

249.    Consideration of the impact on others also weighed against any sanction requiring a period of separation from the University. Brady Chitkara provided inconsistent information regarding the impact to him, and failed to provide evidence supporting his claim that Plaintiff's posts specifically, which were made over a brief period of a few days almost one year prior, which were taken down quickly (and only available briefly to a local Nashville group), and which did not appear on a search engine results page, somehow caused all of the harm he suffered.

250.    Finally, and of particular importance, Vanderbilt has consistently advocated for students to report sexual assault and speak out for victims of sexual assault with Vanderbilt's Project Safe serving as a resource for the owner of the VU Survivors Instagram page, on which students report victims' stories of sexual assault, either anonymously or by publicly naming the accused. To this day, this option to publicly post about an alleged assailant without any investigation having been completed, and without any report to Project Safe, the Title IX office, or any other agency having been made, and while remaining anonymous, remains on this site.

251.    Thus, to penalize Plaintiff so severely for reposting about claims of sexual assault—all of which Plaintiff understood to be fully credible, and which were made with the goal of bringing further attention to a campus wide issue in an effort to protect further victims—was unwarranted and unfounded.

252.    On April 14, 2023, Defendant Lowe denied Plaintiff's appeal in its entirety, and upheld the findings and sanctions reached by Defendant Bourgoin.

253.    While the Handbook provides that the appeal decision is to be issued by the Chair, it is unclear whether Defendant Lowe was the Chair of the Board, as she was not identified as such on Vanderbilt's website, nor did she sign a designation as Chair along with her name in the appeal decision letter.

254.    In fact, Defendant Lowe did not and still does not appear anywhere on the list that identifies Vanderbilt's Appellate Review Board members (https://www.vanderbilt.edu/provost/committees/active/appellate-review-board/)[3], calling into question her qualifications and raising doubt as to whether she received appropriate training on deciding student conduct appeals.

255.    Defendant Lowe inaccurately determined that Plaintiff's appeal did not set forth a basis sufficient to provide relief, which disregards and ignores every one of Plaintiff's well established and substantiated arguments without any rational basis.

256.    Defendant Lowe concluded that Plaintiff had not "set forth a sufficient basis for the Board to determine that the Office of Student Accountability did not conduct themselves in accordance with their policies and procedures, or that any irregularities were harmful to the extent that they adversely affected the process."

---

[3] Since the filing of the Complaint, this webpage has since been removed.

257.     Specifically, in response to Plaintiff's arguments regarding procedural irregularities, Dr. Lowe erroneously concluded that: (i) providing Plaintiff with a specific definition of disorderly conduct and impersonating a university official would not have affected the finding; (ii) the definition of harassment was properly applied; (iii) Plaintiff was not precluded from presenting witnesses on Plaintiff's behalf; (iv) Defendant Bourgoin did not have a bias against Plaintiff; (v) the University did bear the burden of proof and properly applied the preponderance of the evidence standard; (vi) the cross-complaint filed by Plaintiff was not relevant to the finding; and (vii) Plaintiff was permitted an opportunity to examine all documents relevant to the case.

258.     While concluding that had Defendant Bourgoin provided Plaintiff with a specific definition of disorderly conduct would not have affected the finding, she nonetheless applied her own, brand new, never before presented to Plaintiff, definition of disorderly conduct—which does not appear in the Handbook—for purposes of the appeal decision.

259.     Specifically, she stated: "I find there is sufficient evidence for the original hearing authority to conclude that your conduct disrupted the civility of the University community, especially the campus culture for reporting sexual assault."

260.     Not only does this description of disorderly conduct not appear anywhere in the Handbook, but Defendant Lowe also found Plaintiff responsible for "disrupting the civility," a new charge which Plaintiff had never previously been notified for which Plaintiff was under investigation.

261.     While making such a far-reaching statement, and "vague and expansive" new charge, Defendant Lowe conspicuously failed to point to any evidence in support of this conclusion that Plaintiff's conduct disrupted the civility of the entire University, as none existed.

262.     In fact, the evidence demonstrated to the contrary: (i) the posts made by Plaintiff were taken down very quickly after they were made in April 2022, confirming that very few people actually saw them; (ii) for several months prior to, and several months after April of 2022, various other students posted about Brady Chitkara on both Yik Yak and on Greek Rank; (iii) Plaintiff never posted about Brady Chitkara on Greek Rank; and (iv) at no time did OGL either take down, or publicly condemn, any of the posts that related to Brady Chitkara, while it has removed posts in the past deemed "offensive and culturally unacceptable." Defendant Lowe was aware of this as part of the appeal record.

263.     Additionally, because the charge was not defined by the University in this manner, and because Plaintiff was never offered this definition previously during any of Plaintiff's meetings with Defendant Bourgoin, Defendant Lowe's unilateral imposition of this new, over-broad, and ambiguous definition was arbitrary and capricious and further deprived Plaintiff of the opportunity to meaningfully put forth a defense against this charge.

264.     Notably, in refuting the argument that Defendant Bourgoin had a bias against Plaintiff, Defendant Lowe proclaimed that Defendant Bourgoin's assessment of Plaintiff's truthfulness was impacted by Plaintiff's statement that a Title IX case was filed against Brady Chitkara. However, Defendant Lowe disregarded the evidence before her and misconstrued this information as presented by Plaintiff.

265.     In fact, Plaintiff never stated that there was a Title IX report that had been filed against Brady Chitkara. Instead, Plaintiff explained to Defendant Bourgoin that the absence of a formal report does not mean that a sexual assault did not occur given there are various reasons that people decide not to make a formal report and that many do not report sexual assaults.

266.    To use this misinterpretation of Plaintiff's testimony against Plaintiff, in support of a finding that Plaintiff was not truthful, was wholly improper and further indicative of the predetermined conclusion, as well as Defendant Lowe's failure to review the record evidence in its entirety.

267.    Additionally, as Defendant Lowe highlighted credibility as a key factor in the decision, she knew from the record that Defendant Bourgoin demonstrated clear bias when he challenged statements Plaintiff made despite Plaintiff providing supportive evidence but never challenging any statements made by Brady Chitkara in which Plaintiff said were untruthful.

268.    Another blatant example of bias against Plaintiff that Defendant Lowe would have determined had she done a full review of the record when Defendant Bourgoin told Plaintiff the other posters would just say they posted because Plaintiff did, without ever speaking to these posters, despite Plaintiff's and Brady Chitkara's father's request Defendant Bourgoin not only speak to them but also investigate them.

269.    To hold truthfulness against Plaintiff and outright deny Plaintiff's claim that Defendant Bourgoin acted with bias was baseless and clearly refuted by the record Defendant Lowe was required to review in its entirety.

270.    As for the appeal ground of insufficient information, Defendant Lowe stated that she was not able to substitute her judgment for that of the original hearing authority and must give deference to the hearing authority's judgment. Accordingly, she accepted without question the findings of Defendant Bourgoin, and refused to conduct an independent level of review of the evidence to determine whether the outcome was supported by the evidence.

271.    However, had Defendant Lowe considered the entire record, she would not have been able to allow these incorrect claims to stand.

272. As for Plaintiff's argument regarding the harshness of the sanction, Defendant Lowe upheld the sanctions assigned by Defendant Bourgoin concluding that there was no abuse of discretion in imposing the sanctions.

273. This conclusion rubber stamped and overlooked the unsupported finding reached by Defendant Bourgoin that Plaintiff allegedly instigated all of the posts about Brady Chitkara. Had Defendant Lowe thoroughly reviewed the evidence, she would have learned that there was zero evidence to support a finding that Plaintiff was the instigator and that Defendant Bourgon came up with this charge without informing Plaintiff and without speaking to the witnesses/other posters. Accordingly, any sanctions imposed on this basis were entirely groundless and excessive, and warranted a granting of the appeal on this factor alone.

274. Defendant Lowe also failed to consider or address the eight specific instances provided by Plaintiff in Plaintiff's appeal which irrefutably demonstrated that the sanctions assigned to Plaintiff were severely disproportionate and inconsistent with prior cases and failed to address each of the factors to be considered when assigning a sanction.

275. Vanderbilt's conduct policies are clear in that students are to be treated consistently. Instead, Defendant Lowe allowed Defendant Bourgoin's arbitrary and inconsistent punishment to Plaintiff. Defendant Lowe was aware at the time of the appeal that Plaintiff did not have access to the knowledge that the other posters were never investigated and not even informally spoken to, regardless of making similar or worse posts including contacting Brady Chitkara's employer and allegedly impersonating a victim of Brady Chitkara. Regardless, Defendant Lowe was required to know this very information in order to make any determination on consistent discipline that is specified in Vanderbilt's disciplinary policies. This fact alone would have proved Plaintiff was not disciplined consistently, let alone the eight other examples Plaintiff provided.

276.     Defendant Lowe also stated only that Plaintiff's lack of a prior disciplinary record was taken into account. However, the Handbook is clear that the following criteria must also be considered: "the student's previous record, the circumstances surrounding the violation, the nature and severity of the event and the impact on others, and the student's level of cooperation and honesty throughout the process."

277.     Defendant Lowe disregarded the circumstances surrounding the violation. Plaintiff presented a plethora of evidence concerning school culture and showing why Plaintiff's actions should have been commended rather than punished, in the name of ending violent sexual assault on campus.

278.     Defendant Lowe failed to properly consider the nature and severity of the event and the impact on others. Had Defendant Lowe reviewed the full record, it would have become apparent that Brady Chitkara presented inconsistent information concerning the impact sustained as a direct and proximate result of Plaintiff's action alone.

279.     Had Defendant Lowe read the record in its entirety, she would have known that the posts that caused the most worry to Brady Chitkara were admittedly the previous posts Plaintiff did not make because these posts were searchable on search engines. Plaintiff's posts on Yik Yak were clearly not searchable on any search engine.

