UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **PARKER ROE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | No. 3:24-cv-00368 |
| | ) | |
| **DR. MELANIE LOWE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION**

Following his academic suspension, Plaintiff Parker Poe[1] brought a ten-count complaint against Vanderbilt University ("Vanderbilt"), Associate Professor Dr. Melanie Lowe ("Lowe"), Director of Student Accountability Dr. Jeremy Bourgoin ("Bourgoin"), former Assistant Dean of Students, Community Standards and Support Neil Jamerson ("Jamerson"), Director of Student Care Network and Student Care Coordination Lisa Clapper ("Clapper"), Executive Director of Student Access Service Dr. Jamie Bojarski ("Bojarski"), and Senior Associate Dean for Undergraduate Students, School of Engineering Dr. Cynthia Paschal ("Paschal") (collectively, "Defendants"), alleging various statutory violations, torts, and a breach of contract. Before the Court is Defendants' Motion to Dismiss First Amended Complaint (Doc. No. 62) ("Motion"), to which Poe has responded in opposition (Doc. No. 77), and the Defendants replied (Doc. No. 83). For the following reasons, the Motion will be granted in part and denied in part.

---

[1] Parker Poe is a pseudonym, under which Plaintiff filed this case pursuant to a state court order. (See Doc. No. 93 at 1–2).

## I.  FACTUAL ALLEGATIONS[2]

### A.  Background and Events Leading to the Disciplinary Procedure

Vanderbilt is a private research University, located in Nashville, Tennessee, that receives federal funding. (Doc. No. 34 ¶¶ 14, 385). All other defendants were employees of Vanderbilt "[a]t all times relevant." (Id. ¶¶ 11–13, 15–17). Poe attended Vanderbilt as a student. (Id. ¶ 20). Underlying this lawsuit is a disciplinary procedure against Poe, which resulted in Poe's suspension and additional sanctions. Poe alleges that irregularities in this procedure were illegal.

The FAC, which incorporates Vanderbilt's Student Handbook for the 2021 to 2022 school year ("Handbook") and Vanderbilt's Standards of Conduct ("Standards"), alleges that Poe enrolled at Vanderbilt in 2020. (Id. ¶ 20). In 2022, Poe "took a semester off from Vanderbilt to prepare and apply to a highly competitive and specialized internship." (Id. ¶ 21). Poe later accepted a job offer with an out-of-state company for the Spring semester of 2023, during which he took remote classes at Vanderbilt to remain on track to graduate. (Id. ¶¶ 21–23).

In April of 2022, while he was away from campus, Poe felt "a moral and ethical obligation to take a stand with the victims of sexual assault," which prompted him to repost allegations of sexual assault and "roofying"[3] against another student, Simon Roe ("Roe"),[4] on a social media

---

[2] The relevant background and facts necessary to resolve the pending Motion to dismiss are drawn only from the First Amended Complaint ("FAC") (Doc. No. 34) and its attachments. They are accepted as true for purposes of ruling on the Motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

[3] To "roofie" means "to secretly and illegally give someone a drug, especially Rohypnol, usually in a drink, in order to make them unconscious or unable to function normally so that they can be raped (= made to have sex against their wishes) or otherwise harmed." *Roofie*, CAMBRIDGE DICTIONARY, https://dictionary.cambridge.org/dictionary/english/roofie (last visited Oct. 3, 2024).

[4] Simon Roe is a pseudonym, which the parties must use pursuant to this Court's Order. (See Doc. No. 93 at 15).

platform called Yik Yak.[5] (Id. ¶¶ 22–23). Poe had no personal knowledge of wrongdoing by Roe but had "learned about [Roe's] negative reputation from various credible sources, including other students and numerous social media posts." (Id. ¶ 28). Poe believed the rumors about Roe to be true. (Id. ¶ 33). In addition to Poe's posts, there were hundreds of similar posts targeting Roe by other students. Although Vanderbilt "monitored" those posts, Vanderbilt's "lack of action" allowed students to continue to make such posts. (Id. ¶¶ 40–41).

B. The Investigation

Roe's father complained about the offensive posts to Assistant Dean Jamerson in February and April of 2022, but "no action" was taken until the fall of 2022, when Roe filed suit for defamation. (Id. ¶¶ 41–44). During discovery, Roe "obtain[ed] identifying information of several student posters," including Poe. (Id. ¶¶ 45). Roe's father provided the information to Jamerson, and demanded that "all posters who made posts concerning his son be severely punished" and that Vanderbilt conduct remote hearings to speed up the disciplinary procedure. (Id. ¶¶ 45, 47). "Jamerson was clearly worried about his own repercussions as a result of [Roe] now having retained counsel" given that "Jamerson had taken zero action whatsoever after [Roe's father] lodged at least two different complaints to him nearly one year prior and accused Vanderbilt of not protecting his son." (Id. ¶ 48). The FAC alleges that Roe's father's continuous involvement in the disciplinary procedure "deep[ly]" influenced Jamerson and the disciplinary procedure itself, in violation of Vanderbilt's policies set forth in the Handbook. (Id. ¶¶ 48, 69–73, 82–86, 89).

On January 3, 2023, Jamerson corresponded with Vanderbilt's Student Accountability department and Office of Sexual Misconduct to determine which entity had jurisdiction. (Id. ¶

---

[5] According to Wikipedia, Yik Yak is a pseudonymous social media smartphone application that allows college students to create and view discussion threads within a five-mile radius. *Yik Yak*, WIKIPEDIA, https://en.wikipedia.org/wiki/Yik_Yak#:~:text=Yik%20Yak%20is%20a%20pseudonymous%20social%20media%20smartphone (last visited Oct. 3, 2024).

52). In that correspondence, Jamerson acknowledged that "multiple students, including female students, had been identified as having made the posts," and there was a "concern that one of the female students may allege they [*sic*] had been sexually assaulted by [Roe] or were [*sic*] speaking on behalf of a victim." (Id.). Ultimately, only Poe was investigated and charged, even though Roe's father had also filed a complaint against two female students. (Id. ¶¶ 53–54, 59–61). According to the FAC, this was the result of an "affirmative decision [by Jamerson and Director of Student Accountability Bourgoin] to avoid investigating the female posters," which amounted to "selective enforcement." (Id. ¶¶ 60, 76). Moreover, to provide "closure" to Roe and cast blame on a male, Bourgoin decided to blame Poe for all posts and "secretly" designate him as the "instigator" of all posts. (Id. ¶¶ 55–57). This resulted in Bourgoin filing an official complaint against Poe, which attributed various posts to Poe that he did not make. "This was hidden from [Poe] during the investigation and during the appeal request, so [Poe] could not properly defend nor appeal these added complaints/charges." (Id. ¶¶ 62–63). The official complaint also contained parts of Roe's father's complaint, which Burgoin selectively copied and pasted so to reflect "only the portion that could be attributed to [Poe]," while omitting portions incriminating the female posters. (Id. ¶¶ 62, 359, 390–91).

As a result of the investigation and official complaint, Vanderbilt charged Poe with three violations of the Handbook: harassment, disorderly conduct, and impersonation. (Id. ¶¶ 68–91). Poe claims he never received adequate notice of these charges, which itself is a violation of Vanderbilt's policies. (Id. ¶¶ 63–72, 90, 100–104, 114, 144, 146, 178). He also contends that the definitions of his charges were vague, and that Defendants allegedly altered the definition of certain charges to influence the outcome of the investigation. (Id. ¶¶ 90–99). Poe claims there were many other flaws and biases in the investigation, including that Bourgoin relied on

misleading personal-impact statements that Poe never had a chance to review, withheld exculpatory evidence, refused certain witness testimony, accepted all of Roe's statements as true, and essentially placed the burden on Poe to disprove his own guilt. (Id. ¶¶ 51, 74, 77–78, 107–125, 128, 131–33, 141, 143, 145). Ultimately, Poe "never had a chance of any unbiased review at any stage of this matter" because the Defendants "predetermined" the result of the disciplinary procedure. (Id. ¶¶ 69–70, 79, 88–89, 107).

C.     Notification Regarding the Outcome of the Investigation

The FAC alleges that the Defendants were unnecessarily and purposefully hurtful in the way they notified Poe about the results of the investigation. Concerned that the results of Vanderbilt's investigation were "adverse" and could cause Poe to end his life, Poe's mother asked Vanderbilt to delay the results of the investigation until Poe returned to Vanderbilt from his internship. (See id. ¶¶ 207, 212–15). Jamerson and Bourgoin denied this request and scheduled a call for March 6, 2023. (Id. ¶¶ 214–215). Poe's mother was not informed that they had scheduled a call. (Id. ¶ 217).

It was known and documented at Vanderbilt that Poe was suicidal. (Id. ¶ 216). Bourgoin acknowledged that the results of the investigation "will likely be rough" on Poe, and Director Clapper emailed Bourgoin the night before the call, stating "[t]he parents better have flown out there. [L]ol." (Id. ¶ 216, 219). Nonetheless, "[a]fter being informed that Poe's parents were not with [him] . . . . Bourgoin delivered the outcome with a smirk on his face." (Id. ¶ 221). The outcome was that Vanderbilt found Poe responsible for all three alleged violations and disciplined him as follows: suspension, notation of the suspension on Poe's academic record; prohibition from being on campus; prohibition against transferring credits earned elsewhere during the suspension

period; completion of a seminar; obligation to read a book and watch a movie;[6] meeting with a member of Project Safe;[7] and obligation to submit reflection papers.  (Id. ¶¶ 157, 179).  "Upon receipt of the decision . . . [Poe] made an actual attempt to commit suicide."  (Id. ¶ 224).

D.      Appeal

Poe appealed Vanderbilt's decision on various grounds, but his appeal was denied.  The FAC alleges that Vanderbilt's appellate procedure involved "severe and harmful contract violations."  (Id. ¶¶ 108, 154).  For example, it alleges that Lowe, who was in charge of the appeal, improperly relied on information outside of the record, found Poe responsible for an entirely new charge, applied a new definition of "disorderly conduct" that did not appear in the Handbook, improperly "rubber stamped" unsupported findings without considering the entire record, and failed to recognize that the punishment was "severely disproportionate and inconsistent with prior cases" as well as Vanderbilt's policies requiring that students be treated equally.  (Id. ¶¶ 235, 260–61, 271–74).  Lowe further failed to consider Poe's lack of prior disciplinary violations—a factor required by the Handbook.  (Id. ¶¶ 274–76).  Finally, Jamerson was involved in the appeal, which was improper and constituted a conflict of interest in further violation of Vanderbilt's policies.  (Id. ¶¶ 283–89).

E.      Privacy Breaches and Additional Allegations

Throughout this time, Poe further alleges that he was the victim of several privacy breaches and "unfair actions."  (See id. ¶ 332).  For example, Jamerson shared Poe's telephone number and leave of absence information with Roe's father, Vanderbilt publicly disseminated information

---

[6] The FAC notes that the book was centered around gender-based themes and that the movie portrayed a person contemplating suicide.  (See id. ¶¶ 226, 401).

[7] Project Safe provides support to persons impacted by sexual and intimate partner violence.  *About Us*, VANDERBILT STUDENT AFFAIRS, https://www.vanderbilt.edu/projectsafe/ enforcement resources (last visited Oct 3, 2024).

about Poe's disability accommodations and academic sanctions, and faculty members shared "disparaging remarks about" Poe. (Id. ¶ 298–307, 334–38, 343). Vanderbilt further notified Roe of the outcome of the disciplinary procedure, allegedly in violation of state and federal law as well as Vanderbilt's policies. (Id. ¶¶ 180–82, 210, 335). The notification letter to Roe was defamatory because it designated Poe as the "instigator" of all posts against Roe. (Id. ¶¶ 198–202). Roe then "took advantage of this official Vanderbilt University issued letter/information and used it improperly." (Id. ¶ 334). As a result of the above privacy breaches and "unfair actions," Poe alleges that he lost his job and academic opportunities, among other things. (See id. ¶¶ 345–54).

