**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **PARKER POE,** | ) | |
| | ) | |
|     **Plaintiff,** | ) | **Case No. 3:24-cv-00368** |
| | ) | |
| **v.** | ) | **Judge Crenshaw** |
| | ) | **Magistrate Judge Frensley** |
| **DR. MELANIE LOWE,** *et al.*, | ) | |
| | ) | |
|     **Defendants.** | ) | |

**MEMORANDUM IN SUPPORT OF
<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

This case centers on Plaintiff's suspension from Vanderbilt after he admitted to making a spree of 19 anonymous social media posts over five days accusing another student of rape. Vanderbilt investigated the matter through its student disciplinary process, found that Plaintiff violated Vanderbilt's policies, issued a sanction, and the sanction was upheld on appeal. In a transparent attempt to deflect any responsibility for his actions, Plaintiff brought this lawsuit alleging that he should not have been disciplined and that the suspension caused him $300 million in damages. The undisputed material facts taken in the light most favorable to Plaintiff show that his claims have no legal merit and that Defendants are entitled to judgment as a matter of law.

## I.       FACTUAL BACKGROUND

Beginning in February 2022, Vanderbilt student Simon Roe ("Roe") was the target of anonymous internet posts accusing him of sexual misconduct on Greek Rank. (Deposition of Parker Poe ("Pl. Dep.") at 107:24-108:10, 119:3-5). A few months later, Roe was the target of additional anonymous posts on a site called "Yik Yak." (Second Amended Complaint ("SAC") ¶ 31). Many of those posts were admittedly made by Plaintiff, a 2020 Vanderbilt transfer from ▮▮▮▮▮▮▮▮▮ who was on a personal leave from Vanderbilt to "prepare for and apply to a highly competitive and specialized internship opportunity." (SAC ¶¶ 21, 31; Pl. Dep. at 24:21-25:13). Plaintiff did not have a personal relationship with Roe, yet Plaintiff's posts included allegations that Roe committed sexual assault and that students were "roofied" at parties hosted by Roe's fraternity. (SAC ¶¶ 27-28, 31; Pl. Dep. at 81:5-25).

In response to the posts, Roe's father contacted Vanderbilt's Director of Greek Life, Kristin Torrey to express his concern about the posts. (Deposition of Neil Jamerson ("Jamerson Dep.") at 22:16-23:4). Torrey alerted Vanderbilt officials including Defendant Neil Jamerson ("Jamerson"), who followed up with Roe's father to provide him with resources for support. (*Id.*; Deposition of

2

Simon Roe's Father ("Roe Father Dep.") at 141:20-142:12, Ex. 3). During the summer of 2022, Roe and his father took steps to try and remove the remaining online posts about Roe. (Roe Father Dep. 160:14-17).

In the fall of 2022, Roe filed a defamation lawsuit in the Davidson County Circuit Court based on the anonymous posts. (SAC ¶¶ 44-45). Roe then served a series of subpoenas on the social media sites to learn the identities of the anonymous posters, including phone numbers. (*Id.*). Roe's subpoena to Yik Yak, specifically, sought poster information for 39 distinct original posts or comments concerning Roe. (Pl. Dep. at Ex. 2[1]). At that time, Roe's father told Jamerson about the subpoenas. (Roe Father Dep. at Ex. 4). Jamerson responded: "If you learn the phone numbers, you could share those with me as well as any additional information uncovered for [student] conduct proceedings." (*Id.*).

Yik Yak's response to Roe's subpoena revealed the breadth of Plaintiff's postings from earlier that year. Plaintiff's phone number posted about Roe 19 times over the course of a 5-day period from April 23 through April 28, 2022. (Pl. Dep. at 124:15-125:1, Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236). The content of Plaintiff's posts varied but all focused on Roe and Roe's fraternity, █████ (*Id.*). For example, Plaintiff posted variations of "[Simon Roe] is a rapist" eight times, as well as specific allegations such as, "[Simon Roe] slipped me a roofie this fall, but I just wasn't able to definitely prove it." (*Id.*). Plaintiff also replied to some of his own posts to add additional commentary or context. (*Id.* at VU_00002340). In a comment on Plaintiff's post asking, "odds ███ holds one of their own accountable?" another user posited,

[1] Plaintiff's Student Accountability evidence packet is Ex. 2 to Plaintiff's Deposition. The packet as maintained by Vanderbilt (including the Yik Yak subpoena results and the annotated Yik Yak screenshots sent to Vanderbilt by Simon Roe's father) had other students' names and information redacted from the Yik Yak documents. Vanderbilt subsequently produced unredacted versions of the Yik Yak documents within the evidence packet ("Deanonymized Ex. 2 to Pl. Dep.").

3

"It's literally not true and it's other frats writing that about him." (*Id.*). Plaintiff replied, "[I]'m in a sorority here and have personally seen him be overly touchy with girls to the point where [I]'ve had to drag my friends away from him." (*Id.*).

The Yik Yak subpoena response also revealed the phone numbers of ten other posters, seven of whom Roe was able to match with possible identities. (Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236; Roe Father Dep. at 186:6-24). Those ten other posters combined to account for 20 of the discrete posts/comments included in the subpoena result, with Plaintiff alone accounting for the other 19. (Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236). No other individual poster was responsible for more than five posts, with most having one to two posts each. (*Id.*). Plaintiff does not dispute the information contained in the Yik Yak subpoena but alleges that he was "reposting" other posts that he "had seen on Greek Rank and Yik Yak about Simon Roe." (Pl. Dep. at 127:1-2; SAC ¶ 30). Plaintiff alleges that the other Greek Rank and Yik Yak posts about Roe numbered in the hundreds, but he has not produced evidence of a single one.[2] (Pl. Dep. at 119:6-17).

On December 30, 2022, Roe's father shared the subpoena results and post screenshots with Jamerson. (Roe Father Dep. at 189:8-19, Ex. 5). Roe's father informed Vanderbilt that Plaintiff was responsible for "the great majority of the terrible posts . . . initiated the entire incident, posed as a Sorority Member and as a rape victim and accused [Roe] of drugging him." (*Id.* at Ex. 5). In his email, Roe's father advocated for punishment of all the posters. (*Id.*). The information from Roe's father was sent to Vanderbilt's Student Accountability office ("Student Accountability")

---

[2] While not produced by Poe, Roe's family provided Vanderbilt with nine pages of Greek Rank posts and comments, but only one thread was dated prior to Poe's first post on Yik Yak. (Pl. Dep. at Ex. 2, p. 29-37). Roe's father confirmed that the Greek Rank posts provided were the only Greek Rank posts that he or Roe were aware of. (Roe Father Dep. at 353:16-354:11).

