# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

PARKER POE,

     Plaintiff,

v.

DR. MELANIE LOWE, *et al.*,

     Defendants.

Case No. 3:24-cv-00368

Judge Crenshaw

Magistrate Judge Frensley

## PLAINTIFF PARKER POE'S MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

J. Alex Little
Edward J. Canter
LITSON PLLC
54 Music Square E, Suite 300,
Nashville, TN 37203
Telephone: (615) 985-8205
alex@litson.co
ted@litson.co

*Attorneys for Parker Poe*

## INTRODUCTION

The record in this case is a catalog of institutional failure, documented in Vanderbilt's own words. In early 2023, Vanderbilt investigated and suspended Parker Poe—a student with no prior disciplinary history—for social media posts that repeated publicly circulating rumors of sexual assault by another student, Simon Roe. Multiple students made similar posts, but Vanderbilt investigated only Poe, declining to investigate a female poster whom its own investigators believed may have been a victim of sexual assault by Roe himself. Vanderbilt's investigators prepared for their initial meeting with Poe by strategizing how to "make [out] we know more than we do." Its administrators, knowing Poe was suicidal, built a timeline by "taking the mental health concerns out of the . . . planning." This was driven not by Poe's safety but by the influence of Roe's wealthy family. Vanderbilt's only care professional was sidelined by non-care personnel who had "very strong feelings that there is no flexibility."

The night before the outcome was delivered to Poe—who was isolated and away from family—the care professional wrote: "His parents better have flown there. LOL, safe travels!" The suspension was delivered, and Poe attempted suicide. The investigator acknowledged that "it went unfortunately as we feared it would go," but assured his colleague it was "a mess but for the greater good."

Vanderbilt now asks this Court to find no genuine dispute of material fact on breach of contract—without addressing a majority of the pending theories this Court identified in its November 2024 order—selective enforcement under Title IX, negligence, emotional distress, tortious interference, and defamation. The record forecloses that conclusion at every turn. The motion should be denied.

2

## I. The Court Should Deny Vanderbilt Summary Judgment on Poe's Breach-of-Contract Claim, Including the Theories it Fails to Address.

Vanderbilt's motion fails at the threshold. It does not address eight of the twelve pending breach-of-contract theories. As to the four it does, the record creates genuine disputes of material fact. Vanderbilt withheld timely notice and access to incriminating evidence, denied Poe the right to call witnesses who could corroborate his defense, and offered an appeal that was no more than a rubber stamp—conducted on a sanitized record by a screener who denied virtually every petition for a decade.

### A. Vanderbilt failed to move on eight of the twelve pending breach-of-contract theories—and may not cure that failure on reply.

Vanderbilt's motion addresses, at most, four of the ten breach-of-contract theories pending in this action. It says nothing about the remaining six. Because it fails to carry its initial burden as to those theories, the Court should deny summary judgment on each of them. Vanderbilt may not cure that omission on reply.

In November 2024, this Court found that Poe's complaint set forth *prima facie* claims for breach of contract with respect to eight handbook provisions: (1) timely notice of charges; (2) access to and the right to challenge incriminating information; (3) the right to call witnesses; (4) recusal of conflicted Student Accountability personnel; (5) the prohibition against informing a complainant the outcome; (6) severity of the sanction; (7) flaws in the appeal stemming from underlying irregularities; and (8) Poe's ignored complaints. Dkt. 97 at 18, § III.A.6. Vanderbilt's pending motion to dismiss addresses two additional theories: (9) unauthorized sharing of disability information, and (10) lack of jurisdiction. Dkts. 165, 166. But Vanderbilt did not move to dismiss two others:

(11) disparate treatment of female students who posted about Simon Roe, and (12) disability-based retaliation. *See* SAC ¶ 376. Twelve theories remain pending.

Vanderbilt's summary judgment motion addresses theories (1), (2), and (3). Dkt. 242 at 12-13. It says nothing about (4), (5), (6), (8), (9), (10), (11), or (12). It addresses theory (7) only as Vanderbilt recharacterizes it. *Compare* Dkt. 97 at 15 *with* Dkt. 242 at 13. And it devotes briefing to a theory that appears only fleetingly in the operative complaint, *see* Dkt. 242 at 13-14; Dkt. 161 ¶ 374, and that theory appears indistinguishable from claims the Court already dismissed, *see* Dkt. 97 at 14.

In a footnote, Vanderbilt concedes it may not have addressed all the pending theories and requests leave to raise new arguments on reply. Dkt. 242 at n.8. This blinks reality. The theories are not unforeseen. They are largely set forth in this Court's November 13, 2024 order, which Vanderbilt has cited repeatedly. See Dkt. 242 at 13, 17, 19, 23–24; Dkt. 166 at 11. The other theories are highlighted in redline. *See* Dkt. 130-1 at 95. And the Sixth Circuit does not permit parties to raise issues for the first time on reply. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008); *Ritchie v. Coldwater Cmty. Schs.*, 947 F. Supp. 2d 791, 806 (W.D. Mich. 2013).

Under Rule 56, the movant bears the initial burden of showing the absence of a genuine dispute of material fact. *Fitzke v. Shappell*, 468 F.2d 1072, 1077 n.8 (6th Cir. 1972). Vanderbilt has not met that burden for eight of twelve pending theories. The motion should be denied as to those eight for that reason alone.

