# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| PARKER POE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:24-cv-00368 |
| | ) | |
| v. | ) | Judge Crenshaw |
| | ) | Magistrate Judge Frensley |
| DR. MELANIE LOWE, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.01(b), Defendants Vanderbilt University ("Vanderbilt"), Neil Jamerson ("Jamerson"), Jeremy Bourgoin ("Bourgoin"), and Lisa Clapper ("Clapper") (collectively, "Defendants") submit the following Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment:

1.    In April 2022, Vanderbilt student Simon Roe ("Roe") was the target of anonymous posts on a social media site called "Yik Yak." (Second Amended Complaint ("SAC") ¶ 31).

**RESPONSE:**

Disputed in part. Plaintiff does not dispute that posts referencing Simon Roe appeared on YikYak in April 2022. However, this statement is materially incomplete and misleading as framed. The undisputed record establishes that posts about Simon Roe appeared on multiple social media platforms—including Greek Rank—beginning by at least February 2022. *See* FORSR000004-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, *see also* Bourgoin Tr. 164:22-165:15 (recalling GreekRank posts about Roe in 2021). The statement as drafted improperly suggests that the relevant social media activity began in April 2022 and was confined to Yik Yak, thereby omitting critical context.

2.      Plaintiff admits to making posts about Roe on Yik Yak in April 2022. (SAC ¶ 31).

**RESPONSE:**

Disputed in part. Plaintiff does not dispute that he made posts on YikYak in April 2022. However, this statement is materially incomplete and misleading as framed. The record establishes that Plaintiff's posting activity was limited to a brief period of only a few days, consisted largely of reposting content Plaintiff had already encountered on other platforms, and that Plaintiff ceased posting entirely on his own initiative, without any intervention by Defendants. Poe Tr. at 109:17-110:5, 118:16-17. Moreover, Plaintiff testified that he had heard negative rumors about Roe relating to sexual assault prior to posting, and that posts about Roe were already present on the platform before he made any posts of his own. Poe Tr. at 83:4–23, 184:17–188:4.

3.      Plaintiff did not have a personal relationship with Roe. (SAC ¶ 28; Pl. Dep. at 81:5-25).

**RESPONSE:**

Undisputed.

4.      Plaintiff does not dispute the information contained in the Yik Yak subpoena response. (Pl. Dep. at 127:1-2).

**RESPONSE:**

Undisputed as to the accuracy of the metadata produced by Yik Yak in response to the subpoena. Plaintiff does not deny that he reposted content about Simon Roe during the relevant period. Poe Tr. at 127:1–2. However, this statement is materially incomplete and misleading as framed. Plaintiff cannot verify that the subpoena response reflects the totality of posts made about Simon Roe on YikYak. The statement as drafted improperly invites the inference that the subpoena response constitutes a complete and exhaustive record of all posts concerning Simon Roe. The undisputed record establishes that posts about Roe appeared across multiple platforms and

predated Plaintiff's activity by months. *See* FORSR000004-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, *see also* Bourgoin Tr. 164:22-165:15.

5.    Yik Yak's response to Roe's subpoena showed that Plaintiff's phone number posted about Roe 19 times over the course of a 5-day period from April 23 through April 28, 2022. (Pl. Dep. at 124:15-125:1, Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236).

**RESPONSE:**

Undisputed as to what is within the YikYak subpoena response. However, this statement is materially incomplete and misleading without context. The record establishes that hundreds of posts were made about Simon Roe across multiple platforms over a period of months. *See* FORSR000001 at 4-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, *see also* Bourgoin Tr. 164:22-165:15, Poe Tr. at 108:11-17. Plaintiff's posts over five days represent a small fraction of the overall posting activity about Roe. Moreover, the subpoena response itself reflects only an artificial snapshot: it consists solely of posts Roe managed to screenshot and submit to YikYak, not the full universe of posts made about him. 30(b)(6) Tr. 41:13-44:25. That record was further distorted by the fact that Roe was actively deleting posts with Vanderbilt's direct assistance during the relevant period. *Id*. at 44:21-45:3. The statement as drafted improperly isolates Plaintiff's limited conduct from this broader context, creating a misleading impression of his relative role.

6.    A post from Plaintiff's phone number was the first in the group of Yik Yak posts that Roe's father provided to Vanderbilt. (Pl. Dep. at 137:3-14, 184:12-19).

**RESPONSE:**

Undisputed as to the order of YikYak posts within the subset Roe's father provided to Vanderbilt in 2022. However, this statement is misleading without context. That Plaintiff's post appeared first in the materials Roe's father selected and submitted does not establish that it was the first post made about Roe. The materials reflect an artificial sample—curated by an interested

party from a narrow subset of screenshots—not a complete or chronological record of posting activity. The undisputed record establishes that posts about Roe appeared across multiple platforms as early as February 2022, months before Plaintiff posted anything. *See* FORSR000001 at 4-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, Bourgoin Tr. 164:22-165:15, Poe Tr. at 108:11-17.

7. Other posts were made after the first post from Plaintiff's phone number in the group of Yik Yak posts that Roe's father provided to Vanderbilt. (Pl. Dep. at 137:8-14).

**RESPONSE:**

Undisputed as to the sequencing within the materials Roe's father provided. However, this statement carries the same misleading implication as the preceding fact—that Plaintiff's post prompted or triggered subsequent posting activity. The sequencing of posts within Roe's father's curated submission says nothing about the broader chronology. Posts about Roe were already circulating across multiple platforms months before Plaintiff posted, and hundreds of posts were made by numerous other individuals. *See* FORSR000004-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, Bourgoin Tr. 164:22-165:15, Poe Tr. at 108:11-17.

8. The content of Plaintiff's posts on Yik Yak varied, but all focused on Roe and Roe's fraternity, ▮▮▮▮▮▮ (Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236).

**RESPONSE:**

Undisputed in part, disputed in part. Plaintiff does not dispute that his posts concerned Simon Roe and Roe's fraternity. Poe Ex. 2. But this fact omits critical context: Plaintiff's posts were reposts of content Plaintiff had seen elsewhere on other platforms. *See, e.g.*, Poe Ex. 2 (reflecting numerous posts about Roe and his fraternity). Plaintiff genuinely believed the statements to be true, and Plaintiff posted during Sexual Assault Awareness Month about rumors concerning behavior that was already widely circulating on campus. Poe Tr. at 83:4–23, VU_00002697 Tr. at 9:23. The statement as drafted strips Plaintiff's posts of this context.

9.      Plaintiff replied to comments made on some of the posts he made on Yik Yak. (Deanonymized Ex. 2 to Pl. Dep. at VU_00002340).

**RESPONSE:**

Undisputed. Plaintiff does not dispute that the YikYak subpoena appears to show that Plaintiff's phone number replied to comments on some YikYak posts. This fact is immaterial.

10.      The Yik Yak subpoena response revealed the phone numbers of other ten other posters who combined to account for 20 of the discrete posts/comments included in the subpoena response. (Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236).

**RESPONSE:**

Undisputed, but incomplete. Plaintiff does not dispute the contents of the YikYak subpoena response. Poe Ex. 2. However, the subpoena response reflects only an artificial snapshot of the posting activity about Roe: it consists solely of posts that Roe himself screenshotted and submitted to Yik Yak, not the full universe of posts made about him. That universe was further distorted by the fact that Roe was actively deleting posts about himself, with Vanderbilt's direct assistance, during the relevant period. *See* 30(b)(6) Tr. 41:13-45:3. The subpoena response therefore cannot be treated as a reliable or complete measure of posting activity.

11.      Of the eleven individuals responsible for at least 1 of the 39 posts subject to Simon Roe's father's subpoena to Yik Yak, five were men (Plaintiff, S.A., A.G., O.R., and A.C.), three were women (L.N., M.G., and T.I.), and three were of unknown gender (phone numbers ending 5908, 2397, and 5388). (Deanonymized Ex. 2 to Pl. Dep., VU_00002332-VU_00002350).

