# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| PARKER POE, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:24-cv-00368 |
| | ) | |
| DR. MELANIE LOWE, *et al.*, | ) | |
| | ) | |
|     Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

This suit involves claims that Parker Poe[1] brought after he was suspended from Vanderbilt University ("Vanderbilt"). Before the Court is Vanderbilt, Neil Jamerson, Dr. Jeremy Bourgoin, and Lisa Clapper's ("Defendants") Motion for Summary Judgment (Doc. No. 232), which has been fully briefed and is ripe for review. (Doc. Nos. 233, 247, 261). For the reasons that follow, the motion for summary judgment will be granted in part and denied in part.

## I. PROCEDURAL BACKGROUND

Poe filed the First Amended Complaint ("FAC") against Vanderbilt, Lowe, Bourgoin, Jamerson, Clapper, Executive Director of Student Access Service Dr. Jamie Bojarski, and Senior Associate Dean for Undergraduate Students, School of Engineering Dr. Cynthia Paschal. (Doc. No. 34). The defendants moved to dismiss the FAC (Doc. No. 62), which the Court granted in part. (Doc. No. 97). Poe filed a second amended complaint ("SAC") (Doc. No. 161) and a supplemental complaint (Doc. No. 192-1), which are the operative complaints.

Poe brings the following claims:

- Count I: Breach of Contract against Vanderbilt (Doc. No. 161 at 88);

---

[1] Parker Poe is a pseudonym, under which Plaintiff filed this case pursuant to a state court order. (<u>See</u> Doc. No. 93 at 1–2).

- Count II: Title IX Selective Enforcement in Violation of the Education Amendments of 1972, 20 U.S.C. 1681, *et seq.* against Vanderbilt (id. at 95);

- Count III: Violation of Section 504 of the Rehabilitation Act of 1973 against Vanderbilt (id. at 101);

- Count IV: Defamation-Libel against Bourgoin (id. at 104);

- Count V: Negligence against Vanderbilt, Bourgoin, Jamerson, Clapper, and Lowe[2] (id. at 108);

- Count VI: Intentional Infliction of Emotional Distress ("IIED") against Vanderbilt, Jamerson, Bourgoin, Clapper, and Lowe (id. at 110);

- Count VII: Negligent Infliction of Emotional Distress ("NIED") against Vanderbilt, Jamerson, Bourgoin, Clapper, and Lowe (id. at 113);

- Count VIII: Tortious Interference with Business Relations against Vanderbilt and Bourgoin (id. at 117); and

- Count IX: Violation of Section 504 of the Rehabilitation Act of 1973 against Vanderbilt (Doc. No. 192-1 at 10).

## II.     LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The Court does not, however, weigh the evidence, judge the credibility of

---

[2] Poe acknowledges that the Court previously dismissed all claims against Lowe, "but repleads the claim[s against her] in [their] entirety to preserve for appeal his position on the scope of the [] claim[s]." (Doc. No. 161 at 108 n.8, 110 n.9, 113 n.10). Nevertheless, Lowe remains dismissed.

2

witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249, 255. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

As an initial matter, neither party has followed the proper summary judgment procedures. The movant "has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers, 344 F.3d at 595 (internal citation omitted). The movant may do this "by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (citation omitted).

Pursuant to the Local Rules of this Court, the movant "must file a concise, non-argumentative statement of the alleged undisputed material facts," each of which "must be supported by a citation to materials permitted by Fed R. Civ. P. 56(c)(1)." M.D. Tenn. L.R. 56.01(c)(1), (2). The nonmovant must respond with "non-argumentative responses" and, if the nonmovant disputes a fact, "the evidentiary citations supporting the respondent's position must be limited to evidence specific to that particular fact." M.D. Tenn. L.R. 56.01(e)(1), (3).

Both parties have failed to follow these procedures. For example, Defendants repeatedly cite to the SAC to support their statement of facts, which is not in the list of materials permitted by Federal Rule of Civil Procedure 56(c)(1). (See Doc. No. 255) (citing the SAC a total of 11 times). Defendants' reliance on the SAC is puzzling, given that "[t]he very mission of the

3

summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment. On the other hand, Poe responds by engaging in argument that is unresponsive and unhelpful to the Court. (E.g., Doc. No. 255 ¶ 22) (arguing about "violat[ion of] [Poe's] due process rights"). He also responds to some of Defendants' facts with nonresponsive citations. (E.g., Doc. No. 255 ¶ 30) (citing the Court's opinion on the motion to dismiss to support his assertion that Vanderbilt administrators had conflicts of interest). Therefore, the parties have presented the facts in an awkward posture that makes it difficult for the Court to review the substance of the motion for summary judgment. Given that the parties have not aided the Court as required by the applicable legal standard and Local Rules, the Court will set forth what it has discerned to be the undisputed material facts.