280.     Defendant Lowe disregarded the fact that despite the numerous meetings with Defendant Bourgoin caused much disruption and problems to Plaintiff's work, which was well documented in the record. Plaintiff still made every attempt to meet with Defendant Bourgoin in a timely manner, responded to every email, and was overall highly cooperative.

281.     Consequently, Plaintiff's appeal was dismissed without a hearing, and the suspension was put into effect as of the date of the decision, April 14, 2023.

282.    This was the final decision in Vanderbilt's conduct process.

g.    *Evidence of Defendant Jamerson's continued influence through to the Appeal*

283.    Plaintiff learned an explanation for Defendant Lowe's obvious disregard for facts in the complete record she was contractually obligated to review in its entirety. Defendant Jamerson, who clearly already applied pressure and influence on Defendant Bourgoin's investigation and findings and his role in delivering the outcome in an unconscionable manner, continued to be involved even after an appeal was sought.

284.    It is clear from email evidence that Defendant Jamerson was involved with communications with the Appellate Review Board.

285.    When Plaintiff emailed the Appellate Review Board to request an extension to submit the appeal, the Liaison to the Appellate Review Board, Ms. Mindy Ireland, replied approximately 1.5 hours later and said, "The Chair has reviewed and approved your request for an extension".

286.    There is no email evidence that Ms. Ireland even spoke to the Chair, the alleged decision maker, but there is evidence that Defendant Bourgoin acknowledged the concern that "before anyone could connect with Mindy, she replied".

287.    Another email from Defendant Bourgoin said, "Just giving that info to help Neil support Mindy". If there was any official reason Defendant Jamerson could be involved with the Appellate Review Board, he would need to recuse himself completely after his significant influence and involvement in the process and outcome against Plaintiff. Conflicts of interest are against the Handbook and Vanderbilt's policies.

288.    The Appellate Review Board is commissioned with doing an independent review of the entire record with no one's involvement whatsoever, with the exception of whoever would provide Defendant Lowe with the "entire record".

289.    Yet, limited evidence available to date shows there were up to three versions of Defendant Lowe's appeal denial letter. That means Defendant Lowe invited outside influences not prescribed within Vanderbilt's processes in deciding to deny Plaintiff's appeal. Defendant Jamerson was involved in the communication of Defendant Lowe's appeal denial.

## V.    *CONTINUED BREACHES, BIASED & HARMFUL ACTIONS AGAINST PLAINTIFF*

### a.    *Bad Faith Dispute Resolution*

290.    After the rubber stamp Appeal Denial, Plaintiff's counsel drafted a Complaint and provided a copy to Vanderbilt, via Vanderbilt's external counsel at that time, Mr. Bruce Berman in about May 2023. Dispute resolution immediately followed.

291.    As an extension of the contract and implied contract, disputes as a result of carrying out this contract must be resolved with the same standard of fairness. However, over the next approximately seven months, this did not occur on the part of Vanderbilt.

292.    Vanderbilt made multiple "offers", but continually moved the bar when they or any part were accepted by Plaintiff, wasted valuable time (valuable to Plaintiff) in response time and other senseless delay tactics, made offers of no value, and retracted, without reason, any meaningful offers.

293.    As one example, the first offer was for Plaintiff to finish up their studies online with external classes, and graduate on time. Plaintiff relied, to Plaintiff's detriment, on this significant offer and continued their application process for full time positions. This offer was thereafter retracted after Plaintiff agreed to accept it with no reason given.

294.    The "offers" continued to evolve, but the next notable offer (suggested by Vanderbilt's counsel) was for Plaintiff to switch from their School of Engineering Majors to one within the College of Arts & Science. Precious months were spent identifying and obtaining approval for an Interdisciplinary major that would again allow Plaintiff to graduate on time. After all of the time and effort and approvals worked out, Vanderbilt retracted a significant piece of their offer that would make this major no longer possible. Even though the proposed major was an academic downgrade, Plaintiff felt, at the time, that graduating on time was more important, especially since Plaintiff was now in critical stages of interviewing for full time positions.

295.    These breaches in fair dealings prevented Plaintiff from other fruitful actions had Plaintiff known the offers to resolve this matter were illusory promises that only delayed the inevitable litigation, and even spread the word of Plaintiff's suspension to additional faculty members that would have otherwise not been involved in multiple resolution evaluations.

296.    There are numerous details regarding all of the events surrounding these and other "offers" by Vanderbilt University demonstrating further examples of complete disregard for Plaintiff, their health, and their future, especially considering all the knowledge Vanderbilt knew about the entirety of this situation and their horrific actions to date.

### b.    *Harmful Privacy Breaches*

297.    In addition to the horrific consequences to Plaintiff as a result of Defendant Bourgoin's March 9, 2023, letter to Brady Chitkara, Vanderbilt further violated Plaintiff's privacy rights and therefore breached the contract Plaintiff has with Vanderbilt on a multitude of occasions that spanned about January 3, 2023 to at least December 7, 2023 that has resulted in ongoing damages.

298.    On or about January 3, 2023, Defendant Jamerson shared Plaintiff's private cell phone number and shared that Plaintiff was on a personal leave of absence to Nevin Chitkara.

299.    In November 2023, the Student Access Office disclosed to the College of Arts and Science that Plaintiff had accommodations with Vanderbilt, despite prior assurances to both Plaintiff and Plaintiff's mother on multiple occasions that the only individuals who would ever be informed of such accommodations would be those that Plaintiff specifically decided Plaintiff wanted to inform, such as certain of Plaintiff's professors, that would need to know in order to implement them.

300.    Despite prior assurances by Student Access of specific nondisclosure, on November 7, 2023, Tiffany Culver from Student Access shared private details about Plaintiff's application for accommodations to both Defendant Clapper and the Director of the Title IX office, Michael Fazi.

301.    In response, Defendant Clapper decided to further share this information to someone that had no academic need to know, to Defendant Bourgoin. There is simply no legitimate reason for the Director of Student Accountability to learn any of this very private information, especially after multiple assurances by multiple people at Student Access that they NEVER share any of this information in the first place (yet they did and breached their promise and policies).

302.    Then on or around December 7, 2023, Tiffany Culver's manager, Dr. Jamie Bojarksi ("Defendant Bojarski"), Executive Director of Student Access Services, shared specific information about Plaintiff's accommodation to both Roger Moore, a Dean of the College of Arts & Science, and G.L. Black, Vice Provost for Student Affairs and Dean of Students, who is also Defendant Jamerson's boss. Neither needed to know any specifics about Plaintiff's private

accommodation, according to Student Access's rules, policies, and clear communications to both Plaintiff and Plaintiff's mother.

303.    Roger Moore further spread this confidential information to two other Deans in his office, Carrie Russell and Andrea Hearn.

304.    Vanderbilt has also spread the sanctions against Plaintiff to faculty members that have zero educational reason to know of such. Spreads to other departments were made evident by the fact that numerous faculty members that Plaintiff had emailed requesting access to their FERPA records, refused to respond and instead immediately directed all of Plaintiff's email correspondence to the Office of General Counsel.

305.    Additionally, on February 21, 2024, Plaintiff's mother spoke to a well-known professional in Nashville, TN about a separate private matter and this person told her they had heard about what happened to Plaintiff at Vanderbilt from a Vanderbilt employee whose role was so far removed from Student Accountability and any department that Plaintiff had ever been involved in such that Plaintiff had never even heard of the name of this Vanderbilt employee.

306.    Each of these breaches show a flagrant disregard for Plaintiff's privacy, regardless of all employees' obligation to comply with federal and state law and Vanderbilt's Standards of Conduct and other policies that require maintaining confidentiality of these private and protected records.

307.    Plaintiff knows that with all of these breaches and the vast spreading of the improper sanctions against Plaintiff, that they can never get a recommendation letter from anyone at Vanderbilt going forward. This is a fact that will be backed up by a specific example of such an occurrence at Vanderbilt. Consequences to Plaintiff from all of these privacy breaches are grave.

c.    ***Abusive Treatment Related to and Improper Interference and Retaliation with Disability Accommodations.***

308.     During the fall of 2023, Plaintiff applied for disability accommodations, and they were granted after multiple exchanges of information and rigorous review which took approximately two months to complete.

309.     Then only a week after Plaintiff was granted accommodations, on December 7, 2024, Defendant Bojarski, whom Plaintiff had never communicated with, emailed Plaintiff falsely accusing Plaintiff of attempting to use the accommodations to "override institutional sanctions". To justify this falsehood, Defendant Bojarski claimed that "Student Access reached out to the College of Arts & Science to discuss what course options might be possible for the spring, 2024 semester and was informed that you are suspended" making it appear as though she just learned this days after the accommodations were approved, which turns out to be untrue.

310.     Aside from the impossibility of her accusation, as one can only take classes if they register for classes, which is not possible during a suspension, the letter was meant to threaten, interfere with, and intimidate Plaintiff from trying to implement the accommodations in the future.

311.     To say it would be humiliating to reach back out Student Access to set up accommodations is an understatement. Defendant Bojarski's offensive and insulting false accusation was an effort to and was successful in stripping away Plaintiff's accommodations, thus stripping Plaintiff's ability to return to Vanderbilt.

312.     Defendant Bojarski's interference also added a new level of approval going forward. No longer does Plaintiff work directly with Professors, as per the approval letter, and as prescribed in the process for every other student, but now, Defendant Bojarski added "Administration" to approve all classes. It is clear the accommodations were unjustly threatened and interfered with, otherwise management would not need to get involved when they do not in other circumstances.