Poe complained about this conduct and reported the privacy breaches to Associate Dean Paschal. Poe also requested a leave of absence. Although no one responded to the complaints (allegedly in violation of Vanderbilt's policies), Paschal responded to the request for a leave as follows:

> It sounds from what you wrote that you are really unhappy with Vanderbilt and don't want to come back to earn your degree from VU. Please know that you can withdraw from VU if you don't envision yourself coming back, which of course is the only way to finish a VU degree. If you later change your mind, you could then apply for readmission. Do you want to withdraw?

(Id. ¶ 321–23, 325). Poe alleges that this response was retaliatory, deceitful, and an attempt "to try to get [Poe] to withdraw from Vanderbilt." (See id. ¶¶ 326–330).

## II.    LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "the complaint must include a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ryan v. Blackwell, 979 F.3d 519, 524 (6th Cir. 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When determining whether the complaint meets this standard, the Court must accept all the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an

entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018); see also Ashcroft v. Iqbal, 556 U.S. 662, 678–79 (2009). Moreover, the Court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer v. Rhodes, 416 U.S. 232 (1974)). And "[w]hile the complaint 'does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Blackwell, 979 F.3d at 524 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." Com. Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)); Hall v. Trump, No. 3:19-CV-00628, 2020 WL 1061885, at *1 (M.D. Tenn. Mar. 5, 2020) (same)).

## III. ANALYSIS

The FAC contains ten counts: injunctive relief (Count I), breach of contract (Count II), violation of Title IX (Count III), violations of the Rehabilitation Act and Americans with Disabilities Act ("ADA") (Count IV), defamation (Count V), negligence (Count VI), intentional infliction of emotional distress (Count VII), negligent infliction of emotional distress (Count VIII), unjust enrichment (Count IX), and tortious interference with contract (Count X). Defendants have moved to dismiss the FAC in its entirety.

In his opposition brief, Poe agreed to dismiss Counts I and IX. (See Doc. No. 77 at 9, 25). Regarding Count IV, Poe agreed to dismiss his (1) ADA claims in their entirety and (2) Rehabilitation Act claims against Bojarski and Paschal. (See Doc. No. 77 at 17). Accordingly, the Court will dismiss these claims without further analysis.

The Court will address the remaining counts below.

8

A.    Breach of Contract (Count II)

Defendants argue that the FAC does not plausibly allege a breach of contract claim because it fails to "specify[] the discrete contractual provisions that Vanderbilt allegedly breached."  (Doc. No. 63 at 8–9).  Poe counters that he is not required to plead with such detail, and even if he were, he attached the Handbook and Standards to the FAC.  (Doc. No. 77 at 9–10).  Poe's opposition also provides a table listing the alleged breaches in the FAC and the corresponding pages of the Handbook and Standards.  (Id. at 10–13).  Defendants argue that the Court should disregard this evidence because Poe's opposition "seeks to add factual allegations to the [FAC] in the form of identification of specific contractual provisions."  (Doc. No. 83 at 2–3).

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract."  Kryder v. Est. of Rogers, 296 F. Supp. 3d 892, 908 (M.D. Tenn. 2017) (quoting Ingram v. Cendant Mobility Fin. Corp., 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006)).  "To prevail on any breach of contract claim, the plaintiff must prove all elements."  (Id.) (quoting Hampton v. Macon Cty. Bd. of Educ., 2014 WL 107971, at *9 (Tenn. Ct. App. 2014)).  "A student may raise breach of contract claims arising from a university's alleged failure to comply with its rules governing disciplinary proceedings."  Anderson v. Vanderbilt Univ., 450 F. App'x 500, 502 (6th Cir. 2011) (citing Atria v. Vanderbilt Univ., 142 F. App'x 246, 255 (6th Cir. 2005)).  The Sixth Circuit has held that the provisions of Vanderbilt's Student Handbook may be enforced as an implied contract and that "[c]atalogs, manuals, handbooks, bulletins, circulars and regulations of a university may help define this contractual relationship."  Atria, 142 F. App'x at 255 (citing Doherty v. S. Coll. of Optometry, 862 F.2d 570, 577 (6th Cir. 1988)).

The FAC alleges that either an express or implied contract existed between Poe and Vanderbilt.  (Doc. No. 34 ¶ 370).  The FAC further alleges that the parties' contractual relationship

9

was "defined by and through Vanderbilt's policies and procedures, including the Handbook." (Id.). The FAC also alleges that, "[t]hrough these policies, Vanderbilt provided specific, enforceable provisions outlining certain practices and procedures that were to be followed by the institution before imposing discipline upon its students." (Id. ¶ 371). "Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of [Vanderbilt]'s contract[.]" (Id. ¶¶ 371). Further, the FAC sets forth the alleged breaches by Vanderbilt. Indeed, the FAC alleges that Vanderbilt "failed to follow several procedures in the Handbook." (Id. ¶ 374). Specifically, it "fail[ed] to conduct a full and unbiased investigation"; "[a]llow[ed] outside influence from" Roe's father; failed to inform Poe of all charges against him; "chang[ed], [did] not provid[e] and us[ed] incorrect definitions"; denied Poe access to information used against him and an opportunity to rebut the same; refused to hear witnesses and denied Poe the right to challenge adverse testimony; failed to follow proper appeal procedures; and "[i]invit[ed] information and/or evidence not prescribed within Vanderbilt's process." (Id.). In addition, the FAC alleges additional breaches arising from privacy violations, discrimination, retaliation, conflicts of interest, and "not following . . . policies that require basic respect and fairness." (Id. ¶ 375). Finally, the FAC alleges that Vanderbilt breached the implied covenant of good faith and fair dealing by not "conduct[ing] proceedings with basic fairness." (Id. ¶ 376). As for damages, the FAC alleges that the above breaches caused, *inter alia*, emotional distress, loss of professional and academic opportunities, and reputational damages. (Id. ¶ 379).

The FAC does not expressly allege the specific terms the Defendants breached by engaging in the above conduct.[8] (See, e.g., id. ¶¶ 2–3, 50, 61, 83, 85, 109, 134, 137, 154, 175, 190, 194, 244,

---

[8] While Poe's opposition provides a table of breaches alleged in the FAC and corresponding pages of the Handbook and Standards, this table falls beyond the scope of the pleadings. See Bates v. Green Farms Condo. Ass'n, 958 F.3d 470, 484 (6th Cir. 2020) ("If a complaint fails to state a claim

256, 275, 287, 301, 306, 334, 338, 368, 373–75, 383) (alleging breaches of "policies," "policy,"

"other policies," "disciplinary policies," "privacy policies," "promise," "contract," the "Handbook,"

or the "Agreement"). In the same vein, the FAC's descriptions of terms allegedly breached are

generally vague. (See, e.g., id. ¶¶ 24, 83, 375 (describing the terms as "basic respect and fairness,"

"fair, consistent, and confidential procedures," and "fairness in the process and just findings").

However, Poe attached the Handbook and the Standards to the FAC, thereby making these

documents an integral part of the pleadings. (See generally Docs. No. 34-1, 34-3).

It is true that "a plaintiff must identify the specific term of a contract that has allegedly

been breached." Archambeault v. Wyndham Vacation Ownership, Inc., No. 3:20-CV-01044, 2021

WL 6496827, at *7 n.19 (M.D. Tenn. July 14, 2021) (citing KSA Enterprises, Inc. v. Branch

Banking & Tr. Co., 761 F. App'x 456, 460 (6th Cir. 2019)); see Simmons v. Countrywide Home

Loans, No. 3:09-00621, 2010 WL 1408592, at *3 (M.D. Tenn. Feb. 25, 2010) (recommending

dismissal because the complaint did not allege which provisions were breached), report and

recommendation adopted, No. 3:09-0621, 2010 WL 1408595 (M.D. Tenn. Apr. 5, 2010); see also

Hames v. SunTrust Bank, No. 18-CV-2121-SHM-CGC, 2023 WL 9184103, at *4 (W.D. Tenn. Aug.

15, 2023) ("Failure to identify a specific contract provision in the complaint is grounds for

dismissal."); Berry v. Regions Fin. Corp., 507 F. Supp. 3d 972, 980 (W.D. Tenn. 2020) (the

proposed amendment was futile where the complaint failed to specify the provision or contract

allegedly breached). Nonetheless, this District has typically applied a less stringent standard when

---

even under the liberal requirements of the federal rules, the plaintiff cannot cure the deficiency by
inserting the missing allegations in a document that is not either a complaint or an amendment to a
complaint." (quoting Harrell v. United States, 13 F.3d 232, 236 (7th Cir. 1993)). Even if the Court
were to consider these additional allegations, some degree of uncertainty would remain given that
the opposition describes the information in the table as mere "examples." (See Doc. 77 at 10).

a party attached the contract at issue to a pleading.  See, e.g., Bridgestone Am.'s, Inc. v. Int'l Bus. Machines Corp., 172 F. Supp. 3d 1007, 1022 (M.D. Tenn. 2016) (finding that the plaintiff adequately pleaded a breach of contract by attaching the contracts at issue to the complaint, despite failing to identify the specific provisions allegedly breached); Nashville Acupuncture Clinic, PLLC v. Holistic Billing Servs., LLC, No. 3:23-CV-00572, 2023 WL 8851603, at *3 (M.D. Tenn. Dec. 21, 2023) (same); accord Northampton Rest. Grp., Inc. v. FirstMerit Bank, N.A., 492 F. App'x, 518, 522 (6th Cir. 2012) ("without the contracts *or* reference to specific language, [the plaintiff] has failed to put forth a plausible claim for relief") (emphasis added).  Therefore, the Court will examine whether the attachments support Poe's claims.

The FAC, which is far from a model of clarity, alleges numerous grounds for breach.  These grounds fall in the following categories: irregularities in the investigation, irregularities in the appeal, disproportionate sanctions, ignored complaints, and additional miscellaneous breaches.  The Court will address these each of these categories.

### 1.    Investigation

With respect to the investigation, Poe complains that he did not receive timely notice of the charges.  (See, e.g., Doc. No. 34 ¶¶ 63–72, 90, 100–104, 114, 144, 146, 178, 374).  The FAC also alleges that Poe was unable to access and rebut information used against him.  (Id. ¶¶ 185–90, 234–38, 374).  The FAC further alleges that Poe was unable to present witnesses.  (See, e.g., Id. ¶¶ 107, 109, 112, 116, 120, 145, 150, 206, 374).  Finally, the FAC alleges that Jamerson had a conflict of interest, insofar as he was worried about legal repercussions for himself. [9]  (See id. ¶¶ 48–49).  By extension, Bourgoin was also conflicted given that Jamerson, his "direct supervisor,"

---

[9] Drawing all inferences in favor of Poe, the Court will construe the sparse allegations in the complaint as alleging that Jamerson was a member of the Office of Student Accountability to the extent he was the supervisor of Bourgoin, who was the director of that office.  (See id. ¶¶ 12, 14).

allegedly exerted pressure on him.  (See id. ¶¶ 14, 49, 69-71, 77–87, 283).  The Handbook clearly provides that students are entitled to timely notice of the charges, the opportunity to examine and challenge adverse information, and the opportunity to present witnesses.  (See Doc. No. 34-1 at 110–11).  The Handbook also expressly states that conflicted members of the Office of Student Accountability are ineligible to consider a case.  (Id.).  In their reply, the Defendants argue these allegations are nonetheless insufficient because they are similar to those of the plaintiff in Z.J. v. Vanderbilt University, 355 F. Supp. 3d 646 (M.D. Tenn. 2018), which this Court found to be deficient.  But Z.J. is distinguishable.  As this Court noted, the provisions at issue in that case were solely permissive.  See Z.J., 355 F. Supp. 3d at 691–92.  In our case, the FAC alleges violations of Handbook provisions that appear to be mandatory as evidenced by verbs such as "will" and "must" as well as phrasing that vests the discretion of whether to take a specific action in the student being investigated.  (See Doc. No. 34-1 at 110–112).  Therefore, the Court finds that, these allegations suffice to state a claim for breach of contract at this stage.