4

headed by Jeremy Bourgoin ("Bourgoin"), who generated a complaint against Plaintiff on January 4, 2023. (Deposition of Jeremy Bourgoin ("Bourgoin Dep") at 164:19-165:15; SAC ¶ 53). At that time, based on the smaller number of posts they had made, Student Accountability decided that the other Vanderbilt student posters (three women and three men) would be referred to Vanderbilt's Project Safe for an educational conversation rather than subject to formal Student Accountability proceedings.[3] (30(b)(6) Deposition of Vanderbilt University ("VU Dep.") at 98:10-99:12, 100:7-15; Bourgoin Dep. at 336:14-337:7; Deanonymized Ex. 2 to Pl. Dep., VU_00002332-VU_00002350).

In accordance with Vanderbilt's Student Handbook, Plaintiff was notified by email on January 9, 2023, that a report about him was received and that he should schedule a meeting with Student Accountability. (SAC ¶¶ 63-64; VU Dep at Ex. 2, VU_00001634). At that time, Plaintiff was again taking personal leave from Vanderbilt and completing an internship in ███████ (SAC ¶¶ 21-22; Pl. Dep. at 156:16-17).[4] Three days after the notification email, Plaintiff—who had private legal representation during the Student Accountability process—attended a video conference call with Bourgoin. (SAC ¶¶ 63-64, 72; Pl. Dep. at 156:18-157:8; Deposition of Plaintiff's Mother ("Pl. Mother Dep.") at 35:21-36:13). During the introductory call, Bourgoin showed Plaintiff a copy of his "charge sheet" with the basis of the complaint against him and the three provisions of the Student Handbook that he was accused of violating: harassment, disorderly

---

[3] After L.N. (one of the other female posters) met with Project Safe, Simon Roe's father sent Vanderbilt a declaration from the State Court case wherein L.N. admitted to knowingly posting false information about Roe. (Roe Father Dep. at 328:8-18; Bourgoin Dep. at 191:10-17; Jamerson Dep. at 345:20-346:4). Based on this new information, Vanderbilt brought formal Student Accountability charges against L.N. (Jamerson Dep. at 345:20-346:4). L.N. admitted responsibility and was given the sanction of probation. (Declaration of Jeremy Bourgoin ("Bourgoin Dec.") ¶ 5; Bourgoin Dep. at 191:10-17).

[4] Students on leave are within the jurisdiction of Student Accountability. (VU Dep. at Ex. 2, VU_00001633).

conduct, and impersonating a University official or any other person. (SAC ¶ 91; Pl. Dep. 157:9-158-10). Those three provisions (along with approximately 25 others) are explicitly listed in both the 2021-2022 and 2022-2023 Student Handbooks as "violation[s] of University policy" for which a student may be subject to corrective action. (VU Dep. at Ex. 1, POE000682-POE000684, Ex. 2, VU_00001618-VU_00001620).

Plaintiff had six additional accountability meetings with Bourgoin from January to March of 2023—a longer process than most student conduct cases that semester. (Pl. Dep. at 103:16-25, 163:12-164:5; Jamerson Dep. at 227:6-12). During the meetings, Plaintiff had the opportunity to review the post materials submitted by Roe's father, review the impact statements from Roe and his family, explain his rationale for "reposting," and otherwise explain his "side of the story." (Pl. Dep. at 164:6-22). Plaintiff asked Bourgoin to talk to "two other posters and other students at the university and [Roe] as well," but Plaintiff did not bring those witnesses (or any others) to an accountability meeting for Bourgoin to consider. (*Id.* at 165:24-166:16). Plaintiff presented his own evidence in the form of a written statement with 43 separate attached documents, including a written impact statement from his parents. (*Id.* at Ex. 1, VU_00002835-VU_00002836). Plaintiff admits that Bourgoin did not prevent Plaintiff from presenting any evidence. (*Id.* at 168:9-19). Plaintiff also submitted a cross-complaint against Roe for providing false and misleading statements about Plaintiff to Vanderbilt (Bourgoin Dec. ¶ 4). Bourgoin considered Plaintiff's cross-complaint as a part of his evaluation of the complaint against Plaintiff and ultimately determined that there was insufficient information to charge Roe. (Bourgoin Dec. ¶ 5).[5]

---

[5] Plaintiff submitted a second complaint against Roe to Vanderbilt on February 26, 2024, this time alleging that Roe "had access to [Poe's] confidential information that he then broke [Vanderbilt] policy to share." (Pl. Dep. at Ex. 1, VU_00002839). Bourgoin found that Plaintiff did not "provide sufficient evidence . . . to warrant charging [Simon Roe] at th[at] time." (*Id.* at VU_00002840).

On February 23, 2023, Plaintiff's mother contacted Vanderbilt to express concerns that her son might be suicidal. (Deposition of Lisa Clapper ("Clapper Dep.") at Ex. 11). Lisa Clapper ("Clapper"), Director of Student Care Coordination at Vanderbilt and a Licensed Clinical Social Worker, returned Plaintiff's mother's call later that same day. (Clapper Dep. at 10:24-11:1, 16:5-12, Ex. 11). Clapper asked Plaintiff's mother questions to assess suicide risk factors, including whether Plaintiff had access to a gun or drugs. (Pl. Mother Dep. at 102:5-103:7). Plaintiff's mother denied that Plaintiff had access to either. (*Id.*). Following the call, Plaintiff's mother memorialized the conversation in an email to Clapper and Bourgoin, stating that Plaintiff "is now talking suicide, and we are trying to manage that right now with appropriate resources. We are absolutely convinced an adverse decision now will take his life." (Clapper Dep. at Ex. 11). Bourgoin responded less than an hour later confirming that he would "not be sending an outcome at present until I have a chance to connect on care and well-being . . . ." (*Id.*).