4

**B.      Vanderbilt failed to provide adequate notice of the charges or meaningful access to the underlying evidence.**

Vanderbilt says it gave Poe "written and timely notices of charges . . . including consequences" and a meaningful opportunity to access and challenge the evidence against him. Dkt. 242 at 12-13. The record says otherwise.[1]

On January 9, 2023, Poe received a letter directing him to schedule a meeting with Student Accountability. *See* VU_00000744. It did not name the reporting party, describe the allegations, or cite the policy provisions at issue. *Id.* Three days later, Poe was shown—but not given—a charge sheet that referenced a "single social media site." Poe Tr. at 157:9-25. The charges themselves were either undefined in the Handbook, defined in terms too vague to put Poe on notice of the prohibited conduct, or subject to contradictory definitions. 2021/2022 Student Handbook at 95/232, 97/232. This alone raises a genuine dispute as to whether Vanderbilt satisfied its notice obligation.

But Vanderbilt was not investigating Poe for posts on a "single social media site." The morning of January 12—the day Poe was to appear—Dr. Jeremy Bourgoin had not yet finalized the charges. *See* Jamerson Ex. 13 at 1. Hours before the session, he emailed Neil Jamerson about adding "Fraud or Impersonating a University Official or Any Other Person," a charge Bourgoin called a "stretch." *Id.* Jamerson directed him to include it. *Id.* He then instructed Bourgoin to "inquire about Greek Rank as well," writing, "Family wasn't able to get those but I'd [be] suspicious it was him. That post claimed to be a

---

[1]      In its motion to dismiss order, the Court described this claim as "the right to access and challenge incriminating information." Dkt. 97 at 18. Vanderbilt's summary judgment motion recharacterizes that claim as a "contractual obligation to provide Plaintiff the opportunity to present evidence," Dkt. 242 at 13, but then argues that Poe was given access to his evidence packet—which appears to be the access-and-challenge theory by another name. Plaintiff responds to it as such.

woman at Belmont if we want to make [out] we know more than we do and add that to the Impersonation charge as well." *Id*. Vanderbilt never disclosed the "Belmont" post to Poe—it was excluded from the "evidence packet" that was given to Poe and has not been produced even in this litigation. Bourgoin Tr. 289:15-18; *see generally* Poe Ex. 2. And Jamerson conceded that his instruction—"to make [out] we know more than we do"— was a deceptive investigative technique. *See* Jamerson Tr. 262:15-24; 263:10-16.

The post-hearing record confirms what Vanderbilt never disclosed to Poe during the process itself. On March 9, 2023, Bourgoin wrote to the complainant and described Poe as "the person who instigated the harassing posts against you." Jamerson Ex. 15. That label is revealing. Posts about the complainant appeared on GreekRank as early as February 2022—months before Poe's YikYak posts. Bourgoin Tr. 164:22-165:15 (recalling GreekRank posts about Roe in 2021). The complainant's own parents acknowledged as much. *See* Bourgoin Ex. 11. For Vanderbilt to call Poe the "instigator," it had to be holding him responsible for the GreekRank posts. Yet it did not notify Poe that he was being investigated for those posts. Poe did not learn until after the process concluded that he had been held accountable for any of the GreekRank posts, let alone ones that alleged the complainant had drugged and sexually assaulted women, used racial slurs, and manipulated the university's diversity program. *See* Dkt. 17 at 2.

On this record, a reasonable jury could find that Vanderbilt neither provided written and timely notice of the charges nor afforded Poe a meaningful opportunity to access and challenge evidence like the Belmont post.

6

**C.  Vanderbilt denied Poe the right to call the only witnesses who could establish his defense.**

Even setting aside the notice failures, Poe was denied the means to defend against the charge he did understand. The question was not whether Poe posted on YikYak—he did not dispute that. It was whether he was merely repeating what other students had already posted publicly. The record contains substantial evidence of the latter.[2] But Poe had no way to prove this through documents. The investigation began nearly a year after the posts were made. *See* VU_00000744. Poe had no reason to preserve the original posts, and he could not have obtained them through legal process since the Stored Communications Act barred their production. *See* 18 U.S.C. § 2702; *Lucas v. Jolin*, No. 1:15-cv-108, 2016 WL 2853576, at *5 (S.D. Ohio May 16, 2016) (SCA bars providers from releasing content of stored communications in response to civil subpoenas). So Poe did exactly what the Handbook entitled him to do. He asked Bourgoin to let him call the other posters as witnesses. Poe Tr. at 165:24-166:3, 168:14-19. Bourgoin ignored these efforts. *See, e.g.*, VU_00003090 Tr. at 1:17. The record establishes that this was prejudicial. Bourgoin's subsequent interview of L.N. confirmed that there were posts that Roe did not preserve. VU_00002697 Tr. at 15:7-11 (explaining to Bourgoin that "it had been going on for a while before even the screenshots were taken"). Vanderbilt thus relied on an incomplete documentary record, and denied Poe means to prove it was incomplete.

---

[2]   *See* FORSR000001 at 4-5 (May 10, 2022 email from Roe's father to Vanderbilt board member George Huber about posts in February 2022 until "Spring Break"); Bourgoin Ex. 12 (screenshots of GreekRank posts preserved by Roe); Poe Ex. 2 at 38 (Google results referencing derogatory GreekRank posts about Roe from February 7, 2022, which were not otherwise preserved).