**RESPONSE:**

Undisputed in part, disputed in part. Plaintiff does not dispute the gender breakdown of posters identified in the YikYak subpoena response. However, this breakdown reflects only the

artificial sample of posts Roe screenshotted and submitted to YikYak—not the full universe of individuals who posted about Roe across multiple platforms over months. *See* FORSR000001 at 4-5, Bourgoin Ex. 12, Poe Ex. 2 at 38, *see also* Bourgoin Tr. 164:22-165:15, Poe Tr. at 108:11-17.

12.     No other individual Yik Yak poster was responsible for more than five posts included in the subpoena response, with most having one to two posts each. (Deanonymized Ex. 2 to Pl. Dep., VU_00002233-VU_00002236).

**RESPONSE:**

Disputed. The record establishes that L.N. made at least 12 documented YikYak posts, with L.N. herself acknowledging that additional posts were omitted from the screenshots provided. VU_00002656; VU_00002697 Tr. at 15:7–11. More fundamentally, the post counts presented here suffer from the same deficiency pervading Defendants' statement of facts: they derive from an artificial and incomplete record. Not all comments captured in screenshots were identified to specific posters, leaving unclear which known posts are attributable to which individuals. Other posts were made but never submitted to Yik Yak for unmasking, rendering unknown what additional posts these individuals made. And Roe was actively deleting posts with Vanderbilt's assistance throughout this period. See 30(b)(6) Tr. 41:13–45:3. Any attempt to minimize these individuals' posting activity relative to Plaintiff's based on this fragmentary record is unsupported.

13.     The three female posters included in the subpoena response posted less than Plaintiff, with L.N. posting three times, M.G. posting three times, and T.I. posting once. (Deanonymized Ex. 2 to Pl. Dep., VU_0000232233-VU_00002236, VU_00002342).

**RESPONSE:**

Disputed. The record establishes that L.N. made at least 12 documented YikYak posts, with L.N. herself acknowledging that some of her posts were omitted from the screenshots

provided. VU_00002656; VU_00002697 Tr. at 15:7–11. The post counts presented here also suffer from the same deficiency pervading Defendants' statement of facts: they derive from an artificial and incomplete record. Not all comments captured in screenshots were identified to specific posters, leaving unclear which known posts are attributable to which individuals. Other posts were made but never submitted to Yik Yak for unmasking, rendering unknown what additional posts these individuals made. And Roe was actively deleting posts with Vanderbilt's assistance throughout this period. *See* 30(b)(6) Tr. 41:13–45:3. Any attempt to minimize these individuals' posting activity relative to Plaintiff's based on this fragmentary record is unsupported.

14. Plaintiff is male. (SAC ¶ 400)

    **RESPONSE:**

    Undisputed.

15. Plaintiff is not in a sorority. (Pl. Dep. at 50:22-23).

    **RESPONSE:**

Undisputed, but immaterial. Plaintiff does not dispute this fact. However, it lacks relevance when viewed in proper context. Plaintiff was reposting sexual assault misconduct posts he had encountered on other platforms. Poe. Tr. 154:16-18. These posts were being taken down quickly, limiting their visibility and impact. *Id*. at 117:6-118:7; FORSR000005 (describing efforts to take down posts). Critically, both Bourgoin and Jamerson knew prior to Plaintiff's investigation that a post under Plaintiff's phone number referencing a sorority member could be a repost or sharing of someone else's story—not original content authored by Plaintiff. *See* Jamerson Ex. 13.

16. On December 30, 2022, Roe's father shared the Yik Yak subpoena results and Yik Yak post screenshots with Neil Jamerson ("Jamerson"). (Roe Father Dep. at 189:8-19, Ex. 5).

**RESPONSE:**

Undisputed in part, disputed in part. Plaintiff does not dispute that Roe's father shared YikYak materials with Jamerson on December 30, 2022. However, this statement is incomplete. While Roe's father provided YikYak materials on that date, the evidence establishes that he provided screenshots for only one phone number at that time. *Compare* Jamerson Ex. 10 *with* Jamerson Ex. 19. Rather than receiving or reviewing the full subpoena response identifying multiple posters, Vanderbilt proceeded based on a partial submission targeting a single individual.

17. Roe's father testified that he viewed the group of 39 Yik Yak posts in April 2022 as the "attack" on his son that spurred the complaint to Vanderbilt. (Roe Father Dep. at 371:23-372).

**RESPONSE:**

Undisputed as to Roe's father's testimony but disputed as to characterization and completeness. While Roe's father testified in this manner, his characterization is incomplete and inconsistent with his own contemporaneous representations to Vanderbilt. Roe's father's communications from the relevant period establish that the alleged targeting of his son began well before April 2022. In May 2022, Roe's father emailed George Huber, a member of Vanderbilt's Board of Trustees, specifically referencing the February 2022 Greek Rank posts, writing: "In the current environment, it is our belief that those accusations were picked up by others who reiterated them on Greek Rank and Yik Yak (a geolocation anonymous social media platform) in February." FORSR000004-5. Roe's father then filed a complaint against multiple posters and demanded that all posters be "disciplined severely." Bourgoin Ex. 8 at 4. The alleged "attack" on his son

encompassed posts from February forward across multiple platforms—not solely Plaintiff's five days of Yik Yak activity in April. That Roe's father now seeks to minimize the earlier Greek Rank posts and attribute the entirety of the posting activity to Plaintiff is contradicted by his own contemporaneous words. The record does not support the narrative that Plaintiff was the source or instigator of the conduct about which Roe's father complained.

18.     Around time Vanderbilt decided to charge Plaintiff, it decided that the other Vanderbilt student posters would be referred to Vanderbilt's Project Safe for an educational conversation. (VU Dep. at 98:10-99:12, 100:7-15; Bourgoin Dep. at 336:14-337:7; Deanonymized Ex. 2 to Pl. Dep., VU_00002332-VU_00002350).

**RESPONSE:**

Undisputed in part, but disputed as to timing and characterization. The evidence does not establish that the decision to refer other student posters to Project Safe occurred "around the time" Vanderbilt decided to charge Plaintiff. The cited depositions and exhibits do not specify when— if at all—such a referral decision was made or whether Project Safe was the designated forum. *See* VU Dep. at 98:10-99:12, 100:7-15; Bourgoin Dep. at 336:14-337:7; Deanonymized Ex. 2 to Pl. Dep., VU_00002332-VU_00002350.

19.     The 2022-2023 Vanderbilt Student Handbook provides that "students on official leaves from the University (medical, personal, disciplinary, or otherwise) fall under the jurisdiction of the accountability system from the time of their arrival on campus or matriculation, whichever is sooner, until degree conferral." (VU Dep. at Ex. 2, VU_00001633).

**RESPONSE:**

Undisputed that the cited provision exists in the 2022-2023 Student Handbook, but disputed as to its application. The contract speaks for itself. However, the 2022–2023 Student Handbook language cited by Defendant was not in effect during the 2021–2022 academic year

when Plaintiff's alleged conduct occurred. Vanderbilt improperly applied the 2022–2023 Handbook retroactively to conduct that predated its adoption. Vanderbilt's 30(b)(6) witness testified that the University applies "the policies and procedures in time at the adjudication, not at the time of the incident." 30(b)(6) Tr. at 20:4–9. The witness also recognized the retroactive application of year-to-year changes could be unfair. *Id*. at 27:8–25. This admission directly undermines Defendant's reliance on the 2022–2023 jurisdiction language to justify disciplining Plaintiff for April 2022 conduct governed by a different handbook.

20.     In accordance with Vanderbilt's Student Handbook, Plaintiff was notified by email on January 9, 2023, that a report about him was received and that he should schedule a meeting with Student Accountability. (SAC ¶¶ 63-64; VU Dep at Ex. 2, VU_00001634).

**RESPONSE:**

Undisputed in part, disputed as to whether this email was "in accordance with Vanderbilt's Student Handbook." Plaintiff does not dispute that Plaintiff received an email from the university on January 9, 2023. However, the initial notice did not include any information about the identity of the reporting party, the precise allegations at issue, or the policy violations in question.