## III. UNDISPUTED MATERIAL FACTS

Poe, a male Vanderbilt student, made social media posts about another male Vanderbilt student, Roe, and his sexual behaviors with females. (Doc. No. 255 ¶¶ 2, 4, 5, 8); (e.g., Doc. No. 236-3 at 6) (showing posts by Poe's Yik Yak[3] account, including stating that "[Roe] is a rapist" and "[Roe] slipped me a roofie this fall, but I just wasn't able to definitively proove [sic] it. When I brought it up to some of the [] brothers [from Roe's fraternity] they tried to gaslight me about it"). Poe was not alone—a number of posts were made about Roe by other people, including other Vanderbilt students. (Doc. No. 255 ¶¶ 10, 11); (e.g., Doc. No. 259-57) (containing Yik Yak posts by a female Vanderbilt student, L.N., including stating that she had "personal experience" with Roe and "he is a RAPIST, that is the truth and if you don't believe it after so many girls have said

---

[3] Yik Yak is one of the social media sites where posts about Roe appeared. (Doc. No. 255 ¶ 1). Greek Rank is another. (Id.).

it, there is nothing I can do to convince you"). Once this came to Vanderbilt's attention, Bourgoin, Vanderbilt's Director of Student Accountability, Community Standards, and Academic Integrity, opened a disciplinary case against Poe, charging him with three violations of the Student Handbook ("Handbook"): disorderly conduct, harassment, and impersonating a University official or any other person. (Doc. No. 255 ¶¶ 20, 22). Poe had multiple virtual meetings with Bourgoin as part of the disciplinary process. (Id. ¶ 24).

Vanderbilt allowed both Roe's and Poe's parents to be involved in the disciplinary process. For example, Roe's father made clear to Vanderbilt that he considered the posts about Roe to be defamatory. (See id. ¶ 17). He shared subpoena documents with Vanderbilt that included phone numbers and identities of people that he thought were responsible for 39 posts on Yik Yak from April 2022 (the "Yik Yak posts"). (Id. ¶ 16). He also complained to Vanderbilt about additional posts about Roe. (See Doc. No. 236-7 at 3) (Poe's father emailing Jamerson in May 2022 about "posts from both February and April and from both Yik Yak and Greek Rank"). Roe's father shared his expectation about discipline of Poe to Jamerson, Vanderbilt's former Assistant Dean of Students, Community Standards and Support, and that Vanderbilt should initiate disciplinary proceedings against other posters. (Doc. No. 255 ¶ 17); (e.g., Doc. No. 236-9 at 2) (Roe's father emailing Jamerson, "advocat[ing] strongly for the harshest punishment for [Poe]" and expressing "hope [that the other posters] are disciplined severely").

Vanderbilt also allowed Poe's mother to be involved. She told Clapper, Vanderbilt's Director of Student Care Network and Student Care Coordination, that she did not want anyone from Vanderbilt to contact Poe except through her. (Doc. No. 255 ¶ 32). Clapper complied, to a limit. (Id. ¶¶ 31–34, 38, 39). She did so even though her role, according to her own testimony, "is not to work primarily with parents." (Doc. No. 236-18 at 149). Poe's mother also expressed

concerns about Poe's mental health, including that he was suicidal and she believed that learning of an adverse disciplinary outcome could end his life. (Doc. No. 255 ¶¶ 31, 33). She even requested that Vanderbilt delay delivering the disciplinary outcome by one week so that Poe could be with family when he received Vanderbilt's decision. (Id. ¶ 33).

Despite Poe's mother's requests, the delivery of Poe's disciplinary outcome decision ("outcome call") was not delayed. (Id. ¶ 34); (Doc. No. 251-1 at Bates 58–60) (Clapper informing Bourgoin, "[Jamerson] has very strong feelings that there is no flexibility" to move the outcome delivery back). However, Vanderbilt emailed Poe's mother the target date for the outcome call (March 6, 2023) and encouraged her to travel[4] to be with Poe for the outcome call. (Doc. No. 255 ¶¶ 37, 39). Poe's mother did not respond or otherwise acknowledge the email. (Id. ¶ 39). She now admits that she received the email but did not read it until after the outcome call. (Id.). So, on March 6, 2023, Bourgoin and Clapper had a video call with Poe to deliver the outcome. (Id. ¶ 44). At the beginning of the call, Clapper asked Poe why his mother was not present. (Doc. No. 236-18 at 150). Poe admitted to intentionally lying to her about the scheduling of the outcome call and telling her that it was the following day, March 7. (Doc. No. 255 ¶ 46). Bourgoin then told Poe that he was found guilty of the disciplinary charges against him and would be suspended for one year. (Doc. No. 236-1 at 181). Poe abruptly ended the call and subsequently attempted suicide. (Doc. No. 255 ¶ 48); (Doc. No. 236-1 at 193, 195) (Poe testifying that he attempted suicide after he was informed that he was suspended).

On March 9, 2023, Bourgoin sent a letter to Roe stating, *inter alia*, "the person who instigated the harassing posts against you has completed our process and been held accountable."

---

[4] Poe was doing an internship at the time in a different state from where his parents lived. (Doc. No. 255 ¶ 37).

(Doc. No. 251-1 at Bates[5] 78).  Poe appealed his suspension on three grounds: procedural irregularities, insufficient information supporting Bourgoin's findings, and abuse of discretion related to his sanction.  (Doc. No. 255 ¶ 50).  Vanderbilt's Chair of the Appellate Review Board, Dr. Melanie Lowe, denied Poe's appeal.  (Id. ¶ 51).  Lowe found that Poe's appeal did "not set forth a basis sufficient to provide relief." (Doc. No. 236-22 at 1).  She also stated that the sanction of suspension was "within the normal range for similar cases."  (Id. at 3).

While there were other students who posted about Roe's sexual behaviors with females, Vanderbilt only opened a disciplinary case against one of them—L.N.  (Doc. No. 255 ¶ 53).  L.N. was given probation.  (Doc. No. 246-12 at 191) (Bourgoin testifying that L.N. received probation instead of suspension).

## IV.    ANALYSIS

The Court will address the motion for summary judgment as it relates to each claim.