313. Additionally, the letter was further shocking because of this significant privacy breach. Plaintiff was assured by and through multiple people in multiple ways that their name would never be released to anyone outside of the department related to the accommodations or process itself. Only professors, which would be handpicked by Plaintiff in a specific electronic system, would be pulled in. Plaintiff would even have the option of implementing accommodations in just one class or all classes. The system is clearly designed to guarantee privacy and meet each student's unique needs. This is well documented in multiple ways. Plaintiff is now left worried and wondering about how much information was inappropriately disclosed and to whom.

314. Even more disturbing, Plaintiff learned months later, that Defendant Bojarski fabricated the entire accusation. Just two days before Plaintiff's accommodations were approved, and approved by Defendant Bojarksi, she was informed of the following in an email between her, and two of her employees, Tiffany Culver, Plaintiff's case manager, and Catherine Buttrey.

315. Catherine Buttrey wrote, "since the student told you [they] are trying to appeal[4] [their] suspension and that [they] plan to come back in the spring, I think for next steps we should tell the student we have sufficient documentation to consider [their] request for spring 2024 on a class by class basis and we would assess each class [they] register for".

316. Defendant Bojarski replied to this and said, "I agree the below sounds good". So Defendant Bojarski's letter a little over a week later was mean-spirited and certainly at a minimum disingenuous, but in fact false, as she was aware of the very information, she insinuated she was surprised to learn.

317. The reason for Defendant Bojarski's action was later discovered. On or about December 4, 2023, just seven days after Dr. Bojarski agreed with "the plan", and only five days

---

[4] Referring to the dispute resolution that was ongoing between Plaintiff and Vanderbilt.

after the accommodation approval letter was issued to Plaintiff, she sent an email to Tiffany Culver asking for information and stated, "some concerns that came up".

318.    Since it was too late to randomly and without cause, call back these accommodations, Defendant Bojarski caved in to what had to be an incredibly powerful external influence, as she is charged with a critical role requiring federal Office of Civil Rights laws to be followed. The influence was serious, causing her to break federal law and merely three days later, sent that December 7, 2023, letter to Plaintiff.

319.    Aside from the intentional and reckless, law-breaking action, Defendant Bojarski knew the devastating impact her actions would have on any student's emotional well being, but specifically in this case in which she had access to Plaintiff's application for accommodations.

320.    After Defendant Bojarski sent this December 7, 2023, letter to Plaintiff, she immediately forwarded it to G.L. Black, the person whose department was responsible for all of the unfair and malicious actions against Plaintiff related to the disciplinary process, and the mocking of Plaintiff regarding their suicidal ideology and subsequent attempt.

### d.    Abusive Treatment & Incremental Punishment Continues into 2024

321.    Upon learning of all of this and knowing their accommodations cannot be implemented and will likely get blocked if attempted, Plaintiff informed the College of Arts & Science, School of Engineering (Dr. Krishnendu Roy) and their advisor (Dr. Jonathan Sprinkle) about the disability accommodations problem and requested a leave of absence. This request also alerted them to the facts that breaches of privacy and malice against Plaintiff as learned in their FERPA records review was also a problem. No one responded until Plaintiff again emailed eight days later requesting feedback about their leave of absence request (noting that when Plaintiff had requested leaves of absence in the past, responses were swift).

322.     After Plaintiff emailed the reminder about the leave of absence request, Dr. Cynthia Paschal, ("Defendant Paschal") Senior Associate Dean School of Engineering, responded and provided Plaintiff with a form to complete. She also indicated she would be busy over the next couple of weeks, as she was clearly referring to graduation ceremony activities that she was involved in. This was a knowing and unnecessary punch in the gut to Plaintiff, as a reminder that Plaintiff would otherwise be participating in those very exciting and honorable ceremonious rehearsals and activities.

323.     No one else responded, not even Plaintiff's advisor. As a matter of fact, no one ever even responded to complaints Plaintiff lodged in the leave of absence request; this in itself violates the Vanderbilt Standards of Conduct, that requires any employee who learns of or suspects any "violations of law or Vanderbilt policies or any concern that a compliance violation may have occurred" to report these concerns as quickly as possible. Certainly, the disability accommodation and FERPA breach complaints are serious violations that someone that was copied should have reported.

324.     Sometime after Plaintiff filled out their form which included the same complaints of disability accommodations were threatened, interfered with and Plaintiff was intimidated from implementing them, privacy breaches, and that there was no safe place for them on campus right now. Defendant Paschal's response was alarming, retaliatory, and indeed knowingly further inflicted unnecessary harm.

325.     Defendant Paschal included in her response, "It sounds from what you wrote that you are really unhappy with Vanderbilt and don't want to come back to earn your degree from VU.  Please know that you can withdraw from VU if you don't envision yourself coming back,

which of course is the only way to finish a VU degree. If you later change your mind, you could then apply for readmission. Do you want to withdraw?".

326. Defendant Paschal was aware of the sanctions and had been involved in the dispute resolution between Plaintiff and Vanderbilt as early as the summer of 2023. Notably, when Defendant Paschal was pulled into settlement discussions and solutions by Vanderbilt's counsel in the summer of 2023, it was later discovered from an email that Defendant Paschal said how she did not think it was right for a suspended student to be able to take credits that count while on suspension. Thereafter, the previous resolution "offer" from Vanderbilt to count certain credits and take additional online credits was in fact withdrawn.

327. Defendant Paschal clearly already formed a negative opinion of Plaintiff based upon the one-sided information she obtained from the extreme sanctions unfairly inflicted upon Plaintiff, that are reserved for the worst of possible offenses. This judgment resulted in adversely impacting and destroying the possibility of a fair resolution discussion and arrangement. Defendant Paschal now took this new opportunity to inflict incremental punishment on Plaintiff.

328. Defendant Paschal, being in a position of power and held in high regard by Vanderbilt, made Plaintiff's educational environment more difficult by disregarding valid concerns and suggesting withdrawal without cause as an attempt to achieve the same end as expulsion.

329. Defendant Paschal's suggestion of withdrawal also disingenuously and deceitfully suggested Plaintiff could get readmitted at a later date. Defendant Paschal knew Plaintiff could never get readmitted with one of the most severe sanctions at Vanderbilt, a sanction comparable to or more severe than that of a student found responsible for rape. This in itself was telling that

Defendant Paschal wanted Plaintiff to leave Vanderbilt and inflict additional punishment to the already severe sanction that was unfairly, unjustly and arbitrarily already inflicted upon Plaintiff.

330.    Plaintiff's advisor, Dr. Jonathan Sprinkle, never even gave Plaintiff the courtesy of any reply, not even lending a comforting word after alerting him to very serious issues. This silence demonstrates not only a form of retaliation, but also reinforces the advisor's support of his management/Defendant Paschal's actions to disregard and belittle Plaintiff to try to get Plaintiff to withdraw from Vanderbilt.

331.    This was reinforced on May 29, 2024, after still never even responding to Plaintiff's concerns, when Plaintiff's advisor, Dr. Jonathan Sprinkle, took the time to disingenuously forward an invitation for Plaintiff to apply to an Institute of National Defense and Global Security Immersion Fellows program; it is quite obvious that Plaintiff's application would get flat out rejected based upon the severe sanction unduly and unfairly inflicted and recorded in their file, and since Plaintiff could never obtain any recommendation letters.

332.    Through multiple FERPA records reviews that took place since March 11, 2024, it is clear there are disparaging remarks about Plaintiff shared amongst faculty members. It is outrageous the magnitude of breaches and unfair actions in which Plaintiff learned from their review of some, not even all, of their records.

333.    In fact, approximately a dozen faculty members /employees had been completely unresponsive to FERPA requests and others continue to block information for over 90 days, when FERPA requires 45 days to provide access to records.

   **e.    *Ongoing Evidence of Bias and Continued Breaches of Contract Against Plaintiff Continues into 2024.***

334.    Due to multiple Handbook policy violations related to Brady Chitkara breaching Plaintiff's privacy, during 2023 that continued into 2024, Plaintiff was forced to yet file a second

Student Accountability Complaint against Brady Chitkara on or about February 26, 2024. Note however, that the actions by Brady Chitkara that violated the Student Handbook were only possible and as a result of Defendant Bourgoin's March 9, 2023, letter to Brady Chitkara that breached federal and state law and Vanderbilt's own policies. After Defendant Bourgoin shared information about Plaintiff, including defamatory information, Brady Chitkara took advantage of this official Vanderbilt University issued letter/information and used it improperly. However, the letter was marked "Private and Confidential" and as such, the Handbook required it be kept private.

335.    With that said, upon filing of this new Complaint against Brady Chitkara, because Defendant Bourgoin would have an obvious conflict of interest, Plaintiff emailed a copy to Defendant Jamerson and his boss, Mr. Black to ensure this urgent matter gets an unconflicted and unbiased review. Specifically, Plaintiff said:

> "In order to eliminate any possible conflicts of interest, I am requesting your help to review this matter to ensure an appropriate person is placed in charge for determining the attached Student Conduct "Complaint" that I just submitted to Student Accountability.
>
> Since Defendant Bourgoin is directly involved in this matter and would be a witness to communications with Brady Chitkara, whom this Complaint is being made against, I believe it is a conflict of interest if Defendant Bourgoin took up this Complaint. Therefore, I am sharing this Complaint with you to help ensure it is given an impartial review by someone not involved in the facts, the history, and communications related to this matter.
>
> Also, I would like to add that this is a grave situation that needs immediate attention as there is ongoing, significant damage to my reputation, health, employment and finances related to these apparent/alleged violations of the Student Handbook. I look forward to your response and am trusting you will try to help me under what feels to me to be overwhelming and out-of-control circumstances."

336.    Further affirmation that Plaintiff was treated completely different than Brady Chitkara and his father, no response was sent to Plaintiff. So a week later, Plaintiff emailed again:

"Can someone please provide me with the status of the below complaint submission (#00031170) from last Monday? I have not received any follow up on this complaint.

The impact of the facts of this complaint are devastating to me in numerous ways, from emotional, to interfering with employment.