Some of Poe's breach theories, however, do not pass muster under the plain language of the Handbook.  For instance, the Handbook clearly forbids the use of polygraph results, which effectively disposes of any claims relating to Vanderbilt's refusal to consider such results.  (Id. at 111; cf. Doc. No. 34 ¶¶ 127–129).  Similarly, the provisions that provide that the investigative body will "seek to interview any other individuals who, in the investigators' judgment, may have information pertinent to the investigation" and that "[i]nvestigators will collect from the complainant, respondent, witnesses, and third parties information that may be relevant" is not only permissive on its face, but also appears in a section of the handbook that only applies to complaints for discrimination.  (See Doc. No. 34-1 at 226 (emphasis added)).  As such, the Court finds no support in the Handbook for Poe's claim that Vanderbilt should have interviewed other students.

(Cf. Doc. No. 34 ¶¶ 112, 116, 145, 273). In the same vein, the FAC makes allegations of "bias" related to the investigation procedure. (See id. ¶ 1, 3, 78, 107, 116, 183, 192, 197, 341, 343.) These allegations of bias, which appear to pertain to the investigation procedure itself and be unrelated to the FAC's Title IX claim,[10] essentially allege that the investigation was unfair. (See, e.g., id. (alleging that Bourgoin and Jamerson were "biased" because they predetermined the result of the investigation to benefit Roe and at Poe's detriment)). Without more, this claim is indistinguishable from other grievances related to the investigation. See Doe v. The Trustees of the Univ. of Pennsylvania, 270 F. Supp. 3d 799, 813–4 (E.D. Pa. 2017) (finding that the promise that an investigating officer will lead a "thorough and fair" investigation, followed by more specific provisions, did not impose requirements in addition to those of the more specific provisions).

Therefore, with respect to the investigation, the FAC only states a *prima facie* case of breach of contract based upon alleged violations of a limited number of Handbook sections, namely the right to receive timely notice of charges, the right to access and challenge incriminating information, the right to call witnesses, and the duty of conflicted members of the Student Accountability office to not consider a case. These claims will remain pending. Conversely, claims premised upon the use of polygraph results, the failure to interview witnesses that Poe did not seek to call, and amorphous allegations of unfairness will be dismissed.

      2.    Appeal

Poe raises two theories of breach with respect to the appeal. First, Poe takes issue with Lowe's consideration of information outside of the record. (See, e.g., Doc. No. 34 ¶ 235). But the

_____

[10] The Court notes that the Handbook prohibits sex-based discrimination. (See Doc. No. 34-1 at 218-22). However, the FAC does not appear to premise its breach of contract claim upon allegations of sex-based discrimination.

14

Handbook allows the consideration of "new information the Board determine[d] should be considered." (Doc. No. 34-1 at 117). The FAC falls short of alleging that the information Lowe considered did not fall in that category. Second, Poe claims that the appeal was tainted by irregularities stemming from the investigation. For instance, the FAC alleges that Vanderbilt withheld incriminating information from Poe, which deprived him of a meaningful opportunity to appeal. (See Doc. No. 34 ¶¶ 62, 100, 112, 135–37, 185–86, 234–35, 243). The FAC further alleges that the appeal merely rubber stamped Bourgoin's vitiated investigation findings and therefore failed to provide an independent layer of review. (See Id. ¶¶ 104, 262, 270, 273, 290). In addition, the FAC alleges that "Jamerson's involvement and influence continued with the Appellate Review Board." (Id. ¶ 89). Construing the FAC in favor of Poe, the Court finds that these allegations suffice to move forward to discovery.

3.    Sanctions

The FAC takes issue with the sanctions on three grounds. First, it argues that the sanctions imposed upon Poe are disproportionate, including because Poe has no prior record, and therefore contrary to the Handbook's guidelines. (See Doc. No. 34 ¶¶ 8, 175, 197, 223, 244–45, 249, 273-74, 374, 378). Second, it argues that the Handbook does not allow taking into consideration victim impact statements. (See id. ¶ 249). Third, it argues that Vanderbilt should not have informed Roe and Roe's parents of the investigation outcome and sanctions against Poe. (See id. ¶ ¶ 180–81, 192, 230). As for the severity of the sanctions, the limited guidelines in the Handbook confer substantial discretion to Vanderbilt. (See Doc. No. 34-1 at 119–23). Poe did not receive the harshest sanction, which is expulsion. In addition, a student's prior record is not the only factor that Vanderbilt may consider when imposing a sanction. Indeed, "the nature and severity of the event and the impact on others[ ] may also be considered." (See Id. at 119). However, the FAC alleges that Poe was singled out, insofar as he merely reposted pre-existing allegations of rape and

15

was not the only student who did so.  (See, e.g., Doc. No. 34 ¶¶ 177, 180).  The FAC further alleges that he did not instigate posts by others, and that his posts were "taken down very quickly."  (See id. ¶¶ 183-84).  Bourgoin and Jamerson allegedly did not investigate other posters and ultimately attributed to Poe posts he did not make.  (See, e.g., id. ¶¶ 173, 185).  The FAC contends that the impact of Poe's small number of posts was limited, especially given the "hundreds of posts" made by other individuals and Roe's statement that "the posts which were searchable on Google were the ones that had the most significant impact on [Roe], and not the ones posted by Plaintiff."  (See id. ¶¶ 40, 110, 172, 201).  Read in the light most favorable to Poe, these allegations state a plausible claim that the sanction and underlying findings were questionable.  As for the FAC's second contention, the Handbook expressly provides that the impact of the violation on others may bear upon the severity of the sanction.  (See Doc. No. 34-1 at 119).  Therefore, the Court finds that the FAC cannot state a claim for breach based upon Vanderbilt's consideration of victim statements.  As for Poe's third contention, i.e., that Vanderbilt should not have informed Roe and Roe's parents of the investigation outcome and sanctions, the Handbook merely states that "[i]f a student is found to be in violation of University policy, the findings of the case, including any sanction, may be made known to appropriate persons, including, but not limited to, the complainant (only where applicable and as required by law)[.]"  (Id. at 123).  The Handbook and the Standards do not specify in what instances it is appropriate to notify the complainant.  However, the FAC alleges that such circumstances are limited to "cases involving sexual misconduct."  (Doc. No. 34 ¶ 180).  Taken as true, this allegation supports the inference that Vanderbilt should not have notified Roe that Poe "has been held accountable."[11]

---

[11] Drawing all inferences in Poe's favor, the Court finds that the term "accountable" implies that Poe has been found to be guilty.  As for sanctions, the Court doubts that the statement that Poe was "not an enrolled student" discloses Poe's punishment, especially because the FAC alleges that

Accordingly, the Court finds that the FAC states a *prima facie* claim of breach with respect to the severity of the sanctions and the letter sent to Roe. All other claims relating to sanctions will be dismissed.

### 4. Ignored Complaints

The FAC contends that Vanderbilt ignored Poe's complaints in violation of the Handbook and Standards. (Doc. No. 34 ¶¶ 131–33, 323, 340, 429, 485). Specifically, the FAC alleges that "no one ever responded to [the plaintiff's] complaints" and that "Plaintiff never learned if this second Complaint was given even a thought." (Id. ¶¶ 323, 340). The Handbook contains only limited guidance with respect to student complaints. (See Doc. No. 34-1 at 13–14). As for the section of the Standards allegedly breached, it imposes a reporting duty upon Vanderbilt employees who become aware of a violation but does not specify the scope of this duty or provide a reporting procedure. (See Doc. No. 34 ¶ 323 (citing Doc. No. 34-2 at 2 ("Vanderbilt employees are obligated to report in good faith all violations of law or Vanderbilt policies or any concern that a compliance violation may have occurred.")). Nonetheless, it flows from logic that, if Vanderbilt has a complaint procedure, then Vanderbilt must do something when someone files a complaint. Here, Poe alleges that the Vanderbilt entirely ignored his complaints. (See, e.g., Doc. No. 34 ¶¶ 133, 340). Therefore, the Court finds that the FAC states a claim for breach of contract based upon Vanderbilt's lack of response to Poe's complaints.[12]

---

Poe took multiple leaves of absence of which Roe's father was aware. (See Id. ¶¶ 23, 298, 517).

[12] As for the allegations that, by ignoring Poe's complaint, Vanderbilt impermissibly handled it less favorably than Roe's (Id. ¶¶ 85, 134, 338), the FAC does not tie them to any provision in the attached policies; nor was the court able to locate a provision that could plausibly apply. Ultimately, it is not the Court's role to construct a plaintiff's legal arguments. See Goodell v. Ervin, 591 F. Supp. 3d 232, 238 (E.D. Mich. 2022) ("[C]ourts may not rewrite a complaint to include claims that were never presented, nor may courts construct the plaintiff's legal arguments for him. Neither may the court conjure up unpled allegations, nor create a claim for Plaintiff." (citations and quotations omitted)). Therefore, the Court will dismiss this facet of the claim.

5.      Additional Miscellaneous Breaches.

Finally, the FAC contends that "Vanderbilt committed additional breaches of privacy and confidentiality, as well as other breaches of policy including but not limited to, not following the law, discrimination against Plaintiff, retaliating against Plaintiff, ignoring conflicts of interest regarding Plaintiff's matter, unfair dispute resolution, and not following Vanderbilt's policies that require basic respect and fairness."  (Doc. No. 34 ¶ 375).  The FAC does not correlate these allegations with any of its general allegations; nor does it provide any further detail regarding the alleged "additional breaches of privacy and confidentiality" or "other breaches of policy."  Therefore, the Court finds that these allegations are too generalized and conclusory to survive a 12(b)(6) motion.

6.      Summary

In sum, some portions of the breach of contract claim based upon the non-compliance with the Handbook's investigation and complainant notification procedures will remain pending.  Namely, the Court finds that the FAC sets forth a *prima facie* claim for breach of contract with respect to the following provisions in the Handbook: the right to receive timely notice of charges, the right to access and challenge incriminating information, the right to call witnesses, the duty of conflicted members of the Student Accountability office to not consider a case, and the prohibition of informing a complainant of the outcome of an investigation.  The claim based upon the severity of the section will also remain pending; and so will the claim based upon the alleged flaws in the appeal stemming from underlying irregularities in the investigation.  Finally, the Court will not dismiss the claim based upon the ignored complaints.  All other aspects of the FAC's breach of contract claim will be dismissed, although without prejudice at this time.