After the email from Plaintiff's mother, Clapper and Jamerson had a discussion regarding Plaintiff's risk for suicide and the need to have a care plan in place. (Clapper Dep. at 127:15-129:16). Jamerson was trained on the National Association for Behavior Intervention and Threat Assessment's "risk rubric" and the assessment of risk related to threats of harm to self or others.[6] (Jamerson Dep. at 42:21-45:4; Clapper Dep. at 128:11-14). Jamerson evaluated Plaintiff at "a moderate-to-elevated risk of suicide because the no intent, no plans, no means, no timeline, and the student was able to safety-plan with his mom, according to his mother." (Jamerson Dep. at 395:5-14). Jamerson also understood that "the mother felt like it was a situation where we didn't

---

For both cross complaints, Plaintiff cannot prove damages from any alleged deviation from the Student Handbook.
[6] Moderate risk is above mild, while elevated risk is below severe. (Risk Rubric, VU_00001389.) Under both scenarios, additional support is provided to the student compared to students with mild risk. (Jamerson Dep. at 61:7-62:22.)

need to reach out to do any additional care support, that she would be able to manage the situation."

(*Id*. at 395:10-14). Indeed, during her call with Clapper, Plaintiff's mother expressed that she did not want anybody from Vanderbilt to reach out to Plaintiff and felt that she would continue to communicate with Plaintiff. (Pl. Mother Dep. at 105:6-106:2). At that point, Jamerson felt comfortable proceeding to deliver the Student Accountability outcome to Plaintiff:

> But at the time, I felt it was safe to move forward with adding additional precautions like having Lisa [Clapper] available to be on the call, who is a licensed clinical social worker, also notifying the mom of when the date would be so that the mom was aware of when it was coming out. So we do not normally notify a mother or parent of when an outcome is going to be delivered, but given the concerns, we took extra precautionary steps to mitigate any potential risk.

(Jamerson Dep. at 395:16-25). As to Plaintiff's mother's request to delay delivery of the Student Accountability outcome, Jamerson declined to grant that request based on consideration of the toll that the process was taking on Roe, the toll the process was taking on Plaintiff, and the fact that Bourgoin "was basically at an end of any questions and no substantive information was being added." (*Id.* at 396:17-397:2).

As part of Vanderbilt's safety plan, Clapper called Plaintiff's mother on March 1, 2023, to tell her that the outcome would be delivered on March 6, 2023. (Pl. Mother Dep. 111:8-23). During the call, Plaintiff's mother again requested that the outcome be delayed indefinitely (but at least a week) so that Plaintiff could be home with family and have a chance to decompress. (*Id.* at 111:24-112:11, 129:18-130:19, Ex. 3, VU_00002828). Clapper agreed to inquire but recommended that Plaintiff's mother still plan to be in ███ on March 6 if she wanted to be with Plaintiff at the time the outcome was delivered. (*Id.* at Ex. 3, VU_00002828). After confirming with Bourgoin that the meeting would not be moved, Clapper emailed Plaintiff's mother later that same day:

> Monday March 6 will continue to be the target date to discuss the outcome with ███. I know this is concerning for you, ███, and your family. I think the important piece is to ensure that ███ has support available to him in ███ for

8

whatever the outcome may be. As I understand it, Jeremy will be in touch with
███ by Friday around next steps and specific scheduling information. Please let
me know how I may be able to assist in terms of planning for support.

(Pl. Mother Dep. at Ex. 2). Plaintiff's mother claims that she never received the email. (*Id.* at
118:22-119:2).

On March 5, 2023, Clapper responded to an email from Bourgoin about travel issues
related to a power outage and his concern about whether they would be able to complete the
outcome meeting with Plaintiff scheduled for the following day. (Clapper Dep., Ex. 15). In her
response, Clapper responded: "Ugh! This power situation is the worst. I'm really hoping they have
ours on tonight. Either way I can swing 4:45. If ours is not on I'll go into campus tomorrow. His
parents better have flown there. [l]ol safe travels." (*Id.*). Clapper testified that the "laugh out loud"
comment was "in reference to all of the various elements of not having power, []Jeremy not even
being in town, us trying to ensure that we could go forward with this plan and for it to be run
smoothly," not that she thought it was a funny situation. (*Id.* at 147:10-22). Plaintiff did not see
this email until nearly a year later in early 2024. (Pl. Dep. at 179:5-14).  Plaintiff's mother also
testified that, before she saw the email (also in late 2024), she thought Clapper "was trying to help"
and "was very nice to talk to." (Pl. Mother Dep. at 141:5-14).

Plaintiff's Student Accountability outcome meeting proceeded by video call on March 6,
2023, at 4:45 PM (the conclusion of Plaintiff's workday). (SAC ¶ 215). Plaintiff refused to disclose
where he was located and Defendants did not know who was in town with him. (Pl. Dep. at 182:7-
16; Bourgoin Dep. at 390:13-20). As it turns out, Plaintiff's mother was not in ███ and
Plaintiff purposely told her that the call was set for March 7 because he "did not want her to come
to ███ (Pl. Dep. 178:14-179:4). During the call, Bourgoin informed Plaintiff of his decision:
he found Plaintiff responsible for all three charges (i.e., harassment, disorderly conduct, and

9

impersonation). (SAC ¶ 157). Plaintiff was also informed that he was being suspended, which was confirmed in writing by a letter sent via email the same day. (Pl. Dep. 181:6-8; SAC ¶ 157). Clapper was on the call with Bourgoin to provide support to Plaintiff, but Plaintiff left the call before speaking with her. (Pl. Dep. at 180:16-18). Plaintiff claims that he attempted to take his own life by ███████████ later that evening. (*Id.* at 193:15-22).

A few days later on March 9, 2023, Bourgoin provided Roe with an update about his complaint against Plaintiff, stating: "The person who instigated the harassing posts against you has completed our process and has been held accountable. He is currently not an enrolled student, and we would notify you if the student is re-enrolling at the university at any point while you are an undergraduate student." (SAC ¶¶ 180-181). Roe shared the letter with his father, who did not share it further aside from with his wife and his attorneys. (Roe Father Dep. at 298:15-17, 297:14-298:4).