**D. The irregularities that infected the underlying investigation carried forward into the appeal.**

Vanderbilt argues that the appeal was unbiased because Dr. Melanie Lowe, the Co-Chair of Vanderbilt's Appellate Review Board, reviewed the petition, purported to apply standards of review, and issued a denial. Dkt. 242 at 14. This confuses the existence of an appellate process with the integrity of one. Lowe testified that her review was limited to the documents placed before her: "I have documents in front of me and that's all I do." *Id.* at 104:25–105:1. But she could not confirm that she reviewed all the material she was provided, testifying: "I'm unwilling to say that I listened to every single second of every single recording." *Id.* at 55:1–14, 70:24-71:2.

The record establishes that Dr. Lowe operated as a rubber stamp. *See* Dkt. 97 at 15. Lowe testified that she screened "hundreds" of petitions for appeal—approximately twenty per year—during her tenure. Lowe Tr. at 17:24–19:19, 20:2–21:7, 29:2–21. Of those hundreds, she could recall granting one, at some unspecified point during the 2010s. *Id.* at 22:22–23:6, 33:19–35:8. When pressed, Lowe could not identify a single granted petition in the last five years—and could not confirm granting one within the last ten. *Id.* at 21:14–22:24. According to Lowe, not a single panel hearing for co-curricular matters has been convened for an appeal in the entire decade of the 2020s. *Id.* at 21:14–22:7; 36:16–37:7. A reasonable jury could find that this process was designed not to provide meaningful review but to rubber-stamp outcomes.

Given the circumscribed nature of her review, Lowe described certain conditions under which her review would be compromised. She testified that if someone were "deliberately withholding information . . . I would have a problem with that," *id.* at

8

102:4-6, and she agreed that a "deliberate effort to keep things offline that expressed a false, negative personal view on the part of the adjudicator" would be relevant "[b]ecause it's supposed to be a fair process," *id.* at 100:18-101:4.

The record establishes that every one of those conditions was met. The "documents placed before" Lowe did not include the evidence of procedural irregularities, conflicts of interest, outside influence, and investigator animus at the heart of this case—and a jury could infer that Vanderbilt deliberately kept it out:

- The "offline" communications between defendants that derided Poe as "very unstable and unwell in my untrained assessment," falsely characterized prior Title IX complaints filed by Poe as "baseless" and "retaliatory," and described dealing with him as "super messy." Bourgoin Tr. 230:16-252:2, Ex's. 7-8.

- Bourgoin's "offline" communications with Jamerson about Bourgoin's "pretty close" personal relationship with another poster, S.A., and the view he had formed before the investigation began that S.A.'s posts were "well-intentioned." Bourgoin Tr. at 266:6–270:15, Ex. 10.

- The influence of the Roe family on the investigation, including the "agreement" with Roe's father to deliver Poe his outcome on March 6, 2023, and Bourgoin's direction to close an impersonation and disorderly conduct investigation against Roe "[f]or all of our sanity" to "head off family's calls to Neil panicking about [Roe] now being in trouble." Bourgoin Tr. 354:7-357:15, Ex's. 14, 19 at 2.

- Roe's fathers pressure campaign against Vanderbilt employees like Bourgoin, Jamerson, and G.L. Black, and its Board of Trustees member George Huber. *See, e.g.*, Jamerson Ex's 9-12, 14, 16, 18-20, 23-24, FORSR000001-6.

- Jamerson's directive to "wrap this one up" hours after learning of the suicide warning—clarifying, when questioned, "I want to be clear, it isn't a sentiment, it is my instructions." Bourgoin Tr. at 340:11-351:10, Ex. 18.

- Clapper's description of Poe's mother as a "mess" and Bourgoin's characterization of her as a "crazy parent" when she raised concerns about her son's suicidal ideation. Clapper Tr. at 121:3–124:15, Ex. 13.

- Bourgoin's instruction to the appellate review board liaison—while Poe's appeal petition was pending—that she should not discuss Poe "in the chat" because the

University was "actively on notice about lawsuit." 30(b)(6) Tr. at 92:19-93:10, 96:9-13; Bourgoin Tr. at 297:16–310:14, Ex. 13.

The sanitized file was not the only way the underlying irregularities infected Lowe's review. Lowe agreed that if the burden of proof had been shifted onto the student—such that a finding was based on the student's inability to provide evidence—it would be a problem. Lowe Tr. at 103:2–104:10. That is what happened. Bourgoin gave Poe two weeks to produce evidence of pre-existing posts—evidence he had no legal mechanism to obtain. Bourgoin Tr. at 200:20-219:15, 328:1-329:4.

Lowe's denial letter compounded these deficiencies with an affirmative misrepresentation. She wrote that "the sanction you received is neither unreasonable nor unusual when compared to similar cases in which students have been found responsible for harassment, disorderly conduct and/or impersonation." Lowe Tr. at 113:2-23, Ex. 6 at 2. The record establishes that this was categorically false.

Vanderbilt has no information to support Lowe's representation in that Poe's punishment was consistent with comparable cases. 30(b)(6) Tr. at 85:18-21. Lowe testified that she reached her conclusion based on phone conversations with Mary Helen Davidson about two alleged comparators. Lowe Tr. at 64:22–65:21, 77:20-78:4. But she could confidently identify only one: Case No. 2022021202. Lowe Tr. at 65:19-21, 79:20-80:22. And that case was not comparable by any measure.