21.     Three days after email notifying him that a report about him was received, Plaintiff attended a video conference call with Bourgoin. (SAC ¶¶ 63-64, 72; Pl. Dep. at 156:18-157:8).

**RESPONSE:**

Undisputed.

22.     Three days after the notification email, Plaintiff attended a video conference call with Bourgoin where Bourgoin showed Plaintiff a copy of his "charge sheet" which explained the basis of the complaint against him and specified the three provisions of the Student Handbook that he was accused of violating: harassment, disorderly conduct, and impersonating a University official or any other person. (SAC ¶¶ 63-64, 72, 91; Pl. Dep. 156:18-158-10).

**RESPONSE:**

Undisputed that Plaintiff was shown a charge sheet listing three violations. Disputed as to adequacy and completeness. The charge sheet did not provide the actual basis of the complaint. As Bourgoin himself acknowledged in the January 12, 2023 meeting, the charge sheet was merely "a summary of the allegations," and Plaintiff would not see "all the things" until the accountability meeting. VU_00000990 Tr. at 31:20-24. More fundamentally, two of the three charges lacked any handbook definition. Neither "disorderly conduct" nor "impersonating a University official or any other person" were defined in the Handbook. Bourgoin told Poe that "disorderly conduct" could mean "basically any behavior that could be considered disorderly," VU_00000990 Tr. at 40:10-11, "disorderly conduct on our campus is used as a pretty significant umbrella," *id.* at 40:7-9. This vagueness violated Plaintiff's due process rights and prevented him from meaningfully responding to the charges. Additionally, Plaintiff was never informed at this initial meeting—or at any point before the accountability hearing—that he was being charged with "instigating" all posts about Simon Roe or with making Greek Rank posts. He was ultimately found responsible for precisely these charges. Jamerson Ex. 15 (March 9 letter describing Plaintiff as "the person who instigated the harassing posts"); Bourgoin Tr. 289:15-18 (Belmont post excluded from evidence packet).

23.     The three provisions of the Student Handbook that Plaintiff was accused of violating (along with approximately 25 others) are explicitly listed in the both the 2021-2022 and 2022-2023 Student Handbooks as "violation[s] of University policy" for which a student may be subject to corrective action. (VU Dep. at Ex. 1, POE000682-POE000684, Ex. 2, VU_00001618-VU_00001620).

**RESPONSE:**

The contract speaks for itself. However, Plaintiff disputes the application and scope of these provisions. While the three charges are listed in the Handbooks, two of them—disorderly conduct and impersonation—are not meaningfully defined, depriving Plaintiff of notice of what conduct would constitute a violation. 2021-2022 Student Handbook, p. 95; 2022-2023 Student Handbook, VU_00001620. More significantly, Plaintiff was never informed that he was accused of violating approximately 25 additional Handbook provisions beyond the three charges specified in his charge sheet. This constitutes a breach of contract and a violation of the Handbook itself, as Plaintiff was deprived of notice of the full scope of alleged violations and thus unable to mount a meaningful defense. Bourgoin never stated to Plaintiff—in any hearing or explanation of charges—that the 2022-2023 Handbook would be applied retroactively to his April 2022 conduct, yet Vanderbilt appears to have done so. Regarding impersonation specifically, the provision is not clearly applicable to Plaintiff's conduct. The Handbook defines impersonation in the context of "Forgery, alteration, or misuse of University or other documents, records, or identification, impersonating a University official or any other person." 2021-2022 Student Handbook, p. 95; 2022-2023 Student Handbook, VU_00001620. This definition contemplates identity fraud or document misuse, not anonymous social media posts. Plaintiff's posting under a phone number on Yik Yak does not constitute impersonation under this definition.

24.     Plaintiff had seven total accountability meetings with Bourgoin from January to March of 2023 (Pl. Dep. at 103:16-25, 163:12-164:5).

**RESPONSE:**

Undisputed as to the number of meetings, but disputed as to timing. The meetings occurred from January to February 2023, not January to March. Poe Tr. at 103:16-25, 163:12-164:5.

25.     During his accountability meetings, Plaintiff had the opportunity to review the post materials submitted by Roe's father, review the impact statements from Roe and his family, explain his rationale for "reposting," and otherwise explain his "side of the story." (Pl. Dep. at 164:6-22).

**RESPONSE:**

Undisputed in part, disputed in part. While Plaintiff was permitted to view some materials on a screen during Zoom meetings, he was not provided copies of all documents, was not provided the official complaint, and critically, was not shown all posts for which he was ultimately found responsible—including Greek Rank posts and the "Belmont" post. Bourgoin Tr. 289:15-18. Plaintiff was also denied the opportunity to call witnesses, including the other posters, despite repeated requests. *See, e.g.*, VU_00003090, Tr. at 5:11-6:25.

26.     Plaintiff did not bring any witnesses to an accountability meeting for Bourgoin to consider. (Pl. Dep. at 165:24-166:16).

**RESPONSE:**

Disputed as misleading. Defendants' framing takes an analog approach to a digital fact pattern. To start, Plaintiff was participating in hearings remotely; it was not possible for him to physically "bring" witnesses to an accountability meeting for Bourgoin to consider. The relevant conduct occurred entirely online, the relevant evidence was digital, and the relevant witnesses were

other anonymous posters whose identities were known only to Roe and Vanderbilt. Yet Vanderbilt and Bourgoin withheld the information Plaintiff needed to contact those witnesses. Plaintiff did, however, ask Bourgoin to call witnesses. Poe Tr. at 165:24–25. Plaintiff further explained that he needed Bourgoin's assistance in identifying and contacting witnesses because of the limited information Vanderbilt had provided to him. VU_00003090, Tr. at 1:1–17. But Bourgoin withheld the identities and contact information for the other identified posters, effectively preventing Plaintiff from contacting potential witnesses in his own defense. Vanderbilt contacted other posters only *after* issuing the outcome against Plaintiff. Jamerson Ex. 15.

Plaintiff also submitted a written witness statement from his attorney establishing he did not make the Greek Rank posts, VU_00000339, but Bourgoin had already decided on "separation" approximately nine hours before receiving it. Clapper Ex. 14. Bourgoin admitted he would not have "fully trusted the statement from the lawyer." Bourgoin Tr. at 226:16–19.

27.    Plaintiff presented his own evidence to Bourgoin in the form of a written statement with 43 separate attached documents, including a written impact statement from his parents. (Pl. Dep.at Ex. 1, VU_00002835-VU_00002836).

**RESPONSE:**

Undisputed.

28.    Bourgoin did not prevent Plaintiff from presenting any evidence. (Pl. Dep. at 168:9-19).

**RESPONSE:**

Disputed. Plaintiff sought to call witnesses and sought assistance from Vanderbilt to help facilitate this. Pl. Tr. 165:24-166:10. Plaintiff further explained that he needed Bourgoin's assistance in identifying and contacting witnesses given the limited information Vanderbilt had

provided to him. VU_00003090, Tr. at 1:1–17. Rather than assist, Bourgoin withheld the identities and contact information for the other identified posters—effectively preventing Plaintiff from contacting potential witnesses in his own defense. Vanderbilt then contacted those same posters only after issuing the outcome against Plaintiff. Jamerson Ex. 15.

29.     During the Student Accountability process, Plaintiff submitted a cross-complaint against Roe for providing false and misleading statements about Plaintiff to Vanderbilt. Bourgoin states that he considered Plaintiff's cross-complaint as a part of his evaluation of the complaint against Plaintiff and ultimately determined that there was insufficient information to charge Roe. (Bourgoin Dec. ¶¶4-5).