### Count I: Breach of Contract against Vanderbilt

The parties disagree about whether all or some of Poe's twelve breach of contract theories are at issue.  Those theories are:[6]

(1) the right to receive timely notice of the charges (Doc. No. 97 at 14);

(2) the right to access and challenge incriminating information (id.);

(3) the right to call witnesses (id.);

(4) the duty of conflicted members of the Student Accountability office to not consider the case (id.);

(5) the appeal being tainted by irregularities stemming from the investigation (id. at 15);

---

[5] In some instances (e.g., if an exhibit does not have original page numbers), the Court will refer to the Bates stamps instead of an exhibit's original page numbers.

[6] This list tracks the Court's memorandum opinion on the motion to dismiss (Doc. No. 97) and Poe's subsequent amendments in the SAC (Doc. No. 161).

7

(6) the severity of the sanction imposed on Poe and the questionable nature of the findings underlying the sanction (id. at 16);

(7) Vanderbilt notifying Roe of the outcome of Poe's disciplinary proceedings (id. at 16–17);

(8) Vanderbilt's lack of response to Poe's complaints (id. at 17);

(9) Vanderbilt sharing confidential information about Poe (Doc. No. 161 ¶ 375);

(10) Poe being discriminated against based on his disability  (id. ¶¶ 374(h), 376);

(11) Poe being subjected to disparate gender-based treatment (id.); and

(12) Vanderbilt lacking jurisdiction to adjudicate Poe's disciplinary proceedings (id. ¶ 377).[7]

(See Doc. No. 247 at 3).

As an initial matter, Poe argues that Defendants fail to address the majority of his contract theories, which Defendants attempt to cure in their reply brief.  (Doc. No. 247 at 3–4).  Defendants explain that they adequately addressed all of Poe's "countless and indecipherable breach of contract theories" in their opening brief  (Doc. No. 242 at 11).  They also reason that they are permitted to respond to any remaining theories in their reply brief because Poe adequately articulated those theories for the first time in his response to the summary judgment motion.  (Id.).

While the parties have created a record that is certainly convoluted, it is clear that Defendants were on notice of Poe's contract theories before they filed for summary judgment.  The Court specified the surviving breach of contract theories in its ruling on the motion to dismiss. (Doc. No. 97). Then, Poe filed the SAC, which clarified his theories.  (Doc. No. 161).  Most importantly, Defendants acknowledged in the partial motion to dismiss the SAC that Poe had

---

[7] For ease of reference, the Court will refer to these theories of breach by their numbers.  For example, when discussing the theory based on the right to call witnesses, the Court will refer to that as "Theory 3."

added paragraphs 374 through 377 to the SAC, "each apparently representing different theories (and sub-theories) of breach." (Doc. No. 166 at 8). Defendants cannot now claim that they were unaware of Poe's contract theories.

"Generally speaking, arguments raised for the first time in reply briefs are waived, and this applies both on appeal and to summary judgment motions filed in the trial court." Palazzo v. Harvey, 380 F. Supp. 3d 723, 730 (M.D. Tenn. 2019) (citations omitted). Reply briefs are intended to "reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration." Id. (citation omitted). Moreover, "the non-moving party ordinarily has no right to respond to the reply brief, at least not until oral argument. As a matter of litigation fairness and procedure, then, we must treat [such issues] as waived." Id. (citation omitted). Accordingly, the Court will address only the following theories: Theory 1, based on the right to receive timely notice of the charges; Theory 2, based on the right to access and challenge incriminating information; Theory 3, based on the right to call witnesses; and Theory 5, based on the appeal being tainted by irregularities stemming from the investigation. Summary judgment on all other theories of breach of contract will be denied.

To state a claim for breach of contract under Tennessee law,[8] Poe must show "(1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of contract." BancorpSouth Bank, Inc. v. Hatchel, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006) (citations and quotation marks omitted). Defendants only contest the second element, nonperformance amounting to breach. (Doc. No. 242 at 11–14). The Court will confine its analysis to breach.

---

[8] There is no dispute that Tennessee law governs each state law claim.

9

Whether there is a breach of contract claim here requires interpretation of the Handbook. See Bourland, Heflin, Alvarez, Minor & Matthews, PLC v. Heaton, 393 S.W.3d 671, 674 (Tenn. Ct. App. 2012) (citation and quotation marks omitted) ("Questions of contract interpretation are generally considered to be questions of law, and thus are especially well-suited for resolution by summary judgment."). Under Tennessee law, "[a] cardinal rule of contract interpretation is to ascertain and give effect to the intent of the parties." Allstate Ins. Co. v. Watson, 195 S.W.3d 609, 611 (Tenn. 2006) (citation omitted). "In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent." Id. (citation omitted). The "[C]ourt's initial task in construing a contract is to determine whether the language is ambiguous." Planters Gin Co. v. Federal Compress & Warehouse Co., Inc., 78 S.W.3d 885, 890 (Tenn. 2002). "Contractual language is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.'" Watson, 195 S.W.3d at 611 (citation and quotation marks omitted). "If clear and unambiguous, the literal meaning of the language controls the outcome of contract disputes." Id. "Only if ambiguity remains after the court applies the pertinent rules of construction does [the legal meaning of the contract] become a question of fact appropriate for a jury." Planters Gin Co., 78 S.W.3d at 890 (citation and quotation marks omitted).

With those principles in mind, the Court will address Theories 1, 2, 3, and 5.

Theory 1: The right to receive timely notice of the charges

The Handbook provides that students subject to disciplinary action will receive "[w]ritten and timely notice of charges." (Doc. No. 34-1 at 110–11). Defendants argue that Poe received timely written notice of the charges against him. (Doc. No. 242 at 5, 12, 13). Poe disagrees. (Doc. No. 247 at 5–6).