It will cause more harm to me emotionally, to not even know whether this matter is even being investigated."

337.    Finally, Defendant Jamerson responded:

"Thank you for reaching out regarding your concerns. We received your complaint and will review and refer to the appropriate university process for resolution should your concerns rise to the level of a policy violation. Note, however, that due to federal privacy regulations related to educational records we may not be able to share the outcome with you."

338.    Clearly, this is further evidence that Defendant Jamerson treated Plaintiff's complaint completely different in comparison to how Defendant Jamerson jumped through hoops for Nevin Chitkara's Complaint and even set up a first hearing with Plaintiff even before they figured out any charges for Plaintiff and was willing to breach federal law for Brady Chitkara to provide Brady Chitkara feedback. Strikingly, Defendant Jamerson informed Plaintiff here they will have to follow federal law about providing any outcome, regardless of the impact Plaintiff described.

339.    Then about a week later, after Plaintiff's FERPA records review, Plaintiff learned of the devious role and unfair, contract-breaching, life threatening and life altering influence Defendant Jamerson forced on the entire investigation and outcome process against Plaintiff. Plaintiff realized Defendant Jamerson should have recused himself from this new Complaint (and obviously from the complaint against Plaintiff a year prior). It was especially disconcerting that after Plaintiff raised concerns about a conflict of interest with Defendant

Bourgoin, that Defendant Jamerson would continue the facade of a "fair evaluator" knowing full well what he had done to Plaintiff.

340.    The Handbook's disciplinary provides provisions for conflicts of interest and having someone else review a student conduct matter. As a result, Plaintiff raised their newly discovered concerns to Mr. Black and the Conflict-of-Interest Department. Although acknowledged by Mr. Black, until this day, months later, Plaintiff never learned if this second Complaint was given even a thought.

341.    Evidence will show this Complaint has merit and delineates clearly documented breaches of the Student Handbook. So, any decision not to investigate was biased, based upon how Plaintiff was treated.

342.    Certainly, not providing any meaningful feedback to comfort Plaintiff that the significant issues Plaintiff raised in their Complaint were at least discussed, at the bare minimum, with Brady Chitkara, so that Plaintiff could potentially be given some sense of comfort that perhaps Brady Chitkara will discontinue their harmful actions, is further evidence of malice against Plaintiff.

343.    No comfort or assurance was even hinted at for Plaintiff, yet the complete opposite and favorable bias treatment was given to Brady Chitkara and his father for well over a year and a half now.

## VI.    DAMAGES

344.    This is a general summary of Plaintiff's damages. All of Plaintiff's damages are quantifiable, not hypothetical, and not an all inclusive list of every specific damage. Additionally, new damages continue to surface and cannot be captured fully at this point in time.

345.     Plaintiff's career delay and future career damages can be quantified as a direct and proximate result of Defendants' action. At multiple firms, Plaintiff either had their employment offer rescinded, had to turn down an offer, had to withdraw from the interview process, or was prevented from applying altogether. Such opportunities include those that exceed a half million dollars before discretionary bonus in the first year of compensation. For instance, Plaintiff was offered a position in his field and accepted that position. When the employer that offered Plaintiff an employment position was made aware of the situation between Plaintiff and Vanderbilt and Vanderbilt's unfair process against Plaintiff, the employer rescinded Plaintiff's employment offer and informed Plaintiff that they would not be considered for future employment considerations. Plaintiff's offer for employment, which Plaintiff had accepted, paid Plaintiff hundreds of thousands of dollars on an annual basis before additional discretionary income.

346.     Plaintiff would have been extended more lucrative offers with both a higher base salary and overall career trajectory, as well as given them the ability to negotiate with multiple competing offers.

347.     Firms in the industry were already aware of Plaintiff's prior intended graduation date and such change will prevent employment in and of itself. Plaintiff has made reasonable attempts to mitigate all damages in this Complaint.

348.     Plaintiff was prevented from participating in multiple collegiate STEM competitions, in which Plaintiff would have accomplished a prestigious ranking.

349.     Plaintiff was prevented from applying to graduate programs and will be prevented from applying to advanced degree programs in the future because Plaintiff has a suspension on their record. None of this is speculative as it is baked into the punishment of a permanent disciplinary record, delay in graduation date, followed by removal of degree altogether. With

Defendant Bourgoin's knowledge of Plaintiff's career, he would have known the importance of an advanced degree. The value of the loss of a prestigious school degree at Vanderbilt can be and will be quantified.

350. Plaintiff lost the ability to continue as a teaching assistant in classes at Vanderbilt, which not only has the immediate loss of income, but is also detrimental to future educational and career prospects.

351. Plaintiff lost the ability to have several papers that they wrote published in undergraduate journals.

352. Plaintiff lost the ability to participate in research at Vanderbilt, which not only has the immediate loss of income, but is also detrimental to future educational and career prospects.

353. Plaintiff lost the ability to obtain letters of recommendation, which impacts not only application to other institutions, but employers as well.

354. Vanderbilt is, and was, well aware that the cycle of applications for the industry Plaintiff was entering exceeded two years prior to full time start dates. If Plaintiff was a first year student, this extreme sanction would not have the same impact. Plaintiff's sanction was intended to cause this level of career and academic damage, as Vanderbilt was fully aware of Plaintiff's graduation date. There is nothing speculative of the damage that a suspension of this length has on a Vanderbilt University student's permanent record. A permanent mark on one's record is by definition designed to inflict future punishment. If Vanderbilt thought that it had zero effect, then there would not be a reason to remove disciplinary notes from a student's record on lesser offenses after a predetermined time period.

355. Plaintiff lost tuition, housing, and other related expenses over the past several years due to Defendants' abhorrent conduct.

356.    Plaintiff incurred medical expenses and will incur future medical expenses as a direct cause of Defendants' abhorrent conduct

357.    Plaintiff has sustained specific physical injuries as a result of the infliction of emotional damage. This includes, but is not limited to, a suicide attempt, post-traumatic stress disorder, panic attacks, anxiety, and the inability to sleep.

358.    Plaintiff is entitled to punitive damages. Tennessee law permits recovery of punitive damages for common law breach of contract. See Riad v. Erie Ins. Exch., 436 S.W.3d 256, 276 (Tenn. Ct. App. 2013); Lindenberg v. Jackson Nat'l Life Ins. Co., 912 F.3d 348, 359 (6th Cir. 2018. Defendants' conduct in adjudicating the complaint filed against Plaintiff and failing to afford Plaintiff a fair process thereby denying Plaintiff due process was intentional, malicious, and/or reckless thereby supporting a claim for punitive damages.

## CAUSES OF ACTION

## COUNT I: INJUNCTIVE RELIEF

### (Against Vanderbilt)

359.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

360.    Plaintiff seeks preliminary and permanent injunctive relief against Vanderbilt requiring the school to expunge its records of any evidence of disciplinary action taken against Plaintiff in connection with the averments contained herein.

361.    Plaintiff has a strong likelihood of success on the merits for the claims asserted against Vanderbilt herein.

362.    Absent injunctive relief, Plaintiff is suffering and will continue to suffer irreparable harm by way of impairment to his education, employment opportunities, and professional

aspirations. Due to the conduct of Defendants, Plaintiff is unable to pursue their professional aspirations in their desired field.

363.     Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to Plaintiff's reputation, the interruption in and loss of Plaintiff's education, and the lifelong ramifications that will flow therefrom.

364.     Defendants will not be harmed by the grant of the injunctive relief requested in this count.

365.     The grant of injunctive relief is in the public interest, as the grant of an injunction in this instance will both permit Plaintiff the ability to advance in education and/or professional development, while at the same time acting as a deterrent to future misconduct on part of Vanderbilt.

## COUNT II: BREACH OF CONTRACT

### (Against Vanderbilt)

366.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

367.     Plaintiff applied to and enrolled at Vanderbilt and paid all required fees and expenses. Plaintiff did so in reliance on and with the reasonable expectation that the University would provide Plaintiff with academic instruction, and, upon satisfaction of all academic and financial requirements, Plaintiff would receive a degree and diploma from Vanderbilt University.

368.     Plaintiff also reasonably expected that Vanderbilt would implement and enforce the provisions and policies set forth in its official publications, including the Handbook, and would refrain from breaching policies and unfair practices that could unfairly and/or arbitrarily result in punishment that would hinder Plaintiff's educational and career opportunities.

369.     The U.S. Court of Appeals for the Sixth Circuit, applying Tennessee law, has stated that "the student-university relationship is contractual in nature." <u>Sifuna v. S. Coll. of Tenn., Inc.</u>, No. 17-5660, 2018 U.S. App. LEXIS 8754, at *4 (6th Cir. Apr. 5, 2018). It is well settled that a student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings. See <u>Anderson v. Vanderbilt Univ.</u>, 450 F. App'x 500, 502 (6th Cir. 2011).

370.     An express contract, or alternatively, a contract implied in law or in fact was formed between Plaintiff and Vanderbilt. At all times relevant hereto, a contractual relationship existed between Vanderbilt and Plaintiff by virtue of Plaintiff's enrollment at Vanderbilt and payment of required tuition and fees, and as defined by and through Vanderbilt's policies and procedures, including the Handbook.

371.     Through these policies, Vanderbilt provided specific, enforceable provisions outlining certain practices and procedures that were to be followed by the institution before imposing discipline upon its students, including Plaintiff.

372.     Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its student.

373.     Vanderbilt failed to perform in accordance with the policies set forth in the Handbook during the Student Accountability investigation and disciplinary process, amounting to a significant breach of its agreements with Plaintiff.