18

B.    Title IX / Selective Enforcement (Count III)

Defendants next argue that the Court should dismiss Poe's "claim for selective enforcement of Title IX because he . . . fails to allege that a female student facing comparable disciplinary action was treated more favorably." (Doc. No. 63 at 9–12). "Title IX was enacted to supplement the ban on discrimination in the Civil Rights Act of 1964, and it is designed to prevent sexual discrimination and harassment in educational institutions receiving federal funding." Doe v. Belmont Univ., 367 F. Supp. 3d 732, 755 (M.D. Tenn. 2019) (citing Bonnell v. Lorenzo, 241 F.3d 800, 810 n.6 (6th Cir. 2001)). "It states that: '[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied benefits of, or be subjected to discrimination under any education program receiving Federal financial assistance . . . .'" Id. (citing 20 U.S.C. § 1681(a)). "It is beyond cavil that 'Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.'" Doe v. Vanderbilt Univ., No. 3:18-CV-00569, 2019 WL 4748310, at *6 (M.D. Tenn. Sept. 30, 2019) (citing Yusuf v. Vassar Coll., 35 F.3d 709, 715 (2d Cir. 1994)). Further, "regulations require educational institutions to implement 'grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by [Title IX].'" (Id. (citing 34 C.F.R. § 106.8(b)). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available."[13] Doe, 367 F. Supp. 3d at 755 (citing Klemencic v. Ohio State Univ., 263 F.3d 504, 510 (6th Cir. 2001)).

There are "at least four theories of liability that a student who is attacking a university disciplinary proceeding on grounds of gender bias can potentially assert under Title IX." Z.J., 355 F. Supp. 3d at 673 (citing Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018)). "These theories

_____

[13] The parties do not dispute that Vanderbilt receives public funding.

are: (1) erroneous outcome; (2) selective enforcement; (3) deliberate indifference; and (4) archaic assumptions. Id. (internal quotations omitted). Here, the FAC only alleges the second theory—selective enforcement. (See Doc. No. 34 ¶¶ 382–99).

"In a selective enforcement claim, 'a plaintiff essentially asserts that even if he or she did violate a university policy, the decision to initiate disciplinary proceedings or the severity of the penalty imposed was motivated by gender bias.'" Z.J, 355 F. Supp. 3d at 677 (quoting Marshall v. Ohio Univ., No. 2:15-CV-775, 2015 WL 7254213, at *6 (S.D. Ohio Nov. 17, 2015)). "To prevail on a selective enforcement claim, the plaintiff must show that a similarly-situated [*sic*] member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Cummins, 662 F. App'x 437, 452 (6th Cir. 2016) (citing Mallory v. Ohio Univ., 76 F. App'x 634, 641 (6th Cir. 2003) (other citations omitted)). "Critical to such a claim is evidence that gender bias motivated the selective enforcement." Doe v. Oberlin Coll., 60 F.4th 345, 356 (6th Cir. 2023).

Here, the FAC alleges that Roe's father filed a "formal complaint" against multiple students who had made posts about Roe, including Poe and two female students. (Doc. No. 34 ¶¶ 59–60). The FAC further alleges that the "complaint filed against two female posters was not addressed through the Student Accountability process[.]" (Id. at 61). According to the FAC, Bourgoin even generated a new "Student Accountability form Complaint" by selectively cutting and pasting from Roe's complaint "only the portion that could be attributed to [Poe]," while omitting portions that pertained to the female student posters. (Id. ¶¶ 62, 359, 390–91). In other words, "[Poe] was treated differently when he was the only one investigated" given that "Vanderbilt chose not to do anything with any female posters." (Id. ¶359). "Vanderbilt chose not

to do anything with any female posters because Vanderbilt feared one of the posters was a victim or was speaking out on behalf of a friend who was a victim." (Id. ¶¶ 52, 359).

The FAC provides specific examples of this alleged disparate treatment and identifies two female students who made posts similar to Poe's. One such female poster, L.N., was also subject to Roe's father's pleas for a severe punishment, but "as a female student, was treated more favorably than Plaintiff, the male student, when she was not even subject to an investigation for any conduct policy violations and did not receive any sanctions, while Plaintiff was found responsible for three violations and issued a sanction including suspension." (Id. ¶¶ 392–94). The FAC also mentions a second female poster, M.G., who allegedly posted about Roe twice and instigated L.N. to contact Roe's employer. (Id. ¶ 395). The FAC alleges that Bourgoin declined to investigate M.G. and L.N., despite Roe's father's requests and statements that their posts had a "significant impact" on Roe. (Id. ¶¶ 396–98). Further, Bourgoin allegedly told Roe's father that he "could pursue the others, the females, 'criminally' but Vanderbilt will not investigate them." (Id. ¶ 398). The FAC further alleges that "[a]ny criminal charge in itself is a violation of the Student Handbook, but Vanderbilt was willing to ignore this possible violation as well for the female students." (Id.). Moreover, the FAC alleges that "Vanderbilt's mishandling of the case against Plaintiff was influenced by institutional, systemic gender bias[.]" (Id. ¶ 403). [14] Lastly, the FAC alleges that "Plaintiff had inquired with Vanderbilt's Title IX office about whether or not the school would take action against a female who was making and spreading sexual assault

---

[14] The FAC also alleges that the book and movie Poe had to read and watch as part of his punishment are further evidence of gender bias. The book, for instance, discusses men and their role related to "women's issues." (Id. ¶¶ 400–02).

allegations, even if they were false, to which the Title IX representative replied, that wasn't something the school would do, because it would be 'Anti-MeToo.'"[15]  (Id. ¶ 404).

In light of the above, the Court finds that the FAC sets forth the *prima facie* elements of a Title IX claim for selective enforcement.  Indeed, providing specific examples, the FAC alleges that Poe, who is a male, violated university policies in a manner equivalent to two other female posters.  It also alleges that Roe's father filed a complaint against Poe and the two female posters. The FAC further alleges that, because Poe is a male, Bourgoin decided to selectively initiate disciplinary proceedings against him only.  Finally, the FAC alleges a motive and a smoking gun. Specifically, it alleges that Vanderbilt was "concern[ed] that one of the female students may allege they [*sic*] may have been sexually assaulted by [Roe] or were speaking on behalf of a victim" and "under pressure from the student body and the United States Department of Education."  (Id. ¶¶ 52, 403; see also id. 407–417 (detailing how the Department of Education pressured Vanderbilt and other universities to aggressively discipline males)).  Jamerson allegedly expressed this "concern" in an email to Vanderbilt's Office of Sexual Misconduct.  (Id. ¶¶ 52, 120).  Moreover, Vanderbilt's Title IX office expressly told Poe that Vanderbilt would not take action against female students culpable of equivalent misconduct.  Taken as true, these allegations suffice to state a *prima facie* Title IX claim.

Nonetheless, the Defendants make two arguments in support of their contention that the Court should dismiss the Title IX claim.  First, they argue that the female posters were not similarly

---

[15] "#MeToo is a social movement originating among women, advocating for survivors of sexual harassment or violence to speak out about their experiences in order to expose and combat various forms of sexual misconduct." *#MeToo*, Dictionary.com, https://www.dictionary.com/e/gender-sexuality/metoo/ (last visited Oct. 9, 2024); see also *Me Too*, Merriam-Webster, https://www.merriam-webster.com/dictionary/me-too (last visited Oct. 9, 2024) ("a movement calling attention to the frequency with which primarily women and girls experience sexual assault and harassment").

situated to Poe because Vanderbilt did not generate a formal complaint against them. Second, they argue that the FAC fails to plead facts showing that the female posters were similarly situated to Poe. The Court will address these arguments in turn.

1. Lack of a Formal Student Accountability Complaint

The Defendants argue that the FAC fails to allege that Poe and the two female students were similarly situated because the latter "were not the subject of a formal Student Accountability complaint[.]" (Doc. No. 63 at 10–11). In his opposition, Poe counters that the discrimination at issue is the generation of the Student Accountability complaint itself, which selectively targeted Poe but not the female students. (Doc. No. 77 at 14). The Court agrees that the Defendants' argument misses the point. Simple logic commands the disciplinary procedure at issue started when Bourgoin decided to generate a "formal Student Accountability complaint" based on the complaint received from Roe's father. The FAC alleges that Bourgoin decided to selectively exclude the two female posters from this preliminary stage of the procedure. The Defendants cannot argue with any credibility that the female posters were not similarly situated to Poe at a later stage of the procedure simply because the alleged act of discrimination excluded those same women at an earlier stage.

In support of their argument, the Defendants cite Routh v. University of Rochester, 981 F. Supp. 2d 184 (W.D.N.Y. 2013) and Prasad v. Cornell University., No. 5:15-CV-322, 2016 WL 3212079 (N.D.N.Y. Feb. 24, 2016). In Routh, the court found that the plaintiff failed to state a Title IX claim, inter alia, because "[t]he pleading also does not plausibly plead facts suggesting that the University ever received a complaint against a female student comparable to that filed against [the plaintiff], and treated the female student more favorably." Id. at 211–12. Routh is distinguishable from our case because the FAC alleges that Vanderbilt received a complaint against three students, Poe and the two female posters, but that Vanderbilt "made the affirmative

decision to avoid investigating the female posters, despite the [c]omplaint that was filed against them." (Doc. No. 34 ¶ 76; see id. ¶¶ 60–61). Prasad is distinguishable for the same reasons. There, the court found that a plaintiff who had merely alleged that "complaints of sexual misconduct are disproportionately lodged by females against males" failed to "include any allegations that female students were treated more favorably than males in similar circumstances." Id. at 18. As discussed above, the FAC provides a wealth of specific allegations of such disparate treatment.

A review of decisions by this and other courts further supports the Court's finding that the FAC sufficiently alleges a claim for selective enforcement. See Doe v. Miami Univ., 882 F.3d at 593 (finding that the complaint sufficiently stated a Title IX claim by, inter alia, alleging that the institution at issue initiated an investigation into the plaintiff but not a female student and that the institution faced external pressure from the federal government); accord Doe v. Vanderbilt Univ., 2019 WL 4748310 at *9 (dismissing selective enforcement claim where the plaintiff "has failed to allege that any female student was not disciplined by [Vanderbilt] after a complaint was filed similar to the allegations . . . against [Plaintiff] in this case."); Z.J., 355 F. Supp. 3d 646 at 678 (dismissing selective enforcement claim where the plaintiff "has failed to allege that any female student was not disciplined by [Vanderbilt] after a complaint was filed"); Schaumleffel v. Muskingum Univ., No. 2:17-CV-463, 2018 WL 1173043, at *17 (S.D. Ohio Mar. 6, 2018) ("Plaintiff, here, has failed to assert any allegations that a female student was not disciplined by [the university] after a complaint was filed similar to the allegations made against Plaintiff in this case. Therefore, Plaintiff's conclusory allegations are insufficient to maintain a claim for selective enforcement under Title IX."); Marshall, 2015 WL 7254213 at *6 (dismissing selective enforcement claim on grounds that plaintiff (1) "never allege[d] facts about a single instance when [the university] declined to investigate allegations that a similarly situated female violated the

policy" and (2) failed to allege that the university decided to investigate the victim's allegations about the plaintiff because the plaintiff was male and that the university would not have investigated the allegations had the plaintiff been female).

### 2. Allegations that the Female Students Were Similarly Situated to Poe

The Defendants argue that, insofar as the alleged act of gender-based discrimination is the selective generation of the Student Accountability complaint, the FAC fails to plead that Poe and the two female students were similarly situated because it does not "allege facts plausibly suggesting that the circumstances of the female posters were sufficiently similar to Plaintiff's (e.g., with regard to number of posts, content of posts, timespan of posts, etc.)."  (Doc. No. 63 at 11–12).  The Court disagrees.