Plaintiff appealed the findings of Dr. Bourgoin's investigation on March 23, 2023. (SAC ¶ 242). Dr. Melanie Lowe ("Lowe"), Chair of the Appellate Review Board, issued a finding on April 14, 2023, dismissing Plaintiff's appeal because he had not "set forth a sufficient basis for the Board to determine that the Office of Student Accountability did not conduct themselves in accordance with their policies or procedures, or that any irregularities were harmful to the extent that they adversely affected the process." (SAC ¶¶ 252, 256). Plaintiff's suspension was put into effect as of the date of the decision, April 14, 2023. (*Id.* ¶ 281).[7]

---

[7] Collateral to his Student Accountability proceedings, Plaintiff applied for remote attendance disability accommodations with Vanderbilt in the fall of 2023 and again when he sought to return to Vanderbilt after suspension in 2025. (SAC ¶ 308). Vanderbilt could not implement any accommodations during his suspension, and his renewed request for fully remote attendance in the spring of 2025 was denied. (*Id.* ¶ 308; SC ¶ 15). Plaintiff resumed on-campus studies in the Fall of 2025 and completed the classes necessary for his degree in December 2025. (Pl. Dep. at 13:14-21, 213:24-214:3).

Plaintiff filed this lawsuit on April 1, 2024. (ECF No. 1). Plaintiff claims that he suffered $300 million in damages, including "emotional distress, psychological damages, delay/loss in education, delay/loss of future educational and career opportunities, specific job and career loss, future lost income, reputational damages, punitive damages, and other direct and consequential damages." (SAC ¶¶ 379, 417, 430, 452, 462, 479, 495, 521). After filing of the Second Amended Complaint and in response to Defendants' request for mental health records through trial, Plaintiff clarified that he is "narrow[ing] his claim for emotional distress and psychological harm to focus exclusively on the March 6, 2023 suicide attempt and a related hospital visit" and that "continuing care is not part of [his] claim." (ECF No. 183 at 10; ECF No. 228 at 4; Pl. Dep. at 201:3-11).

## II.    ARGUMENT

### A.  Plaintiff's Breach of Contract Claim Fails as a Matter of Law

Plaintiff's countless and indecipherable breach of contract theories[8] boil down to two common themes: (1) he thinks he should have had some level of "due process" that the Student Handbook does not provide, and (2) he is dissatisfied with the outcome of the Student Accountability process. Neither can sustain a claim for breach of contract, and the undisputed evidence shows that Defendants complied with all relevant requirements of the Student Handbook.

To succeed on a breach of contract, a plaintiff must prove (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach. *Thomas v. Meharry Med. Coll*., 1 F. Supp.3d 816, 828 (M.D. Tenn. 2014).

---

[8] The multiple versions of Plaintiff's 500-plus paragraph complaint coupled with Defendants' pending Partial Motion to Dismiss Plaintiff's Second Amended Complaint (ECF No. 165) make it nearly impossible for Defendants to reasonably determine Plaintiff's discrete breach of contract theories. Defendants believe they have addressed all contractual provisions upon which Plaintiff could reasonably rely, but in the event that Plaintiff advances unforeseen arguments in his Response, Defendants may seek leave for an extended Reply to address such arguments.

11

In the specific context of a breach of contract claim based on a university handbook, a student's "disappointment" with the outcome of university disciplinary proceedings "is an insufficient basis for a breach of contract claim." *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 692 (M.D. Tenn. 2018). Additionally, the "generic promise of 'fairness' does not give rise to 'fairness' procedural obligations independent of specific provisions in university's disciplinary procedures, which themselves describe procedures designed to be fair." *Id.* at 700 (citing *Doe v. The Trs. of the Univ. of Pennsylvania*, 270 F. Supp. 3d 799, 812 (E.D. Pa. 2017)). Vanderbilt is a private university to which the requirements of Constitutional due process do not apply. *See Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *14 (M.D. Tenn. Sept. 30, 2019).

Here, Vanderbilt's Student Handbook sets forth the four "basic elements" of its Student Accountability process:

- Written and timely notice of charges against students, including possible consequences;
- Opportunity for students to present all relevant information at an accountability meeting, to challenge adverse testimony and information, to speak on their own behalf, to call witnesses, and to be accompanied by a Vanderbilt student, faculty, or staff adviser of their own choosing, to whom they are not related, and who has not had formal legal training (except in cases involving students in the Law School);
- Findings reached on the basis of the information presented, proof to accountability staff for a finding of responsibility using a "preponderance of the evidence," or more likely than not, standard; and
- An unbiased appellate body to which students may appeal.

(VU Dep. at Ex. 2, VU_00001634). Plaintiff's own admissions negate any finding of breach of these provisions.

First, it is undisputed that Vanderbilt did not breach its contractual obligation to provide "written and timely notice of charges . . . including consequences." (*Id.*). Plaintiff admits that he received a letter on January 9, 2023, notifying him of the need to schedule a Student Accountability meeting. (SAC ¶ 63). Plaintiff also admits that he had his first call with Student Accountability

12

three days later wherein he was shown a copy of his "charge sheet," including the three provisions of the Student Handbook that he was alleged to have violated. (SAC ¶ 91; Pl. Dep. 157:9-158-10). This is precisely the procedure set forth in the Student Handbook. (VU Dep. at Ex. 2, VU_00001634-VU00001635). There was no breach.

Second, it is undisputed that Vanderbilt did not breach its contractual obligation to provide Plaintiff the opportunity to present evidence. Plaintiff admits that he was provided the opportunity to review his "evidence packet" during the meetings with Bourgoin, was permitted to explain "his side of the story," and was able to submit evidence for Bourgoin's consideration. (Pl. Dep. at 164:6-22, Ex 1). Plaintiff and Bourgoin met on a total of seven occasions, during which Plaintiff admits that he did not attempt to present any evidence to Bourgoin that Bourgoin prevented him from presenting. (*Id.* at 168:9-19). Further, Plaintiff admits that he did not bring any witnesses to the Student Accountability meetings that Bourgoin failed to consider. (*Id.* at 166:14-16). Though Bourgoin declined to interview the individuals Plaintiff suggested, Plaintiff was not prevented from producing his own witnesses. *See* ECF No. 97 at 13 ("[T]he Court finds no support in the Handbook for Poe's claim that Vanderbilt should have interviewed other students."). Again, there was no breach.