Lowe testified the basis for comparability was impersonation, but the comparison collapsed under scrutiny. Lowe Tr. at 65:16-21. The student in Case No. 2022021202 had at least two prior findings of responsibility, escalating through deferred probation and probation until graduation, before the conduct at issue that led to his or her

expulsion during graduate school. Lowe Tr. at 91:8-14. The charges underlying that expulsion—seven in total, including unauthorized entry, failure to comply, and violation of probation—did not include impersonation. Lowe Tr. at 81:1–85:13, 87:5–89:23, Ex. 4. When confronted about this inconsistency, Lowe could offer only that "in my mind it was, they're related." Lowe Tr. at 87:24-25. But the impersonation incident Lowe purported to rely upon was not the case that resulted in expulsion. It was the student's prior offense, which resulted in probation. *See* VU_00003093. Lowe's sole comparator thus proves the opposite of what her letter told Poe: impersonation of the chancellor yielded probation, not expulsion. The premise of her letter was false.

And the most obvious comparators were the ones Lowe never considered. Other students posted about the same individual, on the same platform, during the same period—none were investigated or sanctioned. Lowe dismissed them as "completely outside of the document review that I undertake," though information about these posters appeared in the very file she reviewed. Lowe Tr. at 106:4–111:6, 116:24-117:5. And the comparator she *did* use came from outside that record too. Lowe looked beyond her file when it suited her conclusion and refused to look within it when it did not.

Moreover, Lowe's letter informed Poe that "the sanction imposed is within the normal range for similar cases." Lowe Ex. 6 at 3. That, too, was false. Every other student charged with impersonation received probation or deferred probation. Lowe Ex. 4. Every other student charged with harassment—with one exception—received the same. *Id.* That lone exception involved a student with four prior findings of

responsibility who had exhausted lesser sanctions before suspension. Lowe Tr. at 120:2-18, Ex. 4. Poe, in contrast, had no prior disciplinary history.[3]

There is ample evidence that "the appeal was tainted by irregularities stemming from the investigation." Dkt. 97 at 15. Whether an appeal conducted by a screener who has denied virtually every petition for over a decade, operating on a deliberately sanitized record, and resting on undocumented and demonstrably wrong comparator analysis, satisfied that promise is a question for the jury.

## II.    Poe's Selective Enforcement Claim Presents Triable Issues of Fact

A Title IX selective enforcement claim requires showing that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The plaintiff must demonstrate that "a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender" and that "gender bias motivated the selective enforcement." *Doe v. Oberlin Coll.*, 60 F.4th 345, 356 (6th Cir. 2023) (cleaned up).  Vanderbilt contends the undisputed facts negate both showings. Dkt. 242 at 15. But the facts are very much in dispute.

This Court already has rejected Vanderbilt's argument that L.N. and Poe were not similarly situated. Dkt. 97 at 25-26. Both heard on-campus rumors about Roe. Poe Tr. at 83:4-23 ("I heard negative rumors with [Simon Roe] relating to, like, a sexual assault."); VU_00002697 Tr. at 9:23 ("I heard someone mention . . . I saw [Simon Roe], like, being weird about the drinks . . . . And then someone else responded, yeah, a little

---

[3]    Vanderbilt's motion does not address Poe's breach-of-contract theory based on the severity of the sanction—but even if defendants had not waived this argument, this evidence would defeat it.

pushy.") Both made posts repeating those rumors over multiple days in April 2022, after GreekRank posts about Roe had already appeared in February 2022. *See* Section I.B, *supra*. Roe's father complained to Vanderbilt about both.

Vanderbilt's post-count analysis is artificial. It reflects only the posts Roe managed to screenshot, not the posts that were made. 30(b)(6) Tr. 41:13-44:25. It also ignores that Roe was actively deleting posts with Vanderbilt's assistance. *Id.* at 44:21-45:3. And even then, it is off by an order of magnitude. L.N. posted at least twelve times and told Bourgoin that additional posts were missing. VU_00002657, VU_00002697 Tr. at 15:7-11. These are therefore disputed facts, not undisputed ones.

Vanderbilt claims Poe's posts were more egregious than L.N.'s but offers only *ipse dixit.* Poe says he merely reposted a deleted post about Roe being "overly touchy." L.N. posted multiple times about her own alleged "personal experience" with Roe and resulting "trauma." VU_00002657. Vanderbilt does not explain why one is worse than the other. What the record does show is that Vanderbilt believed L.N. may have been a victim of Roe's conduct. Jamerson Ex. 19. The assumption that a female student posting about sexual assault is sharing her truth while a male student posting similar content is instigating a harassment campaign is not a gender-neutral inference—it is a gendered stereotype that a jury is entitled to scrutinize under Title IX.[4]

Vanderbilt selectively quotes *Z.J. v. Vanderbilt*, 355 F. Supp. 3d 646 (M.D. Tenn. 2018), to suggest that a Title IX gender bias claim requires statistical evidence. But *Z.J.*

---

[4]    Vanderbilt appears to suggest that one reason for the disparate treatment was that Poe was not in a sorority, making his post false. But Vanderbilt's own investigators recognized from the outset that Poe could have been sharing someone else's story. Jamerson Ex. 13. And the record confirms that reposting others' accounts was part of the campus culture at the time. *See* Torrey Ex. 3: FORSR000005.

stands for no such thing. Gender bias may be shown through "statistics, patterns, *or* anecdotal evidence." *Id.* at 683. Poe can point to multiple female students who engaged in the same conduct, on the same platform, in the same timeframe—and were treated differently. Vanderbilt's counterexamples fail. The three male posters it cites—A.G., S.A., and O.R.—are not comparators. Dkt. 242 at 16–17. A.G. and S.A. had already graduated; Vanderbilt had no jurisdiction and never referred them for educational conversations with Project Safe. *See, e.g.*, Jamerson Ex. 8. O.R. made a single vague post—"give me a time and a place"—with no reference to sexual assault. Poe Ex. 2 at 27. He is not similarly situated.[5]

Further, the sanction disparity confirms selective enforcement. After Roe's father reacted negatively to learning that L.N. had not been investigated, Vanderbilt reversed course and opened proceedings against her the following semester.[6] Vanderbilt charged both Poe and L.N. with the same core offenses. L.N. received several months' probation and graduated without interruption. VU_00002645 at 2. Poe was suspended for more than a year and a half. The same interpretive lens that cast L.N. as a victim and Poe as an instigator carried forward into the sanction. Under the same policy, adjudicated by the same decision-maker, on the same core charges, one student's education continued uninterrupted while the other's was derailed for nearly two years.