      **RESPONSE:**

Disputed in part. Plaintiff does not dispute that he submitted a cross-complaint against Simon Roe. Bourgoin's after-the-fact declaration lacks contemporaneous support and is contradicted by the record. No Complaint Resolution Form documenting this alleged decision exists in discovery. Bourgoin produced the cross-complaint only after Plaintiff provided it to the Appellate Chair, Mindy Ireland. In a subsequent email, Bourgoin wrote: "I did pull in the 'cross complaint' he is referencing from the Maxient IR so the chair can have that." VU_00000432. This communication confirms that Bourgoin did not voluntarily incorporate or investigate the cross-complaint—he was compelled to acknowledge it only after Plaintiff escalated the matter on appeal. Bourgoin's self-serving declaration cannot establish that any meaningful investigation of Plaintiff's cross-complaint occurred when the contemporaneous record demonstrates otherwise.

30.     Plaintiff submitted a second complaint against Roe to Vanderbilt on February 26, 2024, alleging that Roe "had access to [Poe's] confidential information that he then broke [Vanderbilt] policy to share." Documentation shows that Bourgoin found that Plaintiff did not

"provide sufficient evidence . . . to warrant charging [Simon Roe] at th[at] time." (Pl. Dep. at Ex. 1, VU_00002839-VU_00002840).

**RESPONSE:**

Undisputed in part, disputed in part. Plaintiff does not dispute that he submitted a second complaint on February 26, 2024, or that it was declined. However, the decision-maker, rationale, and adequacy of review are all disputed. Jamerson — not Bourgoin — administered this complaint, VU_00002705, but both had obvious conflicts of interest, as the complaint concerned Bourgoin's own March 9, 2023 letter that violated federal and state privacy law. Dkt. 97 at 18. Jamerson declined to pursue charges despite acknowledging a basis for them, reasoning the conduct related to the student's "right to litigate." VU_00002705. Plaintiff requested reassignment to unconflicted personnel, but no independent review occurred.

31.     During her February 23, 2023 call with Plaintiff's mother, Clapper asked her questions to assess Plaintiff's suicide risk factors, including whether Plaintiff had access to a gun or drugs. (Pl. Mother Dep. at 102:5-103:7; Clapper Dep. at Ex. 11). Plaintiff's mother denied that Plaintiff had access to either. (Pl. Mother Dep. at 102:5-103:7).

**RESPONSE:**

Disputed in part. Plaintiff does not dispute that Clapper asked Plaintiff's mother about access to guns and drugs on February 23, 2023. Clapper Ex. 10. However, the characterization of this inquiry as being part of a risk assessment is disputed. Clapper herself testified that a reliable risk assessment cannot be conducted without speaking directly to the student—yet no one from Vanderbilt spoke with Plaintiff. Clapper Tr. at 76:21–78:24, 88:1–88:20. Instead, Vanderbilt relied on Plaintiff's mother, who could only confirm "to her knowledge" that Plaintiff did not have access to guns or drugs. Clapper Ex. 10. Plaintiff's mother recalled questions about guns and drugs, but her deposition does not support the characterization that these questions were posed as part of any

formal suicide risk assessment. Pl. Mother Dep. at 102:5–103:7. By Vanderbilt's own witness's standard, the assessment conducted was inadequate on its face.

32. During her call with Clapper, Plaintiff's mother expressed that she did not want anybody from Vanderbilt to reach out to Plaintiff and felt that she would continue to communicate with Plaintiff. (Pl. Mother Dep. at 105:6-106:2).

**RESPONSE:**

Undisputed, but incomplete. Plaintiff's mother's primary concern was protecting her ability to communicate with Plaintiff. She stated: "Well, [Clapper] never said that she wanted to talk to him or needed to talk to him about assessing a suicide risk. I didn't really think he will feel comfortable—I also didn't want—it was hard enough for him to talk to me and share what he did with me, and now here I'm sharing it with the school right away. So, I just didn't think it was like a good idea because it could—you know, I didn't want to jeopardize my ability to talk to him because he was still talking to me. So, I just wanted to keep that connection, and I thought that was the most important." Pl. Mother Dep. at 106-107. Plaintiff's mother's primary request was that the outcome delivery be delayed by one week until Plaintiff returned home to a safe, supportive environment. Pl. Mother Dep. at 111:24-112:11. Defendants refused this request.

33. There was no certainty that Plaintiff's mother's proposed alternative plan (delaying the outcome meeting) would have eliminated the risk to Plaintiff. (Pl. Mother Dep. at 130:9-12).

**RESPONSE:**

Disputed as misleading and argumentative. No standard requires certainty that an alternative plan would eliminate all risk. The relevant question is whether Defendants acted reasonably in light of the known risk. They did not. Plaintiff's mother explicitly warned that an adverse decision delivered while Plaintiff was alone at an internship across the country "will take

his life." Clapper Ex. 11. She requested only a one-week delay so Plaintiff could receive the outcome in a safe, supported environment. Pl. Mother Dep. at 111:24–112:11. Defendants refused.

Vanderbilt's own witness confirmed that reasonable alternatives existed. When asked whether Vanderbilt did everything it could, Clapper answered: "I think we've established that there are other options that could have been before the date that we met with [Poe]." Clapper Tr. at 165:5–17. Clapper acknowledged she could have stopped the proceeding or asked questions to assess risk. *Id.* And being able to confirm that his parents were with him would have been better from a care perspective. Clapper Tr. at 178:20–179:22.

34.     In response to Plaintiff's mother's concerns, Clapper and Jamerson discussed Plaintiff's risk for suicide and the need to have a care plan in place for the delivery of Plaintiff's Student Accountability outcome. (Clapper Dep. at 127:15-129:16).

**RESPONSE:**

Disputed as to substance and characterization. The cited deposition pages do not establish that Clapper and Jamerson meaningfully discussed Plaintiff's suicide risk. Rather, these pages reflect that Jamerson had no flexibility regarding the March 6 delivery date. Clapper Tr. at 127:15–129:16. Clapper texted Bourgoin: "Neil has very strong feelings that there is no flexibility." Clapper Tr. at 139–140:12; Clapper Ex. 13. Clapper herself confirmed that an agreement with another student's parents shouldn't be a factor when dealing with a student in distress. Clapper Tr. at 126:18–127:10. The contemporaneous communications reveal how Defendants actually treated the situation. When Clapper relayed that Plaintiff's mother was requesting a one-week delay, Bourgoin responded: "Dear god too many crazy parents." Clapper Tr. at 121:3–21; Clapper Ex. 13. The night before delivery, Clapper emailed: "The parents better have flown out there. lol." Clapper Ex. 15. And hours after learning of the suicide warning, Jamerson directed Bourgoin to "wrap this one up"—later clarifying that "I want to be clear, it isn't a sentiment, it is my

instructions." Bourgoin Tr. at 340:11–351:10; Bourgoin Ex. 18. These are not the actions of officials who took a credible suicide warning seriously.

35.     Jamerson was trained on the National Association for Behavior Intervention and Threat Assessment's "risk rubric" and the assessment of risk related to threats of harm to self or others. (Jamerson Dep. at 42:21-45:4; Clapper Dep. at 128:11-14).

**RESPONSE:**

Disputed as to scope. Clapper testified only that Jamerson was trained on the risk rubric, not on assessment of threats of harm to self or others. Clapper Tr. at 128:11–14. The majority of Jamerson's cited training occurred after the March 6, 2023 outcome delivery. Jamerson Dep. at 42:21–45:4.

36.     Jamerson evaluated Plaintiff at "a moderate-to-elevated risk of suicide because the no intent, no plans, no means, no timeline, and the student was able to safety-plan with his mom, according to his mother." (Jamerson Dep. at 395:5-14).

**RESPONSE:**

Disputed. Clapper testified that a reliable risk assessment cannot be conducted without speaking directly to the student. Clapper Tr. at 76:21–78:24, 88:1–88:20. Jamerson never spoke to Plaintiff. His purported risk assessment lacks any contemporaneous documentation, appearing only in deposition testimony nearly three years later. Jamerson never spoke to Plaintiff, his parents, or Clapper about suicide risk, yet claims no intent or timeline existed. Jamerson Tr. at 395:5–14. This directly contradicts Plaintiff's parents' February 23, 2023 email: "he is now talking suicide" and "We are absolutely convinced an adverse decision now will take his life." Bourgoin Ex. 15.