Summary judgment is required on this theory of breach. Poe, who has the burden of proof, has failed to present evidence that could lead a reasonable jury to find that he was not provided timely notice of his charges. The Handbook prescribes the following procedure for notifying students of disciplinary charges:

> A student facing potential corrective action . . . will be notified that a report has been received and will be instructed to schedule a meeting with the Office of Student Accountability. The Office of Student Accountability will meet with the student to present a notice of charges, which will include the specific regulations or policies allegedly violated. The student will also be notified of the procedures that the Office of Student Accountability will follow. Following the presentation of the charges, the student may take a three-day waiting period before an accountability meeting is held or may request to proceed immediately.

(Doc. No. 34-1 at 110). The record shows that Vanderbilt followed this process. Poe received written notice "that a report about him was received and that he should schedule a meeting with Student Accountability." (Doc. No. 255 ¶ 20). Three days later, he had an initial video call with Bourgoin where he was shown a "charge sheet" listing three charges against him: harassment, impersonating a University official or any other person, and disorderly conduct. (Id. ¶ 22). Poe has not presented evidence to create a genuine dispute of material fact about whether he received timely notice of the charges in accordance with the Handbook. Summary judgment will be granted on this theory.

<u>Theory 2: The right to access and challenge incriminating information</u>

The Handbook also provides that students subject to disciplinary action may "examine all information that may form the basis for corrective action." (Doc. No. 34-1 at 110–11). Indeed, Bourgoin told Poe during the initial call that he would not receive "all the information [Vanderbilt] ha[d]" until the accountability meetings. (Doc. No. 259-54). Defendants argue that Poe was allowed to review the evidence during the accountability meetings with Bourgoin. (Doc. No. 242 at 5, 12, 13). Poe disagrees and relies on admissible evidence. (Doc. No. 247 at 5–6).

11

The Handbook is not a model of clarity. Poe was charged with "harassment," "disorderly conduct," and "impersonating a University official or any other person." (Doc. No. 255 22). Those terms are not defined. (See Doc. No. 34-1 at 92–125) (Chapter Three of the Handbook ("Student Accountability"), nowhere defining the charges). "Impersonating . . . any other person" could suggest identity fraud, or a student pretending to be someone on social media who may or may not actually exist. (See Doc. No. 34-1 at 95) (listing "[f]orgery, alteration, or misuse of University or other documents, records, or identification, impersonating a University official or any other person" together as charges). These terms "may fairly be understood in more ways than one.'" Watson, 195 S.W.3d at 611 (citation and quotation marks omitted). As such, it is for the jury to apply the evidence at trial to the charges.

Poe has come forward with admissible evidence that he did not have the opportunity to examine all information supporting the charges. For example, he testified that the charge sheet alleged he posted on "a single social media site." (Doc. No. 236-1 at 157–58). It is undisputed, however, that Vanderbilt investigated him for posting on more than "a single social media site," which was relied upon to discipline him. (Doc. No. 259-28) (Jamerson emailing Bourgoin the night before Bourgoin's first call with Poe, asking Bourgoin to "inquire about Greek Rank as well" as the Yik Yak posts). Likewise, Poe states that Vanderbilt never showed him the post in which he allegedly impersonated a Belmont University student. (Doc. No. 255 ¶ 25); (Doc. No. 259-28) (Jamerson emailing Bourgoin that he suspected Poe of impersonating a female Belmont student in a Greek Rank post). This is enough for a reasonable jury to find for Poe on Theory 2. (Doc. No. 34-1 at 110–11). Summary judgment will be denied on this theory of breach.

<u>Theory 3: The right to call witnesses</u>

The Handbook states that students in accountability proceedings have the opportunity "to call witnesses." (Doc. No. 34-1 at 110). Although Defendants argue that Poe was not prevented from producing witnesses, (Doc. No. 242 at 13), Poe has presented admissible evidence to the contrary. Specifically, he was unable to call as witnesses other persons who made posts about Roe. For example, his attorneys tried to gather information from Greek Rank and Yik Yak. (<u>E.g.</u>, Doc. No. 251-1 at Bates 264) (Poe emailing Bourgoin, "My attorneys are working with YikYak and Greek Rank attorneys to see if there is any additional information that they can provide."). His attorneys advised Bourgoin that they were ultimately unable to subpoena information about other posts. (Doc. No. 236-11 at 220–21, 225) (Bourgoin confirming this in his testimony). There is evidence that Vanderbilt, on the other hand, knew the names of those other posters and, at a minimum, this would have been information relied upon by Vanderbilt that Poe would have been entitled to receive. (<u>See</u> Doc. No. 236-4) (listing the identities of the people who made the Yik Yak posts in a packet of information provided to Vanderbilt by Roe's family). The parties do not make clear exactly when Defendants discovered each poster's identity, but they did know of them before suspending Poe. (Doc. No. 255 ¶ 18) (Defendants stating, in their statement of undisputed material facts, that "[a]round the time Vanderbilt decided to charge [Poe], it decided that the other Vanderbilt student posters would be referred to Vanderbilt's Project Safe for an educational conversation."). There is a genuine dispute of material fact regarding whether Bourgoin denied Poe the opportunity to call witnesses by withholding witnesses' identities from Poe. Summary judgment will be denied on this theory of breach.