374.     Vanderbilt committed several breaches of its agreements with Plaintiff during the investigation and adjudication processes as described in detail in the preceding paragraphs a non-exhaustive list of Vanderbilt's breaches includes the following:

- Vanderbilt failed to follow several procedures in the Handbook, including, but not limited to, failure to conduct a full and unbiased investigation;

- Allowing outside influence specifically from Nevin Chitkara, who is Brady Chitkara's father;

- Not providing all charges that would ultimately be held against Plaintiff;

- Changing, not providing, and using incorrect definitions;

- Denying Plaintiff access to information used against them in the disciplinary process and the opportunity to rebut the same;

- Denying Plaintiff witnesses;

- Denying Plaintiff the ability to challenge adverse testimony imposition of sanctions in a manner disproportionate with the nature of the offense;

- Failure to treat Plaintiff consistently as others with the same alleged offenses;

- Significant irregularities in the Appeal application review process;

- Inviting information and/or evidence not prescribed within Vanderbilt's processes; and

- The failure to provide for an appeal as set forth in the Handbook, and then engaging in unfair dispute resolution.

375.    Vanderbilt committed additional breaches of privacy and confidentiality, as well as other breaches of policy including but not limited to, not following the law, discrimination against Plaintiff, retaliating against Plaintiff, ignoring conflicts of interest regarding Plaintiff's matter, unfair dispute resolution, and not following Vanderbilt's policies that require basic respect and fairness.

376.    The contract between Vanderbilt and Plaintiff also contained an implied covenant of good faith and fair dealing in its performance and enforcement, implicitly guaranteeing that any proceedings would be conducted with basic fairness. It guaranteed that any proceedings would be conducted with basic fairness. See Thomas v. Meharry Med. Coll., 1 F. Supp. 3d 816, 829 (M.D. Tenn. 2014).

377.    The conduct of each and every Defendant demonstrates that such covenant of good faith and fair dealing in the performance of the contract between Vanderbilt and Plaintiff was breached.

378.    Each of the foregoing breaches contributed to a process that deprived Plaintiff of Plaintiff's fundamental and contractually guaranteed rights, ultimately leading to an erroneous finding and severely disproportionate sanctions.

379.    As a proximate and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages including, but not limited to, emotional distress, psychological damages, delay/loss in education, delay/loss of future educational and career opportunities, specific job and career loss, future lost income, reputational damages, punitive damages, and other direct and consequential damages.

380.    Defendants' conduct giving rise to Vanderbilt's breach of contract with Plaintiff was intentional, malicious, and/or reckless, thereby entitling Plaintiff to a recovery of punitive damages against Vanderbilt.

381.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, post-judgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT III: TITLE IX SELECTIVE ENFORCEMENT: VIOLATION OF 20 U.S.C. § 1681, *et seq.*

### (Against Vanderbilt)

382.    Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

383.     Title IX of the Education Amendments of 1972 provides, in relevant part, that: "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." Vanderbilt's own policies and Handbook repeats that no student will be discriminated against.

384.     Title IX may be violated by a school's failure to remedy sexual harassment, and by a school's imposition of discipline where gender is a motivating factor in the decision. In either case, the statute is enforceable through an implied private right of action. See Cannon v. Univ. of Chicago, 441 U.S. 677 (1979); Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994).

385.     Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Vanderbilt, which does in fact receive federal funding.

386.     Vanderbilt all times relevant to this Complaint, received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a)Under a "selective enforcement" theory, the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

387.     For a Plaintiff to prevail on a Plaintiff's selective enforcement claim, Plaintiff "must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Univ. of Dayton, 766 F. App'x 275, 284 (6th Cir. 2019). Specifically, it must be demonstrated that gender bias motivated the selective enforcement. See Mallory v. Ohio Univ., 76 F. App'x 634, 641 (6th Cir. 2003).

388.     One way in which a Plaintiff can establish gender biased motivation is by showing that all relevant aspects of Plaintiff's situation are "nearly identical" to those of an individual of the opposite sex who was treated more favorably. See <u>Doe v. Oberlin Coll.</u>, 60 F.4th 345, 356 (6th Cir. 2023).

389.     Here, Plaintiff was treated differently when he was the only one investigated and subjected to a disproportionately severe punishment, in comparison to female students who engaged in the same conduct, and this selective enforcement was motivated by gender bias. Female students of Vanderbilt accused Brady Chitkara of committing sexual assault online. Brady Chitkara's father, Nevin Chitkara, submitted a complaint to Vanderbilt about these female posters and requested Vanderbilt hold them accountable. Vanderbilt chose not to do anything with any female posters because Vanderbilt feared one of the posters was a victim or was speaking out on behalf of a friend who was a victim of Brady Chitkara.

390.     Vanderbilt's decision to investigate and discipline Plaintiff with a suspension was not in line with its actions in responding to allegations in a formal complaint brought against female students who had engaged in similar conduct.

391.     One Complaint was submitted by Nevin Chitkara against all the posters. Then, only the portion that could be attributed to Plaintiff was cut and pasted and incorporated into a Vanderbilt Student Accountability form Complaint. This did not occur with the female student posters.

392.     One female student, L.N., made multiple posts concerning Brady Chitkara, including but not limited to an allegedly false claim (according to Brady Chitkara) she was a victim of Brady Chitkara's and accusing Brady Chitkara of being a rapist. Further, L.N. posted that she had contacted Brady Chitkara's employer to notify them about his conduct.

393. Defendant Bourgoin failed to investigate the female poster (L.N.) for any of her posts despite Nevin Chitkara's insistence that she be punished severely for her posts.

394. L.N., as a female student, was treated more favorably than Plaintiff, the male student, when she was not even subject to an investigation for any conduct policy violations and did not receive any sanctions, while Plaintiff was found responsible for three violations and issued a sanction including suspension.

395. Similarly, another female student, M.G. identified Brady Chitkara's employer, and instigated L.N. to contact said employer. M.G. posted about this twice, to which L.N. replied that she had contacted Brady Chitkara's employer, and M.G. responding by "laughing" at the post.

396. Defendant Bourgoin failed to investigate the female poster (M.G.) for any of her posts despite Nevin Chitkara insistence that she be punished severely for her posts.

397. Nevin Chitkara specifically asked that both of these posters (female posters) be "severely punished" because of the alleged significant impact their posts had on his son, yet Defendant Bourgoin and Defendant Jamerson chose to not even investigate them.

398. Defendant Bourgoin said Nevin Chitkara could pursue the others, the females, "criminally" but Vanderbilt will not investigate them. Any criminal charge in itself is a violation of the Student Handbook, but Vanderbilt was willing to ignore this possible violation as well for the female students.

399. Gender bias is further demonstrated by the selective punishment applied to Plaintiff and Vanderbilt's actions in responding to and addressing the complaint against Plaintiff.

400. After improperly finding Plaintiff responsible for three policy violations, Defendant Bourgoin assigned several sanctions that were not only irrelevant to the issue at hand but also demonstrated a clear bias against Plaintiff as a male accused of wrongdoing.

401.    One part of Plaintiff's sanctions included a requirement that Plaintiff read "Some Men: Feminist Allies and the Movement to End Violence Against Women," a book that discusses men and their role related to "women's issues." Specifically, it is described as exploring "the strains and tensions of men's work as feminist allies in preventing sexual assault and domestic violence."

402.    The integrity assignment imposed by Defendant Bourgoin as part of the sanctions imposed on Plaintiff included a number of required readings and a movie, all of which centered around a male figure that Plaintiff was intended to learn a lesson from. This "integrity" assignment is specifically tailored to each student.

403.    Vanderbilt's mishandling of the case against Plaintiff was influenced by institutional, systemic gender bias, as well as external pressure from the student body and the United States Department of Education, under a threat of rescission of federal funds.

404.    Notably, when Plaintiff had inquired with Vanderbilt's Title IX office about whether or not the school would take action against a female who was making and spreading sexual assault allegations, even if they were false, to which the Title IX representative replied, that wasn't something the school would do, because it would be "Anti-MeToo".

405.    In November 2023, Vanderbilt invited the "MeToo" Founder to speak on campus, whom included in her remarks how men end up with the media attention, as opposed to the women, the victims. Vanderbilt's commitment to the "MeToo" movement is supported by this invitation.

406.    Additionally, the Office for Civil Rights is currently investigating nine complaints dating back to March of 2014, alleging Title IX discrimination against Vanderbilt University, raising additional concerns about how the University responds to and disciplines male students accused of.

407.     Additionally, on April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL"). U.S. Department of Education, *Dear Colleague* (Apr. 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.pdf. (hereinafter "Dear Colleague Letter" or "DCL").

408.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

409.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, NATIONAL PUBLIC RADIO (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493.

410.     The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (e.g., that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sexual aggressor role.

411.    The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." See Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, TIME MAGAZINE (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record- straight/.

412.    Despite its supposed purpose as a mere guidance letter, the Department of Education ("DOE") treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus.

413.    Since the DCL was published, schools including Vanderbilt have changed their sexual assault and sexual harassment policies and procedure, out of concern for being investigated and/or sanctioned by the Department of Education.

414.    The threat of revocation of federal funds remains a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.

415.    Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX, designed to find him, the male, responsible and to punish him severely for it.

416.    Plaintiff was treated adversely in comparison to similarly situated members of the opposite sex, due to gender bias.

417.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, delay/loss in education, delay/loss of future educational and career

opportunities, specific job and career loss, future lost income, reputational damages, actual lost monies spent on educational experiences at Vanderbilt, and other direct and consequential damages.

418.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus pre and post judgment interest, attorneys' fees, expenses, costs and disbursements.

### COUNT IV: SECTION 504 of *Rehabilitation Act of 1973* and *Title II of the Americans with Disabilities Act ("ADA") of 1990*

### (Against Vanderbilt, Defendant Bojarski, and Defendant Paschal)

419.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

420.     Section 504 of the Rehabilitation Act prohibits anyone from interfering with the exercise of rights granted by the law to individuals with disabilities. Section 504 incorporates the anti-retaliation provision of Title VI of the Civil Rights Act of 1964, which provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. § 100.7 (emphasis added).