The FAC describes the wrongful conduct by Poe as follows: "[t]he conduct for which Plaintiff was found responsible and disciplined related to posts made by Plaintiff to a social media platform during a brief period of time in April 2022, concerning allegations of sexual assault committed by [Roe]."  (Doc. No. 34 ¶ 4; see also id. ¶ 31 ("during a handful of days in April of 2022, Plaintiff made posts to [social media platform], some of which concerned reposting allegations of sexual assault and roofing that were allegedly committed by [Roe]").[16]  The two female students mentioned in the FAC are L.N. and M.G. L.N. allegedly made "multiple posts concerning [Roe], including but not limited to an allegedly false claim (according to [Roe]) she was a victim of [Roe]'s and accusing [Roe] of being a rapist."  As for M.G., she "identified [Roe]'s employer, and instigated L.N. to contact said employer. M.G. posted about this twice[.]"  (Id. ¶

---

[16] The FAC also alleges that Poe was "found responsible for" posts alleging that Roe "cheat[ed] a diversity program" and "us[ed] racial slurs."  (Id. ¶ 105).  Further, the FAC alleges that Poe was "charged with instigating" harassing posts against Roe.  (Id. ¶¶ 103, 183, 193, 197).  However, the FAC does not allege that this was known to Bourgoin at the time he decided to generate the complaint against Poe.

392).  Roe's father submitted a complaint against all posters, including Poe, L.N., and M.G.  (Id. ¶¶ 389–391).  Just as with respect to Poe, Roe's father alleged that L.N.'s and M.G.'s posts had a "significant impact" on Roe and requested that Vanderbilt "severely punishe[s]" them.  (Id. ¶ 397).  This is enough to survive Vanderbilt's Motion.

Taking all allegations in the FAC as true and drawing reasonable inferences in favor of Poe, the Court finds that L.N. was similarly situated to Poe to the extent that she made multiple posts against Roe, alleging that Roe is a rapist.  Given that the FAC alleges Poe only made a "limited number of posts in a handful of days" (See Id. ¶ 344), the FAC's lack of allegations with respect to the exact number of posts by L.N. and timeframe thereof does not change the Court's analysis, especially given that all details were likely not known to Bourgoin at the time he generated the complaint against Poe.  To prevail on a selective enforcement claim, a plaintiff must only show that one similarly situated person of the opposite sex was treated more favorably.  See Z.J. v, 355 F. Supp. 3d at 677 ("the plaintiff must show that *a* similarly-situated member of the opposite sex was treated more favorably) (emphasis added) (quoting Cummins, 662 F. App'x 437, 452 (6th Cir. 2016)); Doe v. Vanderbilt Univ., 2019 WL 4748310 at *9 (noting that the plaintiff "has failed to allege that *any* female student was not disciplined by [Vanderbilt] after a complaint was filed) (emphasis added); Schaumleffel , 2018 WL 1173043 at *14 (same).  The FAC meets this standard.

In sum, the Court finds that the FAC contains sufficient allegations to state a selective enforcement claim.  Therefore, the Court will not dismiss the FAC's Title IX claim at this juncture.[17]

---

[17] Because the Court finds that the FAC sufficiently pleads a selective enforcement claim based on L.n. being treated more favorably than Poe and Vanderbilt's express statement that it would not have undertaken a disciplinary proceeding against a female in similar circumstances, the Court

C.     Section 504 of the Rehabilitation Act (Count IV)

The only remaining claim in Count IV is Poe's Rehabilitation Act claim against Vanderbilt. "To state a retaliation claim successfully under [section 504 of the Rehabilitation Act], a plaintiff's pleading must establish a prima facie case of retaliation, which requires showing that: (1) the plaintiff engaged in protected activity; (2) the defendant knew about the protected activity; (3) the defendant took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action." L.G. by & through G.G. v. Bd. of Educ. of Fayette Cnty., Kentucky, 775 F. App'x 227, 232 (6th Cir. 2019) (citing A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ., 711 F.3d 687, 697 (6th Cir. 2013)); Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir. 2001) (same). "To be adverse, a retaliatory action must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances' cannot qualify. A.C. ex rel. J.C., 711 F.3d at 698 (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)). "The initial burden falls on Plaintiffs to present a prima facie case of retaliation." A.C. ex rel. J.C., 711 F.3d at 697. "The burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." (Id. (quoting Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000)).

The FAC alleges that Poe applied for and was granted disability accommodations. (Doc. No. 34 ¶ 308). Bojarski discussed Poe's disability accommodations and was therefore aware of them. (Id. ¶ 314–16). When Poe requested to attend classes remotely during his period of suspension, Bojarski replied with a letter, accusing him of "attempting to use the accommodations to 'override institutional sanctions.'" (Id. ¶¶ 309–10, 424). Bojarski also added an additional layer

_____

needs not examine Poe's additional argument that "allegations of pressure from outside forces to treat males differently than females suffice to state a Title IX violation." (Cf. Doc. No. 77 at 14–15). For the same reason, the Court needs not examine whether M.G. was similarly situated to Poe.

of approval by the administration for further accommodation requests. (Id. ¶ 312). The FAC alleges that "it would be humiliating to reach back out Student Services [*sic*] to set up accommodations," and that Bojarski's "offensive and insulting false accusation was an effort to and was successful in stripping away [Poe]'s accommodations, thus stripping [Poe]'s ability to return to Vanderbilt." (Id. ¶ 311; see also Id. ¶ 425 ("These unlawful actions effectively unlawfully removed Plaintiff's accommodations and their [*sic*] ability to return to school as the accommodations are needed")). Further, Poe contends that "accommodations will be difficult to achieve going forward," due to the "incremental approval layer." (Id. ¶ 424).

Poe allegedly lodged a complaint about this "interference, intimidation and threat" to his disability accommodations and requested a leave of absence, but nobody responded. (Id. ¶¶ 427-28). Eight days later, Poe lodged a second complaint and request a leave of absence, repeating his grievances regarding the accommodations.[18] (Id. ¶¶ 324, 428). Paschal responded, stating: "[i]t sounds from what you wrote that you are really unhappy with Vanderbilt and don't want to come back to earn your degree from VU. Please know that you can withdraw from VU if you don't envision yourself coming back, which of course is the only way to finish a VU degree. If you later change your mind, you could then apply for readmission. Do you want to withdraw?" (Id. ¶¶ 324-325, 428). Poe interprets Paschal's response as retaliatory and a "constructive exp[ulsion]." (Id. ¶ 428).

The Defendants argue that the FAC's retaliation claim is deficient for two reasons. First, they argue that the alleged acts of retaliation "hardly amount to petty slights or minor annoyances,"

---

[18] Given that this complaint and request for a leave were addressed to Paschal, the Court will construe these allegations as implying that Paschal was aware of the accommodations. (Id. ¶ 324).

which cannot constitute adverse action in the eyes of a reasonable person.[19]  (Doc. No. 63 at 14–15).  Second, the Defendants argue that the FAC fails to allege causation.  (Id. at 15).

As for the Defendants' first argument, the Court finds that Bojarski's email would not have dissuaded a reasonable person from seeking disability accommodations in the future.  To the contrary, the email invited Poe to request accommodations when eligible to take classes again, *i.e.* after the suspension.  Indeed, Bojarski's letter simply let Poe know that he could not circumvent the suspension by requesting to attend classes remotely, that requesting accommodations before registering for classes was premature, and that Vanderbilt would "consider any request for remote learning on a course-by-course basis" in due time.  (Doc. 63-1 at 1).  The Court also disagrees with Poe's contention that the "accommodations will be difficult to achieve going forward" due to the "incremental approval layer" mentioned in the letter.  (Cf. Doc. 34 ¶ 424).  In relevant part, the letter states:

> Once registered for courses, our team will review the courses you enrolled in and consult with A&S administration to determine, on a course-by-course basis, whether remote attendance would be a reasonable accommodation for those courses.  Most of Vanderbilt's coursework is intended to be offered in-person and on-campus, reflecting both the pedagogical design of the courses and the institutional commitment to in-person living and learning experiences.  Student Access' commitment to review your request for remote learning does not assure that any or all of the courses you select will be appropriate for remote learning.

(Doc. 63-1 at 1).  On its face, this language does not require an additional layer of approval to grant accommodations to Poe.  Rather, it states that the administration will continue to engage in

---

[19] The Defendants ask the Court to review a copy of Bojarski's letter because "it is referred to in the pleadings and integral to Plaintiff's claims."  (Doc. No. 63 at 15 n.5).  The Court agrees. See Com. Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335-36 (6th Cir. 2007) ("when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment").

the interactive process and will have to review whether the specific courses that Poe enrolls in are compatible with such accommodations.

As for Paschal's email, the Court finds that it could have discouraged a reasonable person from requesting accommodations in the future. Indeed, the FAC alleges that Paschal was "in a position of power." (See Doc. No. 34 ¶ 328). The FAC further alleges that Poe "lodged a Complaint regarding the disability accommodations (and interference, intimidation and threat to them) and asked a [sic] leave of absence[.]" (Id. ¶ 328). In response, Paschal suggested to Poe to withdraw from Vanderbilt. (Id. ¶ 325). Construing these allegations in the light most favorable to Poe, the Court finds that the take-it-or-leave nature of the response could well have discouraged a reasonable person from requesting accommodations again, or at least from complaining about the denial of such a request.[20]

The Court further disagrees with the Defendant's contention that the FAC fails to allege causation because it contains no allegations that Paschal acted "solely by reason of" or "because of" Poe's participation in protected activity. (Cf. Doc. No. 63 at 15). In support of this argument, the Defendants cite Lewis v. Humboldt Acquisition Corp., 681 F.3d 312, 317 (6th Cir. 2012). But Lewis is a case about jury instructions. See id. at 314. To make a prima facie case of causation, a plaintiff's burden is "minimal." A.C. ex rel. J.C., 711 F.3d at 699. "Temporal proximity can often help meet this causal burden, [citation], and where the adverse action comes 'very close in time' after the exercise of protected activity, 'such temporal proximity . . . is significant enough' to meet the burden alone. Id. (citing Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000) and Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 524 (6th Cir. 2008)). Here, Paschal's

---

[20] As for the FAC's contention that the response amounted to a "constructive exp[ulsion]," the Court finds that it is an exaggeration. (Cf. id. ¶ 428).

alleged act of retaliation was a direct response to Poe's complaint regarding the denial of his accommodation request and related request for a leave of absence. (See Id. ¶¶ 324-25). In addition, the FAC alleges that Paschal responded to Poe's request for a leave of absence after that task was delegated to her, which, construed in light most favorable to Poe, implies temporal proximity. (See Id. ¶ 428). Thus, drawing all inferences in favor of Poe, the Court finds that the FAC states the *prima facie* elements of a retaliation claim under the Rehabilitation Act. As such, the Court will not dismiss the retaliation claim based upon Paschal's email, at least not at this stage. All other aspect of Count IV, however, will be dismissed.

      D.      Defamation / Libel (Count V)

"To state a claim for defamation under Tennessee law, a plaintiff must allege: (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Hunt v. S. Baptist Convention, No. 3:23-CV-00243, 2024 WL 1019276, at *4 (M.D. Tenn. Mar. 8, 2024) (citing Brown v. Christian Bros. Univ., 428 S.W.3d 38, 50 (Tenn. Ct. App. 2013)). "[T]o be defamatory in nature, statements 'must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule.'" Hudik v. Fox News Network, LLC, 512 F. Supp. 3d 816, 829 (M.D. Tenn. 2021) (citing Tennessee law). "[O]nly statements that are false are actionable [in a defamation case]; truth is, almost universally, a defense." Brown, 428 S.W.3d at 50 (citing Davis v. The Tennessean, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001)). The plaintiff must also allege actual damages. (See id.).

Here, the FAC alleges that Bourgoin's letter to Roe was defamatory. (Doc. No. 34 ¶ 434). The FAC quotes the following language from the letter:

I am writing to update you regarding your complaint of misconduct. The person who ***instigated*** the harassing posts against you has completed our process and has been held

31

accountable. [Plaintiff] is currently ***not an enrolled student***, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student . . . .