Third, it is undisputed that Vanderbilt did not breach its contractual obligation to reach its findings "on the basis of the information presented" and using a "preponderance of the evidence" standard. (VU Dep. at Ex. 2, VU_00001634). Plaintiff has put forth no evidence that Bourgoin failed to base his findings on information presented at the accountability meeting. In fact, many of Plaintiff's arguments are based on the fact that Bourgoin declined to consider information *outside* of the information presented. There are also no facts in the record to rebut Bourgoin's testimony that he found Plaintiff accountable for the policy violations "by a preponderance of the evidence."

13

(Bourgoin Dep. at 203:20-204:1). Indeed, Plaintiff admitted to making the posts, and Plaintiff's dissatisfaction with Bourgoin's credibility determination as to Plaintiff's justification for posting does not serve as evidence that Bourgoin used the wrong evidentiary standard or had any doubt that Plaintiff violated Vanderbilt's policies.

Fourth, it is undisputed that Vanderbilt did not breach its contractual obligation to provide Plaintiff an unbiased appeal. Plaintiff admits that he was sent a letter finding him responsible for all three charges. (SAC ¶ 157). Plaintiff admits that he was permitted to file an appeal based on three separate grounds. (*Id.* ¶ 242). Plaintiff admits that Lowe considered his appeal and sent him a written "appeal denial" explaining her rationale. (*Id.* ¶¶ 235, 257-280). Lowe's written denial explained the standards of review that she employed for all three grounds of appeal as well as her reasoned conclusions as to each, and there is no evidence that Jamerson was involved in the appeal (Deposition of Melanie Lowe ("Lowe Dep") at 63:9-19, Ex. 6). Plaintiff cannot dispute these facts but rather bases his breach of contract claim on his disagreement with Lowe's conclusion: "Defendant Lowe inaccurately determined that Plaintiff's appeal did not set forth a basis sufficient to provide relief, which disregards and ignores every one of Plaintiff's well established and substantiated arguments without any rational basis." (SAC ¶ 255). His disagreement cannot sustain a breach of contract claim.

In summary, Vanderbilt did not breach any of the contractual provisions to which it contractually obligated itself to abide. Moreover, Student Accountability proceedings were not conducted in a court of law, and any additional theories of breach that Plaintiff attempts to squeeze under the umbrella of "fairness" are without merit. *See Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 893 (N.D. Ohio 2017) ("Fundamental fairness does not dictate that a school disciplinary hearing adhere to all procedural safeguards afforded defendants in a court of law.").

14

### B. Plaintiff's Title IX Selective Enforcement Claim Fails as a Matter of Law

To support a claim for selective enforcement under Title IX, a plaintiff must show "that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." *Doe v. Cummins*, 662 F. App'x 437, 452 (6th Cir. 2016). Also critical to a selective enforcement claim is "evidence that gender bias motivated the selective enforcement." *Doe v. Oberlin Coll.*, 60 F.4th 345, 356 (6th Cir. 2023). Here, the undisputed facts negate Plaintiff's ability to make these showings.

First, Plaintiff was not similarly situated to the other female posters. The Sixth Circuit has analogized the requisite similarly situated showing "to Title VII disparate treatment claims, in which a plaintiff must show that all relevant aspects of his situation are <u>nearly identical</u> to those of the female alleged to be treated more favorably." *Oberlin Coll.*, 60 F.4th at 356 (quotations omitted) (emphasis added). Of the eleven individuals responsible for at least 1 of the 39 posts subject to Simon Roe's father's subpoena to Yik Yak, five were men (Plaintiff, S.A., A.G., O.R., and A.C.[9]), three were women (L.N., M.G., and T.I.), and three were of unknown gender (phone numbers ending 5908, 2397, and 5388). (Deanonymized Ex. 2 to Pl. Dep., VU_00002332-VU_00002350). Plaintiff does not dispute the results of the Yik Yak subpoena which show that Plaintiff posted 19 times, including 14 of the first 18. (*Id.* at VU_00002233-VU_00002236). The female posters posted far less, with L.N. posting three[10] times, M.G. posting three times, and T.I. posting once. (*Id.*). The sheer volume of Plaintiff's posts and the fact that he was the first to post illustrate that his behavior was significantly different than that of his female comparators. *See*

---

[9] It was later determined that A.C. was not a Vanderbilt student. (Bourgoin Dec.¶ 8)

[10] While the Yik Yak subpoena results only showed 2 posts from L.N.'s phone number, Simon Roe's father was able to attribute an additional comment to her (a reply to her own post) as noted in his annotated screenshots. (Deanonymized Ex. 2 to Pl. Dep., VU_00002342).

*Mallory v. Ohio Univ.*, 76 F. App'x 634, 641 (6th Cir. 2003) (affirming the dismissal of a selective enforcement claim when the comparator student's circumstances were "significantly different" than the plaintiff's).

Substantively, the content of Plaintiff's posts was more egregious than the female posters and his posts were facially false. Defendants anticipate that Plaintiff will focus on L.N. as a comparator because she alluded to her alleged "personal experience" with Roe, implying that she might have been assaulted. (Deanonymized Ex. 2 to Pl. Dep., VU_00002234, VU_00002342). But L.N.'s post is not comparable to Plaintiff's posts alleging a specific sexual assault by Roe because at least one of Plaintiff's posts was demonstrably false when he posted: "[I]'m in a sorority here and have personally seen him be overly touch with girls to the point where [I]'ve had to drag my friends away from him." (*Id.* at VU_00002340). Because Plaintiff (a male) was not in a sorority, that allegation was demonstrably false compared to L.N.'s post, which Defendants could not have known was false at the time it was presented. (Jamerson Dep. at 249:2-22). Once Vanderbilt received evidence in the form of a pleading in the state court case that L.N.'s purported assault allegation was knowingly false, Vanderbilt pursued Student Accountability charges against her— just as they did with Plaintiff. (*Id.* at 345:20-346:4).