---

[5]    The records reflect that O.R. was the only male who was referred. VU_00002902 (meeting request from Project Safe to O.R.). In contrast, the assertion that A.G. and S.A. were referred to Project Safe is not reflected by any documents produced in the litigation. There are no meeting invites for either student.

[6]    The record does not support Vanderbilt's claim that its decision to proceed against L.N. was about a change in proof from the state court case. Instead, the record reflects Roe's father went over Jamerson's head to complain. Jamerson Ex. 18 (contacting Jamerson's boss); FORSR000006 (contacting Huber).

## III. Poe Has Established a Triable Tortious Interference Claim.

Vanderbilt seeks summary judgment on Poe's tortious interference claim arguing that he has not identified a specific class of third parties, he cannot show improper motive, he cannot show intent, and his damages are speculative. Dkt. 242 at 24–26. Each argument fails on this record.

*Poe has identified specific business relationships.* Vanderbilt caricatures Poe's claim as a generalized hope for future employment, Dkt. 242 at 25, ignoring the specific relationships at issue. First, Poe had an existing employment relationship with the company where he interned during the proceedings. ████████ 000005-12. The record reflects that Vanderbilt was aware of the internship and its impact on Poe's ability to perform. Clapper Ex. 10-11, 14. Second, Poe had a prospective relationship with Company C, the employer that extended and later revoked a job offer. ███ 000005-06. Both are identifiable third parties with whom Poe had business relationships.

*The record supports a finding of improper means.* Tortious interference requires either improper motive *or* improper means. *Techmatic, Inc. v. Plating Specialists, Inc.*, 637 F. Supp. 3d 519, 526 (M.D. Tenn. 2022). Tennessee defines qualifying conduct broadly to include violations of statutes and regulations, defamation, misuse of confidential information, and unethical conduct. *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 701 n.5 (Tenn. 2002); *Am. Addiction Centers, Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 848 (M.D. Tenn. 2021). Poe's surviving claims independently supply the predicate: breach of the Handbook's confidentiality provisions, *see* Section I.A *supra*; selective enforcement in violation of Title IX, *see* Section II *supra*; and defamation through Bourgoin's false characterization

of Poe as the "instigator," *see* Section VI *infra*. The record further establishes conflicts of interest, FERPA violations, retaliation, and pervasive unethical conduct. A jury could find improper means on any of these bases.

*The record supports intent and causation.* Vanderbilt argues there is no evidence of intent to interfere or of causation. Dkt. 242 at 25–26. Both arguments require improperly resolving factual disputes in Vanderbilt's favor.

On intent, Bourgoin was on notice that the investigation was impairing Poe's internship performance. Clapper Ex. 10-11, 14, VU_00000110. At the same time, Roe's father was exerting pressure on the university. And Bourgoin's own outcome rationale— which expressly references a desire to impose a "sizeable life impact"—supports the inference that the process had crossed from accountability into punitive overreach. VU_00002831. On causation, the record establishes a triable issue as to each relationship. As to the internship at Company A, Poe's performance evaluations reflect that he was exceptionally talented at coding and showed strong potential, but also noted concerns that corroborate exactly what was being communicated to Bourgoin—that the investigation was taking a toll on his performance. ███████ 000022-23. As to the revoked offer from Company C, Vanderbilt frames the revocation because of Poe's failure to obtain a degree, Dkt. 242 at 26, but that framing obscures the cause. Poe could not graduate as planned because Vanderbilt imposed an unprecedented suspension and then refused to honor his accommodations upon return. *See* Section I.A *supra* (theory (11), undisputed). The causal chain runs through Vanderbilt.

Vanderbilt's remaining observation—that Poe does not know whether his transcript bears a suspension notation, Dkt. 242 at 26—does not alter the analysis. A

16

gap in enrollment, change in major, and the inability to graduate as planned are independent sources of reputational and professional harm that do not depend on a transcript notation. *See* Prasad Report at 10. Summary judgment should be denied.

## IV. Vanderbilt Delivered a Suspension to an Isolated, Suicidal Student After Its Own Officials Predicted He Would "Spiral."

Vanderbilt's negligence argument rests on three propositions: that Defendants assessed the risk and took reasonable precautionary steps, that delay was not a feasible alternative, and that Poe's suicide attempt was not a foreseeable consequence of their conduct. Dkt. 242 at 19. The record contradicts each one.

### A. Vanderbilt ignores the substance of Lewis' report and ignores other evidence in the record that sets out the standard of care.

Vanderbilt asserts that it "indisputably met" the standard identified by Poe's expert, Scott Lewis. Dkt. 242 at 21. That is not what Lewis concluded. His report details Vanderbilt's failures. *See* Lewis Report at 10-11. Vanderbilt quotes Lewis selectively and ignores the rest. It also ignores that Lewis chairs the NABITA Advisory Board— the same organization whose risk rubric Vanderbilt invokes as the foundation for Jamerson's "assessment." He did not merely review Vanderbilt's process from the outside. He co-founded the organization whose framework Vanderbilt claims to have followed. And he concluded Vanderbilt fell short of it.