Jamerson further claims Plaintiff could "safety-plan with his mom." Plaintiff's mother said the opposite: she "didn't know what to do" and believed she and Defendants were "going to come up with a plan" together. Pl. Mother Dep. at 98; Bourgoin Ex. 15. She begged for a one-week delay

to stabilize the situation. Pl. Mother Dep. at 112:1–11, 113:6–16. Jamerson's after-the-fact assessment is contradicted by what Defendants were being told in real time.

37.     Vanderbilt took extra precautionary steps to mitigate any potential risk to Plaintiff associated with the delivery of his outcome, including having Clapper on the outcome call, informing Plaintiff's mother of the date of the outcome call, and encouraging Plaintiff's mother to travel to ▆▆▆▆ to be with Plaintiff. (Jamerson Dep. at 395:16-25).

**RESPONSE:**

Disputed. The "precautionary steps" were inadequate and not followed through. Defendants never confirmed Plaintiff's mother was able to travel or was present. Clapper Tr. 145:11-25 and 146:16-24. The night before the outcome, Defendant Clapper emailed "The parents better have flown out there. Lol"—demonstrating she did not know whether Plaintiff would have support and treated the situation as a joke. Pl. Mother's Tr. at 141:14-25 and 142:1-20. No one discussed logistics with Plaintiff's parents or had any plan for what should happen when Plaintiff became distressed. Pl. Mother Depo at 104:18-23; Clapper Depo at 145:11-25 and 146:16-24. Defendants proceeded with the outcome delivery despite not knowing whether Plaintiff was alone.

38.     Clapper called Plaintiff's mother on March 1, 2023, to tell her that the outcome would be delivered on March 6, 2023 and documented in her notes that, though she agreed to inquire one more time whether the outcome meeting could be moved, she still encouraged Plaintiff's mother to plan to be in ▆▆▆▆ on March 6. (Pl. Mother Dep. at 111:8-23, Ex. 3, VU_00002828).

**RESPONSE:**

Undisputed that the call occurred. However, Plaintiff's mother never received a definitive "yes" or "no" regarding her requested delay. Pl. Mother's Tr. at 112:12-20. Defendant Jamerson had already decided the date would not be moved. Clapper Ex.13.

39.     Clapper sent Plaintiff's mother an email at 5:03 PM on March 1, 2023, confirming that "Monday March 6 will continue to be the target date to discuss the outcome with ████." (Pl. Mother Dep. at Ex. 2; Clapper Dep. at Ex. 2).

**RESPONSE:**

Undisputed in part, disputed in part. Plaintiff does not dispute that Clapper sent an email on March 1, 2023 referencing March 6 as the target date. Pl. Mother Ex. 2. However, Plaintiff's mother did not receive this email until approximately one week after it was sent—well after the March 6 outcome delivery. She testified: "I know I only saw it a week after it was sent. I never saw this e-mail until after March 6th, like a few days later at least." Pl. Mother Tr. at 110.

40.     Plaintiff's mother wanted to go to ████ to be with Plaintiff when the outcome was delivered. (Pl. Mother Dep. at 96:22-97:1).

**RESPONSE:**

Undisputed that Plaintiff's mother wanted to be with her son when the outcome was delivered. Pl. Mother Dep. at 96:22–97:1. Clapper documented it in her own March 1, 2023 notes: "Student's mother is still very concerned about student's wellbeing and asked if the decision could be held until the following week when [Plaintiff] would be home with family." Poe Ex. 1 at 25. Defendants ignored this request, proceeded with the outcome delivery on March 6, and did not confirm that family support was in place before doing so. Clapper Dep. at 145:11–25, 146:16–24.

41.     The "laugh out loud" comment in Clapper's March 5, 2023 email was "in reference to all of the various elements of not having power, []Jeremy not even being in town, us trying to ensure that we could go forward with this plan and for it to be run smoothly," not that she thought it was a funny situation. Clapper Tr. at 147:10-22.

**RESPONSE:**

Disputed. This post-hoc explanation does not change what the email says. On March 5, 2023—the night before delivering a life-altering outcome to a student Defendants knew was suicidal—Clapper wrote: "The parents better have flown out there. lol safe travels!" Clapper Ex. 15. This was an acknowledgment that Defendants had no idea whether Plaintiff would have any support present—and found that uncertainty amusing. Clapper's deposition testimony that the "lol" referenced logistical frustrations, Clapper Dep. at 147:10–22, is a self-serving recharacterization offered years later under oath in litigation. At most, it raises a credibility issue. The plain language of the email speaks for itself. Defendants treated the delivery of this outcome as an administrative inconvenience, not as a situation involving a credible suicide risk demanding care. Whatever Clapper's subjective intent, the email demonstrates that Defendants failed to take the most basic step available—confirming Plaintiff would not be alone—and were cavalier about that failure.

42.     Plaintiff did not see the March 5, 2023 email thread between Clapper and Bourgoin until early 2024. (Pl. Dep. at 179:5-14).

**RESPONSE:**

Undisputed.

43.     Before Plaintiff's mother she saw the March 5, 2023 email thread between Clapper and Bourgoin sometime in 2024, she thought Clapper "was trying to help" and "was very nice to talk to." (Pl. Mother Dep. at 141:5-14).

**RESPONSE:**

Undisputed.

44.     Plaintiff's Student Accountability outcome meeting proceeded by video call on March 6, 2023, at 4:45 PM (the conclusion of Plaintiff's workday). (SAC ¶ 215).

**RESPONSE:**

Undisputed in all material respects.

45.     Plaintiff refused to disclose where he was located for the outcome meeting. (Pl. Dep. at 182:7-16).

**RESPONSE:**

Undisputed.

46.     Plaintiff purposely told his mother that the outcome call was set for March 7, 2023 (one day after the call was scheduled) because he "did not want her to come to ▮▮▮▮▮ (Pl. Dep. 178:14-179:4).

**RESPONSE:**

Undisputed that Plaintiff told his mother the call was scheduled for March 7 rather than March 6. Disputed as incomplete and requiring critical context. Plaintiff's testimony at Deposition 178:14-179:4 does not capture the full picture. According to Plaintiff's mother's deposition testimony, when she asked Plaintiff why he could not tell her the true date, he responded: "because

he wanted to die." Pl. Mother Dep. at 136. Regardless, this fact does not excuse Defendants' failure to take adequate precautions. Defendants knew Plaintiff was suicidal, knew the outcome was going to be a disaster and proceeded without confirming any support was in place. Clapper Ex. 14.

47.     Defendants did not know that Plaintiff's mother was not in ███████ at the time they delivered the outcome to Plaintiff. (Bourgoin Dep. at 390:8-22).

**RESPONSE:**

Disputed as misleading. Defendants did not know because they failed to confirm. The night before, Defendant Clapper wrote "The parents better have flown out there. Lol"—demonstrating uncertainty about whether Plaintiff would have support. Clapper Ex. 15. No one contacted Plaintiff's mother on March 6 to confirm she was present before proceeding. Clapper Depo Tr. 145:11-25 and 146:16-24. Defendants' ignorance was the product of their own failure to follow through on their purported "care plan."

48.     Clapper was on the outcome call with Bourgoin to provide support to Plaintiff, but Plaintiff left the call before speaking with her. (Pl. Dep. at 180:16-18).

**RESPONSE:**

Undisputed that Plaintiff left the call. However, Defendant Clapper immediately attempted to find Plaintiff's location so she could send police, and called Plaintiff's mother in a panic worried something might happen — demonstrating Defendants recognized the danger of the situation they had created. Jamerson Ex. 25.

49.      Plaintiff was sent a letter from Student Accountability notifying him that he was found responsible for all three charges against him. (SAC ¶ 157).

**RESPONSE:**

Undisputed.