<u>Theory 5: The appeal was tainted by irregularities stemming from the investigation</u>

The Handbook affords students the right to an unbiased appeal if a student is found to have engaged in misconduct. (Doc. No. 34-1 at 110). In conducting the appeal, the Chair of the Appellate Review Board (Lowe) should be provided with and review "the entire record of the case," the student's appeal petition, and "all supporting information provided by the [student] petitioner . . . in the light most favorable to the petitioner." (<u>Id.</u> at 117). Defendants believe that Poe was provided an unbiased appeal. (Doc. No. 242 at 14).

Poe responds with admissible evidence to avoid summary judgment. First, he argues that Lowe did not review all of the materials available to her and instead merely rubber stamped Bourgoin's decision. (Doc. No. 247 at 8–9). Poe relies on Lowe's testimony that her appellate review was limited to a "Box file" from a digital sharing platform. (Doc. No. 236-19 at 52, 101). She could not confirm under oath that she did in fact review everything in the Box file. (<u>Id.</u> at 55, 70–71).

Second, Poe argues that the appeal documents omitted information reflecting Bourgoin's bias against him, and this "sanitized file . . . infected Lowe's review." (Doc. No. 247 at 9–10). Lowe agrees that omission of information about Bourgoin's negative personal views of Poe would be problematic. (<u>See</u> Doc. No. 236-21 at 99–100). Poe also relies on a text message from Bourgoin to Jamerson stating, in part, "FYI to offline context. We've had countless interactions with [Poe] from accountability, honor, and multiple title ix things. . . . He is very unwell and not stable in my untrained assessment. . . ." (Doc. No. 236-12 at 230–31). This text was "offline," meaning it was not included in Poe's disciplinary file. (<u>Id.</u> at 232).

Third, Poe argues that Bourgoin improperly shifted the burden of proof to Poe to prove his innocence. (Doc. No. 247 at 10). Lowe agreed that would be problematic. (Doc. No. 236-21 at

14

103–04). Bourgoin admits that he held Poe's inability to present evidence of other posts about Roe against Poe. (Doc. No. 236-11 at 221).

Fourth, Poe claims that Lowe erroneously found that his sanction was comparable with similarly situated students. (Doc. No. 247 at 10–11). Yet, Poe points to evidence that casts doubt on that conclusion. This includes a list of other Vanderbilt students who had similar charges and lacked disciplinary history, like Poe, but were not suspended. (Doc. No. 259-39).

In sum, each of the above create disputes of material fact. Defendants are not entitled to judgment as a matter of law on the breach of contract claim, other than on Theory 1.

**Count II: Title IX Selective Enforcement against Vanderbilt**

Title IX of the Education Amendments of 1972, 20 U.S.C. 1681, *et seq.*, prohibits sex discrimination in educational institutions that receive federal funding. See 20 U.S.C. § 1681(a). "Title IX is enforceable through a judicially implied private right of action, through which monetary damages are available." Klemencic v. Ohio State Univ., 263 F.3d 504, 510 (6th Cir. 2001). There are "at least four theories of liability that a student who is 'attacking a university disciplinary proceeding on grounds of gender bias,' can potentially assert under Title IX," only one of which is relevant here: "selective enforcement." Doe v. Miami Univ., 882 F.3d 579, 589 (6th Cir. 2018) (citations and quotation marks omitted).

"In a selective enforcement claim, a plaintiff essentially asserts that even if he or she did violate a university policy, the decision to initiate disciplinary proceedings or the severity of the penalty imposed was motivated by gender bias." Z.J. v. Vanderbilt Univ., 355 F. Supp. 3d 646, 677 (M.D. Tenn. 2018) (citations and quotation marks omitted). "To prevail on his selective enforcement claim, [a plaintiff] must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her gender." Doe v. Oberlin Coll., 60

15

F.4th 345, 356 (6th Cir. 2023) (citations and quotation marks omitted). "Critical to such a claim is evidence that gender bias motivated the selective enforcement." Id.

The comparator in this case is a female student named L.N. (See Doc. No. 247 at 14). Defendants argue that Poe and L.N. were not similarly situated because of the differences in timing, volume, and subject matter of their posts. (Doc. No. 242 at 15–16). Poe has come forward with sufficient admissible evidence for a reasonable jury to conclude that he and L.N. were similarly situated. It is undisputed that L.N. made at least twelve posts about Roe. (See Doc. No. 261 at 4 n.4). Her posts about Roe were very similar to Poe's—they accuse Roe of sexual misconduct. Therefore, there is a genuine dispute of material fact regarding whether Poe and L.N. were similarly situated.

The remaining elements of a selective enforcement claim are whether Poe was treated less favorably than L.N. due to gender. It is undisputed that Bourgoin knew that Poe was male and L.N. was female. (E.g., Doc. No. 251-1 at Bates 83) (Bourgoin referring to L.N. as "she" in an email). There is evidence that upon learning of L.N.'s identity, including her gender, Bourgoin apparently believed the accusation that Roe raped L.N., because he wanted to report the rape to Vanderbilt's Title IX Director, stating (in an email),

> at this point we have the name [L.N.] who is saying she has personal experience with [Roe] as a rapist and says she is discussing her personal trauma. . . . I imagine I need to file something in Guardian for you and I as mandatory reporters. That said I wonder if we need to connect with TIX on it as [it's] obviously another set of accusations against [Roe] (this time now sitting in TIX)[.]

(Doc. No. 251-1 at Bates 83). It is also undisputed that even after learning L.N.'s posts were knowingly false, she only received probation, whereas Poe was suspended for a year. (See Doc. No. 259-63) (Bourgoin's documentation of L.N.'s disciplinary outcome). Therefore, there is

evidence from which a reasonable jury could conclude that gender affected Vanderbilt's decision to selectively enforce a disciplinary process against Poe. Summary judgment is inappropriate.