421.     Retaliatory action is defined broadly: "The law deliberately does not take a 'laundry list' approach to retaliation, because unfortunately its forms are as varied as the human imagination will permit." Knox v. Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996).

422.     Section 504 and Title II of the ADA applies to all public and private educational institutions that receive federal funding, including Vanderbilt and a right of private action exists.

423. At all times relevant to this Complaint, Vanderbilt received and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Acts of 1972, 20 U.S.C. § 1681(a).

424. Vanderbilt's intentional, malicious, and/or reckless actions threatened, intimidated and interfered with Plaintiff's rights to access their disability accommodation by way of Defendant Bojarski's false and intimidating letter of December 7, 2023. This letter further threatened Plaintiff's accommodations when it added an incremental approval layer to send the message to Plaintiff that accommodations will be difficult to achieve going forward. This was especially egregious, as just one week prior, the accommodations were fully approved with the standard class-by-class implementation and approval process with professors, but now "administration" approval was added, against the department's clear policy.

425. The offensive threatening, an intimidating letter also interferes with and precludes Plaintiff from working with Student Access, a small, intimate department, after false and humiliating accusations were made and shared against Plaintiff.

426. These unlawful actions effectively unlawfully removed Plaintiff's accommodations and their ability to return to school as the accommodations are needed.

427. When Plaintiff lodged a Complaint regarding the disability accommodations (and interference, intimidation and threat to them) and asked a leave of absence to the Deans of the College of Arts & Science, School of Engineering and their Advisor no one responded. It is retaliatory to ignore such complaints.

428. After another request eight days later, Defendant Paschal was delegated to handle Plaintiff's Leave of Absence request. In addition to her slow response, she responded and suggested to Plaintiff that due to their unhappiness with Vanderbilt, that Plaintiff could withdraw

from the University. Defendant Paschal retaliated by constructively expelling Plaintiff, i.e. constructive termination, by this retaliatory response to the Complaint lodged in the Leave of Absence Request.

429. Notably, as of the date of this First Amended Complaint, no one from Vanderbilt ever followed up with Plaintiff regarding this accommodations' complaint.

430. These unlawful acts proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: emotional distress, psychological damages, delay/loss in education, delay/loss of a Vanderbilt degree, loss of future educational and career opportunities, specific job and career loss, future lost income, reputational damages, and other direct and consequential damages.

431. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **COUNT V: DEFAMATION-LIBEL**

### **(Against Defendant Bourgoin)**

432. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

433. To establish the elements for defamation in Tennessee, a Plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement.

434. Defendant Bourgoin published a defamatory statement to a third party when, by letter dated March 9, 2023, he wrote to Brady Chitkara: "The person who *instigated* the harassing posts against you has completed our process and has been held accountable. [Plaintiff] is currently

*not an enrolled student*, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student….".

435.     Defendant Bourgoin also published to a third-party a statement that Plaintiff was no longer enrolled at Vanderbilt, leading Brady Chitkara to believe Plaintiff had been expelled from Vanderbilt as a result of his father's complaint against Plaintiff. Defendant Bourgoin's published statements to a third-party made its way to Plaintiff's employer at the time leaving Plaintiff to answer questions about his enrollment status at Vanderbilt.

436.     Defendant Bourgoin also knew that his statement about Plaintiff's enrollment status would lead Brady Chitkara to believe that Plaintiff had been expelled from Vanderbilt, as Defendant Bourgoin had admitted previously to Plaintiff, that "not enrolled" could mean expelled.

437.     Defendant Bourgoin knew his statement to Brady Chitkara, that Plaintiff "instigated the harassing posts" was demonstrably false, and Defendant Bourgoin was aware of its falsity. Not only is such a breach of Plaintiff's private educational information, but such statement is also defamatory.

438.     There was no question that numerous posts were made on a different site entirely (Greek Rank) which accused Brady Chitkara of committing sexual assault and drugging women, beginning as early as January or February 2022, at least two months prior to any post that Plaintiff made in April 2022 and continued into March and April according to the record. This was a fact that even Brady Chitkara's parents admitted to in their impact statements. Additionally, even a claim of being an instigator "only" on Yik Yak also fails, as Defendant Bourgoin was aware of previous posts on Yik Yak made prior to Plaintiff.

439.     There was simply no evidence establishing that Plaintiff instigated the harassing posts against Brady Chitkara.

440.    Even Vanderbilt's own website says suspension could be indefinite, as is expulsion. Based upon prior discussions between Plaintiff and Defendant Bourgoin, the reference to "not enrolled" and the verbiage that followed was meant to create a false impression, thus defaming Plaintiff further.

441.    As recently explained by the Middle District of Tennessee, for a communication to be considered defamatory, "[i]t must constitute a serious threat to the plaintiff's reputation." In other words, the statement "*must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule.*" Hudik v. Fox News Network, LLC, 512 F. Supp. 3d 816, 825 (M.D. Tenn. 2021) (emphasis in original).

442.    Plaintiff was in fact ridiculed and it was defamatory for Defendant Bourgoin to publish to a third-party that Plaintiff was the instigator in making posts concerning Brady Chitkara. It was defamatory for Defendant Bourgoin to publish to a third-party that Plaintiff was no longer enrolled at Vanderbilt thereby implying that Plaintiff was expelled from Vanderbilt.

443.    Defendant Bourgoin's letter to Brady Chitkara that Plaintiff instigated the harassing posts against Brady Chitkara was defamatory because it constituted a serious threat to Plaintiff's reputation and will subject Plaintiff to hatred, contempt, or ridicule from Brady Chitkara, his parents, his fraternity brothers, and his friends, and other persons in Plaintiff's community.

444.    Making a false accusation of instigating an entire matter against Plaintiff was knowingly false and intended to defame. "Instigating" a matter that involved hundreds of posts about Brady Chitkara and spanned about six months is the exact opposite as the truth, which is that Plaintiff made a limited number of posts in a handful of days sandwiched by dozens of posts.

445. The information conveyed in the March 9 letter has been published to third parties by Brady Chitkara, further harming Plaintiff's name and reputation. Defendant Bourgoin refuses to provide Plaintiff with an unredacted copy of this letter, so it is unclear who else is copied.

446. Plaintiff has been directly damaged by the publication of this false information, as he has suffered reputational harm, emotional harm, and lost job opportunities.

447. Subsequent to the issuance of the defamatory letter, multiple students and employees at Plaintiff's paid internship confronted him to ask Plaintiff about the sanction, which they understood to be an expulsion from Vanderbilt.

448. Moreover, since the issuance of the March 9 letter, Plaintiff has received inquiries from students that he otherwise would not be in contact with about where he is employed, places he is applying to for jobs, and where he is currently located, which adds to the harassment and severe level of distress that Defendants' actions have caused.

449. Undoubtedly, these statements in the March 9, 2023, letter were defamatory in that it falsely declared, through publication to a third party, that Plaintiff was the individual who had initiated all of the harassing posts against Brady Chitkara. It also falsely declared and/or implied that Plaintiff was expelled from Vanderbilt, which was certainly not true.

450. Defendant Bourgoin was requested to retract this defamatory statement and he refused. Defendant Bourgoin should have never even sent the letter in the first place as he is clearly aware of his inability to share the outcomes of disciplinary actions with other students.

451. Finally, because the university's process was inherently unfair to Plaintiff, the mere publishing of the statement by Defendant Bourgoin stating that he had found Plaintiff responsible was defamatory in and of itself because it implies that Plaintiff was found responsible through a fair and just process, which was clearly not so. See Wells v. Xavier Univ., 7 F. Supp. 3d 746, 750

(S.D. Ohio 2014). As such, this is further support for Plaintiff's claim that Defendant Bourgoin defamed Plaintiff.

452.     Plaintiff has been directly damaged by the publication of this false information, as Plaintiff has suffered reputational harm, emotional harm, and lost job opportunities.

453.     Defendant Bourgoin is therefore liable to Plaintiff for defamation.

## COUNT VI: NEGLIGENCE

### (Against Vanderbilt, Defendant Lowe, Defendant Bourgoin,

### Defendant Jamerson, Defendant Clapper)

454.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

455.     To establish a claim for negligence in Tennessee, a Plaintiff must prove each of the following elements: (1) a duty of care owed by the Defendant to the Plaintiff; (2) a breach of that duty; (3) an injury or loss; (4) cause in fact; and (5) damages as a result thereof.

456.     As stated by the Sixth Circuit in Atria v. Vanderbilt University 142 F. App'x 246, 251 (6th Cir. 2005), "Vanderbilt and its agents owe everyone, including [the Plaintiff], a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm. In Tennessee [a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. Thus, it has been said that duty is the legal obligation that a defendant owes a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm.'"

457.     Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Lowe, and Defendant Clapper owed Plaintiff a duty to conduct a disciplinary and appeal process that was fair and impartial, to ensure that any findings reached were just, and to refrain from imposing arbitrary

sanctions, to not discriminate against Plaintiff, and conduct a fair and impartial appeal review. Furthermore, Vanderbilt and its agents had a duty to Plaintiff to provide surety of Plaintiff's well-being and safety. Vanderbilt and its agents had a duty to investigate the claims being made by Brady Chitkara, the defenses presented by Plaintiff against the claims made by Brady Chitkara, and the conduct of similarly situated persons. Vanderbilt had a duty to investigate claims made by Nevin Chitkara months prior to Plaintiff making any social media posts concerning Brady Chitkara. Vanderbilt and its agents assumed a duty to monitor social media sites for speech of Vanderbilt students. Defendant Lowe had a duty to perform her duties as Appellate Chair within the scope of her employment as Appellate Chair. Vanderbilt and its agents owed Plaintiff a duty to protect Plaintiff's privacy and maintain confidentiality regarding Plaintiff's punishment, findings, personal accommodations, and/or health records.