(Id. ¶¶ 181, 434 (emphasis in original)). Poe, for good reasons, takes issue with the term "instigated" and the phrase "not an enrolled student." Specifically, Poe contends that the term "instigated" conveys the meaning that Poe was responsible for all posts against Roe, including posts that Poe did not make. (Id. ¶¶ 437–39, 444). As for the phrase "not an enrolled student," Poe contends that it falsely implies Vanderbilt expelled him. (Id. ¶¶ 436, 440). The FAC further alleges that "because the university's process was inherently unfair to [Poe], the mere publishing of the statement by Defendant Bourgoin stating that he had found Plaintiff responsible was defamatory in and of itself because it implies that Plaintiff was found responsible through a fair and just process." (Id. ¶ 451). As for damages, the FAC claims that the publication of the letter subjected Poe to the "hatred, contempt, or ridicule" from Roe, his parents, and third parties.[21] (Id. ¶ 443).

        In their Motion, the Defendants argue that the statements at issue are true and therefore not capable of defamatory meaning. With respect to the term "instigated," the Defendants contend that context, namely that Poe admitted to making some of the posts, renders the statement true. (Doc. No. 63 at 17). In the same vein, the Defendants claim that "just because others may have previously posted about Roe on a different social media site does not make the statement that [Poe] instigated the posts on the second anonymous social media site untrue." (Id.). Finally, the defendants argue that the statement is incapable of defamatory meaning because it is "innocuous." (See Doc. No. 63 at 17–18). The Court finds these arguments unpersuasive.

_____

[21] The FAC also alleges that information in the letter was further disseminated to third parties, including Poe's employer. (See, e.g., id. ¶ 447).

As the Defendants point out, "[w]hether a communication is capable of conveying a defamatory meaning is a question of law." Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000). The relevant context is that Roe's father submitted a complaint against multiple posters, including Poe. (See Id. ¶¶ 389–391). Without additional context, the use of the definite article "the" indeed makes it plausible that a reasonable person could have understood the letter as referring to all the posts at issue. Therefore, drawing all inferences in favor of Poe, the Court finds it plausible that the statement that Poe "instigated the harassing posts" implies that Poe instigated all of the posts, including those made by other posters. The Court also notes that the verb "instigate" has the double meaning of either causing something to happen or inciting someone to do something. (Compare *instigate*, THE BRITANNICA DICTIONARY, https://www.britannica.com/dictionary/instigate (last visited Oct.10, 2024) ("to cause (something) to happen or begin") with *instigate*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/instigate (last visited Oct.10, 2024) ("instigate is often used as a synonym of incite"). Accordingly, the Court finds it plausible that the use of the verb "instigate" could lead a reasonable person to believe that Poe incited other posters to make the offending posts. (Cf. Doc. 34 ¶¶ 193–98, 438–39). The Court also disagrees with the Defendants' argument that the statement was "innocuous." (Cf. Doc. No. 63 at 17–18). Accusing someone of instigating false allegations of rape certainly carries the potential of being defamatory. See Hales v. Alexis Preston, No. 1:24CV00045/AW/ZCB, 2024 WL 4342735, at *4 (N.D. Fla. Aug. 26, 2024), report and recommendation adopted sub nom. Hales v. Alexis Preston, No. 1:24-CV-45-AW-ZCB, 2024 WL 4336630 (N.D. Fla. Sept. 27, 2024) (In the context of defamation, opining that "[t]here are few accusations that could be more harmful to a person than false accusations of sexually abusing others."); Goldman v. Reddington, 417 F. Supp. 3d 163, 176 (E.D.N.Y. 2019) (refusing to dismiss

defamation claim based upon the defendant's reposting of allegedly false accusations of rape); Elias v. Rolling Stone LLC, 872 F.3d 97, 111 (2d Cir. 2017) (reversing trial court's dismissal of certain defamation claims brought by members of a university fraternity against defendants who published allegations of gang rape in a fraternity house); Morales v. State, No. CIV. A. 94-1194, 1996 WL 442222, at *4 (E.D. La. Aug. 2, 1996) (referring to false accusations of rape as "defamatory"); Roberts v. Toal, No. CIV. A. 94-608, 1994 WL 725955, at *5 (E.D. Pa. Dec. 30, 1994) (finding that the plaintiff stated a defamation claim by alleging that the defendant published false accusations of rape, and noting that "[a]n accusation of rape is defamatory"). In addition, the FAC clearly alleges that the statement is false, insofar as it states that Poe was only responsible for a limited number of posts. (See Doc. No. 34 ¶¶ 172, 195, 198, 437). The FAC also strongly implies that Bourgoin knew of the falsity of the statement given that it alleges that he falsely accused Poe with the intention of blaming a male for posts made by persons of both genders. (See id. ¶¶ 55–58).

As for the statement that Poe was "not an enrolled student," the Defendants first argue that it is true and therefore incapable of defamatory meaning. (Doc. No. 63 at 17–18). As the Court understands it, however, Poe was taking classes at the time Bourgoin sent the letter, although remotely.[22] (See Doc. No. 34 ¶¶ 2, 180–81 (stating that Bourgoin sent the letter on March 9, 2023, and that Poe was "away from Vanderbilt" but taking "eighteen (18) credits worth of Vanderbilt approved courses" during the second semester of his junior year). The defendant's second argument is that the letter's hypothetical statement that Poe could "re-enroll[]" makes it clear that Poe was not expelled. (See Id.). The Court is persuaded by this argument. The Handbook, to

_____

[22] The FAC is unclear on this point, but the Court will give Poe the benefit of the doubt at this juncture.

which Roe had access, defines expulsion as the "permanent separation from the University." (Doc. 34-1 at 120). Additionally, the FAC alleges that, earlier that semester, Jamerson told Roe's father that Poe was on a personal leave of absence. (See Id. ¶ 298). The Court finds that these allegations, taken together, make it implausible that Roe or his father could have understood the phrase "not an enrolled student" as meaning that Vanderbilt expelled Poe.

Accordingly, the defamation claim based upon the phrase "not enrolled as a student" will be dismissed. The Court, however, will not dismiss the defamation claim based upon the term "instigated."

D.    Negligence (Count VI)

"Under Tennessee law, to plead negligence a plaintiff must allege the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation." Z.J., 355 F. Supp. 3d at 704 (citing Mershon v. HPT TA Properties Tr., No. M201800315COAR3CV, 2018 WL 5793564 (Tenn. Ct. App. Nov. 5, 2018) and Staples v. CBL & Assocs., Inc., 15 S.W.3d 83, 89 (Tenn. 2000)); Doe v. Vanderbilt Univ., 2019 WL 4748310 at *18 (same).

"However, where the alleged 'breach of duty' that a plaintiff alleges occurred is a breach of contractual obligations, whether or not the defendant was negligent in attempting performance, 'the action remains in contract.'" Id. (citing Oak Ridge Precision Indus., Inc. v. First Tennessee Bank Nat. Ass'n, 835 S.W.2d 25, 30 (Tenn. Ct. App. 1992) (dismissing negligence claims because alleged damages arose from breach of contractual relationship and stating "the alleged claim for negligence sounds in contract, and dismissal was proper")); see Doe v. Vanderbilt Univ., 2019 WL 4748310 at *19 (same); Permobil, Inc. v. Am. Exp. Travel Related Servs. Co., 571 F. Supp. 2d 825, 842 (M.D. Tenn. 2008) ("if the only source of duty between a particular plaintiff and

defendant is their contract with each other, then a breach of that duty, without more, ordinarily will not support a negligence action"); Harvest Corp. v. Ernst & Whinney, 610 S.W.2d 727, 728 (Tenn. Ct. App. 1980) (stating "the alleged claim for negligence sounds in contract, and dismissal was proper); Am.'s Collectibles Network, Inc. v. Sterling Com. (Am.), Inc., No. 3:09-CV-143, 2016 WL 9132294, at *19 (E.D. Tenn. Sept. 7, 2016) ("Where the only duty alleged arises from a contractual obligation, its breach cannot form the basis of a parallel negligence claim[.]"); Williams v. SunTrust Mortg., Inc., No. 3:12-CV-477, 2013 WL 1209623, at *4 (E.D. Tenn. Mar. 25, 2013) ("when two parties enter into a contractual agreement, their obligations to each other arise out of the contract itself, so that a violation of the contractual duty supports an action in contract rather than in tort"). In other words, "where a claim for negligence is based only on breach of contract obligations, and there are no alleged extra-contractual duties, 'the first element of the tort claim fails.'" Z.J., 355 F. Supp. 3d 646, 705 (M.D. Tenn. 2018) (citing Silvestro v. Bank of Am., N.A., No. 3-13-0066, 2013 WL 1149301, at *4 (M.D. Tenn. Mar. 19, 2013)).

The Defendants argue that the negligence claim is deficient because it fails to plead a non-contractual duty. (Doc. No. 63 at 18–19). In his opposition, Poe counters that the Defendants' argument is irreconcilable with their argument that the FAC fails to identify the specific contractual provisions breached. Poe further contends that "the negligence claim should not be dismissed against the individual defendants because Plaintiff did not assert a breach of contract claim against them." (Doc. No. 77 at 22). In their reply, the Defendants point out that the FAC contains "no allegations that any of the individual Defendants were acting outside of their capacities as Vanderbilt officials." (Doc. No. 83 at 5). For the most part, the Court agrees with the Defendants.

Under the heading of this claim, the FAC alleges the following duties: "duty to conduct a disciplinary and appeal process that was fair and impartial"; duty "to not discriminate against Plaintiff"; "duty to provide surety of Plaintiff's well-being and safety"; "duty to investigate claims made by [Roe's father]"; "duty to monitor social media posts"; "duty to protect Plaintiff's privacy and maintain confidentiality"; and "duty to follow procedures and adhere to certain standards of care when Plaintiff lodges specific complaints." (Doc. No. 34 ¶¶ 456–58). The FAC further refers to the Defendants as "Vanderbilt and its agents." (See id.). The Court finds nearly all these alleged duties are premised upon the existence of a contract between Poe and Vanderbilt, insofar as they reflect provisions of the Handbook. (See generally Doc. No. 34-1). Duties arising out of Vanderbilt's student handbook are contractual in nature and, thus, cannot not form the basis of a tort claim. See Doe v. Vanderbilt Univ., 2019 WL 4748310 at *19 ("Because Plaintiff has not identified a source of duty outside the relationship established by the Handbook . . . his negligence and gross negligence claims are an impermissible attempt to recast his contractual claims in the language of tort. These claims will therefore be dismissed."); Z.J., 355 F. Supp. 3d at 705 (dismissing negligence claim where the plaintiff did "not allege that Vanderbilt owed him a duty in addition to the obligations set forth in the Handbook").

The only alleged duty that does not correlate with language in the Handbook is that "Vanderbilt and its agents assumed a duty to monitor social media sites for speech of Vanderbilt students" as well as "posts concerning [Roe]." (See Doc. No. 34 ¶ 457). The Court finds this allegation is entirely conclusory and devoid of factual support. Indeed, the FAC merely states that Vanderbilt "acknowledged" that it monitors content posted on certain social media websites and that, "upon information and belief" Vanderbilt monitored posts against Roe. (Id. ¶¶ 6, 38, 40).

These allegations contain no palpable facts that would allow the court to infer that Vanderbilt had a duty to monitor social media posts.