Even if Plaintiff could show that he was similarly situated to the female posters, he has put forth no evidence of gender bias beyond his own speculation. "A Title IX plaintiff successfully alleges gender bias for purposes of this claim 'if he or she points to statistical evidence of gender bias in [a u]niversity's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679–80 (M.D. Tenn. 2018) (citations omitted). No such facts are present here. And while Plaintiff will likely argue that female posters were treated more

favorably than him, Plaintiff cannot negate the fact that there were three other male posters (A.G., S.A., and O.R.) who—like the female posters—were included in the group of "other posters" (along with females T.I., L.N., and M.G.) that were referred for an educational conversation with Project Safe (VU Dep. at 100:7-15).

### C. Plaintiff's Section 504 Retaliation Claims Fail as a Matter of Law

Plaintiff brings two Section 504 retaliation claims: one in the Second Amended Complaint based on a letter from the Dean of Vanderbilt's School of Engineering asking Plaintiff if he wanted to withdraw from enrollment, and one in the Supplemental Complaint based on a "formal retaliation complaint" regarding the accommodation process. (SAC ¶ 428; SC ¶ 35). But on November 21, 2025, the Sixth Circuit published an opinion, holding that "§ 504 of the Rehabilitation Act does not provide a private right of action for retaliation." *Smith v. Michigan Dep't of Corr.*, 159 F.4th 1067, 1082 (6th Cir. 2025). Thus, Plaintiff's claims for retaliation based on Section 504 of the Rehabilitation Act should be dismissed.

### D. Plaintiff's Defamation Claim Fails as a Matter of Law

Plaintiff's remaining defamation claim against Bourgoin is based on Bourgoin's March 9, 2023, letter to Roe stating that "[t]he person who instigated the harassing posts against you has completed our process and has been held accountable." (SAC ¶ 434; ECF No. 97 at 35). To establish a cause of action of defamation in Tennessee, the moving party must prove that: "1) a party published a statement; 2) with knowledge that the statement is false and defaming to the other; or 3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." *Sullivan v. Baptist Mem'l Hosp.*, 995 S.W.2d 569, 571 (Tenn. 1999). Plaintiff's claim suffers from three fatal flaws.

First, Bourgoin's statement that Plaintiff "instigated" the harassing posts that formed the basis of Roe's complaint against Plaintiff was objectively not false—it was true. Here, Plaintiff admits that his posts were the first in the group of posts that Roe's father provided to Vanderbilt. (Pl. Dep. at 137:3-14, 184:12-19). And it was that group of posts that Roe's father viewed as the "attack" on his son that spurred the complaint to Vanderbilt. (Roe Father Dep. at 371:23-372). Therefore, whether you interpret "instigate" to mean "to incite" or "to cause," it is true that Plaintiff's posts "instigated" the posts that were the center of Roe's complaint to Vanderbilt— Plaintiff's posts came first, and others posted after him in response. (Pl. Dep. at 137:8-14).

Second, Plaintiff cannot point to any evidence that Bourgoin acted with reckless disregard for the truth or with negligence in failing to ascertain the truth. In the group of posts that Bourgoin considered when reaching his decision in the Student Accountability process, Plaintiff's posts came first and other posts followed. (Pl. Dep. at Ex. 2, p. 6-24). And while Plaintiff claimed that he was not the first to post about Roe and prior Greek Rank and Yik Yak posts about Roe numbered in the hundreds, Plaintiff never provided any of those posts, either to Bourgoin in the accountability process or through discovery in this lawsuit. (*Id.* at 119:6-17). Plaintiff's assertions were contradicted by Roe's account (who had no reason to lie about additional posts), and Bourgoin noted that Plaintiff's account "did not prove truthful or credible." (*Id.* at Ex. 1, VU_00002833).

Third, Plaintiff cannot prove actual damages arising from the allegedly defamatory statement. A plaintiff is "required to prove actual damages in all defamation cases." *Handley v. May*, 588 S.W.2d 772, 776 (Tenn. Ct. App. 1979). In evaluating actual damages, "[t]he issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering." *Hibdon v. Grabowski*, 195 S.W.3d 48, 68 (Tenn. Ct. App. 2005). Here, Plaintiff claims that "subsequent to the issuance of

18

the defamatory letter, students and employees at Plaintiff's paid internship confronted him to ask Plaintiff about the sanction, which they understood to be an expulsion from Vanderbilt." (SAC ¶ 447). Both Plaintiff and his mother attribute the expulsion rumors to Roe or Roe's father sharing the March 9 letter from Bourgoin—a fact that Roe's father (the person with firsthand knowledge) explicitly denied. (Pl. Mother Dep. at 86:4-7; Pl. Dep. at 183:17-184:5; Roe Father Dep. at 297:14-298:4). Additionally, Plaintiff's alleged reputational damages flow from the portion of the letter for which his defamation claim was already dismissed: Bourgoin's statement that he was "not an enrolled student." (SAC ¶ 435; ECF No. 97 at 35). There is no evidence that Plaintiff suffered any damages from the word "instigated."

### E. Plaintiff's Negligence Claim Fails as a Matter of Law

Plaintiff cannot succeed on his remaining negligence claim that Defendants "acted negligently in delivering the March 6 outcome letter to Plaintiff when he was alone, despite notification from his mother that he was at risk of self-harm" because he cannot show that Defendants breached any duty, nor that any breach caused his alleged damages. (ECF No. 97 at 38)

In Tennessee, "a duty of reasonable care exists if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property." *McCall v. Wilder*, 913 S.W.2d 150, 153 (Tenn. 1995). In evaluating whether a risk is "unreasonable," courts consider:

> [T]he foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or societal value of the activity engaged in by the defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of alternative conduct.

19

*Id.* (citations omitted). If a duty of care is established, determining whether a professional's conduct complies with the applicable standard of care requires expert testimony because it is "beyond the common knowledge of lay persons." *Martin v. Sizemore*, 78 S.W.3d 249, 272 (Tenn. Ct. App. 2001) (citing references omitted). In a university setting, issues involving "safety, security and crime prevention" typically require expert testimony to determine the relevant standard of care. *Prasad v. George Wash. Univ.*, 390 F. Supp. 3d 1, 37 (D.D.C. 2019) (quoting reference omitted). In student disciplinary proceedings where "[e]ach individual defendant exercised his or her own professional judgment at each stage of [the] investigation and proceeding," courts require expert testimony to "explain such complex issues related to defendants' professional responsibilities." *Doe v. Dordt Univ.*, 616 F. Supp. 3d 872, 918 (N.D. Iowa 2022) (citing references omitted).