Lewis's observations are corroborated by the record. Bourgoin himself failed to satisfy the standards he set forth in his own writings. Bourgoin Ex. 4–6. Jamerson has admitted to a lack of training and a lack of care. *See* Jamerson Ex. 4 at 17–18. And the survey results from Bourgoin's own dissertation highlight burnout, numbness, and irrational detachment among Vanderbilt staff—in addition to suggesting that

outsourcing critical decisions to a care team operating under those conditions would itself be "negligent." Bourgoin Tr. at 16:24, 41:23–43:21, 365:7–24.

### B. From February through March 6, defendants recognized the danger, overrode their care professional, and proceeded anyway.

This was not a case where officials were blindsided by a student's crisis. The record traces a weeks-long sequence in which the defendants identified the risk, received warnings, overrode the judgment of their only licensed care professional, and proceeded on a timeline set to accommodate Roe's litigation demands.

On February 21, 2023, Bourgoin told Clapper: "We will deliver this outcome of separation and he will spiral so before we ever get there I'll make sure we have a plan. It's going to be a disaster." Clapper Ex. 14 at 1.

Two days later, on February 23, 2023, Poe's mother called and spoke to Clapper, explaining that Poe had been "expressing suicidal thoughts."  Clapper Ex. 10. Poe's mother then emailed Bourgoin and Clapper saying that Poe was "in a psychiatric crisis" and "not thinking rationally." She warned that he was "now talking suicide" and made clear "We are absolutely convinced an adverse decision now will take his life." Bourgoin Ex. 15. That same day, Bourgoin drafted an email highlighting the pressure from Roe's father "about the length of time this has taken," as well as the mental health concerns raised by Poe's mother. In that email, Bourgoin contemplated delivering the outcome the week of March 6 "[i]f we take the mental health concerns out of the timeline planning." Bourgoin Ex. 16, Clapper Tr. at 119:21–120:11.

The next day, on February 24, 2023, Bourgoin emailed Roe's father and told him the "goal is to be in an outcome meeting at some time during the week of March 6."

Jamerson Ex. 24. Jamerson responded that he was "ready to wrap this one up," later adding, "I want to be clear. It isn't a sentiment. It is my instructions."

On March 1, 2023, Poe's mother requested a one-week delay so that Poe could be with family. Pl. Mother Tr. at 111:24–112:11. Clapper's professional judgment favored the request. *See* Clapper Tr. at 141:4–144:25. It did not move. Clapper texted Bourgoin: "Neil has very strong feelings that there is no flexibility." *Id.* at 139–140:12; Clapper Ex. 13. She confirmed that an agreement with another student's parents "shouldn't be a factor" in deciding when dealing with a student in distress. *Id.* at 126:18–127:10. That same day, when Clapper relayed that Poe's mother was requesting a one-week delay, Bourgoin responded: "Dear god too many crazy parents." *Id.* at 121:3–21, Ex. 13.

Throughout this period, no one ever spoke to Poe. Clapper—the licensed care professional—never spoke to him before the outcome was delivered. Clapper Tr. at 94:22–95:3. She testified that a reliable risk assessment cannot be conducted without speaking directly to the student. Clapper Tr. at 76:21–78:24, 88:1–88:20.[7] The information Vanderbilt relied upon was secondhand, eleven days old, and qualified as being "to [the mother's] knowledge." *Id.* at 86:14–88:20, 94:23–96:20, 155:1–156:23. Vanderbilt received no update on Poe's means, timeline, or plan before the proceeding. *Id.* And Vanderbilt took no steps to confirm Poe's mother was with Poe. *Id.* at 150:8-13.

---

[7] This alone creates a genuine dispute as to whether Jamerson conducted a valid assessment. But even setting that aside, Jamerson's claim that he could assess Poe based on thirdhand information from Clapper is a credibility determination for the jury. No document produced in discovery so much as suggests Jamerson conducted any assessment of Poe. That claim surfaced for the first time at his deposition—nearly three years later. *See* Jamerson Tr. 45:1-4

On March 5, 2023, the night before the outcome was to be delivered to a student whose mother had warned he would kill himself, Clapper wrote: "His parents better have flown there. LOL, safe travels!" Clapper Ex. 15. They proceeded anyway.

On March 6, 2023, when the Zoom call began, Clapper asked whether Poe's mother was present. She was not. Clapper Tr. at 150:14–156:9. The "care plan" that Vanderbilt held out as its key protective measure—parental support—had failed. Yet the proceeding continued. Clapper, the only licensed care professional on the call, did not ask a single risk-assessment question before the suspension was delivered. She testified: "It wasn't my place at that time to ask any of the questions that I would have been able to assess him." Clapper Tr. at 156:24–157:4. She confirmed she "was unable to personally assess" Poe's suicidal ideation. Clapper Tr. at 177:22–178:10.

Clapper repeatedly disclaimed any decision-making authority. She testified that she was told what to do by non-care personnel: "It's Neil's and Jeremy's office, so, yes, they would be the decision-makers." Clapper Tr. at 106, 108–109. She did not feel comfortable sharing her care views with the decision-makers. Clapper Tr. at 106.