50.     Plaintiff was permitted to file an appeal based on three separate grounds. (SAC ¶ 242).

**RESPONSE:**

Disputed as to the characterization. Plaintiff was given an opportunity to file an application to appeal, not an opportunity to appeal. The 2021-2022 Handbook explicitly states students have "the opportunity to appeal"—not merely the opportunity to file an application. Handbook at 112. Bourgoin himself told Clapper to inform Plaintiff's mother that "he has the right to an appeal." VU_00000370. The University promised an appeal process, not just an application process that would be denied. Melanie Lowe, the appellate decision-maker, admitted she has granted only one appeal application out of hundreds over a period greater than ten years. Lowe Tr. at 17:24-35:8. Plaintiff received an application process with no genuine appeal opportunity.

51.     Lowe considered Plaintiff's appeal and sent him a written "appeal denial" explaining her rationale. (SAC ¶¶ 235, 257-280; Lowe Dep. at 63:9-19, Ex. 6).

**RESPONSE:**

Undisputed that Defendant Lowe issued a written denial. However, her written rationale contains multiple misrepresentations. Lowe Ex. 6 at 2. Vanderbilt has absolutely no information to support Lowe's representation in that Poe's punishment was consistent with comparable cases. 30(b)(6) Tr. at 85:18-21. That was false. Lowe Tr. at 81:1–85:13, 87:5–89:23, Ex. 4. As was the representation that "the sanction imposed is within the normal range for similar cases." Lowe Ex. 6 at 3. Every other student charged with impersonation received probation or deferred probation. Lowe Ex. 4. Every other student charged with harassment—with one exception—received the same. *Id*. That lone exception involved a student with four prior findings of responsibility. *Id*.

52.     Roe's father did not share the March 9, 2023 letter with anyone aside from with his wife and his attorneys. (Roe Father Dep. at 298:15-17, 297:14-298:4).

**RESPONSE:**

Disputed. This is fundamentally a credibility question for the jury. Simon Roe has offered no denial. On this record, a reasonable jury could find that the contents of the March 9, 2023 letter were disseminated to third parties by Roe and ultimately reached Plaintiff's employer—where multiple students and employees confronted Plaintiff about the sanctions. POE000446-463. And Bourgoin himself acknowledged that "anything we give them is going to be used in the legal process." VU_00002008.

53.     After Vanderbilt received evidence in the form of a pleading in the state court case that L.N.'s purported assault allegation was knowingly false, Vanderbilt pursued Student Accountability charges against her. (Jamerson Dep. at 345:20-346:4).

**RESPONSE:**

Undisputed that Vanderbilt eventually pursued charges against L.N.—but only after additional pressure from Simon Roe's father, including contact to Jamerson's supervisor, G.L. Black, and the Vanderbilt Board of Trustees. *See* Jamerson Ex. 18, FORSR000006.

54.     Plaintiff applied to and received a job offer from ▆▆▆▆ ▆▆▆▆ Company while he was still suspended from Vanderbilt. (Pl. Dep. at 242:17-21).

**RESPONSE:**

Undisputed.

55.     Plaintiff's job offer from ████████████████ was revoked because he did not have a bachelor's degree. (Pl. Dep. at 244:6-17).

**RESPONSE:**

Disputed. Plaintiff's deposition transcript establishes that the job offer was revoked because Plaintiff's anticipated graduation date changed because of Vanderbilt's decision not to honor his accommodations. *See*, e.g., Poe Tr. 227:19-228:16.

56.     After filing of the Second Amended Complaint and in response to Defendants' request for mental health records through trial, Plaintiff clarified that he is "narrow[ing] his claim for emotional distress and psychological harm to focus exclusively on the March 6, 2023 suicide attempt and a related hospital visit" and that "continuing care is not part of [his] claim." (ECF No. 183 at 10; ECF No. 228 at 4; Pl. Dep. at 201:3-11).

**RESPONSE:**

Undisputed.

## <u>PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS AS TO WHICH A GENUINE ISSUE EXISTS FOR TRIAL</u>

Pursuant to M.D. Tenn. Local Rule 56.04(c), Plaintiff asserts the following additional facts are material and genuinely disputed:

1. On February 21, 2023, Defendant Bourgoin explicitly predicted to Defendant Clapper that delivering the outcome would cause Plaintiff to "spiral" and that "it's going to be a disaster". Clapper Ex. 14 at 1.

2. On February 23, 2023, Plaintiff's mother called Defendant Clapper and stated that Plaintiff had been "expressing suicidal thoughts" and was "in a psychiatric crisis" and "not thinking rationally." Clapper Ex. 10.

3. On February 23, 2023, Plaintiff's mother emailed Defendants Bourgoin and Clapper stating: "he is now talking suicide" and "We are absolutely convinced an adverse decision now will take his life". Bourgoin Ex. 15; Clapper Tr. at 119:21–120:11.

4. On February 23, 2023, Defendant Bourgoin drafted an email contemplating delivering the outcome the week of March 6 "[i]f we take the mental health concerns out of the timeline planning". Bourgoin Ex. 16; Clapper Tr. at 119:21–120:11.

5. On February 24, 2023, Defendant Bourgoin emailed Roe's father stating the "goal is to be in an outcome meeting at some time during the week of March 6". Jamerson Ex. 24.

6. On February 24, 2023, Defendant Jamerson responded that he was "ready to wrap this one up" and later stated, "I want to be clear. It isn't a sentiment. It is my instructions". Jamerson Ex. 24; Bourgoin Tr. at 340:11-351:10.

7. On March 1, 2023, Plaintiff's mother explicitly requested a one-week delay so that Plaintiff could be with family when the outcome was delivered, and Defendant Clapper's professional judgment favored granting that request. Pl. Mother Tr. at 111:24–112:11; Clapper Tr. at 141:4–144:25.

8. On March 1, 2023, when Defendant Clapper relayed Plaintiff's mother's request for a one-week delay to Defendant Bourgoin, Bourgoin responded: "Dear god too many crazy parents". Clapper Ex. 13; Clapper Tr. at 121:3–21.

9. On March 1, 2023, Defendant Clapper texted Defendant Bourgoin that "Neil has very strong feelings that there is no flexibility" regarding the March 6 date. Clapper Tr. at 139–140:12; Clapper Ex. 13.

10. On March 1, 2023, Defendant Clapper confirmed in her professional judgment that an agreement with another student's parents (Roe family) "shouldn't be a factor" in deciding when to proceed with a student in distress, yet Defendants proceeded anyway. Clapper Tr. at 126:18–127:10.

11. Throughout the period from February 21 through March 6, 2023, no Defendant ever spoke directly to Plaintiff to conduct a risk assessment, despite Defendant Clapper's testimony that

a reliable risk assessment cannot be conducted without speaking directly to the student. Clapper Tr. at 94:22–95:3; Clapper Tr. at 76:21–78:24, 88:1–88:20.

12. The risk information Defendants relied upon was secondhand, five days old, and qualified as being "to [the mother's] knowledge," and Defendants received no update on Plaintiff's means, timeline, or plan in the five days before the proceeding. Clapper Tr. at 86:14–88:20, 94:23–96:20, 155:1–156:23.

13. On March 5, 2023, the night before the outcome was to be delivered to Plaintiff, Defendant Clapper wrote: "His parents better have flown there. LOL, safe travels". Clapper Ex. 15.

14. On March 6, 2023, at 4:45 PM, when the Zoom call began, Defendant Clapper asked whether Plaintiff's mother was present and confirmed she was not. Clapper Tr. at 150:14–156:9.

15. On March 6, 2023, despite learning that Plaintiff's mother was not present and that the care plan had failed, Defendants proceeded with outcome delivery anyway, and Defendant Clapper confirmed this was "concerning." Clapper Tr. at 150:14–156:9; Clapper Tr. at 156:24–157:4.

16. On March 6, 2023, Defendant Clapper, the only licensed care professional on the call, did not ask a single risk-assessment question before the suspension was delivered, testifying: "It wasn't my place at that time to ask any of the questions that I would have been able to assess him." Clapper Tr. at 156:24–157:4.

17. Defendant Clapper testified that she was unable to personally assess Plaintiff's suicidal ideation and that she would have been able to assess him had she asked risk-assessment questions. Clapper Tr. at 177:22–178:10.