**Count IV: Defamation-Libel against Bourgoin**

In Tennessee, "[t]o establish a prima facie case of defamation, the plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Hibdon v. Grabowski, 195 S.W.3d 48, 58 (Tenn. Ct. App. 2005). Regarding the first element, "[p]ublication is a term of art meaning the communication of defamatory matter to a third person." Quality Auto Parts Co. v. Bluff City Buick Co., 876 S.W.2d 818, 821 (Tenn. 1994). Regarding the second and third elements, "[p]rivate individuals . . . need only show that allegedly false statements were made negligently to recover in a defamation action." Charles v. McQueen, 693 S.W.3d 262, 269 (Tenn. 2024) (citation omitted). Additionally, "to be defamatory in nature, statements must reasonably be construable as holding the plaintiff up to public hatred, contempt or ridicule." Hudik v. Fox News Network, LLC, 512 F. Supp. 3d 816, 829 (M.D. Tenn. 2021) (citation and quotation marks omitted). Finally, the defamation must have resulted in "an injury to the person's character and reputation" to be actionable. Quality Auto Parts Co, 876 S.W.2d at 820. In other words, "[d]amages from false or inaccurate statements cannot be presumed; actual damage must be sustained and proved." Davis v. The Tennessean, 83 S.W.3d 125, 128 (Tenn. Ct. App. 2001). "When looking at damages for a defamation suit . . . , the issue is whether the record contains any material evidence of impairment of reputation and standing in the community, personal humiliation, or mental anguish and suffering." Brown v. Christian Bros. Univ., 428 S.W.3d 38, 51 (Tenn. Ct. App. 2013) (citation marks and quotations omitted). Here, the final element, damages, is dispositive.

17

Poe's defamation claim is based on the statement in Bourgoin's March 9, 2023 letter to Roe that Poe "instigated" the harassing posts, which he argues is false because other posts about Roe preceded his. (Doc. No. 247 at 24–25). Poe claims that he was damaged by the statement because he was approached at his internship about his academic sanction, thereby suffering reputational harm. (Id. at 26). Poe also testified that the contents of Bourgoin's letter were shared with other students, making him "embarrassed to . . . talk to other people at Vanderbilt." (Doc. No. 236-1 at 183–84).

Based on the record, the Court can conclude that at least six people knew about Bourgoin's letter to Roe: Bourgoin, Roe, Roe's father, Roe's mother, Poe, and Poe's mother. Poe has not offered evidence that any of those people shared the letter with his internship employer or other students. The evidence offered does not change this conclusion. Poe's mother testified that she learned from Poe that Roe had admitted to sharing the information in the letter. (Doc. No. 236-13 at 86–88) (Poe's mother stating, "I know [Poe] learned recently that [Roe] did share at least the information [from the letter]. . . . I believe [Roe] admitted it."). Poe testified that the contents of the letter were disseminated, reaching his employer and other students. (Doc. No. 236-1 at 183–84). He filed a complaint against Roe with Vanderbilt, arguing that "[t]here is only one person Vanderbilt shared anything related to my academic record with, and that is [Roe]. [T]herefore, any release of such private information can be traced back to him." (Doc. No. 259-62 at 1). Roe did not testify at all. Roe's father testified that he shared the letter with his wife, and, to his knowledge, Roe did not share the letter with anyone else. (Doc. No. 236-6 at 297).

For Bourgoin's statement to have harmed Poe in the way he claims, it would have had to be shared with his employer and other students. Brown, 428 S.W.3d at 50 (emphasis added) ("[T]he claimant must prove that the defamation *resulted in* injury to the person's character and

18

reputation.").  The Court cannot conclude that Poe has presented admissible evidence of who shared the letter beyond Bourgoin sending it to Roe.  Summary judgment will be granted on this claim.

**Counts V and VII: Negligence and NIED against Vanderbilt, Bourgoin, Jamerson, and Clapper**

"[I]ssues of negligence are ordinarily not susceptible of summary adjudication, but should be resolved by trial in the ordinary manner."  Daughenbaugh v. Bethlehem Steel Corp., 891 F.2d 1199, 1205 (6th Cir. 1989) (citation and quotation marks omitted).  In Tennessee, "[t]o prevail on a negligence claim, a plaintiff must prove the following elements: 1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause." King v. Anderson Cnty., 419 S.W.3d 232, 246 (Tenn. 2013) (citation omitted).  Defendants argue that Poe's negligence claims fails to satisfy the elements of duty, breach, and proximate cause. (Doc. No. 242 at 19).  Therefore, the Court will limit its analysis to those factors.

Duty of care refers to "the legal obligation owed by [a] defendant to [a] plaintiff to conform to a reasonable person standard of care for the protection against unreasonable risks of harm." McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995) (citation omitted).  "A risk is unreasonable and gives rise to a duty to act with due care if the foreseeable probability and gravity of harm posed by defendant's conduct outweigh the burden upon defendant to engage in alternative conduct that would have prevented the harm."  Id. (citation omitted).  There are several factors that courts consider in determining whether a risk is unreasonable, including:

> the foreseeable probability of the harm or injury occurring; the possible magnitude of the potential harm or injury; the importance or social value of the activity engaged in by defendant; the usefulness of the conduct to defendant; the feasibility of alternative, safer conduct and the relative costs and burdens associated with that conduct; the relative usefulness of the safer conduct; and the relative safety of

alternative conduct. Stated succinctly, a duty of reasonable care exists if defendant's conduct poses an unreasonable and foreseeable risk of harm to persons or property.