458.    Vanderbilt and its agents owed Plaintiff a duty to follow procedures and adhere to certain standards of care when Plaintiff lodges specific complaints about significant breaches in their disability accommodations process and further breaches of education privacy. Plaintiff's complaints should have been referred for investigation, rather than suggesting Plaintiff withdraw from the University.

459.    For the reasons discussed above in the preceding paragraphs Defendants breached their duties of care to Plaintiff, which proximately caused substantial injury to Plaintiff's educational and career trajectories in addition to other economic and non-economic harms.

460.    Further, these damages were reasonably foreseeable given a finding of a violation of Vanderbilt conduct policies and a resultant sanction invariably cause direct harm to the student, and given the outcome related to each and every allegation herein.

461.     The additional conduct in privacy breaches, discrimination, and retaliation against Plaintiff for a protected complaint, further were reasonably foreseeable that they would cause direct harm.

462.     As a proximate and foreseeable consequence of the foregoing, Plaintiff sustained damages including, but not limited to, emotional distress, psychological damages, delay/loss in education, delay/loss of a Vanderbilt degree, loss of future educational and career opportunities, specific job and career loss, future lost income, reputational damages, physical harms, and other direct and consequential damages. Additionally, Plaintiff incurred, and will continue to incur, medical expenses as a result of the voluminous breached of duties of care owed to Plaintiff.

463.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Against Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe)

464.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

465.     To establish a claim for intentional infliction of emotional distress, a plaintiff must establish: (i) the defendant engaged in intentional or reckless conduct; (ii) the conduct was so outrageous that it is not tolerated by civilized society; and (iii) the conduct resulted in serious mental harm.

466.     Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe acted intentionally and/or recklessly when performing their duties related to the investigation and adjudication of the report against Plaintiff during the Student Accountability process.

467. Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe had knowledge of Plaintiff's mental health concerns and deteriorating mental state. Despite this actual knowledge, Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe acted with the intent to cause Plaintiff mental anguish and distress in performing their duties related to the investigation and adjudication of the report against Plaintiff during the Student Accountability process. Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe also acted with intent to cause mental harm against Plaintiff regarding the delivery on the outcome from Student Accountability. Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe could not be bothered pause the delivery of the outcome by merely one week to ensure the safety and well-being of Plaintiff knowing full well of Plaintiff's mental health deterioration. Defendants could not be bother to ensure Plaintiff made progress in their well being before communicating the arbitrarily reached Appeal denial.

468. Defendants misrepresented dates and the status of the Student Accountability process in order to maximize the impact that the Student Accountability findings and punishment effected upon Plaintiff.

469. Defendants desired to inflict serious emotional injury upon Plaintiff, as evidenced by the conduct described in the First Amended Complaint.

470. Plaintiff suffered serious mental injury as a result of Defendants' conduct. This was evidenced by Plaintiff's actual attempt to end Plaintiff's life thus resulting in Plaintiff being hospitalized.

471. As a result of the actions of the Defendants, Plaintiff sought medical care in the hospital due to an attempt of suicide. Plaintiff incurred actual medical expenses as a result thereof.

472. The actions of Defendants, as described herein, were so outrageous that they are not tolerated in a civilized society where due process and the presumption of innocence are the cornerstone of justice and fundamental fairness.

473. Additionally, all of the actions by the individually named Defendants in this First Amended Complaint, in their totality, amount to an additional claim of IIED.

474. Defendants were aware of Plaintiff's emotional status, yet efforts were allowed to continue that would continue to inflict emotional distress every single time another intentional policy violation was outrageously inflicted upon Plaintiff.

475. This includes actions of discrimination, retaliation, defamation and lying to Plaintiff about the March 9, 2023 FERPA violation and then refusing to rectify the privacy breach, interference with disability accommodations, false statements made to Plaintiff, suggesting Plaintiff withdraw from Vanderbilt, not investigating or providing any feedback to Plaintiff on their complaints submitted against Brady Chitkara, misleading Plaintiff for approximately seven months to falsely believe that good faith efforts were being made to try to resolve a dispute; the multitude significant privacy breaches throughout the University and others mentioned throughout this First Amended Complaint, and the shocking revelations discovered Plaintiff's FERPA records review which Defendants knew Plaintiff could access that demonstrated evidence of malice against Plaintiff.

476. This amounts to a "campaign of emotional torture". As the Second Circuit Court of Appeals has stated in <u>Rich v. Fox News Network, LLC</u>, 939 F.3d 112, 123 (2d Cir. 2019), "'where severe mental pain or anguish is inflicted through a deliberate and malicious campaign of harassment or intimidation,' IIED provides a remedy."

477. As a direct, proximate result of the foregoing, Plaintiff sustained and will continue to sustain substantial injury, damages, and losses. Plaintiff's damages, injuries and losses include, but are not limited to: severe emotional distress and injury, injury to reputation, past economic loss, future economic loss, loss of present and future career opportunities, loss of educational and extracurricular opportunities, and a deprivation of a right to the presumption of innocence and a fair and adequate grievance and adjudication process.

478. Defendants acted intentionally and/or recklessly when performing their duties related to the investigation and adjudication of the complaint against Doe, as described in detail in the preceding paragraphs. Defendants' conduct was so outrageous that it is not tolerated by civilized society.

479. As a direct, proximate result of the foregoing, Plaintiff sustained and will continue to sustain substantial injury, damages, and losses. Plaintiff's damages, injuries and losses include, but are not limited to, injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of present and future career opportunities, loss of educational and extracurricular opportunities, and a deprivation of a right to the presumption of innocence and a fair and adequate grievance and adjudication process.

480. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT VIII - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Clapper, and Defendant Lowe)

481. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

482. To establish a claim for negligent infliction of emotional distress, a plaintiff must demonstrate: (1) the defendant owed plaintiff a duty of care, (2) defendant engaged in conduct below the applicable standard of care amounting to a breach of defendant's duty, (3) plaintiff suffered an injury or loss, (4) the defendant's breach of its duty was the cause-in-fact of the injury and (5) defendant's breach was the legal cause of the Plaintiff's injury.

483. Defendants each carried out their duties with respect to the case against Plaintiff in a negligent manner. As stated by the Sixth Circuit in Atria v. Vanderbilt University 142 F. App'x 246, 251 (6th Cir. 2005), "Vanderbilt and its agents owe everyone, including [the Plaintiff], a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm. In Tennessee [a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. Thus, it has been said that duty is the legal obligation that a defendant owes a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm.'"

484. Vanderbilt, Defendant Jamerson, Defendant Bourgoin, Defendant Lowe, and Defendant Clapper owed Plaintiff a duty to conduct a disciplinary and appeal process that was fair and impartial, to ensure that any findings reached were just, and to refrain from imposing arbitrary sanctions, to not discriminate against Plaintiff, and conduct a fair and impartial appeal review. Furthermore, Vanderbilt and its agents had a duty to Plaintiff to provide surety of Plaintiff's well-being and safety. Vanderbilt and its agents had a duty to investigate the claims being made by Brady Chitkara, the defenses presented by Plaintiff against the claims made by Brady Chitkara, and the conduct of similarly situated persons. Vanderbilt had a duty to investigate claims made by Nevin Chitkara months prior to Plaintiff making any social media posts concerning Brady Chitkara. Vanderbilt and its agents assumed a duty to monitor social media sites for speech of

Vanderbilt students. Defendant Lowe had a duty to perform her duties as Appellate Chair within the scope of her employment as Appellate Chair. Vanderbilt and its agents owed Plaintiff a duty to protect Plaintiff's privacy and maintain confidentiality regarding Plaintiff's punishment, findings, personal accommodations, and/or health records.

485.    Vanderbilt and its agents owed Plaintiff a duty to follow procedures and adhere to certain standards of care when Plaintiff lodges specific complaints about significant breaches in their disability accommodations process and further breaches of education privacy. Plaintiff's complaints should have been referred for investigation, rather than suggesting Plaintiff withdraw from the University.

486.    For the reasons discussed above in the preceding paragraphs Defendants breached their duties of care to Plaintiff, which proximately caused substantial injury to Plaintiff's educational and career trajectories in addition to other economic and non-economic harms.

487.    It was reasonably foreseeable that the foregoing standard of care breaches would result in severe emotional distress to Plaintiff given the months long process that forced Plaintiff to continuously put forth a defense, attempt to prove Plaintiff's innocence, face administrators that were not unbiased and had already presumed Plaintiff to be responsible for every wrong complained of by Brady Chitkara, despite all of Plaintiff's efforts, ultimately resulted in Plaintiff being seriously punished by Vanderbilt resulting in substantial and significant damage to Plaintiff's future endeavors and causing irreparable harm to Plaintiff's reputation and emotional well-being.

488.    It was reasonably foreseeable that ignoring the fully documented signs of Plaintiff's level of distress including, but not limited to Plaintiff's mother's emotional pleas and explicit description of the imminent situation, that these acts of negligence would result in severe emotional

distress to Plaintiff. It was reasonably foreseeable that Plaintiff would attempt to end Plaintiff's life as a result of the outrageous actions of Defendants.

489.    It was reasonably foreseeable that ignoring Defendant Clapper's own Code of Ethics required of a Tennessee Licensed Clinical Social Worker when she did not have a plan for Plaintiff to safely receive their outcome communication and allowing the entire process to unfold without objection, despite having specific formal training, that these negligent acts would result in severe emotional distress to Plaintiff.

490.    It was reasonably foreseeable that the foregoing negligent acts with respect to the number of months it took to complete Plaintiff's disability accommodations process, that included divulging highly sensitive information, to only turn around about week later to then essentially strip them from Plaintiff by creating a false narrative, especially  after knowing Plaintiff was already inflicted with one of the most extreme sanctions available at the University, that these negligent acts would result in severe emotional distress to Plaintiff.