Poe's last argument is that "Plaintiffs asserted that Defendants acted negligently in delivering the March 6 outcome letter to Plaintiff when he was alone, despite notification from his mother that he was at risk of self-harm." (Doc. No. 77 at 23 (citing Doc. No. 34 ¶¶ 203–33). In the cited portion, the FAC alleges that Poe's mother informed Bourgoin and Clapper that Poe was suicidal and requested that they refrain from communicating sanctions until the situation is stabilized, warning that he would otherwise commit suicide. (Id. 34 ¶ 207). "Defendant Bourgoin responded to this email that he would not do anything until he 'has a chance to connect on care and wellbeing.'" (Id. at 208). Bourgoin communicated with Jamerson about the matter, but Jamerson refused to delay the delivery.[23] (Id. at 214). The FAC further alleges that "[a]lthough Defendant Clapper, Defendant Bourgoin and Defendant Jamerson owed a standard duty of care to Plaintiff, a student at their University, they also owed Plaintiff an elevated affirmative duty of care under this extreme, isolated and immediate circumstance that they had the absolute power to control and they could have, if they chose to, ensured Plaintiff's health and safety." (Id. at 218). The Court finds that, construed in Poe's favor, as required, these allegations plausibly establish the existence of a duty of care under Tennessee law, unrelated to Vanderbilt's contract with Poe, but rather based upon the existence of an unreasonable and foreseeable risk of harm to him. See Atria, 142 F. App'x at 251 ("Vanderbilt and its agents owe everyone, including [the plaintiff], a duty to refrain from conduct that poses an unreasonable and foreseeable risk of harm. In Tennessee

---

[23] The Court notes that the FAC does not expressly state that Jamerson was aware of Poe's suicidal state. Rather, it merely alleges that "[a]fter Plaintiff's mother's call with Defendant Clapper, an inquiry by Defendant Bourgoin to Defendant Jamerson followed." (Id. at 214). Drawing all inferences in favor of Poe, the Court finds that this statement implies that Bourgoin informed Jamerson of the issue, and therefore implies knowledge by Jamerson.

'[a]ll persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others. Thus, it has been said that duty is the legal obligation that a defendant owes a plaintiff to conform to a reasonable person standard of care in order to protect against unreasonable risks of harm.' [citation] In other words, 'a duty of reasonable care exists if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property . . . . A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm.'") (quoting Burroughs v. Magee, 118 S.W.3d 323, 329 (Tenn. 2003) and McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)).

As for the other elements of the negligence claim, the FAC alleges that the Defendants knew of Poe's distress and suicidal thoughts and expressed the desire that Poe's parents be with him when they deliver the outcome of the investigation, noting that "it will likely be rough." (Id. ¶¶ 207–08, 216). Demonstrating an astonishing, shameful detachment from the gravity of the situation, Clapper allegedly emailed Bourgoin before the delivery of the outcome, stating "[t]he parents better have flown out there. [L]ol." (Id. ¶¶ 219) (emphasis added). "After being informed Plaintiff's parents were not with them [*sic*], the outcome was nonetheless delivered to Plaintiff." (Id. ¶ 221). "Upon receipt of the decision and due to Defendant Bourgoin's, Defendant Clapper's, and Defendant Jamerson's intentional, malicious, and/or reckless actions, Plaintiff made an actual attempt to commit suicide to end their [*sic*] life." (Id. ¶ 224). The Court easily construes these allegations as alleging a breach of duty, actual causation, and damages. As for proximate causation, the Tennessee Supreme Court has adopted a three-pronged test: the conduct must have been a substantial factor of the harm, the harm most have been reasonably foreseeable, and no other rule or policy must relieve the wrongdoer of liability. Haynes v. Hamilton Cnty., 883 S.W.2d

606, 612 (Tenn. 1994) (citing McClenahan v. Cooley, 806 S.W.2d 767, 775 (Tenn. 1991)). "An intervening act will not exculpate the original wrongdoer unless it appears that the negligent intervening act could not have been reasonably anticipated." Id. While "[c]ourts have long been rather reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act[,]" there are "several exceptions" to this rule. Watters v. TSR, Inc., 904 F.2d 378, 383 (6th Cir. 1990); see also Cotten v. Wilson, 576 S.W.3d 626, 639 (Tenn. 2019) (same); Rains v. Bend of the River, 124 S.W.3d 580, 593 (Tenn. Ct. App. 2003) ("Tennessee's courts, like other state and federal courts have consistently recognized that the independent intervening cause doctrine may properly be invoked in cases involving self-inflicted injury or death."). When considering these exceptions, the Tennessee Supreme Court noted, "the focus is on whether suicide was a reasonably foreseeable probability." Cotten, 576 S.W.3d at 642. In other words, under Tennessee law, "the touchstone is foreseeability, not whether a given case fits into a previously carved-out exception." Id. at 647. Here, in light of the allegations that Poe's mother expressly warned that Poe would commit suicide if given bad news, the Court easily finds that the FAC sets forth sufficient facts to show that Poe's harm was foreseeable, and, thus, to raise an issue of fact with respect to proximate causation.

Accordingly, the negligence claim based upon the delivery of the investigation outcome will remain pending, except as to Lowe, whom the FAC does not allege was involved in the delivery. All other aspects of the negligence claim will be dismissed without prejudice.

E.    Intentional Infliction of Emotional Distress (Count VII)[24]

"In Tennessee, the tort of intentional infliction of emotional distress ("IIED") is synonymous with the tort of outrageous conduct." Z.J., 355 F. Supp. 3d 646 at 685 (citing Doe v.

---

[24] The Court notes that the FAC alleges both negligence-based and intentional torts based upon the same set of facts. The Court will construe the FAC as pleading these claims in the alternative. See Clemons v. Couch, No. 6:17-CV-63-HAI, 2018 WL 11463802, at *1 (E.D. Ky. Jan. 3, 2018) ("Although, as Plaintiff admits, he cannot ultimately recover for both negligent and intentional

Belmont Univ., 334 F. Supp. 3d 877, 902–03 (M.D. Tenn. 2018)).  "A Tennessee plaintiff must plead the following elements of an IIED claim: (1) intentional or reckless conduct; (2) conduct so outrageous that it is not tolerated by civilized society; and (3) conduct resulting in serious mental injury."  Id. (citing Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997)).  "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement."  Belmont Univ., 334 F. Supp. 3d at 903.  "The conduct must be 'atrocious,' 'utterly intolerable,' and 'beyond all bounds of decency.'"  Z.J. 355 F. Supp. 3d 646 at 685.  "[W]e have emphasized that it is not sufficient that a defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress.  A plaintiff must in addition show that the defendant's conduct was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community."  Lourcey v. Est. of Scarlett, 146 S.W.3d 48, 51 (Tenn. 2004) (internal quotations and citations omitted).

"Thus, first, the standard is not whether an aggrieved person . . . considers a party's actions to have been outrageous, but whether a civilized society would find them so.  And, second, a plaintiff must prove that the conduct is outrageous and utterly intolerable in character, not just in motive."  Z.J. 355 F. Supp. 3d 646 at 685 (citing Belmont Univ., 334 F. Supp. 3d at 903–04).  "[A] plaintiff seeking damages for IIED must meet an 'exacting standard.'"  Id. (citing Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn. 1999)).  "Furthermore, Tennessee courts have limited recovery for IIED to mental injury that 'is so severe that no reasonable person would be expected to endure it.'"  Id. (citing Arnett v. Domino's Pizza I, L.L.C., 124 S.W.3d 529, 540 (Tenn. Ct.

---

torts arising from the same set of facts, this inconsistency is irrelevant at the pleading stage.  Rule 8(d) clearly permits the pleading of alternative and hypothetical claims, even when the claims are inconsistent with each other.").

App. 2003)). "As the foregoing suggests, '[t]he standard for outrageous conduct is high, indeed[.]'" Doe v. Vanderbilt Univ., 2019 WL 4748310 at *17 (citing Levy v. Franks, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004)). Cases finding conduct sufficient to support an intentional infliction of emotional distress claim are "few and far between." Id. (citing Finley v. Kelly, 384 F. Supp. 3d 898, 912 (M.D. Tenn. 2019)). "It is for the trial court to determine, in the first instance, whether a defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery. [citation] Thus, the trial court may reasonably dismiss this legal theory as a matter of law." Lane v. Becker, 334 S.W.3d 756, 763 (Tenn. Ct. App. 2010) (citing the Restatement (Second) of Torts, § 46).

The FAC alleges three bases for its IIED claim. First, it states that Bourgoin, Clapper, Jamerson, Lowe, and Vanderbilt acted intentionally or recklessly when "performing their duties related to the investigation and adjudication of the report against [Poe] during the Student Accountability process." (Doc. No. 34 ¶¶ 466–67; see also id. ¶¶ 475, 478 (mentioning miscellaneous misconduct related to the disciplinary procedure). Second, the FAC alleges privacy breaches and FERPA violations. (Id. ¶ 475). Third, the FAC alleges that the same defendants "also acted with intent to cause mental harm against [Poe] regarding the delivery on the outcome from Student Accountability" because they "could not be bothered pause the delivery of the outcome by merely one week to ensure the safety and well-being of [Poe] knowing full well of [Poe]'s mental health deterioration." (Id. ¶¶ 466–67). The FAC describes these alleged instances of misconduct as "outrageous" and "not tolera[ble] in a civilized society." (Id. ¶472).

In their Motion and reply, the Defendants argue that these allegations fall short of describing conduct so outrageous that it is not tolerable by civilized society. (See Doc. No. 63 at 21–22; Doc. No. 83 at 5). In his opposition, Poe counters that the Defendants acted outrageously

when delivering the outcome because they "were on notice that Plaintiff was suffering and at risk of suicide if found responsible for the alleged misconduct," but nonetheless ignored Poe's mother's "impassioned plea . . . to wait a short time to deliver the outcome so that [Poe] would be at his parent's [*sic*] home where they could ensure his safety." (Doc. No. 77 at 24). Poe also points out that "Defendants did not notify [Poe]'s mother this was happening, despite her request, and instead sent an email laughing about whether or not she had flown to be with him." (Id. at 24).

As for the portion of the IIED claim based upon the "investigation and adjudication of the report," this Court has previously found that similar allegations fell short of meeting the high bar for extreme and outrageous conduct. See Z.J., 355 F. Supp. 3d 646 at 686 (alleged misconduct by Vanderbilt during the disciplinary procedure against the defendant, including the "unfair" investigation, appeal, and expulsion, was not extreme enough to meet the IIED standard); Belmont Univ., 334 F. Supp. 3d at 904 ("Even if [the university]'s investigation was imperfect or unfair, the alleged conduct is not so atrocious, so beyond the bounds of decency, so utterly intolerable to society such that it meets the demanding Tennessee standard for an IIED claim. Put simply, [the plaintiff] has not alleged discomfort that a student in a modern university . . . misconduct investigation cannot be expected by society to face."); see also Austin v. Univ. of Oregon, 205 F. Supp. 3d 1214, 1230 (D. Or. 2016), aff'd, 925 F.3d 1133 (9th Cir. 2019) (dismissing IIED claim because the lack of presumption of innocence, failure to provide sufficient process, inadequacy of hearing, lack of appellate procedure, and stamping a "badge in infamy" upon the plaintiffs was not "an extraordinary transgression of socially tolerable conduct"). Here, Vanderbilt investigated Poe in response to a complaint. It conducted an investigation that included a hearing with Poe. Poe had the opportunity to appeal the findings. Even if, as the FAC alleges, the disciplinary procedure was far from perfect and intrinsically unfair, the Court finds that it does not amount to "conduct

so outrageous that it is not tolerated by civilized society." In the same vein, the Court finds that, as a matter of law, the alleged breaches of privacy and FERPA violations do not amount to conduct sufficiently outrageous to support an IIED claim under Tennessee law. See Doe v. Vanderbilt Univ., 2019 WL 4748310 at *17 (release of protected educational records and failure to inform parents that the plaintiff was suicidal did not amount to extreme and outrageous conduct).