Here, Plaintiff's expert opines that standard practice for a university on notice of mental health concerns is to "assess the student and take steps to ensure the student is safe." (Expert Opinion of S. Lewis ("Lewis Op.") at 10.) Defendants did exactly that. It is undisputed that, in response to Plaintiff's mother's concerns, Jamerson and Clapper had a discussion regarding Plaintiff's risk of suicide and the need to have a care plan in place. (Clapper Dep. at 127:15-129:16). It is also undisputed that Jamerson utilized the information that Clapper gathered regarding Plaintiff's lack of access to means, lack of plan, and frequent communication with his mother, as well as his extensive training, to evaluate Plaintiff's risk of suicide according to a rubric developed by a leading national association. (Jamerson Dep at 42:21-45:4, 395:5-14). Based on the information that he had at the time, Jamerson evaluated Plaintiff as a "moderate-to-elevated risk" and felt that the risk could be mitigated with "extra precautionary steps," namely having Clapper available for support on the outcome call, informing Plaintiff's mother of the meeting

20

date, and encouraging her to be with him. (*Id.* at 395:5-25). Defendants therefore indisputably met Plaintiff's expert's standard of care requiring them to "assess the student and take steps to ensure the student is safe." (Lewis Op. at 10).

To the extent that Plaintiff argues that Defendants breached their duty by failing to delay the outcome, delay was not a feasible alternative. First, it was of high importance that Plaintiff's outcome be delivered so that the Student Accountability case against Plaintiff could conclude. Vanderbilt's stated goal for "establishing policies and holding students accountable for complying with them is to help students understand how their choices can affect not only their immediate neighbors, but also the University community as a whole." (VU Dep. at Ex. 2, VU_00001618). That important purpose would not be served by indefinitely delaying Plaintiff's outcome. Second, Jamerson testified that it was important to conclude given the toll that the process was taking on all parties involved (including Roe). (Jamerson Dep. at 396:17-397:2). Third, Plaintiff's mother admits that there was no certainty that her proposed alternative plan (delaying the outcome meeting) would have eliminated the risk. (Pl. Mother Dep. at 130:9-12).

Alternatively, even if Defendants could establish duty and breach, there is insufficient evidence to support the conclusion that their conduct was the proximate cause of Plaintiff's injuries. The Tennessee Supreme Court established a three-part test for proximate cause: the conduct must have been a substantial factor of the harm, the harm must have been reasonably foreseeable, and no other rule or policy must relieve the wrongdoer of liability. *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994) (citing *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)). With regarding to whether suicide was reasonably foreseeable, "it is important that courts not indulge in hindsight," but rather "focus on the facts that were available to the Defendant[s] at the time." *Cotten v. Wilson*, 576 S.W.3d 626, 651 (Tenn. 2019). Further, "even for

21

a defendant who is aware of a decedent's past suicide attempt and mental health issues, there must be facts in the record that would have put the defendant on notice that suicide was a reasonably foreseeable probability <u>at the time of the allegedly negligent acts.</u>" *Cotten*, 576 S.W.3d at 653 (emphasis in original). "In the absence of such facts, the suicide must be deemed a superseding intervening event and the defendant, even if negligent, cannot be held liable." *Id.*

In addition to the foreseeability arguments made in duty analysis above (which are equally applicable to causation), there are no facts in the record to indicate that it was foreseeable that Defendants' "extra precautionary steps" to protect Plaintiff would not sufficiently mitigate the risk as intended. Defendants were under the belief that Plaintiff's mother was traveling to ███ to support Plaintiff—something she specifically said she wanted to do. (Pl. Mother Dep. at 96:22-97:1). Clapper worked to facilitate the mother's trip by emailing her confirmation in advance that the meeting was going forward on March 6. (*Id.* at Ex. 2). The record is devoid of any facts indicating that Clapper was somehow aware that Plaintiff's mother would allegedly not receive the email. Defendants were also unaware of another key fact: that Plaintiff purposely told his mother the wrong date for the outcome meeting so that she would not be present, thereby thwarting one of the main aspects of their reasonable care plan. (Pl. Dep. at 178:14-179:4). Defendants therefore had no reason to foresee that one of the key measures they were counting on to mitigate the risk of suicide was purposely obstructed by Plaintiff, undercutting the foreseeability—and therefore the legal causation—of his alleged suicide attempt.

### F. Plaintiff's Intentional Infliction of Emotional Distress Claim Fails as a Matter of Law

Plaintiff's remaining claim for intentional infliction of emotional distress ("IIED") is based on his allegation that Vanderbilt, Jamerson, Bourgoin, and Clapper "acted with intent to cause mental harm against Plaintiff regarding the delivery on the outcome from Student Accountability."

22

(SAC ¶ 467; ECF No. 97 at 46). To state a claim for IIED, a plaintiff must show "that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." *Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 205 (Tenn. 2012). "The standard for outrageous conduct is high[.]" *Levy v. Franks*, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004). As the Court has previously stated, "To say that Tennessee courts narrowly define 'outrageous conduct' would be something of an understatement. The conduct must be 'atrocious,' 'utterly intolerable,' and 'beyond all bounds of decency.'" *Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 903 (M.D. Tenn. 2018) (citing *Goldfarb v. Baker*, 547 S.W.2d 567, 569 (Tenn. 1977)).

As detailed above in the discussion of Plaintiff's negligence claim, Defendants did not act negligently with regard to the delivery of the Student Accountability outcome because they received Plaintiff's mother's concerns, evaluated them based on established criteria, and enacted additional protective measures to mitigate risk. *See supra* Section II.E. Because not even a negligent or inadvertent act will give rise to the heightened claim for outrageous conduct, Plaintiff's claim for IIED fails. *See Johnson v. Woman's Hosp.*, 527 S.W.2d 133, 138 (Tenn. Ct. App. 1975) ("A negligent or inadvertent act will not give rise to a claim of outrageous conduct.").

Further, to the extent that Plaintiff's IIED claim centers on the March 5, 2023 email sent by Clapper, Plaintiff cannot refute the context of the email or Clapper's explanation of it, nor did he see the email until nearly a year later. Additionally, this single email viewed within the landscape of Defendants' response to Plaintiff's mother's concerns and their efforts to mitigate the risk to Plaintiff fails to illustrate outrageous conduct sufficient to meet Tennessee's high standard. At worst, the email is the type of "mere insult[] indignity[y] or other trivalit[y]" to which IIED liability does not extend. *See* Restatement (Second) of Torts § 46 cmt. d.

23

### G. Plaintiff's Negligent Infliction of Emotional Distress Claim Fails as a Matter of Law

Like his claim for IIED, Plaintiff's remaining claim for negligent infliction of emotional distress ("NIED") is also based on Vanderbilt, Jamerson, Bourgoin, and Clapper's "delivery of the investigation outcome." (SAC ¶¶ 481-497; ECF No. 97 at 46). Negligent infliction of emotional distress ("NIED") requires a plaintiff to establish the elements of a general negligence claim: (1) duty, (2) breach of duty, (3) injury or loss, (4) causation in fact, and (5) proximate causation." *Finley v. Kelly*, 384 F. Supp. 3d 898, 914 (M.D. Tenn. 2019). Plaintiff's NIED claim fails for the same reason that his negligence claims fail: Defendants did not have a duty to postpone the outcome meeting and any allegedly negligent behavior was not the proximate cause of Plaintiff's alleged suicide attempt. *See supra* Section II.E. Additionally, like his claim for IIED, Plaintiff fails to plead any facts sufficient to establish outrageous conduct on the part of any Defendant.

### H. Plaintiff's Tortious Interference Claim Fails as a Matter of Law

To state a claim of tortious interference with business relationships under Tennessee law, a plaintiff must establish the following elements:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

*Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002) (internal citations omitted). Plaintiff claims that he had an "existing and prospective" business relationship with the company where he was employed as an intern during the 2023 Student Accountability proceedings, as well as "prospective business relationship[s] with firms hiring in his field." (SAC ¶ 508). According to Plaintiff, his "lack of a return offer from his internship was directly caused by [] Bourgoin's and Vanderbilt's interference with Plaintiff's ability to perform duties at his

24

internship," and his "rescission of offers from other potential employers and forced withdrawal of applications was caused by the overly harsh suspension rendered by Vanderbilt and Bourgoin." (SAC ¶ 509). Plaintiff's threadbare allegations are rooted in speculation, and he cannot establish multiple elements of his prima facie case.

As to the general class of "potential employers," this is not a sufficiently identifiable class of third persons. Plaintiff's general hope to be employed somewhere at some point does not create an identifiable business expectancy. *See Acad. of Allergy & Asthma in Primary Care v. Amerigroup Tennessee, Inc.*, 155 F.4th 795, 826 (6th Cir. 2025) (a plaintiff's "mere hope of a contract falls short" of an identifiable expectancy). Moreover, the fact that Defendants knew that Plaintiff—a college student—would at some point apply for a job is insufficient to establish the requisite knowledge and is nothing more that "mere awareness of the plaintiff's business dealings with others in general." *Trau-Med* 71 S.W.3d at 701.

Additionally, Plaintiff cannot base his tortious interference claim on "improper means" because the record is completely devoid of any allegation (let alone any admissible evidence) that Bourgoin or Vanderbilt's "predominant purpose" in the Student Accountability process was to injure Plaintiff. *See Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 (Tenn. 2002). Moreover, Plaintiff's reliance on claims for "breach of contract and violation of Title IX" to show improper means fails for the reasons set forth above. *See supra*, Sections II.A, II.B. Plaintiff has also failed to meet his burden to show that Bourgoin or Vanderbilt <u>intended</u> to interfere with Plaintiff's ability to secure future employment.

Far and away the largest flaw in Plaintiff's tortious interference claim is its speculative nature coupled with Plaintiff's complete failure to put forth any evidence of causation. First, Plaintiff's belief that he failed to secure a return offer at his internship because of poor performance

caused by the Student Accountability process is an exercise in mental gymnastics. There is no evidence as to why he did not receive an offer (i.e., poor performance, availability of positions, hiring freeze, etc.), and even if poor performance were the reason, there is no evidence that the poor performance was attributable to Defendants. Second, Plaintiff's allegations regarding "forced withdraw" of employment applications are even more tenuous. Plaintiff failed to identify any of these employers, nor is it possible for him to prove that he would not have gotten the job because of his suspension—it is all speculation. In fact, Plaintiff admitted during his deposition that he does not know whether his transcript has a mark denoting a prior suspension. (Pl. Dep. at 65:23-66:8). Plaintiff's theories do not move the needle. *See K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 823 (6th Cir. 2018) (citation omitted) ("a party may not avoid summary judgment by resorting to 'speculation, conjecture, or fantasy.'"). Finally, as to the revoked job offer from another employer, Plaintiff admits that the offer was revoked because he did not have a bachelor's degree. (Pl. Dep. at 244:6-17). Plaintiff was suspended when he received the job offer and was suspended when the job offer was revoked—nothing changed. (Pl. Dep. at 242:17-21). The cause of the revocation was not Plaintiff's suspension, but rather his decision to apply for a job for which he was not yet qualified.

## III.     CONCLUSION

Plaintiff engaged in anonymous cyberbullying and was held accountable for his actions pursuant to Vanderbilt policy. Plaintiff's various legal theories are hollow and not supported by the facts of the case. Defendants therefore respectfully request that the Court grant its Motion for Summary Judgment and enter an Order dismissing Plaintiff's claims with prejudice.

26

Respectfully submitted,

/s Mark A. Baugh
Mark A. Baugh (#15779)
Ryan P. Loofbourrow (#33414)
Katelyn R. Dwyer (#39090)
Baker, Donelson, Bearman,
Caldwell & Berkowitz, P.C.
1600 West End Avenue, Suite 2000
Nashville, TN 37203
(615) 726-5600
mbaugh@bakerdonelson.com
rloofbourrow@bakerdonelson.com
kdwyer@bakerdonelson.com

*Counsel for Defendants*