A reasonable jury could find that Vanderbilt's timeline was driven not by a care assessment but by institutional convenience and pressure from the Roe family—and that the care professional's judgment was sidelined in the process. Whether a purported assessment conducted by a non-clinician, based on stale secondhand information, without any direct contact, and without any updated risk screening, satisfies the standard of care is a question for the jury.

**C.    Defendants had multiple alternatives and rejected all of them.**

Vanderbilt frames the alternative as "indefinitely delaying" the outcome. Dkt. 242 at 21. That mischaracterizes the request. Poe's mother asked for one week so that her son could be with family when the outcome was delivered. Pl. Mother Tr. at 111:24–112:11. And delay was not the only option. Clapper conceded that, in addition to a one-week delay, Vanderbilt could have brought Poe to Nashville where campus resources existed; sent him home to his family; stopped the proceeding when they learned his parents were absent; or simply asked risk-assessment questions before delivering the outcome. Clapper Tr. at 163:17–165:17. When asked whether Vanderbilt did everything it could, Clapper answered: "I think we've established that there are other options that could have been before the date that we met with [Poe]." Clapper Tr. at 165:5–17. She could have stopped the proceeding or asked questions to assess risk. *Id*. And "being able to confirm that his parents were with him would have been better" from a care perspective. Clapper Tr. at 178:20–179:22.

**D.    Foreseeability is a jury question where defendants predicted the harm, were warned of the harm, and acknowledged the harm.**

Vanderbilt argues that Poe's suicide attempt was not reasonably foreseeable. That argument is specious. As set forth above, Bourgoin predicted that Poe would "spiral" and that it was "going to be a disaster." Clapper Ex. 14. Poe's mother wrote that an adverse decision "will take his life." Clapper Ex. 11. After the outcome, Bourgoin texted: "it went unfortunately as we feared it would go." Jamerson Tr. at 412, Ex. 25. A defendant who predicts harm, is warned of it, and then acknowledges it unfolded "as we feared" cannot credibly argue the harm was unforeseeable.

21

Vanderbilt also contends that Poe's decision to lie to his mother about the date breaks the causal chain. But Vanderbilt learned on the call itself that Poe's mother was not present and that Poe had misled her about the date. Clapper Tr. at 150:14–156:9. The proceeding continued anyway. Clapper conceded this was "concerning." *Id*. A jury could find that the moment Vanderbilt learned its care plan had failed was the moment a reasonable actor would have stopped—and that proceeding was the breach.

## V.     The Same Record Independently Defeats Summary Judgment on Poe's Emotional Distress Claims.

Vanderbilt contends that because the defendants were not even negligent, they cannot have engaged in outrageous conduct, and that both the IIED and NIED claims therefore fail. Dkt. 242 at 22–24. That premise collapses for the reasons set forth in Section IV. The facts here go well beyond negligence. The question is whether a reasonable jury could find the defendants' conduct "so outrageous it cannot be tolerated by civilized society." *Doe v. Andrews*, 275 F. Supp. 3d 880, 888 (M.D. Tenn. 2017) (finding sufficient evidence to go to a jury). On this record, it certainly could.

### A.     Defendants' conduct supports an intentional infliction of emotional distress claim.

The facts recounted in Section IV are not the facts of a garden-variety negligence case. The defendants predicted the harm, overrode their care professional, stripped mental health from the timeline, learned their sole protective measure was not in place, and proceeded anyway. When it was over, the investigator acknowledged it went "as we feared" while the student was attempting suicide.

A jury viewing these facts could find that the defendants made a reckless choice to deliver a life-altering sanction to an isolated, suicidal student after predicting the

harm that followed, overriding their own care professional—all while joking about the potential consequences. A reasonable jury could find it outrageous.[8]

Vanderbilt contends that Clapper's March 5 email—"His parents better have flown there. LOL, safe travels," Clapper Ex. 15—cannot support an IIED claim because Poe did not see it at the time and because Clapper has offered self-serving testimony. Dkt. 242 at 23. Both points miss the mark. The email is offered not as a communication that caused Poe direct distress but as evidence of the mindset with which the defendants approached the delivery of a suspension to a student who they knew was suicidal and thus particularly susceptible to emotional distress. *See* Dkt. 97 at 44-56 (collecting cases). The email's evidentiary value does not depend on when Poe saw it. Clapper's after-the-fact explanation that "LOL" referred to logistics is a credibility determination for the jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (credibility determination is a jury function).

The record contains similar evidence of the defendants' mindset. This includes Bourgoin's "crazy parents" remark, which Clapper conceded did not reflect Vanderbilt's "culture of care" and would be "problematic" if directed at a student or parent. Clapper Tr. at 121:7–124:15. And after the suicide attempt, Bourgoin dismissed the outcome as "a mess but for the greater good." Bourgoin Ex. 22. Jamerson, upon learning of the attempt, wrote: "I'm not overly concerned." Clapper Ex. 17. Poe was also assigned the movie, "Shattered Glass," making light of his suicide attempt. Poe Tr. 192:9-21. Summary judgment on the IIED claim should be denied.

---

[8] The defendants only challenge the first two elements of the IIED tort in their motion, conceding that there is sufficient evidence in the record that the defendants' conduct "resulted in serious mental injury to the plaintiff." *See* Dkt. 242 at 22-23.

**B.    Defendants' conduct equally supports a negligent infliction of emotional distress claim.**

NIED requires a plaintiff to establish the elements of a general negligence claim. *Lourcey v. Est. of Scarlett*, 146 S.W.3d 48, 52 (Tenn. 2004). Poe must also establish the existence of a serious or severe emotional injury. *Id.*[9] The negligence elements are met for the reasons detailed in Section IV. This Court has already found that the defendants owed a duty of care to a student that they knew was suicidal. They breached that duty by overriding their care professional's judgment and delivering a suspension without a meaningful risk assessment. The harm that followed was the harm they predicted. Outrageous conduct is not an element of NIED. But to the extent Vanderbilt contends otherwise, the standard is met for the reasons detailed in Section V.A. Summary judgment on the NIED claim should be denied.

**VI.    The Defamation Claim Survives Summary Judgment.**

Vanderbilt does not dispute that Bourgoin published the March 9, 2023 letter. It disputes only whether the statement—that Poe "instigated" the posts—was false, whether Bourgoin acted with the requisite degree of fault, and whether Poe suffered damages. None of these questions can be resolved on summary judgment.

*First*, the Court has already rejected the falsity argument. At the motion-to-dismiss stage, Vanderbilt argued that characterizing Poe as having "instigated" the posts was not actionable. This Court found that argument "unpersuasive." Dkt. 97 at 32. The record developed since then has only strengthened Poe's position. The GreekRank posts predated the YikYak posts entirely, with no evidence tying Poe to

---

[9]    The defendants do not challenge the final element of the NIED tort, conceding that there is sufficient evidence in the record that Poe suffered a serious or severe emotional injury.

GreekRank. Bourgoin Tr. at 164:22-165:15, FORSR000004, Bourgoin Ex. 12, Poe Ex. 2 at 38. Poe testified that posts about Roe were already on the platform before he ever posted. Poe Tr. at 184:17-188:4. "Instigated" implies that Poe originated the campaign against Roe. The record shows he did not. Whether Bourgoin's characterization was false is a classic question of fact for the jury.

*Second*, a reasonable jury could find that Bourgoin failed to exercise reasonable care in determining whether his characterization was true before publishing it. As a private figure, Poe need show only negligence. *Hunt v. S. Baptist Convention*, 777 F. Supp. 3d 776, 827 (M.D. Tenn. 2025). The evidence here exceeds that threshold.

Bourgoin did not approach the matter as a neutral investigator. Before and during the investigation, he described Poe in off-channel communications as "very unstable and unwell," and dismissed Poe's mother as a "crazy parent" when she raised concerns about her son's suicidal ideation. Bourgoin Ex. 7; Clapper Ex. 13. By contrast, Bourgoin had a "pretty close" personal relationship with another poster, S.A., and had formed the view—before the investigation even began—that S.A.'s posts were "well-intentioned." Bourgoin Tr. at 266:6–270:15; Bourgoin Ex. 10. He likewise closed the impersonation charge against Simon Roe "[f]or all of our sanity" to "head off family's calls to Neil panicking." Bourgoin Ex. 14.

A reasonably careful investigator would not have concluded that Poe "instigated" the posts. Bourgoin's own file contradicted the characterization. He knew that posts about Roe appeared on GreekRank, a platform with no connection to Poe. *See* FORSR000004, Bourgoin Ex. 12, Poe Ex. 2 at 38. He knew that Vanderbilt had offered Roe resources to remove posts, further degrading the record's completeness. 30(b)(6) Tr.

25

at 44:21-45:3. And he should have understood that federal law prohibits service providers from disclosing the content of stored communications (e.g., YikYak and GreekRank posts) to private parties in response to a subpoena. 18 U.S.C. § 2702.

*Third*, the record contains evidence of damages. Vanderbilt itself acknowledges that students and employees at Poe's paid internship approached him about the sanction—evidence of reputational harm. *See, e.g.*, *Kessler v. Riccardi*, 363 F. App'x 350, 360 (6th Cir. 2010). Vanderbilt points to Roe's father's denial that he shared the letter with anyone at the internship, but there is no similar denial from Roe, and a mere denial does not eliminate the dispute. That Poe was approached at his internship is not seriously contested. How those individuals learned of the sanction is a question of credibility for the jury, not a basis for summary judgment. A jury could reasonably find that being confronted in a professional setting about a disciplinary incident—one rooted in Bourgoin's false characterization that Poe instigated rape allegations—caused reputational harm, humiliation, and economic injury. *Id.*

## VII. Poe Preserves His Objection to *Smith* for Appellate Review.

Vanderbilt moves for summary judgment on Poe's § 504 retaliation claims, relying exclusively on the Sixth Circuit's recent decision in *Smith v. Michigan Department of Corrections*, 159 F.4th 1067 (6th Cir. 2025). Poe respectfully preserves his objection to *Smith* for appellate review—particularly as applied to student claims against educational institutions subject to Department of Education regulations. Poe also notes that breach-of-contract theory (12), which incorporates this retaliation theory, remains unchallenged by Vanderbilt's motion. *See* SAC ¶ 376.

## **CONCLUSION**

For these reasons, and with Poe's objection to *Smith* preserved for appellate review, the Court should deny the defendant's motion.

Respectfully submitted,

*/s/ Edward J. Canter*

J. Alex Little (TN BPR No. 29858)
Edward J. Canter (NY No. 5345236)
Sloan E. Nickel (TN BPR #42956)
LITSON PLLC
54 Music Square East, Suite 300
Nashville, Tennessee 37203
alex@litson.co
ted@litson.co
sloan@litson.co

*Attorneys for Parker Poe*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2026, a true and correct copy of the foregoing motion has been served via the court's CM/ECF system upon all counsel of record.

_/s/ Edward J. Canter_

Edward J. Canter