18. Defendant Clapper repeatedly testified that she was "told what to do" by non-care personnel Defendants Bourgoin and Jamerson, stating: "It's Neil's and Jeremy's office, so, yes, they would be the decision-makers". Clapper Tr. at 106, 108–109.

19. Defendant Clapper testified that if a different approach were taken, options would have included: a one-week delay, bringing Plaintiff to Nashville where campus resources existed, sending him home to his family, stopping the proceeding when they learned his parents were absent, or asking risk-assessment questions before delivering the outcome. Clapper Tr. at 106; Clapper Tr. at 163:17–165:17.

20. Defendant Clapper testified that "being able to confirm that his parents were with him would have been better" from a care perspective and that "I think we've established that there are other options that could have been before the date that we met with [Plaintiff]." Clapper Tr. at 178:20–179:22; Clapper Tr. at 165:5–17.

21. After Plaintiff attempted suicide immediately following the outcome delivery, Defendant Bourgoin texted: "it went unfortunately as we feared it would go". Jamerson Tr. at 412; Jamerson Ex. 25.

22. Defendant Jamerson, as chair of Vanderbilt's welfare and care teams (which make up

the behavioral threat assessment team), never documented any formal risk assessment of Plaintiff, and no document in discovery suggests any assessment by anyone prior to the outcome delivery. Jamerson Dep. at 45; Plaintiff's discovery responses.

23. Plaintiff told his mother the outcome call was scheduled for March 7 (one day after the actual date), and when his mother asked why, Plaintiff responded: "because he wanted to die". Pl. Mother Dep. at 136; Pl. Dep. 178:14-179:4.

24. Plaintiff's parents explicitly stated in their February 23, 2023 email: "We do not know what to do" and later Plaintiff's mother testified: "I didn't know what to do" and believed she and Defendants were "going to come up with a plan" together. Pl. Mother Dep. at 98.

25. Plaintiff had access to multiple means for suicide including kitchen knives, medications such as Tylenol, and his high-rise workplace, Plaintiff was also living away from home for approximately two months. Clapper Tr. at 76:21–78:24, 88:1–88:20.

26. Vanderbilt scheduled Plaintiff's outcome delivery during business hours (4:45 PM, described by Defendant Bourgoin as "during the business day so 8am-5pm central") despite Plaintiff's repeated requests that accountability meetings not be held during business hours because they were affecting his internship performance. VU_00000396-398; SAC ¶ 215.

27. Defendant Bourgoin's March 5, 2023 email stated: "This one is going to need to line up during the business day so 8am-5pm central. Because it takes so little time, your employer should either let you step away briefly or arrive late/leave early to get home to do the meeting as

it's important". VU_00000396-398.

28. Plaintiff was permitted to file an appeal application based on three separate grounds. SAC ¶ 242; 2021-2022 Handbook at 112.

29. Defendant Melanie Lowe, the appellate decision-maker, admitted she has granted only one appeal application out of "hundreds" over a period greater than ten years. Lowe Tr. at 17:24–19:19, 29:2–21, 22:22–23:6, 33:19–35:8.

30. Defendants Bourgoin and Jamerson sent Simon Roe a March 9, 2023 letter confirming that Plaintiff "was held accountable and he was not enrolled" and that they would inform Roe "if [Plaintiff] ever enrolled while [Roe] was still a student," sent before Plaintiff's appeal was even decided. VU_00002698.

31. Defendant Lowe's appellate denial letter stated that "the sanction you received is neither unreasonable nor unusual when compared to similar cases in which students have been found responsible for harassment, disorderly conduct and/or impersonation". 30(b)(6) Tr. at 85:18-21; Lowe Tr. at 64:22–65:21, 77:20-78:4, 113:2-23.

32. In the comparator case Defendant Lowe cited (Case No. 2022021202), the student had at least two prior findings of responsibility with escalating sanctions before the expulsion, whereas Plaintiff had no prior disciplinary history. Lowe Tr. at 91:8-14, 81:1–85:13, 87:5–89:23; Lowe Ex. 4.

33. Every other student charged with impersonation received probation or deferred probation, while every other student charged with harassment received probation or deferred probation, with the sole exception involving a student with four prior findings of responsibility who had exhausted every lesser sanction before being suspended. Lowe Tr. at 120:2-18; Lowe Ex. 4.

34. Not a single panel hearing for co-curricular matters has been convened in the entire decade of the 2020s under Defendant Lowe's tenure as appellate screener. Lowe Tr. at 21:14–22:7, 36:16–37:7.

35. The "offline" communications between Defendants derided Plaintiff as "very unstable and unwell in my untrained assessment," characterized his prior Title IX complaints as "baseless" and "retaliatory," and described dealing with him as "super messy." Bourgoin Tr. 230:16-252:2; Bourgoin Ex's. 7-8.

36. Defendant Clapper described Plaintiff's mother as a "mess" and Defendant Bourgoin characterized her as a "crazy parent" when she raised concerns about her son's suicidal ideation. Clapper Tr. at 121:3–124:15; Clapper Ex. 13.

37. Defendant Bourgoin had a "pretty close" personal relationship with another poster, S.M., and had formed the view before the investigation began that S.M.'s posts were "well-intentioned". Bourgoin Tr. at 266:6–270:15; Bourgoin Ex. 10.

38. Defendant Bourgoin instructed a colleague that she should not discuss Plaintiff "in the

chat" because the University was "actively on notice about lawsuit". 30(b)(6) Tr. at 92:19-93:10, 96:9-13; Bourgoin Tr. at 297:16–310:14; Bourgoin Ex. 13.

39. Defendant Bourgoin directed to close an impersonation and disorderly conduct investigation against Simon Roe "[f]or all of our sanity" to "head off family's calls to Neil panicking about [Roe] now being in trouble". Bourgoin Tr. 354:7-357:15; Bourgoin Ex's. 14, 19.

40. Defendant Jamerson communicated directly with Roe's father throughout the investigation and appeal process. Jamerson Ex's. 9-12, 14, 16, 18-20, 23-24.

41. Defendant Jamerson's directive to "wrap this one up" was issued hours after learning of the suicide warning, and when questioned, Jamerson clarified: "I want to be clear, it isn't a sentiment. It is my instructions". Bourgoin Tr. at 340:11-351:10; Bourgoin Ex. 18.

42. Defendant Bourgoin held that Plaintiff had made posts on Greek Rank describing Simon Roe as having "drugged and sexually assaulted women, used racial slurs, and manipulated the university's diversity program," yet Plaintiff was never notified he was being investigated for these posts and was never given the opportunity to defend against them. Dkt. 17 at 2; SAC ¶¶ 101-105.

43. Posts about Simon Roe appeared on Greek Rank as early as February 2022—months before Plaintiff's YikYak posts, and there is no evidence tying Plaintiff to Greek Rank. Jamerson Ex. 15; Bourgoin Tr. 164:22-165:15.

44. Defendant Bourgoin instructed a colleague to "make [out] we know more than we do" and to "inquire about Greek Rank as well," while indicating he was "suspicious" Plaintiff made the posts without any actual evidence. Jamerson Ex. 13; Jamerson Tr. 262:15-24; 263:10-16.

45. The "Belmont" post that Defendant Bourgoin suspected Plaintiff of making was never disclosed to Plaintiff—it was excluded from the "evidence packet" and has not been produced even in this litigation. Bourgoin Tr. 289:15-18.

46. Defendant Bourgoin received written statement from Plaintiff's attorney, Ms. Sherwood, establishing that Plaintiff did not make the Greek Rank posts approximately nine hours after Bourgoin had already decided on "separation" from the University, and Bourgoin disregarded the statement based on his distrust of counsel. VU_00002768; Bourgoin Dep., p. 226, ln. 16-19.

47. Defendant Bourgoin refused to identify other posters to Plaintiff or allow Plaintiff to interview them as witnesses, despite Plaintiff's repeated requests, then waited until after the outcome to speak informally with the other posters. SAC ¶¶ 109-117, 193.

48. The investigation began nearly a year after the posts were made, and Defendant Bourgoin gave Plaintiff only two weeks to produce evidence of pre-existing posts—evidence Plaintiff had no legal mechanism to obtain due to the Stored Communications Act. 18 U.S.C. § 2702.

49. At the time of the April 2022 posts, Plaintiff was on a personal leave of absence and was not an enrolled student. SAC ¶¶ 21-23, 377.

50. Posts about Simon Roe appeared on multiple social media platforms, including Greek Rank, beginning as early as February 2022—months before Plaintiff made any posts. SAC ¶¶ 31, 39-40, 152; Bourgoin Tr. 164:22-165:15.

51. Plaintiff's posts were limited to a brief period of a few days, consisted largely of reposting content Plaintiff had seen on other platforms, and Plaintiff stopped posting on his own initiative. SAC ¶¶ 30-32.

52. Female poster L.N. made at least 12 documented Yik Yak posts, with L.N. herself acknowledging some posts were omitted from screenshots, meaning the actual total exceeded 12. VU_00002656-2657.

53. L.N.'s posts included allegedly false rape accusations and claims she had contacted Roe's employer—conduct that caused Roe documented harm including panic attacks and professional damage to his internship—yet Vanderbilt declined to investigate or discipline L.N. until well after Plaintiff was suspended. VU_00002613-2615; SAC ¶¶ 53-61, 76, 112, 193, 397.

54. T.I. posted at least twice about Simon Roe. VU_00002333, VU_00002347.

55. M.K.'s posts remain unknown. VU_00002903.

56. Three of the identified male posters—S.A., A.G., and A.C.—were not students and/or had already graduated at the time of the investigation. Jamerson Deposition, p. 177; Jamerson

30(b)(6) Deposition, pp. 149, 151.

58. Defendant Bourgoin believed L.N. may have been a victim of Roe's conduct. Defendant Bourgoin chose not to initiate proceedings against L.N., while choosing to initiate them against Plaintiff. Jamerson Ex. 19; SAC ¶¶ 53-61.

59. After Roe's father reacted negatively to learning that L.N. had not been investigated, Vanderbilt reversed course and opened proceedings against her the following semester. SAC ¶ 398.

60. Under the same policy, adjudicated by the same decision-maker, on the same core charges, L.N. received several months' probation and graduated without interruption, while Plaintiff—who also had no prior disciplinary history—was suspended for approximately 1.6 years. SAC ¶ 398.

61. Plaintiff had an existing employment relationship with his internship company where he was working during the proceedings, and Vanderbilt was aware of the internship and its impact on Plaintiff's ability to perform. ████████ 000005-12; Clapper Ex. 10-11, 14.

62. Plaintiff had a prospective relationship with Company C, the employer that extended and later revoked a job offer, and the revocation was directly caused by Plaintiff's inability to graduate as planned due to Vanderbilt's suspension and refusal to honor accommodations upon return. ████ 000005-06; SAC ¶¶ 225-231.

63. Plaintiff's performance evaluations at his internship reflected that he was exceptionally talented at coding and showed strong potential, but also noted concerns about his performance. During the same period, Defendant Clapper communicated to Defendant Bourgoin that the investigation was affecting Plaintiff's internship performance. ███████ 000022-23; Clapper Ex. 10-11, 14.

64. Defendant Bourgoin's outcome rationale references a desire to impose a "sizeable life impact". VU_00002831.

65. Plaintiff attempted suicide immediately following the outcome delivery on March 6, 2023. Defendants had previously predicted that delivering the outcome would cause Plaintiff to 'spiral' and that 'it's going to be a disaster.' SAC ¶ 224; Clapper Ex. 14 at 1; Bourgoin Tr. at [page].

66. Defendant Clapper immediately attempted to find Plaintiff's location following the outcome call so she could send police and called Plaintiff's mother. SAC ¶ 222.

67. Defendant Bourgoin characterized Plaintiff's prior Title IX complaints as "baseless" and "retaliatory" in offline communications. Bourgoin Ex's. 7-8.

68. Plaintiff submitted a second complaint against Simon Roe on February 26, 2024, alleging that Roe had access to confidential information and shared it in violation of policy. Plaintiff explicitly objected to Defendants Bourgoin and Jamerson reviewing the complaint due to their involvement in the March 9, 2023 letter to Simon Roe. The complaint was declined without

reassignment to an unconflicted reviewer. SAC ¶¶ 334-340; VU_00002705.

69. Defendant Jamerson declined to charge Simon Roe for sharing confidential information, stating: 'Consistent with other litigation between students, we typically do not get involved in those disputes from a conduct perspective.' Vanderbilt investigated and disciplined Plaintiff for social media posts during the same period. VU_00002705.

70. Defendant Bourgoin and Jamerson sent Simon Roe a letter on March 9, 2023, letting him know that the student accountability process had been completed and that Plaintiff had been held responsible for the conduct. SAC ¶¶ 199-200, 334-340, 447-448.

71. In this letter, Defendant Bourgoin characterized Plaintiff as "the person who instigated the harassing posts against" Simon Roe. SAC ¶¶ 199-200, 447-448.

72. Plaintiff's expert Scott Lewis, who chairs the NABITA Advisory Board (the same organization whose risk rubric Defendants invoked), concluded that Vanderbilt fell short of the standards in that framework. Lewis Report at 10-11.

73. Defendant Bourgoin himself failed to satisfy the standards he set forth in his own writings regarding suicide risk assessment and care planning. Bourgoin Ex. 4–6.

74. Defendant Jamerson admitted to a lack of training and a lack of care in his handling of Plaintiff's situation. Jamerson Ex. 4 at 17–18.

75. Survey results from Defendant Bourgoin's own dissertation highlight burnout, numbness, and irrational detachment among Vanderbilt staff—in addition to suggesting that outsourcing critical decisions to a care team operating under those conditions would itself be "negligent." Bourgoin Tr. at 16:24, 41:23–43:21, 365:7–24.

76. Defendant Lowe testified that if someone were "deliberately withholding information" from her appellate review, she would "have a problem with that," and agreed that a "deliberate effort to keep things offline that expressed a false, negative personal view on the part of the adjudicator" would be relevant "[b]ecause it's supposed to be a fair process." Lowe Tr. at 98:16–101:4, 101:25–102:12.

77. The appellate file provided to Defendant Lowe did not include: the "offline" communications between Defendants, Clapper's characterization of Plaintiff's mother as a 'mess', Bourgoin's personal relationships with other posters, Bourgoin's instruction to avoid discussing Plaintiff in writing due to litigation concerns, and the Roe family's involvement in the investigation. SAC ¶¶ 225-231.

79. The 2022-2023 Student Handbook language regarding jurisdiction of students on official leaves was not in effect during the 2021-2022 academic year when Plaintiff's alleged conduct occurred. Vanderbilt applied the 2022-2023 Handbook to Plaintiff's April 2022 posts. SAC ¶ 377.

80. Defendant Jamerson admitted that the University applies "the policies and procedures in time at the adjudication, not at the time of the incident" and conceded that applying a changed

handbook would be unfair. Jamerson 30(b)(6) Dep., p. 20, ln. 4-9; Jamerson 30(b)(6) Dep., p. 27, ln. 23-25.

81.  Plaintiff was required to read a victim impact statement from Roe and his family, but L.N was not. *See* VU_00002644.

Dated: February 25, 2026    Respectfully submitted,

        */s/ Edward J. Canter*
        J. Alex Little (TN BPR #29858)
        Edward J. Canter (NY #5345236)
        Sloan E. Nickel (TN BPR #42956)
        LITSON PLLC
        54 Music Square East, Suite 300
        Nashville, TN 37203
        (615) 985-8205
        alex@litson.co
        ted@litson.co
        sloan@litson.co

        *Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2026, I filed the foregoing document electronically through the CM/ECF system, which caused all counsel of record to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.


By: _____ */s/ Edward J. Canter* _____
Edward J. Canter