Id. (internal citation omitted). Breach refers to "whether [a] defendant failed to exercise reasonable care under the circumstances." Id. "If [a] defendant does not exercise reasonable care, [the] defendant has breached the duty." Id. at 153–54.

The element of proximate, or legal, causation, is governed by a three-part test in Tennessee: (1) "the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of;" (2) "no rule or policy . . . relieve[s] the wrongdoer from liability;" and (3) the harm "could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." King, 419 S.W.3d at 247 (citation and quotation marks omitted). "[D]isputed issues regarding legal cause, intervening cause, and foreseeability must be left to the jury unless the undisputed facts and inferences to be drawn from the facts enable reasonable persons to draw only one conclusion." Cotten v. Wilson, 576 S.W.3d 626, 638 (Tenn. 2019) (citation and quotation marks omitted)

Pursuant to the Court's order on the motion to dismiss, the negligence and NIED claims are factually limited to the delivery of the disciplinary outcome to Poe. (See Doc. No. 97 at 40, 47). Defendants argue that they met the standard of care that Poe's expert witness opined applies to a university that is on notice of a student's mental health concerns by assessing Poe and taking steps to ensure he was safe. (Doc. No. 242 at 20). Poe responds that his expert's testimony supports that Vanderbilt failed to meet the requisite standard of care, which is corroborated by other record evidence. (Doc. No. 247 at 17); (see Doc. No. 236-23 at 10) (Poe's expert witness opining that "Vanderbilt did not provide adequate support to Poe when notified of his mental health crisis and suicidal ideation").

20

Summary judgment is not warranted on this claim because Poe has come forward with evidence from which a reasonable jury could conclude that Defendants breached their duty of care to Poe, causing him damages. There is no dispute that Defendants were on notice of Poe's serious mental health issues. (E.g., Doc. No. 259-17) (Poe's mother emailing Bourgoin and Clapper that Poe "is now talking suicide . . . . **We are absolutely convinced an adverse decision now will take his life**") (emphasis in original). Jamerson even testified that he had assessed Poe's suicide risk at "moderate-to-elevated." (Doc. No. 236-17 at 394–95). Defendants did not accommodate Poe's mother's request to move the outcome call one week. Yet, they still chose to engage in care planning with her to mitigate the risk of harm to Poe. (E.g., Doc. No. 236-17 at 394–95) (Jamerson testifying that he "felt it was safe to move forward with adding additional precautions like having [Clapper] available to be on the [outcome] cal1, who is a licensed clinical social worker, also notifying the mom of when the date would be so that the mom was aware of when it was coming out."); (Doc. No. 236-15 at 25) (Clapper noting that she "encouraged [Poe's mother] to plan to be with [Poe] on Monday 3/6/23 given [her] concerns [about Poe's wellbeing]").

Apparently, Defendants wanted Poe to have his mother with him during the outcome call, as evidenced by the email to his mother with the target date for the meeting. Clapper also testified that when she and Bourgoin began the outcome call with Poe, she asked Poe if his mother was there. (Doc. No. 236-18 at 150). Despite Poe telling them he lied to his mother, Bourgoin and Clapper proceeded with the outcome call. (Id.). This is evidence from which a jury could conclude that the risk that Poe would commit suicide was sufficiently foreseeable to give rise to a duty of care. Moreover, having already decided to involve Poe's mother, a jury could find that Defendants failed to exercise reasonable care by proceeding with the outcome call after learning that she was not there to support him.

21

The same analysis applies to the element of proximate causation. Defendants argue that Poe cannot establish causation, reasoning that his suicide attempt was not reasonably foreseeable in light of the precautionary steps they took to protect him. (Doc. No. 242 at 22). Critically, he "thwart[e]d one of the main aspects of their reasonable care plan" by lying to his mother about the date for the outcome call. (Id.). But, again, Poe made Defendants aware at the outset of the outcome call that his mom was not with him. They proceeded anyway. There is a genuine issue of material fact regarding whether his suicide attempt was reasonably foreseeable, and summary judgment will be denied on the negligence claim.

The elements of a claim for NIED are the same as a claim of negligence, plus "the plaintiff must prove that the defendant's conduct caused a serious or severe emotional injury." Rogers, 367 S.W.3d at 206. Defendants do not dispute that Poe suffered a serious or severe emotional injury. Therefore, summary judgment will also be denied on Poe's NIED claim.

**Count VI: IIED against Vanderbilt, Jamerson, Bourgoin, and Clapper**

The elements of an IIED claim are that the defendant's conduct was (1) intentional or reckless, (2) so outrageous that it is not tolerated by civilized society, and (3) resulted in serious mental injury to the plaintiff." Rogers v. Louisville Land Co., 367 S.W.3d 196, 205 (Tenn. 2012), abrogated on other grounds by Youree v. Recovery House of E. Tennessee, LLC, 705 S.W.3d 193 (Tenn. 2025). Here, the dispositive element is whether the conduct was outrageous.

"The standard for outrageous conduct is high." Levy v. Franks, 159 S.W.3d 66, 85 (Tenn. Ct. App. 2004). The nature of the conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Sasser v. Quebecor Printing (USA) Corp., 159 S.W.3d 579, 585 (Tenn. Ct. App. 2004) (citations and quotation marks omitted). "'[I]nsults, indignities, threats,

annoyances, petty oppression or other trivialities'" are not actionable. <u>Id.</u> (quoting <u>Bain v. Wells</u>, 936 S.W.2d 618, 622 (Tenn. 1997)).

Per the Court's ruling on the motion to dismiss, the IIED claim is factually limited to the delivery of the outcome to Poe. (<u>See</u> Doc. No. 97 at 46). Defendants argue that Poe cannot claim IIED based on an email Clapper sent to Bourgoin the night before the outcome call where she stated, *inter alia*, "His parents better have flown there. lol safe travels!" (Doc. No. 259-15). Clapper testified that the "lol" comment was in reference to the fact that "we [Clapper and Bourgoin] were working on a Sunday trying to still coordinate details[,] . . . [Bourgoin] [] had to travel[,] [n]either of us had power.[9] There was a lot that could go wrong in this situation." (Doc. No. 236-18 at 145–46). Defendants also point out that Poe did not see the email "until nearly a year later." (Doc. No. 242 at 23). Defendants argue that this email, compared to how they otherwise responded to Poe's mental health issues, does not amount to outrageous conduct. (<u>Id.</u>).

Poe clarifies that he is not contending that Clapper's email caused him "direct distress," but rather it is "evidence of the mindset with which [Defendants] approached the delivery of a suspension to a student who they knew was suicidal and thus particularly susceptible to emotional distress." (Doc. No. 247 at 23). Moreover, Poe points to other record evidence of Defendants' antipathy toward him with respect to the delivery of the outcome. For example, Poe cites Jamerson's comment that he was "not overly concerned" about Poe's suicide risk after the outcome, when Clapper and Bourgoin were concerned that Poe would kill himself. (Doc. No. 259-14).

Even if Defendants' conduct is offensive, Poe has not met his high burden of coming forward with admissible evidence that it was "atrocious and utterly intolerable in a civilized

---

[9] A weather event had apparently caused widespread power outages.

community." <u>Sasser</u>, 159 S.W.3d at 585 (citations and quotation marks omitted).  In <u>Lourcey v. Est. of Scarlett</u>, 146 S.W.3d 48, 52 (Tenn. 2004), the Supreme Court of Tennessee found that the plaintiff had stated a claim for outrageous conduct by alleging that a man had "told [the plaintiff] that his wife was having a seizure [and,] as [the plaintiff] was calling 911 for help, [the man] shot his wife in the head, turned to face [the plaintiff], put a pistol to his head, pulled the trigger, and killed himself." Another example of outrageous conduct, as found by the Court of Appeals of Tennessee, arose in <u>Schrick v. Durham Sch. Servs., L.P.</u>, 667 S.W.3d 259, 268 (Tenn. Ct. App. 2022).  There, a bus crash killed six young students and injured many others. <u>Schrick</u>, 667 S.W.3d at 261.  The bus driver's employer allegedly knew of but "chose to ignore[] a plethora of incidents indicating that the [driver's] on-the-job conduct . . . presented an imminent risk of serious harm to the students." <u>Id.</u> at 268.  Poe has simply not put forward evidence that Defendants' conduct rises to this level of outrageousness.  Therefore, summary judgment will be granted on the IIED claim.

### Count VIII: Tortious Interference with Business Relations against Vanderbilt and Bourgoin

The elements of a claim of tortious interference with business relations are:

(1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortious interference.

<u>Trau-Med of Am., Inc. v. Allstate Ins. Co.</u>, 71 S.W.3d 691, 701 (Tenn. 2002).

Poe claims that the disciplinary proceedings interfered with his job prospects with two employers—first, the company where he was interning when he was suspended, which did not make him a return offer, and second, a company that extended and later revoked a job offer to him. (Doc. No. 247 at 15).  As to the first employer, the element regarding Defendants' intent is dispositive.  Poe points to Bourgoin's comment that he intended to "sanction [Poe] with a sizable

24

life impact proportionate to the effect of his own actions," as evidence of Bourgoin's punitive motive. (Doc. No. 251-1 at Bates 260). Poe also cites record evidence that Bourgoin was on notice of the negative effects that the disciplinary process was having on his internship performance. This includes multiple reports from Poe's mother to Clapper, Bourgoin, and Jamerson that Poe was struggling to function, including at his internship. (See Doc. Nos. 259-16, 259-17). Additionally, Poe emailed Bourgoin directly, stating that having to step out of work to attend multiple meetings with Bourgoin could lead to him getting fired. (See Doc. No. 251-1 at Bates 263). There is also record evidence, however, that Bourgoin accommodated Poe's scheduling constraints, at least sometimes. (See Doc. No. 251-1 at Bates 263) (Bourgoin agreeing to have a meeting at 5:30 PM, per Poe's request). Poe has not met his burden to cite sufficient evidence that Bourgoin or Vanderbilt intended to cause the breach or termination of his relationship with his first employer.

As to the second employer, Defendants argue that they could not have known of Poe's relationship with that company because Poe did not apply there until approximately one year after his suspension. (Doc. No. 261 at 4). The Court agrees. Summary judgment will be granted on this claim.

**Counts III and IX: Violation of Section 504 of the Rehabilitation Act of 1973 against Vanderbilt**

Defendants argue that Poe's claims under Section 504 of the Rehabilitation Act of 1973 fail as a matter of law, in light of the Sixth Circuit's recent decision in Smith v. Michigan Dep't of Corr., 159 F.4th 1067 (6th Cir. 2025). (Doc. No. 242 at 17). In Smith, the court explained that "[Section] 504 of the Rehabilitation Act does not provide a private right of action for retaliation." 159 F.4th at 1082. Poe does not disagree, other than to preserve his objection to Smith for appellate purposes. (Doc. No. 247 at 26). Therefore, Poe's Section 504 claims will be dismissed.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 232) will be granted in part and denied in part, and this case will proceed to trial as scheduled.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

26