491.    It was reasonably foreseeable that ignoring the Vanderbilt's Standards of Conduct when responding to Plaintiff's Leave of Absence request and complaints regarding breaches of law and safety and suggesting the solution to be to withdraw from Vanderbilt,  after knowing, through her own involvement,  what Plaintiff had just been through for an entire year and a half, that these negligent acts would result in severe emotional distress to Plaintiff.

492.    It was reasonably foreseeable that additional negligent acts, such as, the multitude of privacy breaches, allowing a seven month unfair settlement process, and not making any attempt to resolve any of Plaintiff's complaints, would result in severe emotional distress to Plaintiff.

493.     Defendants' conduct continues to cause harm to Plaintiff given the irreparable harm to Plaintiff's reputation, the interruption in and loss of Plaintiff's education, and the lifelong ramifications that will flow therefrom.

494.     It was reasonably foreseeable that Plaintiff would suffer physical, emotional, and psychological harm as a result of Defendants' conduct.

495.     As a direct, proximate result of the foregoing, Plaintiff sustained and will continue to sustain substantial injury, damages, and losses. Plaintiff's damages, injuries and losses include, but are not limited to, injury to reputation, severe emotional distress, past economic loss, future economic loss, loss of present and future career opportunities, loss of educational and extracurricular opportunities, and a deprivation of a right to the presumption of innocence and a fair and adequate grievance and adjudication process.

496.     As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered, and will continue to suffer considerable emotional and psychological harm.

497.     As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## **COUNT IX - UNJUST ENRICHMENT**

### **(Against Vanderbilt)**

498.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

499.     To establish unjust enrichment, Plaintiff must prove: a benefit was conferred upon the Defendant by the Plaintiff; appreciation by the Defendant of such benefit; and acceptance of such benefit under such circumstances that it would be inequitable for Defendant to retain the benefit without payment of the value thereof.

500.     Plaintiff conferred a benefit upon Vanderbilt by way of payment of the tuition and fees associated with attendance at the Vanderbilt.

501.     Vanderbilt appreciated such benefit.

502.     Vanderbilt accepted such benefit from Plaintiff and retained the benefit of the payment of tuition and fees.

503.     Permitting Vanderbilt to retain the benefit of Plaintiff's tuition payments while denying him the rightful benefit of a degree, course credit, and future professional opportunity is inequitable amounting to unjust enrichment.

504.     As such, Vanderbilt has been unjustly enriched by accepting and keeping the tuition and fees but denying Plaintiff the rightful benefit of a degree, course credit, and other equitable opportunities.

## COUNT X: TORTIOUS INTERFERENCE WITH THIRD PARTY CONTRACT
### (Against Vanderbilt and Defendant Bourgoin)

505.     Plaintiff incorporates by reference the allegations contained in all preceding paragraphs as if fully stated herein.

506.     To prove a claim for tortious interference with contract, a Plaintiff must prove: (1) that there was a legal contract; (2) that the defendant knew of the existence of the contract; (3) that the defendant intended to induce a breach of the contract; (4) that the defendant acted maliciously; (5) that the contract was actually breached; (6) that the defendant's acts were the proximate cause of the breach; and (7) that the plaintiff suffered damages resulting from the breach.

507.     Defendant Bourgoin, who was acting as an agent of Vanderbilt, was aware, by multiple communications that Plaintiff had a contractual obligation and was completing a limited time internship during the entirety of the disciplinary investigation. Plaintiff had informed

Defendant Bourgoin on multiple occasions their job performance and obligations to their internship were being impacted. As such, Plaintiff informed Defendant they were going to get fired due to being pulled away from the office from the continued meetings occurring during business hours breaching their obligations, that the process was causing panic attacks during work which caused further departures from the office, and how they could not sleep further adversely impacting their ability to complete their obligations, let alone be able to demonstrate their true value and eventually gain a return job offer.

508.    Plaintiff had a valid, enforceable contract as an intern at a firm located in the United States. Defendants Jeremy Bourgoin and Vanderbilt had actual knowledge of Plaintiff's contract and/or had reasonable knowledge that Plaintiff had a contract at his internship. More specifically, Defendant Bourgoin was made aware of one of the aspects of the contract.

509.    Plaintiff's lack of a return offer from their internship was directly caused by Defendant Bourgoin's and Vanderbilts interference with Plaintiff's contract for the internship and Plaintiff's contractual obligations continued therein.

510.    Defendant Bourgoin's and Vanderbilt's actions of interfering with Plaintiff's third-party contract were malicious.

511.    The third-party contract at issue was in fact breached.

512.    Defendants' actions in consistently pulling Plaintiff away from his contractual duties at Plaintiff's internship were the proximate cause of the breach.

513.    Plaintiff suffered damages as a result of this breach because Plaintiff was not offered a position to return to his internship for employment.

514.    Furthermore, Plaintiff's opportunity for bonus was adversely impacted.

515. Once put on notice, Defendants had a duty to refrain from their actions, but nevertheless, Defendant Bourgoin and Vanderbilt persisted.

516. Defendants even made sure their last opportunity to meet with Plaintiff, would in fact be conducted during the work, and had planned on sending the police there after they delivered the outcome message to further disrupt Plaintiff's internship, the performance of it and further impact their reputation at this internship. It is impossible to construe any other explanation than Vanderbilt deliberately interfered with Plaintiff's performance in fulfilling their contract.

517. Defendants would have held off Plaintiff's disciplinary process for as long as necessary, if it would benefit Brady Chitkara and/or his father in a potential pursuit of criminal charges; however, once it was known Plaintiff did not violate the law, Defendants refused to hold off Plaintiff's disciplinary process a handful of weeks in order to enable Plaintiff to complete their known contractual obligations. Additionally, no other posters were even investigated and both Plaintiff and Brady Chitkara were not in Nashville at all that semester. Since there was no rush whatsoever further demonstrates Vanderbilt's intent.

518. Therefore, any decision to proceed and continue to interfere with Plaintiff's employment contract and obligations was malicious and Defendants were well aware of the consequences to Plaintiff.

519. Defendants were aware of the significance of the internship obligations, and how their continued actions, despite multiple requests and warnings the continued hearings during business hours were causing harm. Nonetheless, Defendants refused to wait to ensure Plaintiff successfully fulfilled their commitments.

520. Defendants were well aware of the purpose and goals of an internship that are designed to secure full time employment.

521. As a direct and proximate result of Defendant's intentional interference when Vanderbilt breached and disrupted Plaintiff's third party contract with their internship employer and the performance thereof, Plaintiff sustained damages including, but not limited to, emotional distress, psychological damages, loss of job offer and recommendation, delay/loss of future educational and career opportunities, future lost income, reputational damages which caused other job application interference, and other direct and consequential damages.

522. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## RELIEF REQUESTED

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

1. That Defendants be required to answer and appear herein;

2. That a constitutional jury be empaneled to try all factual issues herein;

3. That this Court grant the injunctive relief requested herein against Vanderbilt requiring Vanderbilt to: (i) reverse the outcome, findings, and sanctions against Plaintiff; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of the findings or suspension from Plaintiff's educational file/disciplinary records/transcript; (iv) any and all further actions required to return Plaintiff to the status quo ante, as alleged in Counts I and II;

4. That this Court adjudicate and declare that Vanderbilt is liable to Plaintiff for beach of contract and all damages resulting therefrom as alleged in Count II;

5. That this Court adjudicate and declare Vanderbilt is liable to Plaintiff for violations of Title IX, Selective Enforcement, 20 U.S.C. § 1681, *et seq.*, and all damages resulting therefrom as alleged in Count III;

6.      That this Court adjudicate and declare that Vanderbilt, Defendant Bojarski, and Defendant Paschal are liable to Plaintiff for violations of Section 504 of *Rehabilitation Act of 1973* and *Title II of the Americans with Disabilities Act of 1990*, and all damages resulting therefrom as alleged in Count IV;

7.      That this Court adjudicate and declare Defendant Bourgoin is liable to Plaintiff for defamation, and all damages resulting therefrom as alleged in Count V;

8.      That this Court adjudicate and declare that Vanderbilt, Defendant Lowe, Defendant Bourgoin, Defendant Jamerson, and Defendant Clapper, are liable to Plaintiff for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress, and all damages resulting therefrom as alleged in Counts VI, VII, and VIII;

9.      That this Court adjudicate and declare that Vanderbilt is liable to Plaintiff for unjust enrichment, and all damages resulting therefrom, as alleged in Count IX;

10.     That this Court adjudicate and declare that Vanderbilt and Defendant Bourgoin are liable to Plaintiff for tortious interference with contract, and all damages resulting therefore, as alleged in Count X;

11.     That the costs, including discretionary costs, of this action be assessed against the Defendants;

12.     That Plaintiff be awarded Plaintiff's reasonable attorneys' fees; and

13.     For such other and further legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Cory R. Miller* _____
**CORY R. MILLER**
Registration No. 34770
DIRECT: (615) 630-7745
cmiller@bkblaw.com
**JACOB E. MOSES**
Registration No. 41637
DIRECT: (615) 630-7742
jmoses@bkblaw.com
*Attorneys for Plaintiff, Parker Poe*

**BREWER, KRAUSE, BROOKS
CHASTAIN & MEISNER, PLLC**
545 Mainstream Drive, Suite 101
Nashville, TN 37228

## CERTIFICATE OF SERVICE

I hereby certify that on this _____ day of June, 2024, a true and correct copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U. S. Mail. Parties may access this file through the court's electronic filing system.

Mark A. Baugh, Esquire
Ryan P. Loofbourrow, Esquire
Katie Dwyer, Esquire
Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
*Attorneys for Defendants*

*/s/ Cory R. Miller* _____
**CORY R. MILLER**