The allegations pertaining to the delivery of the outcome to Poe are sufficient to move forward to discovery. This District and Tennessee courts "have consistently held that removal from academic programs and frustration of earning academic degrees, even if humiliating, depressing, or distressful, are not sufficiently egregious to support a claim of IIED." Z.J., 355 F. Supp. 3d at 686 (collecting cases); Belmont Univ., 334 F. Supp. 3d at 903 (same); see, e.g., Runions v. Tennessee State Univ., No. M200801574COAR3CV, 2009 WL 1939816, at *6 (Tenn. Ct. App. July 6, 2009) (expulsion from program was not sufficient); Kindred v. Nat'l Coll. of Bus. & Tech., Inc., No. W2014-00413-COA-R3CV, 2015 WL 1296076, at *10 (Tenn. Ct. App. Mar. 19, 2015) (termination from program was not sufficient); Goldfarb v. Baker, 547 S.W.2d 567, 569 (Tenn. 1977) (exclusion from class was not sufficient). Accordingly, the Court finds that the content of the communication to Poe does not in itself support a claim of IIED. On the other hand, the FAC alleges that Poe's mother put the Defendants on notice that Poe would commit suicide if given bad news when alone. Despite learning that Poe was alone, the Defendants went ahead and delivered the bad news. The night before, Clapper emailed Bourgoin, stating "[t]he parents better have flown out there. [L]ol." The context surrounding the way the Defendants delivered the message is relevant to determining whether their conduct was outrageous. See Finley, 384 F. Supp. 3d at 913 (M.D. Tenn. 2019) (the parties' particular relationship or the abuse of the power by one party to affect the interests of the other can give rise to outrageous conduct even where the

conduct would not be otherwise be outrageous; collecting cases); Nelson v. Ford Motor Credit Co., 621 S.W.2d 573, 576 (Tenn. Ct. App. 1981) ("The relationship of the parties is a significant factor in determining whether the acts are beyond the bounds of decency or intolerable in a civilized society, *i.e.*, the act occurring outside a particular relationship would not be considered outrageous but could well be within the confines of the parties' special relationship."); see, e.g., Webb v. Fraternity, No. 3:22-CV-00808, 2024 WL 86397, at *4 (M.D. Tenn. Jan. 8, 2024) (the "alleged regular use of racial slurs, standing alone, *without some context*, does not qualify as conduct sufficiently outrageous to support the claim) (emphasis added); Johnson v. Woman's Hosp., 527 S.W.2d 133, 138 (Tenn. Ct. App. 1975) ("[t]he question then arises whether or not [the defendant's conduct] *under all the circumstances* amounted to outrageous conduct") (emphasis added); Dunbar v. Strimas, 632 S.W.2d 558, 561 n.1 (Tenn. Ct. App. 1981) (concluding that, due to context, "reasonable minds could differ as to whether the conduct of the defendant . . . was extreme, outrageous and intolerable in present-day society"; further noting that "[t]he extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress, by reason of some physical or emotional condition or peculiarity." (quoting the Restatement (Second) of Torts, § 46)); accord Brown v. Mapco Exp., Inc., 393 S.W.3d 696, 704 n.3 (Tenn. Ct. App. 2012) ("[A]nother basis on which extreme outrage can be found is the defendant's knowledge that the plaintiff is especially sensitive, susceptible and vulnerable to injury through mental distress at the particular conduct." (quoting W. Page Keeton, *Prosser and Keeton on Torts* § 12, p. 62 (5th ed. 1984)).

Here, given that the Defendants specifically knew Poe was particularly susceptible to emotional distress and that his life was at stake, context makes it very plausible that the conduct at issue was outrageous enough to support a claim for IIED. The Court also finds that the FAC

45

sufficiently alleges recklessness and a serious mental injury. (See Doc. No. 34 ¶¶ 219, 470 (stating that Clapper emailed Bourgoin prior to delivering the outcome, writing "[t]he parents better have flown out there," and that Poe attempted suicide). Thus, the Court finds that the FAC makes a *prima facie* claim of IIED with respect to the delivery of the outcome to Poe. The Court, however, notes that the FAC does not make any allegations that Lowe was involved in the delivery of the outcome, except for the conclusory allegation that "Defendant Bourgoin, Defendant Clapper, and Defendant Lowe could not be bothered [to] pause the delivery of the outcome by merely one week to ensure the safety and well-being of Plaintiff knowing full well of [Poe]'s mental health deterioration." (Id. ¶ 467). The Court will therefore dismiss the claim against Lowe.

Accordingly, the IIED claim based upon the delivery of the investigation outcome will remain pending, except as to Lowe. All other aspects of the IIED claim will be dismissed.

F.     Negligent Infliction of Emotional Distress (Count VIII)

"The elements of a claim for negligent infliction of emotional distress include the elements of a general negligence claim, as well as the additional requirement that a plaintiff must prove that a defendant's conduct caused a serious or severe emotional injury." Belmont Univ., 367 F. Supp. 3d at 765 (M.D. Tenn. 2019) (quoting Rogers v. Louisville Land Co., 367 S.W.3d 196, 206 (Tenn. 2012)). "A serious or severe injury occurs 'where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.'" (Id. citing Rogers, 367 S.W.3d, at 206). The analysis of the 'serious mental injury' requirement is the same for both intentional infliction of emotional distress claims and negligent infliction of emotional distress claims." Rogers, 367 S.W.3d 196 at 208 (citing Miller, 8 S.W.3d at 614). "The 'extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed.'" Id. at 208 (quoting Restatement (Second) of Torts § 45, cmt. j.).

46

The Defendants argue that the Court should dismiss the negligent infliction of emotional distress ("NEID") claim because the FAC "fails to establish an independent duty of care apart from the duty imposed by . . . contract" and "fails to plead any facts sufficient to establish outrageous conduct on the part of any Defendant." (Doc. No. 63 at 23; Doc. No. 83 at 5). As discussed above, however, the Court finds that the FAC alleges the existence of a non-contractual duty of care with respect to the delivery of the outcome. (See supra, Section III.E). The FAC also alleges extreme and outrageous conduct to the extent the Defendants were on notice that Poe was likely to commit suicide if given bad news while away from home. (See supra, Section III.F). Because the FAC alleges that Poe attempted suicide, the FAC also alleges a serious or severe emotional injury. (Id.). Therefore, the Court will not dismiss the NEID claim based upon the delivery of the investigation outcome, except as to Lowe, whom the FAC does not allege was involved in the delivery. All other aspects of the NEID claim will be dismissed.

G.    Tortious Interference With Contract (Count X)

Under Tennessee law, a plaintiff is required to establish the following elements to prevail on a cause of action for tortious interference with contract: "(1) that there was a legal contract; (2) that the defendant knew of the existence of the contract; (3) that the defendant intended to induce a breach of the contract; (4) that the defendant acted maliciously; (5) that the contract was actually breached; (6) that the defendant's acts were the proximate cause of the breach; and (7) that the plaintiff suffered damages resulting from the breach." Vanderbilt Univ. v. Scholastic, Inc., 382 F. Supp. 3d 734, 759 (M.D. Tenn. 2019) (citing Keith v. Aerus, LLC, No. 2:09-CV-297, 2010 WL 3883434, at *4 (E.D. Tenn. Sept. 29, 2010) and Buddy Lee Attractions, Inc. v. William Morris Agency, Inc., 13 S.W.3d 343, 359 (Tenn. Ct. App. 1999)). "A complaint for tortious interference with contract must do more than simply parrot the legal elements of the cause of action. . . . [I]t must also allege specific facts that, if true, would support each of the seven elements of the tort."

Id. (quoting Lee v. State Volunteer Mut. Ins. Co., No. E200203127COAR3CV, 2005 WL 123492, at *10 (Tenn. Ct. App. Jan. 21, 2005)).

Defendants argue that the FAC fails to plead the existence or breach of a contract because the only two contracts possibly at play are Poe's internship contract (which the FAC does not allege was breached) or an implied contract that would have granted Poe a full-time job offer at the end of the internship (which the FAC does not allege existed). (Doc. No. 63 at 25). Defendants also argue that the FAC fails to plead damages other than the speculative loss of a future job offer. (Id. at 25–26). Poe counters that the FAC alleges "that he lost his internship, bonus, and had a contract for a job offer that was rescinded because of the discipline."[25] (Doc. No. 77 at 35 (citing Doc. No. 34 ¶¶ 345, 507–08)).

The Court agrees that the FAC fails to plead a breach of contract. Although the FAC alleges that Poe "had a valid, enforceable contract as an intern at a firm" and the "contract at issue was in fact breached," (id. ¶ 508, 511), the FAC does not explain *how* the internship contract was breached. Indeed, the FAC merely alleges that Poe "was not offered a position to return to his internship for employment." Id. ¶ 511; see also Id. ¶ 509 ("[Poe]'s lack of a return offer from their [*sic*] internship was directly caused by [Defendants]"). The FAC does not allege that Poe's employer had a contractual duty to offer a post-internship position to him. To the contrary, the FAC states that Poe had to "demonstrate [his] true value and *eventually* gain a return job offer." Id. ¶ 508 (emphasis added). The portion of the FAC that Poe cites in his opposition does not

---

[25] In the alternative, Poe requests leave to amend to add allegations or plead tortious interference with business relationships. (Id. at 25 n.1). This throwaway request to amend is insufficient because it is well settled in the Sixth Circuit that a "request for leave to amend almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." La. Sch. Emps. Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 486 (6th Cir. 2010) (internal quotations omitted).

48

change the Court's analysis. There, the FAC states that "[a]t multiple firms, [Poe] either had [his] employment *offer* rescinded, had to turn down an *offer*, had to withdraw from the *interview process*, or was prevented from *applying* altogether." Id. ¶ 345 (emphasis added). An offer, interview process, or application is not a contract. See Garcia v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee, No. 3:18-CV-00814, 2019 WL 7020355, at *15 (M.D. Tenn. Dec. 20, 2019) ("A valid enforceable contract requires consideration and mutual assent, manifested in the form of an offer and an acceptance.") (citing Ace Design Grp., Inc. v. Greater Christ Temple Church, Inc., No. M201600089COAR3CV, 2016 WL 7166408, at *7 (Tenn. Ct. App. Dec. 8, 2016)). While the FAC does state Poe accepted an employment offer and that the employer ultimately refused to employ him after becoming "aware of the situation between [Poe] and Vanderbilt and Vanderbilt's unfair process against [Poe]," the FAC's claim for tortious interference does not appear to be based upon this contract.[26] (See Doc. No. 34 ¶¶ 505–22 (alleging tortious interference with Poe's internship contract, and referring to the contract in the singular). Nowhere, for instance, does the FAC allege that the Defendants were aware of an employment contract, other than Poe's internship contract. (See generally id.). Accordingly, the Court finds that the FAC fails to state a claim for tortious interference with contract. Therefore, Count X will be dismissed without prejudice.

---

[26] The FAC alleges that the employer "rescinded [Poe]'s employment offer" after Poe had accepted it. See Doc. No. 34 ¶ 345. Drawing all inferences in Poe's favor, the Court will construe the term "employment offer" in this context to mean employment contract.

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss First Amended Complaint (Doc. No. 62) will be granted in part and denied in part. The Motion is denied as to Count III, which will remain pending. The Motion is granted as to Counts I and IX, which will be dismissed. Count X will be dismissed without prejudice. As to Counts II, IV, V, VI, VII, and VIII, the Motion will be granted in part and denied in part. Finally, because no claims remain pending against them, defendants Melanie Lowe and Cynthia Paschal will be dismissed.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE